2025-2146

# United States Court of Appeals For the Federal Circuit

ENTROPIC COMMUNICATIONS, LLC,
*Appellant*

v.

JOHN A. SQUIRES, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,
*Intervenor*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2024-00431.

## APPELLANT'S OPENING BRIEF

May 18, 2026

Jason A. Engel
Erik J. Halverson
Jared R. Lund
K&L GATES LLP
70 W. Madison St., Suite 3100
Chicago, IL 60602
Phone: (312) 781-7166
E-mail: jason.engel@klgates.com
          erik.halverson@klgates.com
          jared.lund@klgates.com

**COUNSEL FOR APPELLANT
ENTROPIC COMMUNICATIONS, LLC.**

**<u>Representative Patent Claim Pursuant to Fed. Cir. Rule 28(a)(12)</u>**

U.S. Patent No. 7,295,518, Claim 1:

1. A data communication network comprising:

at least two network devices, each network device comprising a multi-carrier modulator for modulating data, an up converter for translating the modulated data to an RF carrier frequency, a down converter for translating an RF signal, and a multi-carrier demodulator for demodulating the translated RF signal to produce data; and

cable wiring comprising a splitter with a common port and a plurality of tap ports, and a plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices;

whereby network devices communicate with each other through the cable wiring using multi-carrier signaling;

wherein network devices transmit probe messages through the cable wiring and analyze received probe message signals to determine channel characteristics and bit loading is selected based on the determined channel characteristics.

i

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number**   25-2146

**Short Case Caption**   Entropic Communications, LLC v. Squires

**Filing Party/Entity**   Entropic Communications, LLC

---

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.

2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.

3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.

4. Please do not duplicate entries within Section 5.

5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes.  Fed. Cir. R. 47.4(c).

---

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 05/18/2026

Signature:   /s/ Erik J. Halverson

Name:   Erik J. Halverson

ii

| 1. Represented Entities. Fed. Cir. R. 47.4(a)(1). | 2. Real Party in Interest. Fed. Cir. R. 47.4(a)(2). | 3. Parent Corporations and Stockholders. Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.  ☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.  ☐ None/Not Applicable |
| Entropic Communications, LLC | | Entropic Holdings LLC |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐    Additional pages attached

iii

**4. Legal Representatives.**  List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

**5. Related Cases.**  Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑  Yes (file separate notice; see below)   ☐  No   ☐  N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b).  **Please do not duplicate information.**  This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal.  Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**.  Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

☑    None/Not Applicable          ☐    Additional pages attached

|  |  |  |
|---|---|---|
|  |  |  |
|  |  |  |

## TABLE OF CONTENTS

**Page(s)**

I. STATEMENT OF RELATED CASES........................................................1

II. JURISDICTION .................................................................................2

III. INTRODUCTION ...............................................................................3

IV. STATEMENT OF THE ISSUES .........................................................6

V. STATEMENT OF THE CASE ............................................................7

    A. Summary of the Invention .........................................................7

    B. The PTAB Proceeding.............................................................11

VI. SUMMARY OF THE ARGUMENT ...................................................14

VII. ARGUMENT......................................................................................16

    A. Legal Standards .......................................................................16

        1.    Level of Ordinary Skill in the Art...............................16

        2.    Analogous Art .............................................................17

    B. The Board Committed Legal Error in Determining that the Challenged Claims Are Unpatentable as Obvious .......................................17

        1.    The Board Erred in its Level of Skill in the Art .......................18

        2.    The Board's Factual Determination Regarding the '518 Patent's Field of Endeavor Contradicts the Evidence of Record ...........37

        3.    The Board's Factual Determination Regarding the Reasonable Pertinent Prong Contradicts the Evidence of Record ...............45

VIII. CONCLUSION...................................................................................48

# TABLE OF AUTHORITIES

**CASES**

*Airbus S.A.S. v. Firepass Corp.*,
941 F.3d 1374 (Fed. Cir. 2019)................................................................ 38, 39, 43

*Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*,
119 F.3d 953 (Fed. Cir. 1997)...................................................................... 17, 19

*Belden Inc. v. Berk-Tek LLC*,
805 F.3d 1064 (Fed. Cir. 2015)............................................................................16

*Best Med. Int'l, Inc. v. Elekta Inc.*,
46 F.4th 1346 (Fed. Cir. 2022) ............................................................. 16, 20, 25

*Biestek v. Berryhill*,
139 S. Ct. 1148 (2019) ..........................................................................................18

*Consol. Edison Co. v. NLRB*,
305 U.S. 197 (1938) ..............................................................................................18

*Corephotonics, Ltd. v. Apple Inc.*,
84 F.4th 990 (Fed. Cir. 2023) ...............................................................................17

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*,
807 F.2d 955 (Fed. Cir. 1986)...............................................................................36

*Daiichi Sankyo Co. v. Apotex, Inc.*,
501 F.3d 1254 (Fed. Cir. 2007)............................................................... 16, 19, 24

*Diamond Rubber Co. of New York v. Consol. Rubber Tire Co.*,
220 U.S. 428 (1911)...................................................................................... 19, 36

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*,
464 F.3d 1356 (Fed. Cir. 2006)............................................................... 16, 19, 20

*Envtl Designs, Ltd. v. Union Oil Co.*,
713 F.2d 693 (Fed. Cir. 1983)................................................................... 16, 19

*Google LLC v. MindbaseHQ, LLC*,
No. 2023-1622 (Fed. Cir. Aug. 28, 2025).................................................. 24, 25

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Harmonic Inc. v. Avid Tech., Inc.*,
815 F.3d 1356 (Fed. Cir. 2016).................................................................17

*Hologic, Inc. v. Minerva Surgical, Inc.*,
764 F. App'x 873 (Fed. Cir. 2019) .........................................................21

*In re Bigio*,
381 F.3d 1320 (Fed. Cir. 2004).............................................................39

*In re Clay*,
966 F.2d 656 (Fed. Cir. 1992)........................................................ 17, 45

*In re ICON Health & Fitness, Inc.*,
496 F.3d 1374 (Fed. Cir. 2007).............................................................17

*In re Nat. Alternatives, LLC*,
659 F. App'x 608 (Fed. Cir. 2016) .......................................................43

*Innovention Toys, LLC v. MGA Entertainment, Inc.*,
637 F.3d 1314 (Fed. Cir. 2013).............................................................16

*Koito Mfg. Co. v. Turn-Key-Tech, LLC*,
381 F.3d 1142 (Fed. Cir. 2004).............................................................27

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007).............................................................................36

*Mintz v. Dietz & Watson, Inc.*,
679 F.3d 1372 (Fed. Cir. 2012)............................................... 25, 26, 34

*TQ Delta, LLC v. Cisco Sys., Inc.*,
942 F.3d 1352 (Fed. Cir. 2019)............................................... 16, 27

*Unwired Planet, LLC v. Google Inc.*,
841 F.3d 995 (Fed. Cir. 2016).............................................................40

*Wang Labs., Inc. v. Toshiba Corp.*,
993 F.2d 858 (Fed. Cir. 1993).............................................................41

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

**STATUTES**

28 U.S.C. § 1295(a)(4)(A) ...................................................................................2

35 U.S.C. § 142 ....................................................................................................2

35 U.S.C. § 318(a) ...............................................................................................2

35 U.S.C. § 6 ........................................................................................................2

35 U.S.C. §§ 311-319 ..........................................................................................2

**RULES**

Fed. Cir. R. 15(a)(1) .............................................................................................2

**REGULATIONS**

37 C.F.R. § 90.3(a)(1) ..........................................................................................2

## I. STATEMENT OF RELATED CASES

This appeal concerns the final written decision issued by the United States Patent and Trademark Office ("USPTO") Patent Trial and Appeal Board (the "Board") in Case No. IPR2024-00431, finding Claims 1, 3, and 4 of U.S. Patent No. 7,295,518 (the "'518 Patent") unpatentable. Appx72.

No other appeal in or from that proceeding was previously before this Court or any other appellate court. Except for the following matters that concern the '518 Patent, counsel is unaware of any other case pending in this Court or any other court or agency that will directly affect or be directly affected by this Court's decision:

*Entropic Commc'ns, LLC v. DirecTV, LLC*, 2-23-cv-05253 (C.D. Cal.);

*Entropic Commc'ns, LLC v. DISH Network Corp.,* 2-23-cv-01043 (C.D. Cal.);

*Entropic Commc'ns, LLC v. Cox Commc'ns, Inc.*, 2-23-cv-01047 (C.D. Cal.); and

*Entropic Commc'ns, LLC v. Dish Network LLC*, 25-2145, 25-2147 (Fed. Cir. 2025).

## II.    JURISDICTION

The Board had jurisdiction under 35 U.S.C. §§ 6, 311-319 and issued its final written decision under 35 U.S.C. § 318(a) on September 5, 2025.  Appx1.  Entropic Communications, LLC timely filed its notice of appeal on September 19, 2025, under 35 U.S.C. § 142, 37 C.F.R. § 90.3(a)(1), and Fed. Cir. R. 15(a)(1).  Appx676-Appx680.  This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

2

## III.    INTRODUCTION

The Challenged Claims here address impairments that previously restricted high bandwidth communications over coaxial cable networks.  To overcome these impairments, the inventors introduced a novel approach of using probe messages and bit-loading techniques that had not previously been applied to a coaxial environment.  Although the '518 Patent is specifically, and exclusively, concerned with coaxial cables (*see* Appx91, cls. 1 to 4), the Board generalized the claimed technology, contrary to all record evidence, to cover all forms of wired communication agnostic to the medium over which the communication occurred. *See, e.g.*, Appx27 ("[T]heir network devices are agnostic, at least above the physical layer, to the mediums used to convey signals between them.").    This overgeneralization infected multiple aspects of the Board's analysis and led to legal and factual errors.  These errors warrant reversal.

For example, the Board factually erred in adopting a level of skill that did not include at least some experience with signal transmission over coaxial cables. Appx15-Appx16.  That finding contradicts the intrinsic record, which uniformly demonstrates that the claimed invention concerns coaxial cable networks and the unique technical problems they present. *See, e.g.*, Appx86, 1:27-29; Appx91, cls. 1 to 4.  Instead of grounding its analysis in the claims, specification, or technical field, the Board relied on isolated references to non-coaxial systems in the specification to

3

conclude that coaxial specific experience was unnecessary to the *claimed* invention. By ignoring the coaxial nature of the invention, the Board used hindsight to wipe away the inventors' breakthrough from over twenty years ago. Had the Board properly defined the level of skill as requiring at least some experience with coaxial networks, the Board would have accurately characterized the '518 Patent as addressing its coaxial-specific issues rather than a system agnostic to the medium over which the communication occurred.

The same issues manifest in the Board's analogous art determination. There, the evidence demonstrates that the field of endeavor of the '518 Patent is specific to coaxial cables. The Board, however, disregarded this evidence and found that the '518 Patent reflects the general field of "broadband communication networks." Appx27. Additionally, the Board improperly found that the '518 Patent addresses the problem of "variable attenuation and noise on signals." Appx30. This finding is contrary to all evidence, which demonstrates that the inventors of the '518 Patent set out to address problems specific to signal transmission over coaxial cables.

By improperly characterizing the field of endeavor and problems of the '518 Patent, the Board erred in finding that *Mirfakhraei* was analogous art under both the "field of endeavor" and "reasonably pertinent" prongs. Appx20-Appx31. And, by overgeneralizing the '518 Patent, the Board improperly defined the knowledge of a person of ordinary skill in the art as well as the prior art that such a person would

have consulted.  Appx15-Appx16.  These findings infect the Board's obviousness determination.

Because the Board's erroneous framework distorted every major step of its obviousness analysis—including level of skill and analogous art—its final written decision should be reversed.  At minimum, remand is necessary for reconsideration under the proper legal standards.

5

## IV.    STATEMENT OF THE ISSUES

1.  Did the Board erroneously omit experience with coaxial cables from the level of skill for the '518 Patent, which is directed to solving problems specific to coaxial cable networks?

2.  Did the Board erroneously omit coaxial cables from the field of endeavor of the '518 Patent, even though each aspect of the '518 Patent concerns communications over coaxial networks?

3.  Did the Board erroneously determine that *Mirfakhraei* was analogous art to the '518 Patent, even though *Mirfakhraei* does not pertain to coaxial cable networks and does not solve problems with coaxial networks as identified by the '518 Patent?

## V.    STATEMENT OF THE CASE

On February 15, 2024, a petition for *inter partes* review was filed challenging Claims 1 to 4 of the '518 Patent (the "Petition").  Appx189-Appx273.  In Ground A, Petitioner argued that the Challenged Claims were unpatentable as obvious over the combination of *Afshary* in view of *Mirfakhraei*.  Appx213.  In Ground B, Petitioner argued that Claim 2 was unpatentable as obvious over the combination of *Afshary* in view of *Mirfakhraei* in further view of *Welles*.  Appx213.  On September 6, 2024, the Board granted institution of the Petition under 35 U.S.C. § 314.  Appx344-Appx380.  On September 5, 2025, the Board issued a final written decision, finding Claims 1, 3, and 4 unpatentable as obvious in view of Ground A.  Appx1-Appx74. In doing so, the Board committed several legal errors and came to a determination that was not supported by substantial evidence.

### A.    Summary of the Invention

The '518 Patent provides a broadband network using coaxial cables for device communication.  Appx75, Abstract; Appx2779, ¶ 44.  To optimize communication, devices on the network send probe messages to one another to characterize and determine optimum multi-carrier bit loading for each channel in the broadband coaxial local area data network.  Appx75, Abstract; Appx2779, ¶ 44.  This system constitutes a novel application of probing and bit-loading techniques in the coaxial environment, where such approaches had not previously been implemented.

7

Figure 1 illustrates a traditional coaxial network, including signal splitters, which divide a signal into multiple identical streams, and network devices such as TVs and cable modems.  Appx88, 5:10-11; Appx2779, ¶ 45.  Signal splitters allow for the distribution of signals from a point-of-entry to the premises to multiple network devices on premises.  Appx86, 1:40-45; Appx2780, ¶ 45.  For example, a signal splitter receives a signal at the input port and splits the power between two output ports.  Appx76, 1:53-56, 61-65, Figure 1; Appx2779-Appx2780, ¶¶ 45-46.



Appx76, Figure 1 (illustrating a traditional channel path of signal distribution (green) and isolated channel path between devices (red)); Appx417.

At the time of the '518 Patent, a need arose for communication between devices in the home, and coaxial cabling was widely installed in consumers' homes. However, the same aspects of the coaxial network that facilitated communication *into* the home now presented barriers to communication *within* the home.  Appx86, 2:35-48; Appx417-Appx419.  As detailed below, the splitters used with coaxial

8

cabling introduced several hurdles to in-home communication using a coaxial network.  Appx86-Appx87, 2:28-34, 2:35-48, 4:19-32; Appx2780, ¶ 46.

*First*, a splitter's tap ports, or the "downstream ports," are isolated.  Appx86, 2:27-34; Appx2781, ¶ 47.  This isolation is a good thing when the coaxial cables are used to deliver signals from the cable headend to various TVs (an exemplary endpoint) within a home; however, the isolation presents issues when communicating from one endpoint to another.  Appx86, 2:28-41; Appx2781, ¶ 47.  For example, inter-port isolation leads to signal attenuation when the devices communicate across the tap ports.  Appx86, 2:28-34; Appx2781, ¶ 47.  In a typical cable TV configuration, this isolation is desirable because the devices (*e.g.*, two television sets) did not communicate with each other (and instead only receive signals from the head end and transmit signals to the head end).  Appx86, 2:35-41; Appx2781, ¶ 47.  The claimed system of the '518 Patent, however, requires network devices to communicate with each other across these splitters, and the signal loss caused by inter-port isolation becomes an undesirable byproduct of the existing coaxial cable network design.  Appx86, 2:35-41; Appx2781, ¶ 47.

*Second*, signal attenuation in the broadband coaxial network is variable across the different paths.  Appx86, 2:41-48; Appx2782, ¶ 48.  The signal path between each network device is unique, which results in varying levels of loss between each device through a varied number of splitters/combiners, various connected and

9

nearby devices, and channel length. Appx86, 2:41-48; Appx2782, ¶ 48. Existing solutions for this type of variable signal loss—i.e., the use of a symmetric splitter/combiner—were not practical or cost-effective. In particular, this solution required both a bi-directional power amplifier to boost the signal and a new power source (which is generally not available at the main splitter) in order to power the amplifier. Appx86-Appx87, 2:54-3:4; Appx2783, ¶ 48.

*Third*, splitters create imperfect connection points, causing micro reflections that can combine with the dominant main signal to produce a multipath signal. Appx87, 3:5-10; Appx90, 10:39-54; Appx83, Figure 8; Appx2783-Appx2784, ¶ 49. Multipath signals are undesirable because they can degrade the bit error rate performance of the communication channel and impair data rates in the network. Appx87, 3:7-16, 4:23-25; Appx2783-Appx2784, ¶ 49.

The '518 Patent, recognizing the above impediments to broadband networks over coaxial cables, provides an innovative approach to communication networks to overcome the impediments created by traditional coaxial installations. Appx87, 4:36-47; Appx2784, ¶ 50. The '518 Patent uses a combination of probe messages and multi-carrier modulation to overcome these impairments. In the claimed invention, network devices send probe messages to gather information regarding the channels (signal paths) between them, thereby traversing at least one coaxial splitter. Then, the devices select a modulation scheme (bit loading) for communication

10

between them based on those probes.  Appx87, 4:36-62; Appx2784-Appx2785, ¶¶ 50-51.  The '518 Patent is the ***first instance*** of using probe messages across coaxial splitters to determine what bit-loading scheme should be used for a given signal path.

## B.    The PTAB Proceeding

Petitioner defined the level of ordinary skill in that art as "a bachelor's degree in electrical engineering, computer engineering, or a similar discipline, and three to four years of experience working in signal processing and/or communication systems/networks."  Appx219.  Petitioner argued that the Challenged Claims were obvious to a person of this skill level based on two obviousness combinations: (1) *Afshary* in view of *Mirfakhraei* and (2) *Afshary* in view of *Mirfakhraei* in further view of *Welles*.  Appx213-Appx269.

In the Patent Owner Response, Appellant argued that Petitioner's level of skill failed to require coaxial cable experience, much less signal transmission over coaxial cables, an essential part of the '518 Patent.  Appx419.  Appellant further argued that Petitioner failed to establish that *Mirfakhraei* was analogous art, as it was not relevant to coaxial networks.  Appx420-Appx438.

In reply to Patent Owner's Response, Petitioner argued that it is "unclear" why Patent Owner's level of skill requires coaxial cable experience, even though every aspect of the '518 Patent concerns coaxial cables.  Appx532.  Petitioner also

11

argued that *Mirfakhraei* is analogous art because it is in the field of endeavor of the '518 Patent and reasonably pertinent to the problem addressed by the '518 Patent–both of these arguments were not made in the Petition. Appx509. In Patent Owner's Sur-Reply, Appellant continued to argue that Petitioner's level of skill was incorrect and that *Mirfakhraei* is not analogous art to the '518 Patent under either prong. Appx566-Appx577.

The Board's final written decision found Claims 1, 3, and 4 unpatentable. Appx72. Within this finding, the Board made several incorrect findings.

***First***, the Board adopted a level of skill that did not include experience with coaxial cables. Appx16. To support this finding, the Board relied on citations to references describing prior art non-coaxial networks located in the '518 Patent. Appx15-Appx16. The Board used these references to conclude that "Patent Owner's proposal to limit a POSITA's education and experience to 'broadband networks over coaxial cables' is too narrow." Appx15. However, these statements are not part of the description of the invention and were therefore incorrectly relied upon. These references are separate from the claims, the title, the abstract, and the technical field in the specification, and are rather description of other areas in the art included as "background" information. Although the Board cited to the technical field, the summary, and the problems and solutions of the '518 Patent—all of which are

directed to coaxial networks—it did not incorporate any aspect of coaxial networking into the level of skill.

*Second*, the Board found that *Mirfakhraei* is analogous art to the '518 Patent under both the "field of endeavor" and "reasonably pertinent" prongs. Regarding the field of endeavor, the Board found that "Mirfakhraei is in the same field of endeavor as the '518 patent, i.e., 'broadband communication networks.'" Appx27. Regarding the problems addressed, the Board found that both *Mirfakhraei* and the '518 Patent "address the common problems of variable attenuation and noise on signals transmitted in broadband communication networks." Appx30.

## VI.    SUMMARY OF THE ARGUMENT

The Board committed several errors by concluding that the Challenged Claims of the '518 Patent are unpatentable. The Board's determination should be overturned for the following reasons.

*First*, the Board erred in adopting a level of skill that omits experience with coaxial cables, which the record evidence establishes is essential. Although the Board omitted such experience from its level of skill, it relied on intrinsic evidence that confirms that experience with coaxial cables is necessary. Further, the Board mischaracterized Appellant's proposal, interpreting Appellant's position as a *restrictive* proposal requiring only experience with coaxial cables, whereas Appellant's proposal is clear: while other experience is certainly possible, the skilled artisan must have *at least* some experience with coaxial cables, as this coaxial experience is essential to the invention of the '518 Patent. Appx419-Appx420; Appx566-Appx568. The Board's finding that the level of skill does not require at least some degree of experience with coaxial cables is incorrect and not supported by substantial evidence. By adopting an improper level of skill, the Board divorced the claimed invention from its coaxial context and erroneously treated the '518 Patent's system as medium-agnostic.

*Second*, the Board erred in its factual conclusion that the '518 Patent and *Mirfakhraei* share "broadband communication networks" as the field of endeavor.

14

Appx27.  By excluding coaxial networks, the Board found a field of endeavor that was divorced from the explicit disclosure of the '518 Patent.

*Third*, the Board further erred in its "reasonably pertinent" analysis.  There, the Board lacked substantial evidence in finding that the '518 Patent addresses the general problem of "variable attenuation and noise."  Appx30.  Had the Board approached its analysis of these second two with the proper level of skill, the Board would have concluded that *Mirfakhraei* is not analogous art.  When *Mirfakhraei* is no longer analogous art, the Petition's challenge fails as *Mirfakhraei* is relied on, exclusively, for key elements of the claims of the '518 Patent.

15

## VII.   ARGUMENT

### A.    Legal Standards

This Court reviews legal questions, such as obviousness, *de novo* and underlying factual determinations for substantial evidence. *TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1357 (Fed. Cir. 2019) (citing *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015)).

### 1.    Level of Ordinary Skill in the Art

The Board's finding regarding the level of ordinary skill in the art is a question of fact that the Court reviews for substantial evidence. *See Best Med. Int'l, Inc. v. Elekta Inc.*, 46 F.4th 1346, 1353 (Fed. Cir. 2022); *see also Innovention Toys, LLC v. MGA Entertainment, Inc.*, 637 F.3d 1314, 1324 (Fed. Cir. 2013). The Court uses a non-exhaustive list of factors to guide the fact finder in determining the level of ordinary skill in the art. These factors include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Daiichi Sankyo Co. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007) (quoting *Envtl Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696 (Fed. Cir. 1983)). The purpose of the patent can also be informative. *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1362–63 (Fed. Cir. 2006). The purpose of a properly

defined level of skill in the art is to assure an appropriate perspective of the decisionmaker, and to focus on conditions as they existed when the invention was made. *Arkie Lures, Inc. v. Gene Larew Tackle, Inc.*, 119 F.3d 953, 956 (Fed. Cir. 1997). Good ideas may well appear "obvious" after they have been disclosed, despite having been previously unrecognized. *Id.*

### 2. *Analogous Art*

The Board's finding regarding whether a prior art reference is analogous art is a question of fact that the Court reviews for substantial evidence. *Corephotonics, Ltd. v. Apple Inc.*, 84 F.4th 990, 1004 (Fed. Cir. 2023) ("The Board's determination that a prior art reference is analogous art ... presents an issue of fact, reviewed for substantial evidence.") (quoting *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1378 (Fed. Cir. 2007)). To be analogous, a prior art reference must be either (1) from the same field of endeavor as the patent-at-issue, or (2) reasonably pertinent to the particular problem with which the inventor of the challenged patent is involved. *In re Clay*, 966 F.2d 656, 658–59 (Fed. Cir. 1992).

### B. The Board Committed Legal Error in Determining that the Challenged Claims Are Unpatentable as Obvious

This Court reviews the Board's ultimate obviousness determination *de novo* and underlying factual findings for substantial evidence. *See Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016). Substantial evidence is "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might

17

accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154, 203 L.Ed.2d 504 (2019) (citing *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938)).  Here, the Board erred because several of its factual findings were not supported by substantial evidence.

*First*, the Board erred in adopting a level of skill in the art that ***does not*** require any experience with signal transmission over coaxial cables.  The '518 Patent is entirely directed to—and claims—network communications over coaxial cables. *Second*, the Board erred in its factual conclusion that the '518 Patent and *Mirfakhraei* share the field of endeavor as "broadband communication networks." Again, the Board ignored the coaxial aspects of the '518 Patent in adopting a field of endeavor far too broad and divorced from the record evidence.  *Third*, the Board erred in finding that *Mirfakhraei*, a reference that does not relate to coaxial cables, is reasonably pertinent to the problems addressed by the '518 Patent.

### 1.      The Board Erred in its Level of Skill in the Art

The Board erred by not requiring at least some experience with coaxial cables from the level of skill; the problems and solutions of the '518 Patent are grounded in coaxial networking and to not require at least some familiarity with this medium is an error.  This error infects the Board's analysis on not only obviousness, but most importantly on whether or not *Mirfakhraei* is analogous art and is proper to consider as relevant prior art.

18

To determine the level of skill, the Court relies on a non-exhaustive list of factors, which include "(1) the educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of active workers in the field." *Daiichi Sankyo*, 501 F.3d at 1256 (quoting *Envtl. Designs*, 713 F.2d at 696). The purpose of the patent can also be informative. *DyStar Textilfarben*, 464 F.3d at 1362–63.

All record evidence supports Appellant's proposal that the level of skill must include "at least two years of experience with coaxial cables." Appx419-Appx420; Appx566-Appx568. No record evidence supports the Board's exclusion of coaxial experience.

The '518 Patent is specifically directed to and claims network communications over coaxial cables and coaxial wiring. The Board failed to support its level of skill—which incorrectly omitted such experience—with substantial evidence. And because the Board used the wrong level of skill, it conducted an erroneous obviousness analysis from the perspective of someone who lacked the necessary understanding and experience with the claimed networks. *Arkie Lures v. Gene Larew Tackle*, 119 F.3d at 956; *Diamond Rubber Co. of New York v. Consol. Rubber Tire Co.*, 220 U.S. 428, 434–35 (1911) ("Many things, and the patent law abounds in illustrations, seem obvious ***after they have been done***, and, 'in the light

19

of the accomplished result,' it is often a matter of wonder how they so long 'eluded the search of the discoverer and set at defiance the speculations of inventive genius.'") (emphasis added).

### a.     All Record Evidence Supports Appellant's Position

All record evidence shows that the level of skill must include some experience with coaxial cables.  Starting with the intrinsic evidence, the '518 Patent makes clear that coaxial cables are the central focus of the disclosure.  Appx419-Appx420; Appx566-Appx568.

Every aspect of the '518 Patent concerns coaxial cables: the claims, the title, and the specification.  Appx566; Appx91, cls. 1 to 4; Appx75, Title; Appx75-Appx91.  Further, the Board and experts agree that the '518 Patent implements technology over coaxial cables.  Appx567.  The only countervailing evidence is unsupported expert testimony that is nothing more than a parroting of the Petition's language.  *See* Appx532.  Thus, the record establishes that experience with coaxial networking must be included within the level of skill.

### (i)     The intrinsic evidence demonstrates the need for experience with coaxial cable

To determine the level of skill in the art, the Court can consider the purpose of the patent and the teachings of the patent as a whole.  *See Best Med. Int'l*, 46 F.4th at 1353–54 (citing *DyStar Textilfarben*, 464 F.3d at 1362–63); *Hologic, Inc. v.*

20

*Minerva Surgical, Inc.*, 764 F. App'x 873, 879 (Fed. Cir. 2019) (considering broader teachings in the specification when evaluating the Board's level of skill finding).

Every aspect of the '518 Patent concerns coaxial cables. First, the '518 Patent is titled "Broadband Network for *Coaxial Cable* Using Multi-carrier Modulation." Appx75, Title (emphasis added). Second, the abstract specifies a "broadband local area data network [that] uses *coaxial cable wiring* for interconnection of terminal devices." Appx75, Abstract (emphasis added). Third, the technical field of the '518 Patent states that this "invention relates to broadband communication networks and specifically to *communications using coaxial cable building wiring*." Appx86, 1:27-29 (emphasis added). Fourth, the '518 Patent summarizes its invention as "us[ing] a form of multi-carrier modulation, orthogonal frequency division multiplex (OFDM), to transmit digital data signals through the *coaxial cable wiring* installed in homes." Appx87, 4:37-40 (emphasis added). Fifth, the background of the '518 Patent focuses on coaxial networks, and the issues present in such networks, which the '518 Patent set out to solve. Appx87, 4:19-33. Petitioner's expert, Mr. Bertonis, does not dispute any of this intrinsic evidence. Rather, when considering the title, claims, and abstract of the '518 Patent, Mr. Bertonis' level of skill *included* experience with coaxial cables. Appx567; Appx3109-Appx3111, 13:17-15:18.

The specification of the '518 Patent also confirms the need for experience with coaxial cables. For example, the '518 Patent explains that "[i]n a coaxial cable

21

environment[,] signal-to-noise ratio (SNR) is generally high." Appx88, 6:29-31. Also, Figure 3 "shows a representative frequency allocation between network services and other services on a coaxial wiring system." Appx88, 5:14-16.

The need for experience with coaxial cables is further confirmed by the problem that the '518 Patent set out to solve. The inventors of the '518 Patent endeavored to address specific impairments that previously restricted high bandwidth communication between devices over coaxial cabling. The '518 Patent details that coaxial networks include splitters to distribute signals downstream. Appx86, 2:27-34. In these coaxial networks, splitter ports are isolated and include imperfect connections, leading to the inter-port isolation and reflections that would not be found in network types that do not use splitters. Appx86-Appx87, 2:27-34, 3:5-10. Further, signal paths vary between devices in a coaxial network based on the branch topology, causing variable signal attenuation. Appx86, 2:35-48. Each of these problems is specific to coaxial networks, and the '518 Patent is directed solely to solving these coaxial-specific problems. Appx87, 4:36-47.

The claims of the '518 Patent also reflect the need for experience with coaxial cables. The '518 Patent includes two independent claims—both recite coaxial cables. Claim 1 recites a data communication network comprising "cable wiring comprising a splitter with a common port and a plurality of tap ports, and a plurality of segments of coaxial cable connecting between the splitter tap ports and the

network devices." Appx91, 12:8-26. Claim 1 further recites "network devices [that] communicate with each other ***through the cable wiring*** using multi-carrier signaling." Appx91, 12:8-26 (emphasis added). The cable wiring includes "a plurality of segments of coaxial cable" which are connected "between the splitter tap ports." Appx91, 12:8-26. Likewise, Claim 4 recites a "network device for communicating data to other network devices over a coaxial wiring system." Appx91, 12:36-48. Thus, the claims themselves not only include coaxial cables but further require network communication over such coaxial cables.

The Board minimized this mountain of intrinsic evidence and stated that "Patent Owner points to various parts of the '518 patent as supporting its restrictive proposal." Appx15. Appellant did not point to "various parts" of the '518 Patent; Appellant demonstrated that ***every*** aspect of the '518 Patent requires experience with coaxial cables. Appx419-Appx420; Appx566-Appx568. As covered above, the need for experience with coaxial cables is established by: (1) the title, (2) the abstract, (3) the technical field, (4) the summary of the invention, (5) the background, (6) the detailed description, (7) the problem and solution, and (8) the claims of the '518 Patent. Appx75, Title, Abstract; Appx86, 1:27-29, 2:27-28; Appx87, 4:37-40; Appx91, 12:8-26, 12:36-48; Appx419-Appx420. Without fully considering this evidence, the Board legally erred in adopting a level of skill that ***did not*** include experience with coaxial cables for a patent that is directed to coaxial cable networks.

23

As illustrated in *Daiichi Sankyo Co. v. Apotex, Inc.*, this approach is improper. 501 F.3d 1254 (Fed. Cir. 2007). There, the district court erred in finding a general level of skill rather than one tied to the intrinsic evidence. *Id.* at 1257. The asserted patent was specifically concerned with solving the problem of creating an antibiotic compound to treat ear infections that did not damage the ear as a side effect. *Id.* This goal was reflected in the written description, which focused on testing compounds and determining the results from each compound. *Id.* Thus, the level of skill was not a general practitioner but rather "a person engaged in developing pharmaceutical formulations and treatment methods for the ear or a specialist in ear treatments … who also has training in pharmaceutical formulations." *Id.*

The same reasoning applies here. Like the asserted patent in *Daiichi*, the '518 Patent specifically details its problem and solution in a specific field, which is network communications over coaxial cables. The written description also reflects this conclusion as the inventors of the '518 Patent detail and claim a solution specific to coaxial cable networks. Accordingly, the intrinsic evidence of the '518 Patent demonstrates the need for experience with coaxial cables in the level of skill.

The case of *Google LLC v. MindbaseHQ, LLC* is also instructive. No. 2023-1622, 2025 WL 2471511 (Fed. Cir. Aug. 28, 2025). There, this Court affirmed a finding where "the specification and claims demand[ed] knowledge of [petitioner's] identified areas." *Id.* at *6. On appeal, MindbaseHQ argued that the Board erred in

24

adopting a level of skill too high with qualifications untethered to the patents. *Id.* But this argument was unpersuasive. *Id.* The level of skill in the art was rooted in the patents and "the Board pointed out that the specification's references to lexical concepts were 'too numerous to recount.'" *Id.*

The '518 Patent is filled with references to coaxial cables, which are recited in every claim. Just as this Court reasoned in *Google LLC v. MindbaseHQ, LLC*, the intrinsic evidence of the '518 Patent demands knowledge of coaxial cables in the level of skill. *See also Best Med. Int'l, Inc.*, 46 F.4th at 1354 (holding that the Board was not unreasonable in concluding that a skilled artisan would have formal computer programming experience because "the claimed invention is implemented on a computer … [a]nd the written description is replete with references to the invention being implemented on a computer"); *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1376 (Fed. Cir. 2012) (in a case where the patent was directed towards the "meat encasement art," reversing a finding of level of skill in the art that did not require some experience with mean encasing, confirming that "without some understanding of meat and meat encasement technology in various settings, the artisan of ordinary skill would not grasp many aspects of the invention."). Just like in *Mintz*, at least some experience with the focus of the patented invention is necessary to grasp the invention; without that experience, an otherwise inventive invention may appear seemingly routine.

(ii)    The extrinsic evidence demonstrates the need for experience with coaxial cable

Driven by the intrinsic evidence, Appellant's expert, Mr. Garrett, confirmed the need for experience with coaxial cables. Appx2777-Appx2779, ¶¶ 37-43. For example, Mr. Garrett considered the coaxial-specific title, the Abstract, and the technical field that applies "specifically to communications using coaxial cable building wiring." Appx2777-Appx2779, ¶ 38. This type of evidence was further supported by the summary of the invention, detailed description, and the claims— each specific to coaxial cables. Appx2777-Appx2779, ¶ 38. Mr. Bertonis (and the Board) likewise acknowledged that the '518 Patent implements technology over coaxial networks. Appx6 ("The patent discloses a broadband local area network that uses coaxial cable wiring for interconnecting terminal devices."). Although Mr. Bertonis agreed that his level of skill *could* encompass coaxial experience (Appx3111, 15:15–19), his definition *did not require* such experience—contrary to the intrinsic evidence establishing that such coaxial expertise is essential. *See Mintz v. Dietz & Watson*, 679 F.3d at 1376. Said otherwise, Mr. Bertonis' opinions are offered from the perspective of someone who may not have had any experience with coaxial cables. Simply concluding that the level of skill encompasses coaxial experience is an end-around for requiring the necessary coaxial experience.

Rather than base his opinion on the intrinsic evidence and include experience that he testified could be covered in his level of skill, Mr. Bertonis disagrees with

Appellant's requirement of "at least two years of experience with coaxial cables." Appx2652, ¶ 62. Mr. Bertonis did not provide any explanation or support for this opinion. Appx2652, ¶ 62; *see e.g.*, *TQ Delta*, 942 F.3d at 1359–60 ("Conclusory expert testimony does not qualify as substantial evidence."); *Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1152 (Fed. Cir. 2004) ("General and conclusory testimony ... does not suffice as substantial evidence of invalidity."). Even more, this position conflicts with the disclosure of the '518 Patent, which details various issues in network communications over coaxial cables. Appx86, 2:27-48; Appx87, 3:5-10. Accordingly, the extrinsic evidence does not provide substantial evidence for the Board's finding.

> b.    The Board Mischaracterizes Appellant's Position

In rejecting Appellant's proposal to include experience with coaxial networks, the Board stated that "Patent Owner's proposal *to limit* a POSITA's education and experience to 'broadband networks over coaxial cables' is too narrow." Appx15 (emphasis added); *see also* Appx15 ("Patent Owner points to various parts of the '518 patent as supporting its *restrictive proposal*.") (emphasis added). The Board's language shows that it fundamentally misunderstood Appellant's position.

At no point did Appellant limit the level of skill to *only* include experience with coaxial cables. Appellant, instead, made clear that its level of skill was open-ended: "A POSITA would have at least a bachelor's degree in electrical engineering,

27

computer engineering, or an equivalent field with **at least** two years of experience with coaxial cables." Appx419-Appx420 (emphasis added) (citing Appx2777-Appx2779, ¶¶ 37-43). While additional networking experience is certainly acceptable, the skilled artisan would need at least some experience with coaxial cabling. Mr. Garrett confirmed Appellant's open-ended level of skill, which includes "at least two years of experience with coaxial cables." Appx2777-Appx2779, ¶¶ 37-43. Appellant reiterates its position here. While the level of skill is not limited to coaxial experience, experience with coaxial cables **is required**. This is not a re-weighing of evidence but an error of the Board's level of skill.

> c. <u>The Board's Finding Does Not Rest On Substantial Evidence</u>

In adopting its level of skill, the Board relied on a misreading of the specification. **First**, the Board's references to the technical field and summary of the '518 Patent do not support its level of skill, much less provide substantial evidence. Appx15. The technical field, claims, and teachings of the '518 Patent instead support Appellant's positions. **Second**, the specification's references to twisted pair networks do not avoid the need for experience with coaxial cables. Appx15-Appx16. To the contrary, the '518 Patent uses these references to distinguish its coaxial networking invention from twisted pair networks.

> (i) The Board's citations to the '518 Patent are not substantial evidence

The Board's citations to the technical field, the summary, and the teachings of the '518 Patent do not provide substantial evidence to exclude at least some degree of coaxial experience in the level of ordinary skill. Appx15-Appx16. The technical field specifies coaxial cables: "This invention relates to broadband communication networks and *specifically to* communications using coaxial cable building wiring." Appx86, 1:27-29 (emphasis added). Contrary to the technical field, the Board stated that "the patent's technical field and summary are not limited to coaxial cable." Appx15-Appx16. The Board, however, did not provide any explanation or support for severing the level of skill from what the '518 Patent specifically stated was its field: communications using coaxial cable building wiring.

Additionally, the Board argues that its level of skill, which omits experience with coaxial cables, "is consistent with the problems and solutions identified in the '518 patent." Appx16. This is not true and not substantial evidence. The '518 Patent explains that splitters cause a multipath environment, and this multipath environment "impairs the ability to achieve high data rates in a communication network." Appx87, 4:19-25. "The signal reflections and tap port isolation of splitters existing in a typical cable TV wiring configuration presents a problem to shared usage of the cable for a LAN system." Appx87, 4:25-28. Here, the "typical

cable TV wiring configuration" is a ***coaxial cable network***.  For example, Figure 1

shows the "typical cable TV configuration for a home."  Appx76, Figure 1.



Appx76, Figure 1.

"In a coaxial cable based local area network (LAN), communication between

nodes occurs over a shared coaxial cable."  Appx86, 1:33-35.  Moreover, the splitters

are likewise specific to the coaxial cable environment.  Appx86, 1:53-54 ("Signal

splitters are commonly used in home and other building type coaxial cable wiring.").

Based on this disclosure, the '518 Patent makes clear that the "typical cable TV

wiring configuration" is a coaxial network.  Thus, the inventors of the '518 Patent

set out to "address the impairments present in the home wiring that restricts high

bandwidth communication between devices within the home."  Appx87, 4:28-33.

None of this disclosure supports the Board's reasoning that the problems and

solutions of the '518 Patent support a level of skill without experience with coaxial

30

cables. Appx15-Appx16. Rather, the disclosure shows the opposite—the problems and solutions are all *specific* to coaxial cable networks. The '518 Patent details the issues with splitters and the "typical cable TV wiring configuration" (i.e., an in-home coaxial cable network). Appx87, 4:26-27. Unlike the prior art, the invention solved issues with coaxial cable networks. The summary of the invention confirms Appellant's position. Appx87, 4:37-40 ("The present invention uses a form of multi-carrier modulation, orthogonal frequency division multiplex (OFDM), to transmit digital data signals through the coaxial cable wiring installed in homes.").

In sum, the Board's citations to the technical field, summary, and the problems and solutions of the '518 Patent do not provide substantial evidence and instead support Appellant's level of skill. The technical field specifies that the invention of the '518 Patent applies "*specifically to* communications using coaxial cable building wiring." Appx86, 1:27-29 (emphasis added). The teachings of the '518 Patent make clear that the inventors set out to address issues in a coaxial cable environment, which is further confirmed by the summary of the invention. No reasonable person would view this intrinsic evidence as supporting the Board's finding that the level of skill does not need experience with coaxial cables. Rather than rely on the disclosure of the '518 Patent to drive its analysis, the Board improperly excluded coaxial experience from its level of skill and forced the evidence into its conclusion.

31

(ii)    References to twisted pair networks are not substantial evidence

The Board pointed to the '518 Patent's references to twisted pair networks–identified by the inventors in the specification as part of their effort to distinguish their coaxial-network invention from non-coaxial mediums–as purported evidence supporting its finding that the level of skill in the art need not have at least some coaxial experience.  Appx15-Appx16 (citing Appx87-Appx89, 3:33–35, 3:49–50, 3:67–4:3, 5:61–6:3, 8:20–23, 9:28–33).  But this reasoning is backwards.  The inventors of the '518 Patent provide a novel approach in leveraging techniques from non-coaxial networks to solve problems unique to coaxial architectures.  By treating those disclosures as expanding the relevant field of art, the Board effectively bootstrapped the inventors' own contribution in the coaxial field into the prior art's general networking field.

That error is consequential: it permits the Board to import teachings from outside the proper field that a skilled artisan would not have considered absent the inventors' insight.  Moreover, that the '518 Patent references non-coaxial networks in differentiating its invention does not somehow eliminate the need for experience with coaxial cables to understand what the '518 Patent represents.

The Board cites to Rubinstain and Humphrey, two references in the ***background*** of the specification of the '518 Patent to support its omission of experience with coaxial technology.  Appx15-Appx16 (citing Appx87, 3:33–35,

32

3:49–50, 3:67–4:3).  Rubinstain discloses "a method of transporting Ethernet over twisted pair lines," and Humphrey discloses "OFDM transmission system used to communicate over a twisted pair loop."  Appx87, 3:49-50, 3:67-4:2.  But the inventors explicitly distinguish these non-coaxial networks from the problems and solutions of the '518 Patent (which are coaxial-based), and neither are part of the invention of the '518 Patent: using probe messages to determine channel characteristics of the coaxial cable network for use in selecting bit loading.

The inventors of the '518 Patent explained that splitters cause a multipath environment, and this multipath environment "impairs the ability to achieve high data rates in a communication network."  Appx87, 4:19-26.  For example, "[t]he signal reflections and tap port isolation of splitters existing in a typical cable TV wiring configuration presents a problem to shared usage of the cable for a LAN system."  Appx87, 4:25-28.  While the prior art references "address communicating between a cable head end and in-home units," they "do not address the impairments present in the home wiring that restricts high bandwidth communication between devices within the home."  Appx87, 4:28-33.  The Board improperly based its argument on whether the level of skill would be "limit[ing] a POSITA's education and experience to 'broadband networks over coaxial cables.'"  Appx15.  Appellant never excluded experience with other types of networks, rather, experience with coaxial cables is a necessary inclusion to understand the '518 Patent, which set out

to solve issues in coaxial cable networks and claims communications over coaxial cables.  Appx91, 12:7-49.

The Board mischaracterized Appellant's argument as excluding experience with other networks, but Appellant's position is simply that at least some experience with coaxial-specific implementations is required.  *Mintz v. Dietz & Watson*, 679 F.3d at 1376.  Even if the Board's reliance on the identified passages is correct, they still are not substantial evidence supporting the Board's incorrect assertion that the level of skill in the art of the '518 Patent does not require, ***at least***, some experience with coaxial networking.  Appx15-Appx16 (citing Appx87-Appx89, 3:33–35, 3:49– 50, 3:67–4:3, 5:61–6:3, 8:20–23, 9:28–33).

The '518 Patent makes clear that its problem and solution are specific to "impairments present in the home wiring" that have not been previously addressed. The Board ignores this disclosure to conclude that the level of skill does not require experience with coaxial cables—the exact type of experience that is required to address the problem of the '518 Patent.  Rubinstain and Humphrey confirm this position.  Rubinstain discloses an out-of-home network that transports signals over digital subscriber lines; Humphrey discloses an out-of-home network that transports signals over a subscriber loop.  Appx87, 3:33-35, 3:49-50, 3:67-4:2.  In sum, the inventors used the non-coaxial systems of Rubinstain and Humphrey as examples of different networks that could not and did not solve the challenges in communicating

over coaxial networking within a home. The inventors' citation to these systems does not justify the Board's omission of coaxial networking experience; if anything, it reinforces the need for the person of skill to have this experience.

Similarly, the Board's reference to "satellite communications as media that can be used" is not substantial evidence. Appx15-Appx16 (citing Appx88, 5:61–6:3). Here, the reference to satellite is found in a laundry list of communication types that bring signals to a home. But the invention here has nothing to do with bringing signals to the home—let alone wirelessly—and everything to do with how to communicate those signals over a specific type of network: coaxial cabling. Using the passing reference to "satellite" as a basis to define the level of skill shows that the Board erred in defining that level of skill.

The Board also cites the '518 Patent's reference to "[m]ulticarrier system architecture" and Isaksson, which "discloses discrete multi-tone modulation and a technique for bit loading applied to point-to-point twisted pair wiring." Appx15-Appx16 (citing Appx89, 8:20–23, 9:28–33). But the same reasoning applies. Neither the '518 Patent's reference to multicarrier systems nor Isaksson's disclosure of a twisted pair wiring eliminate the need for experience with coaxial cables. As detailed in Section I.B.1.a, the '518 Patent is directed to network communications over coaxial cables. Thus, the Board's citations do not provide substantial evidence to exclude experience with coaxial cables from the level of skill.

35

d.    The Board's Erroneous Definition Led It To Conduct An Improper Hindsight Analysis

The Board's improper level of skill infected its obviousness analysis. A claim is obvious if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious at the time the invention was made to *a person having ordinary skill* in the art to which the claimed invention pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The person of ordinary skill is a hypothetical person presumed to know the relevant prior art. *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986). By improperly defining the level of skill, the Board undertook the obviousness analysis from the wrong starting point—from the perspective of a person that does not have experience with signal transmissions over coaxial cables. *Diamond Rubber v. Consol. Rubber Tire*, 220 U.S. at 434–35 (explaining the need to conduct the obviousness analysis from the correct perspective).

Had the Board properly defined the level of skill, such a skilled artisan would have understood that *Mirfakhraei* was not analogous art under either the field of endeavor or the "reasonably pertinent" prong. More specifically, a person of ordinary skill *with* the requisite experience with coaxial cables would have readily understood that the inventors of the '518 Patent addressed a problem specific to coaxial cables. And a skilled artisan would have been familiar with the issues in a coaxial cable network that previously restricted high bandwidth communication

between devices over coaxial cabling.  Appx75, Abstract; Appx87, 4:19-33.  These impediments include (1) inter-port isolation from communicating across splitters, (2) variable signal attenuation caused by different channel paths, and (3) imperfect connection points at splitters, which cause micro reflections.  Appx86, 2:27-34, 2:41-48; Appx87, 3:5-16, 4:23-25; Appx2795-Appx2796, ¶ 72.

Without viewing the '518 Patent with the necessary experience, the Board failed to properly consider the coaxial-specific issues that the '518 Patent addressed, which led to the Board's incorrect finding that the '518 Patent generally solves "variable attenuation and noise."  Appx30.  Furthermore, the correct issues and corresponding solution of the '518 Patent are not "reasonably pertinent" to those of *Mirfakhraei*.  Rather, *Mirfakhraei* is clear; *Mirfakhraei's* invention relates to "a process for determining a bit loading for a discrete multi-tone (DMT) communication signal."  Appx1082, [0005]; Appx2798, ¶ 78.  For these reasons, the Board's improper level of skill led the Board to its erroneous conclusion that *Mirfakhraei* is analogous art when it is not.  In view of this error, the final written decision should be remanded for further consideration.

> 2.    *The Board's Factual Determination Regarding the '518 Patent's Field of Endeavor Contradicts the Evidence of Record*

The Board erred in its factual conclusion that the '518 Patent and *Mirfakhraei* share "broadband communication networks" as the field of endeavor.  Appx27.  Contrary to this finding, the field of endeavor of the '518 Patent is not so broad as

to encompass as all "broadband communication networks."  Appx24.  The field of endeavor must be rooted in the patent, considering "explanations of the invention's subject matter in the patent application, including the embodiments, function, and structure of the claimed invention."  *See Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1380 (Fed. Cir. 2019).  Had the Board approached this prong with the proper level of skill driven by all record evidence, the Board would have concluded that the '518 Patent's field of endeavor is specific to coaxial networks, which is not *Mirfakhraei's* field of endeavor.

a.    <u>The '518 Patent's Field of Endeavor is Coaxial Specific</u>

The Board's findings that the '518 Patent's field of endeavor is "broadband communication networks" lacks substantial evidence.  Appx24.  By excluding coaxial networks, the Board's field of endeavor is too broad and divorced from the express disclosure of the '518 Patent.  Every aspect of the '518 Patent supports a field of endeavor that includes coaxial networks.  Appx425-Appx427 (detailing how the title, abstract, technical field, background, and claims support coaxial cables as the field of endeavor).  The Board's analysis—and its failure to apply a holistic approach under *Airbus*—demonstrates its results-oriented approach.

First, the '518 Patent is titled "Broadband Network for ***Coaxial Cable*** Using Multi-carrier Modulation."  Appx75, Title (emphasis added).  *See Airbus S.A.S.*, 941

38

F.3d at 1380 (relying on the title to determine the field of endeavor). The Board did not address the title of the '518 Patent in its field of endeavor analysis.

Second, the abstract specifies a "network [that] uses ***coaxial cable wiring*** for interconnection of terminal devices." Appx75, Abstract (emphasis added). The Board did not address the abstract of the '518 Patent in its field of endeavor analysis.

Third, the summary of the invention includes "a form of multi-carrier modulation … to transmit digital data signals through the ***coaxial cable wiring*** installed in homes." Appx87, 4:37-40 (emphasis added). The Board did not address the summary of the invention of the '518 Patent in its field of endeavor analysis.

Fourth, the background of the '518 Patent focuses on coaxial networks, and the issues present in such networks, which the '518 Patent specifically set out to solve. *See, e.g.*, Appx87, 4:36-47. Although the specification was "indisputably directed to the problem" of coaxial networks, the Board did not address the background or problems and solutions of the invention in its field of endeavor analysis. *See Airbus S.A.S.*, 941 F.3d at 1380.

Fifth, every claim of the '518 Patent requires coaxial cables and network devices that communicate over such cables. Appx91, 12:8-48. *In re Bigio*, 381 F.3d 1320, 1326 (Fed. Cir. 2004) (requiring the claims to be considered in the field of endeavor analysis). The Board did not address the claims of the '518 Patent in its field of endeavor analysis.

In finding a field of endeavor contrary to this evidence, the Board relies only on (1) "the '518 patent's technical field" and (2) "the '518 patent's background [that] mentions several patents relating to 'broadband networks.'" Appx24 (citing Appx86, 1:27–29), Appx26 (citing Appx87, 3:33–35). But this is not substantial evidence. The technical field of the '518 Patent states that this "invention relates to broadband communication networks and specifically to ***communications using coaxial cable building wiring***." Appx86, 1:27-29 (emphasis added). Contrary to the technical field, the Board "choose the '518 patent's broader statement of the field ('broadband communication networks') because the field of endeavor is 'not limited to the specific point of novelty, the narrowest possible conception of the field, or the particular focus within a given field.'" Appx24 (citing *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1001 (Fed. Cir. 2016); Appx510). The Board provided no evidence for severing the level of skill from what the '518 Patent stated was its field: communications using coaxial cable building wiring.

Moreover, Appellant's field of endeavor that is specific to coaxial cables is ***not*** "the specific point of novelty" as the Board concludes. Here, the '518 Patent is entirely directed to communications over coaxial cables, which reflects the field of endeavor. The "specific point of novelty" is the use probe messages to determine channel characteristics of the coaxial cable network for use in selecting bit loading.

Thus, the Board's use of the '518 Patent's technical field—which identifies coaxial cables—is not substantial evidence of the Board's field of endeavor.

The case of *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858 (Fed. Cir. 1993) is instructive. There, the Federal Circuit found that semiconductor "memory" was too broad of a field. *Id.* at 864-65. And a prior art reference did not share a field of endeavor "merely because it relates to memories." *Id.* This Court found that the type of memory, swappable versus fixed size memory banks, and the size of the memory banks needed to be accounted for when deciding the field of endeavor. *Id.* For the same reason, the invention of the '518 Patent specifically applies to coaxial networks; a field of endeavor that does not consider the type, the medium, or location of the network—when the claims of the '518 Patent recite a coaxial network—is far too broad. *Id.*

The Board cannot justify its broad field of endeavor by relying on a DSL reference. Appx26 (citing Appx87, 3:33-35). The '518 Patent discloses Rubinstain, titled "Ethernet Transport Facility Over Digital Subscriber Lines." Appx87, 3:33-35. This reference does not support the Board's conclusion that "DSL technologies are in the same field of endeavor as the '518 patent" because the inventors explicitly distinguish this non-coaxial network reference from the problems and solutions of the '518 Patent. Appx26. The inventors of the '518 Patent explained that splitters

41

cause a multipath environment, and this multipath environment "impairs the ability to achieve high data rates in a communication network." Appx87, 4:19-26.

While the prior art references "address communicating between a cable head end and in-home units," they "do not address the impairments present in the home wiring that restricts high bandwidth communication between devices within the home." Appx87, 4:28-33. In other words, the '518 Patent makes clear that its problem and solution are specific to "impairments present in the home wiring" that have not been previously addressed. Appx87, 4:28-33. Thus, the inventors used the non-coaxial system of Rubinstain as an example network that could not and did not solve for the challenges in communicating over coaxial networking within a home. The inventors' citation to Rubinstain's DSL system does not justify the Board's overly broad field of endeavor determination. Appx26.

When properly considering the complete disclosure of the '518 Patent, the field of endeavor of the '518 Patent is not so broad as to encompass all "broadband communication networks." Appx24. The field of endeavor of the '518 Patent is specific to ***coaxial cable networks*** and even more specific to communication between network devices over the tap-ports of a coaxial splitter.

      b.    <u>*Mirfakhraei's* Field of Endeavor is Not Coaxial Networks</u>

Under the proper analysis of *Airbus*, the Board would have found that the '518 Patent's field of endeavor is specific to coaxial cables and that *Mirfakhraei* does not

share this field of endeavor. *See Airbus S.A.S.*, 941 F.3d at 1380–82. Neither the Board nor Petitioner contend that *Mirfakhraei* is in the field of endeavor of coaxial cables. Thus, the Board improperly broadened the '518 Patent's field of endeavor solely to capture the otherwise non-analogous *Mirfakhraei* reference. But the Federal Circuit has rejected this approach, holding that the Board may not generally define the field of endeavor simply to encompass both references. *See In re Nat. Alternatives, LLC*, 659 F. App'x 608, 614 (Fed. Cir. 2016) (rejecting the argument that the prior art reference and the challenged patent are in the same field of endeavor merely because they are in the same general field).

This is the same improper approach that Appellant highlighted in the Patent Owner Sur-Reply regarding Mr. Bertonis' analysis. Appx573-Appx575. To determine that *Mirfakhraei* was not limited to twisted pair, Mr. Bertonis relied on the "broad title," the "broad field of invention," and the "broad claims" of *Mirfakhraei*. Appx2626-Appx2627, ¶ 17. But when presented with the ***same*** evidence in the '518 Patent—all of which specifically identify coaxial cables—Mr. Bertonis disregarded this type of evidence he previously acknowledged are where to look to ascertain the field of endeavor, and by ignoring that evidence, concluded that the '518 Patent is not limited to coaxial cables. Appx573-Appx575. Rather than correcting this results-oriented approach, the Board applies the same improper approach as did Mr. Bertonis.

43

In its field of endeavor analysis for *Mirfakhraei*, the Board found that *Mirfakhraei* is not limited to telephone lines because *Mirfakhraei's* "title, abstract, technical field, summary, and claims (except for paragraph 9 and claim 14), are set forth broadly and indicate an intention not to limit Mirfakhraei's bit-loading processes to telephone lines, twisted pair, or DSL." Appx26. However, when presented with the same evidence in the '518 Patent—which ***does*** provide a clear intention to limit the field of endeavor—the Board wholesale ignores the evidence.

As introduced above, the title of the '518 Patent specifies coaxial cable. Appx75, Title. The abstract specifies a "network [that] uses coaxial cable wiring for interconnection of terminal devices." Appx75, Abstract. The technical field requires "communications using coaxial cable building wiring." Appx86, 1:27-29. The summary of the invention highlights the goal of "transmit[ing] digital data signals through the coaxial cable wiring installed in homes." Appx87, 4:37-40. And every claim of the '518 Patent requires coaxial cables and network devices that communicate over such cables. Appx91, 12:8-48. Unlike *Mirfakhraei* where the Board concluded that each aspect was "set forth broadly," the '518 Patent does the exact opposite. At every turn, the '518 Patent consistently and unmistakably narrows its field of endeavor to coaxial cables.

44

### 3.    The Board's Factual Determination Regarding the Reasonable Pertinent Prong Contradicts the Evidence of Record

The Board erred in its factual conclusion that "Mirfakhraei is reasonably pertinent to the problems addressed by the '518 patent." Appx30. A reference is reasonably pertinent only if it "logically would have commended itself to an inventor's attention in considering his problem." *In re Clay*, 966 F.2d at 659. *Mirfakhraei* does not meet this standard. First, the Board lacked substantial evidence in finding that the '518 Patent addresses the general problem of "variable attenuation and noise." Appx30. Second, the Board lacked substantial evidence in finding that *Mirfakhraei* likewise addresses the issue of variable attenuation and noise. Appx18. Had the Board approached this prong with the proper level of skill driven by all record evidence, the Board would have concluded that *Mirfakhraei* is not analogous to the '518 Patent.

#### a.    The '518 Patent is Specific to Coaxial Networks

The Board lacked substantial evidence in finding that the '518 Patent is reasonably pertinent to the problem of "variable attenuation and noise." Appx30. This determination is far too broad and is divorced from the explicit disclosure of the '518 Patent. The Federal Circuit has held that the reasonably-pertinent inquiry must focus on the "particular problem with which the inventor is involved," not a generalized concept that is untethered to the purpose of the invention. *In re Clay*, 966 F.2d at 659. Here, the inventors of the '518 Patent set out to address specific

45

impairments that previously restricted high bandwidth communication between devices over coaxial cabling. Appx75, Abstract; Appx87, 4:19-33. These impediments include (1) inter-port isolation from communicating across splitters, (2) variable signal attenuation caused by different channel paths, and (3) imperfect connection points at splitters, which cause micro reflections. Appx86, 2:27-34, 2:41-48; Appx87, 3:5-16, 4:23-25; Appx2796, ¶ 75.

A skilled artisan with coaxial cables experience would have understood that such impairments result from using a preexisting coaxial network and are not present in every type of wired network. Appx2797, ¶ 76. For example, coaxial networks include splitters to distribute signals downstream; twisted pair networks do not use splitters in this fashion. Appx86, 1:40-45; Appx2797, ¶ 76. Splitter ports are isolated and include imperfect connections, leading to the inter-port isolation and reflections that would not be found in networks that do not use splitters. Appx86, 2:27-34; Appx87, 3:5-16; Appx2797, ¶ 76. Further, signal paths vary between devices in a coaxial network based on the branch topology, causing variable signal attenuation, an issue specific to coaxial networks. Appx86, 2:35-48; Appx2797, ¶ 76. The '518 Patent overcomes these issues that previously restricted devices from communicating with each other in coaxial networks. Appx2796, ¶ 74.

In addition to these impairments, the general disclosure of the '518 Patent demonstrates that the inventors are specifically concerned with coaxial networks.

46

Appx569-Appx572. The '518 Patent itself explains that it addresses "impairments present ***in the home wiring*** that restricts high bandwidth communication." Appx87, 4:28-33 (emphasis added). Moreover, the claims of the '518 Patent are specifically directed towards communication between network devices through tap ports of a splitter. Appx91, 12:8-26; Appx2781-Appx2782, ¶ 47 (showing the communication between network devices via two tap ports of a coaxial signal splitter). The '518 Patent requires communication across two tap ports of the same coaxial splitter; the '518 Patent is directed to on-premise networking. Appx91, 12:8-26; Appx2781-Appx2782, ¶ 47. The Board's finding that the '518 Patent is generally directed to "variable attenuation and noise" is unsubstantiated and odds with all the evidence of record.

### b. *Mirfakhraei* Addresses Synchronization Issues

Second, the Board lacked substantial evidence in finding *Mirfakhraei* addresses the issue of variable attenuation and noise. Instead, *Mirfakhraei's* invention relates to "a process for determining a bit loading for a discrete multi-tone (DMT) communication signal." Appx1082, [0005]; Appx2798, ¶ 78. In other words, *Mirfakhraei* solves an entirely different problem than variable attenuation and noise. *Mirfakhraei* explains that bit loading techniques affect the total bandwidth and rate for the connection of the system by estimating the signal attenuation for each sub-channel. Appx1082-Appx1083, [0006]; Appx2798, ¶ 77.

47

These attenuations are caused by frequency dependent issues that "distort communication signals having large bandwidths." Appx1082, [0002]; Appx2798, ¶ 77. To combat these frequency dependent attenuation distortions, DMT protocols were developed to allow each signal to be transmitted over narrow bandwidths to reduce any distortion that may arise. Appx1082, [0003]; Appx2798, ¶ 78. These DMT protocols allow "the local modem [to] estimate the capacity or the target loading of each sub-channel." Appx1082-Appx1083, [0006]. Had the Board approached this prong with the proper level of skill driven and relied on *Mirfakhraei's* explicit characterization of its invention, the Board would have concluded that *Mirfakhraei* is not analogous to the '518 Patent.

## VIII. CONCLUSION

The judgment of the Board should be reversed or, in the alternative, vacated and remanded to the Board for the reasons stated above.

Respectfully submitted,

Dated:  May 18, 2026

*/s/ Erik J. Halverson*
Jason A. Engel
Erik J. Halverson
Jared R. Lund
K&L GATES LLP
70 W. Madison St., Suite 3100
Chicago, IL 60602
Phone: (312) 781-7166
E-mail: jason.engel@klgates.com
             erik.halverson@klgates.com
             jared.lund@klgates.com

*Counsel for Appellant*

49

# ADDENDUM

# INDEX TO ADDENDUM

| Date | Description | Appendix Pages |
|---|---|---|
| September 5, 2025 | Final Written Decision of the U.S. Patent and Trademark Office, Patent Trial and Appeal Board in IPR2024-00431 | Appx1-Appx74 |
| - | U.S. Patent No. 7,295,518 B1 to Monk et al. | Appx75-Appx91 |

Trials@uspto.gov                                                    Paper 32
571.272.7822                                    Entered: September 5, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

———————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————

COMCAST CABLE COMMUNICATIONS, LLC,
Petitioner,

v.

ENTROPIC COMMUNICATIONS, LLC,
Patent Owner.

———————

IPR2024-00431
Patent 7,295,518 B1

———————

Before JON M. JURGOVAN, SCOTT B. HOWARD, and
AARON W. MOORE, *Administrative Patent Judges*.

JURGOVAN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

**Appx1**

IPR2024-00431
Patent 7,295,518 B1

I.   INTRODUCTION ..................................................................................... 4

   A.  Background and Summary ................................................................ 4

   B.  Real Parties in Interest.................................................................... 4

   C.  Related Matters................................................................................ 5

   D.  The '518 Patent................................................................................ 6

   E.  Challenged Claims........................................................................... 8

   F.  Evidence of Record ........................................................................ 10

   G.  The Asserted Challenges to Patentability...................................... 11

II.  ANALYSIS AND DISCUSSION ......................................................... 11

   A.  *Legal Standards for Obviousness* .................................................. 11

   B.  *Claim Construction* ....................................................................... 12

      1.  "means for determining signal activity" ...................................... 13

      2.  "means for producing and transmitting a probe message" ............ 13

      3.  "means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data" .............................................. 14

      4.  Claim Construction Conclusion..................................................... 14

   C.  *Level of Ordinary Skill in the Art* ................................................ 15

   D.  *Ground A: Obviousness over Afshary and Mirfakhraei* .................... 16

      1.  Afshary (Ex. 1006)......................................................................... 17

      2.  Mirfakhraei (Ex. 1007) .................................................................. 19

      3.  Whether Mirfakhraei is Analogous Art ......................................... 20

      a)  Field of Endeavor......................................................................... 21

      b)  Reasonable Pertinence ................................................................. 27

      4.  Motivation to Combine .................................................................. 31

      5.  Claim 1 ........................................................................................... 54

      6.  Claim 2 ........................................................................................... 61

      7.  Claim 3 ........................................................................................... 62

      8.  Claim 4 ........................................................................................... 64

   E.  *Ground B: Obviousness over Afshary, Mirfakhraei, and Welles* ....... 69

      1.  Welles (Ex. 1022) .......................................................................... 70

IPR2024-00431
Patent 7,295,518 B1

   2. Motivation to Combine ................................................................. 70

   3. Claim 2 ........................................................................................ 71

III. CONCLUSION ..................................................................................... 72

IV. ORDER ................................................................................................. 72

3

**Appx3**

IPR2024-00431
Patent 7,295,518 B1

## I.    INTRODUCTION

### A.    *Background and Summary*

Comcast Cable Communications, LLC ("Petitioner") filed a Petition requesting inter partes review ("IPR") of claims 1–4 of U.S. Patent No. 7,295,518 B1 (Ex. 1001, "the '518 patent").  Paper 2 ("Petition" or "Pet."). Entropic Communications, LLC ("Patent Owner") filed a Preliminary Response to the Petition.  Paper 6.  We instituted *inter partes* review. Paper 8 ("Institution Decision" or "Inst. Dec.").

Patent Owner filed a Response (Paper 13, "PO Resp."), Petitioner filed a Reply (Paper 18, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 23, "PO Sur-reply").  An oral hearing was conducted, and the transcript is in the record, along with the demonstratives.  Paper 31 (Transcript); Ex. 1039 (Petitioner's Demonstratives); Ex. 2007 (Patent Owner's Demonstratives).

We have jurisdiction under 35 U.S.C. § 6.  This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a).  Having reviewed the complete trial record, we determine that Petitioner has shown, by a preponderance of the evidence, that the challenged claims 1, 3, and 4 are unpatentable but not claim 2.

### B.    *Real Parties in Interest*

Petitioner identifies Comcast Corporation, Comcast Cable Communications, LLC, and Comcast Cable Communications Management, LLC as real parties-in-interest.  Pet. v (Petitioner's Mandatory Notices).

Patent Owner identifies itself as the real party-in-interest.  Paper 3, 1 (Patent Owner's Mandatory Notices).

IPR2024-00431
Patent 7,295,518 B1

## C.    Related Matters

Petitioner and Patent Owner ("the parties") identify the following as matters related to this proceeding:

*Entropic Communications, LLC v. DirecTV, LLC*,
Case No. 2-23-cv-05253 (C.D. Cal.);

*Entropic Communications, LLC v. DISH Network Corporation*,
Case No. 2-23-cv-01043 (C.D. Cal.);

*Entropic Communications, LLC v. Cox Communications, Inc.*,
Case No. 2-23-cv-01047 (C.D. Cal.); and

*Entropic Communications, LLC v. Comcast Corporation.*,
Case No. 2-23-cv-01048 (C.D. Cal).

Pet. v–vi (Petitioner's Mandatory Notices); Paper 3, 1 (Patent Owner's Mandatory Notices).

Patent Owner identifies the following as patents and patent applications related to this proceeding: U.S. Patent No. 7,154,957; U.S. Patent No. 7,499,397; U.S. Patent No. 7,573,822; U.S. Patent No. 7,594,249; U.S. Patent No. 7,889,759; U.S. Patent No. 8,411,565; U.S. Patent No. 8,588,250; U.S. Patent No. 9,112,803; U.S. Patent No. 9,860,144; U.S. Patent Application No. 10/230,687; U.S. Patent Application No. 10/776,796; U.S. Patent Application No. 10/778,505; U.S. Patent Application No. 12/538,339; U.S. Patent Application No. 15/860,400; U.S. Provisional Application No. 60/288,967; U.S. Provisional Application No. 60/316,820; U.S. Provisional Application No. 60/363,420; U.S. Provisional Application No. 60/385,361; and U.S. Patent Application No. 90/019,247.  Paper 3, 2–3.

Patent Owner also identifies several *inter partes* reviews against Patent Owner's patents: U.S. Patent No. 7,889,759 (IPR2024-00452);

IPR2024-00431
Patent 7,295,518 B1

U.S. Patent No. 8,223,775 (IPR2024-00446); U.S. Patent No. 10,135,682 (IPR2024-00445); U.S. Patent No. 10,135,682 (IPR2024-00444); U.S. Patent No. 9,825,826 (IPR2024-00442); U.S. Patent No. 8,284,690 (IPR2024-00430); U.S. Patent No. 8,792,008 (IPR2024-00441); U.S. Patent No. 11,399,206 (IPR2024-00440); U.S. Patent No. 11,399,206 (IPR2024-00439); U.S. Patent No. 11,399,206 (IPR2024-00438); U.S. Patent No. 11,381,866 (IPR2024-00437); U.S. Patent No. 11,381,866 (IPR2024-00436); U.S. Patent No. 11,381,866 (IPR2024-00435); U.S. Patent No. 9,210,362 (IPR2024-00434); U.S. Patent No. 9,210,362 (IPR2024-00433); and U.S. Patent No. 9,210,362 (IPR2024-00432). Paper 3, 3–4.

### D.    The '518 Patent

The '518 patent is titled "Broadband Network for Coaxial Cable using Multi-Carrier Modulation." Ex. 1001, code (54). The patent discloses a broadband local area network that uses coaxial cable wiring for interconnecting terminal devices. *Id.* at code (57). Orthogonal frequency division multiplexing (OFDM) with bit loading is used to overcome channel impairments to provide a path for terminal devices to transmit to and receive from other terminal devices. *Id.* Probe messages are used to characterize the channel between terminal devices to determine the optimum bit loading for the channel. *Id.*

IPR2024-00431
Patent 7,295,518 B1

Figure 2 of the '518 patent is shown below.



Fig. 2

Figure 2 depicts "a signal distribution plan" of the '518 patent. *Id.* at 5:12–13. LAN modem 270 modulates and demodulates a waveform transmitted over the cable, and has an interface to communicate with LAN device 280, which is the source or destination of data transmitted over the LAN. *Id.* at 5:36–40. LAN device 280 can be a personal computer (PC) and LAN device 282 can be a modulator to produce a signal for driving a TV through a signal combiner. *Id.* at 5:40–43.

LAN devices 280 and 282 can be used for digital video or data services. *Id.* at 5:51–52. LAN device 282 can extract digital video data from a transport stream and produce a signal for a standard TV set. *Id.* at 5:52–56. Existing devices, such as TV 240, cable modem 250, and PC 260, use frequency bands distinct from the frequency band used by the LAN and

7

IPR2024-00431
Patent 7,295,518 B1

operate in the normal manner. *Id.* at 5:57–60. The frequencies used by the LAN can be located above the standard cable frequencies. *Id.* at 5:61–63.

The '518 patent describes multi-tone modulation as including discrete multi-tone (DMT) and OFDM. *Id.* at 7:20–27. The '518 patent states that OFDM uses quadrature phase shift keying (QPSK) and multi-level quadrature amplitude modulation (QAM) in which each OFDM carrier is modulated using an amplitude/phase-varying signal. The modulated carriers are then summed together for transmission over the channel. *Id.* at 7:39–40.

The '518 patent describes bit loading as a method of allocating higher order signal constellations to carriers that have higher signal to noise ratio, and lower order constellations to carriers that have lower signal to noise ratio. *Id.* at 8:9–26.

The '518 patent further describes the use of probe messages transmitted between network devices to estimate channel characteristics. *Id.* at 9:35–41. The probe messages have a known bit sequence that can be used by the receiving device to a bit loading profile to send back to the transmitting device to use if the channel is asymmetric, or the receiving device may calculate a bit loading profile for its own use if the channel is symmetric. *Id.* at 9:42–58.

### E.    *Challenged Claims*

Claims 1 and 4 are independent, and claims 2–3 depend from claim 1. Claim 1 is set forth below with Petitioner's limitation identifiers indicated in brackets.

[1pre] A data communication network comprising:

[1A] at least two network devices, each network device comprising a multi-carrier modulator for modulating data, an up converter for translating the modulated data to an RF carrier

8

**Appx8**

IPR2024-00431
Patent 7,295,518 B1

frequency, a down converter for translating an RF signal, and a multi-carrier demodulator for demodulating the translated RF signal to produce data; and

[1B] cable wiring comprising a splitter with a common port and a plurality of tap ports, and a plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices;

[1C] whereby network devices communicate with each other through the cable wiring using multi-carrier signaling;

[1D] wherein network devices transmit probe messages through the cable wiring and analyze received probe message signals to determine channel characteristics and bit loading is selected based on the determined channel characteristics.

Ex. 1001, 12:8–26.

Claim 4 is set forth below with Petitioner's identifiers:

[4pre] A network device for communicating data to other network devices over a coaxial wiring system comprising a splitter and a plurality of cable segments connected between the splitter and the network devices, the network device comprising:

[4A] a data modulator to produce a multicarrier modulated signal;

[4B] a demodulator for multicarrier modulated signal to produce data;

[4C] means for producing and transmitting a probe message; and

[4D] means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data.

*Id.* at 12:36–48.

IPR2024-00431
Patent 7,295,518 B1

### F.    Evidence of Record

Petitioner relies upon the following prior art references[1]:

| Name | Reference | Date | Exhibit No. |
|---|---|---|---|
| Afshary | US 2006/0218593 A1 | Filed Sept. 30, 1998; Published Sep. 28, 2006 | 1006 |
| Mirfakhraei | EP 1 087 586 A2 | Filed Sept. 22, 2000; Published Mar. 28, 2001 | 1007 |
| Welles | US 6,737,984 B1 | Filed Mar. 10, 2000; Issued May 18, 2004 | 1022 |

Petitioner also supports its challenges with declarations from Mr. James Bertonis. Ex. 1002; Ex. 1036. Patent Owner relies on a declaration from Mr. Albert Garrett. Ex. 2001. Deposition testimony of the declarants is in the record. Ex. 2002; Ex. 2006; Ex. 1032. Other evidence is present in the record as well.

---

[1] Petitioner states that all of the prior art references were filed, issued, or published before the '518 patent's earliest alleged priority date of August 30, 2001. Pet. 8, 11, 15. Petitioner contends that all of these references are prior art under 35 U.S.C. §§ 102(a) and (e) (pre-Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011)). *Id.* Patent Owner does not refute these assertions.

IPR2024-00431
Patent 7,295,518 B1

### G.    The Asserted Challenges to Patentability

Petitioner asserts the following challenges to patentability:

| Ground | Challenged Claim(s) | 35 U.S.C. §[2] | Reference(s)/Basis |
|--------|---------------------|----------------|---------------------|
| A | 1–4 | 103(a) | Afshary, Mirfakhaei |
| B | 2 | 103(a) | Afshary, Mirfakhaei, Welles |

Pet. 17.

## II.    ANALYSIS AND DISCUSSION

In this section, we discuss Petitioner's challenges to claims 1–4 of the '518 patent and Patent Owner's arguments against Petitioner's contentions. For the reasons that follow, we determine that Petitioner has demonstrated that claims 1, 3, and 4 of the '518 patent are unpatentable as obvious, but not claim 2.

### A.    Legal Standards for Obviousness

A patent claim is unpatentable as obvious under 35 U.S.C. § 103(a) if the differences between  the claimed subject matter and the prior art are such that the claimed subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the claimed invention pertains.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations including:  (1) the scope and content of

---

[2] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011), amended 35 U.S.C. §§ 102 and 103, effective March 16, 2013. Because the application from which the '518 patent issued was effectively filed before this date, the pre-AIA versions of §§ 102 and 103 apply.

IPR2024-00431
Patent 7,295,518 B1

the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) where present, objective evidence of nonobviousness. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966).

### B.  Claim Construction

We construe the challenged claims under the same standard used by a federal court in a civil action under 35 U.S.C. § 282(b).  37 C.F.R. § 42.100(b).  This standard is articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) and its progeny, and includes "construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent."  37 C.F.R. § 42.100(b).

Petitioner contends that three claim terms presumptively invoke means-plus-function under pre-AIA § 112 ¶ 6 through the use of the words "means for."  Pet. 23.  Petitioner asserts that all other claim terms should be given their ordinary and customary meaning under § 282(b).  *Id.* at 24 (citing 37 C.F.R. § 42.100(b)).

Patent Owner does not dispute Petitioner's constructions because "the claims containing these terms are not part of any infringement allegation in any district court case."  PO Resp. 70 (citing Ex. 2001 ¶ 57).  Patent Owner asserts that "as no argument advanced by Patent Owner or Petitioner hinges on the construction of these terms, no construction is necessary."  *Id.*

Because an assessment of whether the prior art discloses a means-plus-function limitation depends not only on the presence of the recited function but also the structure that performs that function as described in the

12
**Appx12**

IPR2024-00431
Patent 7,295,518 B1

patent's specification, we address Petitioner's undisputed contentions for the means-plus-function limitations below.

> 1. *"means for determining signal activity"*

Petitioner contends that the claimed function of "determining signal activity" does not require further construction. Pet. 24 (citing Ex. 1001, claim 2; Ex. 1002 ¶¶ 108–109). As to the corresponding structure, Petitioner asserts that the '518 patent describes different approaches for determining signal activity. *Id.* Petitioner states that one approach is to perform a Fast Fourier Transform (FFT) on data samples from an analog-to-digital converter (ADC) using the same receiver signal path that is used for data communication. *Id.* at 24–25 (citing Ex. 1001, 8:51–9:27, 11:7–23; Ex. 1002 ¶¶ 109–110).

Petitioner contends that another approach is to measure received signal power with an envelope detector. *Id.* at 25 (citing Ex. 1001, 11:23–29; Ex. 1002 ¶ 110). Petitioner asserts that the envelope detector is another corresponding structure for "determining signal activity." *Id.* (citing Ex. 1002 ¶ 110).

> 2. *"means for producing and transmitting a probe message"*

Petitioner contends that the claimed function of "producing and transmitting a probe message" does not require further construction. Pet. 25 (citing Ex. 1001, claim 4; Ex. 1002 ¶¶ 111–112). As to the corresponding structure, Petitioner contends that a probe message is a signal "known by the receiving device" that is used "to estimate the channel characteristics" such as SNR.[3] *Id.* (citing Ex. 1001, 4:48–62, 7:22–42, 8:9–35, 9:36–10:20;

---

[3] Signal-to-noise ratio. Ex. 1001, 6:30.

IPR2024-00431
Patent 7,295,518 B1

Ex. 1002 ¶¶ 111–112).  Petitioner contends that the corresponding structure for "producing and transmitting a probe message" is a processor.  *Id.* at 26 (citing Ex. 1002 ¶¶ 111–112).  Petitioner contends that "[t]o the extent the identified structure of a processor requires an algorithm for performing the recited function, the algorithm is: (a) generating a signal known to a receiving device; and (b) transmitting the known signal."  *Id.* (citing Ex. 1001, code (57), 4:48–62, 9:35–10:38, Fig. 7; Ex. 1002 ¶¶ 111–112).

> 3.    *"means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data"*

Petitioner asserts that the claimed function for this term, which is "receiving and analyzing a probe message to determine a bit loading profile used to transmit data," requires no further construction for purposes of this IPR.  Pet. 27 (citing Ex. 1001, claim 4; Ex. 1002 ¶¶ 113–114). Petitioner further asserts that the corresponding structure for this function is a processor.  *Id.* (citing Ex. 1001, 10:29–38; Ex. 1002 ¶¶ 113–114). Petitioner contends that, "[t]o the extent the identified structure of a processor requires an algorithm for performing the recited function, the algorithm is: (a) receiving a known signal; (b) determining a SNR for each subchannel based on the received known signal; and (c) determining a bit loading for each subchannel based on the determined SNR for the subchannel.  *Id.* (citing Ex. 1001, code (57), 4:48–62, 8:9–26, 9:17–19, 9:35–10:38, 10:61–11:6, Fig. 7; Ex. 1002 ¶¶ 113–114).

> 4.    *Claim Construction Conclusion*

Petitioner's constructions for the means-plus-function limitations are reasonable and Patent Owner does not dispute them.  Accordingly, we agree with and will use those constructions in this Decision.  For the remaining

IPR2024-00431
Patent 7,295,518 B1

claim terms, we apply the ordinary and customary meaning.  37 C.F.R.
§ 42.100(b).

## C. *Level of Ordinary Skill in the Art*

Petitioner contends as follows:

> In relation to the '518 patent, a person of ordinary skill in the art ("POSITA") would have had a bachelor's degree in electrical engineering, computer engineering, or a similar discipline, and three to four years of experience working in signal processing and/or communication systems/networks.  Additional education may substitute for experience, and significant work experience may substitute for formal education.

Pet. 23 (citing Ex. 1002 ¶¶ 103–105).

> Patent Owner states the following:

> A POSITA would have at least a bachelor's degree in electrical engineering, computer engineering, or an equivalent field with at least two years of experience with coaxial cables.  . . . Experience with coaxial networking is central to the patent's field of work.  *Id*.  The title, claims, abstract, background, and detailed description all refer to coaxial cable.  . . .  As referenced in the summary of the invention, the use of terms such as "coaxial cable wiring" in connection with "splitters" confirms that the summary of the invention section refers to a coaxial network.  . . . Claim 1's use of a "splitter with a common port and a plurality of tap ports" also confirms the coaxial network.

PO Resp. 10–11 (citing Ex. 1001, codes (54, 57), 1:27–29, 4:36–40, 5:14–16, Fig. 3, claim 1; Ex. 2001 ¶¶ 37–43).

Patent Owner's proposal to limit a POSITA's education and experience to "broadband networks over coaxial cables" is too narrow. Although Patent Owner points to various parts of the '518 patent as supporting its restrictive proposal, other parts of the patent are not so limited.  For example, the patent's technical field and summary are not limited to coaxial cable, and the patent discusses twisted pair wiring and

15

IPR2024-00431
Patent 7,295,518 B1

satellite communications as media that can be used. *See, e.g.*, Ex. 1001, 1:27–29, 3:33–35, 3:49–50, 3:67–4:3, 5:61–6:3, 8:20–23, 9:28–33.

Accordingly, we adopt the following level of ordinary skill in the art for use in this Decision:

> A POSITA would have a bachelor's degree in electrical engineering, computer engineering, or a related field, and two to four years of experience with broadband communication networks. Additional professional experience could substitute for education, and additional education could substitute for professional experience.

We find that this skill level is consistent with the problems and solutions identified in the '518 patent and the prior art references asserted by Petitioner. In addition, we find the adopted skill level consistent with the education and experience that a POSITA would have had. *See In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (citing *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986)) (citing factors to consider when determining level of ordinary skill in the art).

### D. Ground A: Obviousness over Afshary and Mirfakhraei

Petitioner contends that claims 1–4 would have been obvious over the combination of Afshary and Mirfakhraei. Pet. 28–68. Patent Owner disputes Petitioner's contentions. PO Resp. 11–70. We address below the disclosures of Afshary and Mirfakhraei, the parties' contentions on whether Mirfakhraei is analogous art, the motivation to combine, and the parties' contentions regarding obviousness of these claims. We determine that claims 1, 3, and 4 would have been obvious over the combination, but not claim 2.

IPR2024-00431
Patent 7,295,518 B1

> 1. *Afshary (Ex. 1006)*

Afshary is titled "Digital Coaxial Cable LAN." Ex. 1006, code (54). Afshary relates to networking and data distribution through a coaxial cable that takes advantage of the operating frequency spectrum of the coaxial cable so as not to interfere with client data. *Id.* ¶ 2.

Afshary's Figure 1 is shown below.



FIG. 1

Figure 1 shows an in-home coaxial cable LAN. *Id.* ¶ 8. Drop cable 10 enters home 12 after tapping main trunk 14 through splitter 15 within distribution box 16. *Id.* ¶ 14. Low pass filter (LPF) 18 is installed upstream of the in-home cable LAN network and downstream of low pass filter 20 supplied by a cable service company. *Id.* LPF 18 maintains security for the cable LAN by preventing signals generated within the cable LAN from getting back to the public cable network where they may also interfere operations of the cable service company. *Id.* ¶¶ 15–16.

IPR2024-00431
Patent 7,295,518 B1

Splitter 22 divides the signal on cable 10 into different cable wires 24 which are routed to different rooms in home 12 where they connect with devices such as television (TV) 28, set top box (STB) (or cable modem) 30, and personal computer (PC) 36. *Id.* ¶ 18. These client devices are connected to cable wires 24 with cable LAN adapters 32. *Id.* ¶ 19.

Afshary's Figure 3 is shown below.



FIG. 3

Figure 3 shows an operating frequency of the client data and adapter signal. *Id.* ¶ 10. The lower region from 0–950 MHz is where conventional cable TV, digital cable TV, and cable modem services are offered. *Id.* ¶ 25. The cable LAN signal is located within the higher range of 1000–2000 MHz at a center frequency of 1300 MHz, and thus does not interfere with conventional services. *Id.* ¶¶ 25, 28.

Afshary's Figure 4 is shown below.

18

IPR2024-00431
Patent 7,295,518 B1



FIG. 4

Figure 4 shows an architecture of a cable LAN adapter. *Id.* ¶ 11.

Modulator 96 modulates data from a client device using a modulation

scheme such as Quadrature Phase Shift Keying (QPSK) digital modulation.

*Id.* ¶¶ 26, 35–41. Radio Frequency (RF) and Mixed Signal section 100 up-

converts the modulated data to an RF frequency. *Id.* ¶¶ 38–39. RF data

signals received by the cable LAN adapter are down-converted by RF and

Mixed Signal section 100 and demodulated by demodulator 98 for

transmission to a client device. *Id.* ¶¶ 38–42.

> 2.    *Mirfakhraei (Ex. 1007)*

Mirfakhraei is titled "Bit loading Process for Multicarrier

Communications." Ex. 1007, code (54). Mirfakhraei relates to modems and

transceivers that use multiple carrier frequencies for information

transmissions. *Id.* ¶ 1. Mirfakhraei's modems use discrete multi-tone

(DMT) modulation and bit-loading to increase transmission rates. *Id.*

¶¶ 3, 5.

Mirfakhraei discloses that "[f]or data transmission, a sending modem

breaks transmitted data into packets for simultaneous transmission on

separate sub-channels and independently modulates communication signals

19

IPR2024-00431
Patent 7,295,518 B1

for the sub-channels according to the data carried on each sub-channel." *Id.*
¶ 3.  For data reception, the "receiving modem separates sub-channel signals
according to carrier frequency, demodulates the separate sub-channel
signals, and reassembles the data." *Id.*

Mirfakhraei discloses a bit-loading process that determines noise for
each sub-channel of the DMT signal. *Id.* ¶ 5.  The process determines target
loadings to provide a desired error rate at the measured noise. *Id.*  The
process rounds target loadings to integers; and determines whether the
proposed loadings provide a desired error rate. *Id.*  If not, the process selects
one or more sub-channels with a negative difference between target and
proposed loadings, and for each selected sub-channel decreases the proposed
loading by 1. *Id.*  Gains of channels with decreased loadings are decreased
for improved power efficiency. *Id.*

Mirfakhraei discloses a handshake process in which one transceiver
transmits a handshake signal to a remote receiver when establishing a
connection or retraining. *Id.* ¶ 20.  The handshake signal includes a pattern
that the remote transceiver requests or indicates a pattern for the remote
transceiver to transmit to the one transceiver. *Id.*  SNRs for the sub-channels
can be determined from these handshake signals. *Id.* ¶ 22.

> 3.    *Whether Mirfakhraei is Analogous Art*

Prior art references apply to the obviousness inquiry only when they
are analogous to the claims challenged. *In re Clay*, 966 F.2d 656, 658
(Fed. Cir. 1992); *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004).  A prior
art reference is analogous when (1) the reference is from the same field of
endeavor as the claims; or (2) the reference is reasonably pertinent to the
particular problem with which the inventor was involved. *Corephotonics,*

IPR2024-00431
Patent 7,295,518 B1

*Ltd. v. Apple, Inc.*, 84 F.4th 990, 1004 (Fed. Cir. 2023); *Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1379 (Fed. Cir. 2019); *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1378 (Fed. Cir. 2007).  "The Supreme Court's decision in *KSR* . . . directs us to construe the scope of analogous art broadly."  *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1238 (Fed. Cir. 2010).

### a)    Field of Endeavor

Patent Owner initially asserts that the '518 patent's field of endeavor is an "on-premises broadband network implemented over existing cables." PO Resp. 12, 16–17 (citing Ex. 1001, codes (54, 57), 1:25–29, 1:33–4:33; Ex. 2001 ¶¶ 58–59).  In its Sur-reply, however, Patent Owner revises the '518 patent's field of endeavor as "on-premises local area broadband ***coaxial cable networks*** and even more specific to communication between network devices over the tap-ports of a coaxial splitter."  PO Sur-reply 20. According to Patent Owner, "[e]very aspect" including the title, abstract, technical field, background, and claims supports this definition of the '518 patent's field of endeavor.  *Id.*

Patent Owner argues that Mirfakhraei's field of endeavor is "an out-of-home, point-to-point system that communicates over conventional telephone lines" using "DSL connections over twisted pair."  PO Resp. 15– 16, 20–21 (citing Ex. 1007 ¶¶ 2–6, 14–15, 19; Ex. 2001 ¶¶ 61, 71–72), 18. Patent Owner asserts that Mirfakhraei does not discuss broadband networks, or existing on-premises coaxial cables, coaxial splitters, or multi-path reflections which are "all key to the '518 patent."  *Id.* at 16, 21.  In addition, Patent Owner alleges that Mirfakhraei's bit-loading processes would not work with the signal splitters present in a coaxial environment.  *Id.* at 16.

IPR2024-00431
Patent 7,295,518 B1

Patent Owner contends that that twisted pair wiring used in telephone lines only transmits low frequencies and thus is used in simple, point-to-point networks, whereas coaxial cables, being shielded, can support larger, high-frequency bandwidths. *Id.* at 19 (citing Ex. 2001 ¶¶ 63–69; Ex. 2003, 82; Ex. 2004). Patent Owner states that the frequency response of coaxial cables is chaotic due to transmission-line effects such as reflections, with sharp increases in attenuation at specific frequencies. *Id.* at 19–20 (citing Ex. 2001 ¶ 70; Ex. 2003, 67[4]). Patent Owner states that these effects occur even in the much shorter cable lengths used in homes as compared to longer telephone lines. *Id.* at 20.

Patent Owner criticizes the Petition for not undertaking any analysis of Mirfakhraei's field of endeavor or comparing it to that of the '518 patent. *Id.* at 21. Patent Owner asserts, however, that the Petition "appears to agree" that the '518 patent is directed to communications using coaxial building wiring. *Id.* at 17–18 (citing Pet. 2; Ex. 1001, 1:28–29, 1:33–35; Ex. 1002 ¶¶ 59–61).

Patent Owner also alleges that the Institution Decision made its own findings apart from those in the Petition, oversimplified Mirfakhraei's field of endeavor, relied on Mirfakhraei's boilerplate language, and did not appreciate that Mirfakhraei's "communication signal" in claim 1 implies transmission over conventional telephone wires, as described in its specification. *Id.* at 16, 22–23 (citing Ex. 1007 ¶¶ 21, claim 1; Ex. 2001 ¶ 62; Inst. Dec. 20–21).

---

[4] Citation not found.

IPR2024-00431
Patent 7,295,518 B1

In addition, Patent Owner draws comparisons between *Wang Labs.* and the present case, arguing that this precedent binds us to decide the field of endeavor issue in its favor. *Id.* at 23–24 (citing *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 864–865 (Fed. Cir. 1993) (prior art references not in same field of endeavor merely because they relate to computer memories)).

Patent Owner criticizes Petitioner's expert, Mr. Bertonis, for his alleged "results-oriented approach" and inconsistency in how he considered the title, field, and claims of the '518 patent to conclude it was not limited to co-axial cable, and the same parts of Mirfakhraei to conclude it was not limited to telephone lines (twisted pair). PO Sur-reply 20–22. Patent Owner also asserts that Petitioner failed to apply *Airbus*'s holistic approach by ignoring certain parts of the '518 patent, and that Petitioner mischaracterized Patent Owner's proposed field of endeavor for the '518 patent, which Patent Owner did not limit to use of probe messages in adaptive bit-loading. *Id.* at 21–22. In addition, Patent Owner alleges that Petitioner attempted to broaden the '518 patent's field of endeavor and improperly conflated the two prongs of the analogous art test, revealing that Petitioner is using improper hindsight reconstruction in its analysis. *Id.* at 22–23.

Patent Owner further asserts that Petitioner's uses of the '518 patent's references to non-coaxial references amounts to improper hindsight and ignores the '518 patent's claims and the district court's confirmation that claim 1 relates to a coaxial network. *Id.* at 23 (citing Pet. Reply 5). Patent Owner alleges that Petitioner does not dispute Patent Owner's evidence showing that Mirfakhraei is directed to conventional telephone line (twisted pair) communications, and instead uses broad boilerplate language that does

IPR2024-00431
Patent 7,295,518 B1

not outweigh the entirety of Mirfakhraei's disclosure, which does not mention coaxial cables.  *Id.* at 24.  Patent Owner asserts that Petitioner thus broadly characterizes the field of endeavor as "network communications" to capture the non-analogous Mirfakhraei reference.  *Id.*

Petitioner asserts that the field of endeavor is "network communications."  Pet. Reply 3 (citing Ex. 1002 ¶ 88; Ex. 1036 ¶ 2).  Petitioner argues that this is supported by the '518 patent and Mirfakhraei consistent with the holistic approach of *Airbus*.  *Id.* at 2–8.  Petitioner asserts that Petitioner improperly narrowed the field of endeavor, and contends that Mirfakhraei's disclosure is not limited to twisted pair telephone lines.  *Id.*

As previously stated, we determine that the '518 patent's field of endeavor is "broadband communication networks."  *See* § II.C, *supra*.  This is made clear from the '518 patent's technical field which states "[t]his invention relates to *broadband communication networks* and specifically to communications using coaxial cable building wiring."  Ex. 1001, 1:27–29 (emphasis added).  We choose the '518 patent's broader statement of the field ("broadband communication networks") because the field of endeavor is "not limited to the specific point of novelty, the narrowest possible conception of the field, or the particular focus within a given field."  *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1001 (Fed. Cir. 2016); Pet. Reply 3.  Mirfakhraei shares this field of endeavor with the '518 patent.

Although Patent Owner argues that Petitioner failed to conduct an analysis for the field of endeavor, the Federal Circuit has cautioned that a petition may show analogousness even if it does not explicitly identify it as such.  *Netflix, Inc. v. DIVX, LLC*, 80 F.4th 1352, 1359–1360 (Fed. Cir. 2023)

IPR2024-00431
Patent 7,295,518 B1

(Board abused its discretion in determining Netflix failed to articulate a field of endeavor).

The Petition indicated, for example, that Mirfakhraei's receiver (specifically, its time domain equalizer) samples and filters a signal described as *broadband*. *See, e.g.*, Pet. 38–40 (citing Ex. 1007 ¶ 24). The Petition further mentions Mirfakhraei's handshake procedure to implement bit-loading between *network* devices. *See, e.g.*, *id.* at 48 (citing Ex. 1007, code (57) ¶¶ 2–3, 5–8, 14–25, Figs. 1–3). In substance, the Petition identifies Mirfakhraei's field of endeavor as "broadband communication networks."

Patent Owner argues that Mirfakhraei's field of endeavor is limited to twisted pair or DSL. PO Resp. 15–16, 20–21. Mirfakhraei discloses various forms of DSL including ADSL and HDSL (collectively referred to as "xDSL"), and states that its bit loading processes can be implemented with an "xDSL transceiver." Ex. 1007 ¶¶ 3, 9–10, 14–15, 18, 26–28. However, Mirfakhraei does not preclude the use of its disclosed processes in other types of networks. *Id.* ¶¶ 6–9, claim 14; Pet. Reply 6–7.

For example, Mirfakhraei's "Summary" describes its DMT bit-loading processes, and then concludes by stating that "[o]ther embodiments of the invention include xDSL transceiver implementing any of the process disclosed herein." Ex. 1007 ¶ 9. This implies that the processes described in the "Summary" encompass other types of transceivers and networks that are not xDSL. *Id.* ¶¶ 6–8. Similarly, Mirfakhraei's claim 14 recites "[a]n ADSL transceiver that performs the process of any one of the preceding claims" such that the processes recited in the preceding claims are not so limited.

IPR2024-00431
Patent 7,295,518 B1

Furthermore, the '518 patent's background mentions several patents relating to "broadband networks" including one that concerns DSL. Ex. 1001, 3:33–35. In our view, the '518 patent's mentioning this patent is evidence that broadband DSL technologies are in the same field of endeavor as the '518 patent.

Regarding Patent Owner's contention that the '518 patent's field of endeavor is limited to "on-premises" or "local" networks, as Petitioner observes, there is no such limitation in the claims (although it is mentioned elsewhere in the patent). Pet. Reply 4. Even if we agreed with this assertion (we do not), Mirfakhraei discloses that its bit-loading processes use local networks. Ex. 1007 ¶¶ 6, 16.

We do not belabor Patent Owner's criticisms of the Institution Decision (we are beyond the preliminary stage of this proceeding) other than to state we disagree with them. We address, however, Patent Owner's assertion that "communication signal" in the Mirfakhraei's claims limits them to communications over telephone lines because Mirfakhraei's description mentions this. PO Resp. 16, 22–23; Ex. 1007 ¶ 21. Other parts of Mirfakhraei, such as its title, abstract, technical field, summary, and claims (except for paragraph 9 and claim 14), are set forth broadly and indicate an intention not to limit Mirfakhraei's bit-loading processes to telephone lines, twisted pair, or DSL. Pet. Reply 6–7; Ex. 1007, codes (54, 57), ¶¶ 1, 5–8, claims 1–13 and 15–18.

Patent Owner's reliance on *Wang Labs* is misplaced, as Petitioner argues. *See* Pet. Reply 8. In that case, the Federal Circuit determined that an asserted patent related to a compact memory module for personal computers was not in the same field of endeavor as prior art relating to a

IPR2024-00431
Patent 7,295,518 B1

memory module for a larger, more costly industrial controller in which space was not an issue. *Wang Labs.*, 993 F.2d at 864–865. Expert testimony established that the industrial memory module could not be used in a personal computer. *Id.* at 864. In contrast, the '518 patent and Mirfakhraei are directed to the same field of endeavor—broadband communication networks—and their network devices are agnostic, at least above the physical layer, to the mediums used to convey signals between them.

As to Patent Owner's assertion that Mirfakhraei's bit loading would not work with the splitters used for coaxial cables, Petitioner relies on Afshary to explain how this would be done. *See, e.g.*, Pet. 8–9, 45–47. In any case, this argument does not relate to the field of endeavor, but to the reasonable expectation of success in combining prior art references.

Petitioner's statement of the field of endeavor as "communication networks" is too broad in light of the '518 patent for the reasons explained.

We conclude that Petitioner has shown by preponderant evidence that Mirfakhraei is in the same field of endeavor as the '518 patent, i.e., "broadband communication networks." Mirfakhraei is thus analogous art because it is in the same field of endeavor as the '518 patent.

### b) Reasonable Pertinence

Patent Owner argues that Mirfakhraei is not reasonably pertinent to the problems addressed by the '518 patent. PO Resp. 24–29. Patent Owner asserts that the '518 patent solves impairments specific to on-premises communication between network devices over existing coaxial cable wiring and splitters, whereas Mirfakhraei addresses synchronization for "point-to-point" communication within a twisted pair system without these splitters or

27
**Appx27**

IPR2024-00431
Patent 7,295,518 B1

the micro-reflections that they cause. *Id.* at 24 (citing Ex. 1001, 4:36–47; Ex. 2001 ¶¶ 73, 79; Ex. 2002, 78:6–16).

Patent Owner asserts that the '518 patent addresses signal impairments specific to on-premises coaxial cabling including (1) inter-port isolation from communicating across splitters; (2) variable signal attenuation caused by different channel paths, and (3) imperfect connection points at splitters, which cause micro-reflections. *Id.* at 25 (citing Ex. 1001, 2:27–48, 3:5–16, 4:23–25, 4:36–47; Ex. 2001 ¶¶ 75–76).

Patent Owner states that "[s]uch impairments are the result of using a preexisting coaxial network and are not present in every type of wired network." *Id.* Patent Owner asserts that splitters in coaxial networks have isolated ports forming imperfect connections which cause inter-port isolation and reflections not found in other network types. *Id.* According to Patent Owner, the varying signal paths between devices causes variable signal attenuation. *Id.* Patent Owner asserts that the '518 patent overcomes these issues that previously restricted network devices from communicating with each other. *Id.* at 26 (citing Ex. 1001, 4:36–47; Ex. 2001 ¶ 76).

Patent Owner states that Petitioner's expert, Mr. Bertonis, testified that attenuation characteristics apply to any medium while acknowledging that intersymbol interference ("ISI") is specific to reflections caused by insertion points in coaxial networks created by amplifiers and splitters, confirming that problem and solution of the '518 patent is specific to the use of splitters in a coaxial LAN environment. *Id.* (citing Ex. 2002, 118:21–119:10, 120:18–21).

Petitioner contends that Mirfakhraei is reasonably pertinent to the problems that the '518 patent addresses. Pet. Reply 8–11. Petitioner states

IPR2024-00431
Patent 7,295,518 B1

that the Institution Decision recognized that variable attenuation and signal noise are problems shared by the '518 patent and Mirfakhraei and that the solution of multi-carrier modulation with bit-loading is agnostic to whether impairments are caused by coax splitters or other features. *Id.* at 9 (citing Ex. 1001, 4:37–40, 4:42–46, 7:49–50, 8:9–12; Ex. 1036 ¶¶ 23–24).

Petitioner further contends that, like the '518 patent, Mirfakhraei seeks to improve network communication efficiency using the same solution—multi-carrier modulation with bit-loading—in the face of similar channel impairments (including frequency-dependent attenuation). *Id.* at 9–10. Specifically, Petitioner states that Mirfakhraei seeks to increase data transmission rate, select optimal symbol sets, and optimize bandwidth and power to address similar problems using the same solution. *Id.* (citing Ex. 1007 ¶¶ 3–4, 14, 34–35; Ex. 1036 ¶¶ 23–24). Petitioner asserts that "[t]he focus of the problem, commonly addressed by the '518 patent and Mirfakhraei, is finding ways to most effectively deal with encountered transmission impairments, whatever their cause." *Id.* at 10. Petitioner asserts that "Mirfakhraei would have commended itself to an inventor's attention in considering the problem addressed by the '518 patent." *Id.* (citing *Clay*, 966 F.2d at 659).

Petitioner argues that Patent Owner "seeks to exclude Mirfakhraei as analogous art under both the field of endeavor and reasonable pertinence prongs for essentially the same reason: that Mirfakhraei is allegedly focused on a twisted-pair telephone line rather than coaxial cable network." *Id.* at 10 (citing PO Resp. 18–21, 24–29). Petitioner asserts that Patent Owner's approach conflates the field of endeavor and reasonable pertinence inquiries and is improper under Federal Circuit precedent. *Id.* at 8–9 (citing *Donner*

IPR2024-00431
Patent 7,295,518 B1

*Tech. v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1361 (Fed. Cir. 2020); *In re ICON Health*, 496 F.3d at 1380).

Patent Owner responds that the '518 patent "solves impairments specific to on-premises communications between network devices ***over existing coaxial cable wiring***." PO Sur-reply 15. Patent Owner argues that the "Reply continues to ignore the coaxial context, including the claim language, which is directed toward communication between network devices through tap ports of a splitter." *Id.* (citing Ex. 1001, 1:27–29, 4:28–33, claim 1; Ex. 2001 ¶ 47). Patent Owner further argues that Petitioner applies the wrong framework for the reasonable-pertinence inquiry by focusing on the solution rather than the problem addressed by the '518 patent. *Id.* (citing Ex. 2001 ¶¶ 71–72, 79; Ex. 2002, 78:6–16; Ex. 1036 ¶¶ 23–24; *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016)).

Having considered the parties' contentions, we determine that Mirfakhraei is analogous art to the '518 patent at least because the two address the common problems of variable attenuation and noise on signals transmitted in broadband communication networks. Ex. 1001, 2:41–44, 3:11–16, 4:37–62, 6:45–46, 8:9–35; Ex. 1007, code (57), ¶¶ 2, 6. The '518 patent and Mirfakhraei address these problems, at least in part, through the use of the same solution—multicarrier modulation (OFDM or DMT) with bit loading. Ex. 1001, code (57), 4:37–62, 8:9–26; Ex. 1007, code (57), ¶¶ 5–8, 14, 22, 25–28, 31, 35, claims 1, 13, 15, 18.

Although Patent Owner focuses on the differences in transmission media discussed in the '518 patent (coaxial cable with splitters) compared to Mirfakhraei (twisted pair telephone lines), the two types of media suffer the

IPR2024-00431
Patent 7,295,518 B1

same problems of variable attenuation and noise no matter that the sources of those problems might be somewhat different.  Mirfakhraei discloses that conventional telephone lines suffer frequency-dependent attenuation that distorts communication signals having large bandwidths.  Ex. 1007 ¶ 2.  In the '518 patent, similar problems stem from differing coaxial cable lengths in homes or buildings causing variable attenuation, and the fact that the splitters used in such networks were originally designed to prevent communication across the tap ports with high impedances that cause micro-reflections leading to frequency-variable noise (e.g., ISI).  *See, e.g.*, Ex. 1001, 2:28–48, 4:37–47; Ex. 1007 ¶ 2.

Nonetheless, these problems are fundamentally the same, and the fact that Mirfakhraei and the '518 patent address them using the same solution—multicarrier modulation with bit loading—is further evidence they are reasonably pertinent to one another.

Accordingly, Petitioner has shown by preponderant evidence that Mirfakhraei is reasonably pertinent to the problems addressed by the '518 patent.  Mirfakhraei is thus analogous art as reasonably pertinent to the problems that the '518 patent addresses.

### 4.    *Motivation to Combine*

Petitioner contends that a POSITA would have been motivated to combine Afshary and Mirfakhraei for several reasons.  Pet. 40–45.  Petitioner asserts that a POSITA would understand that Afshary's network operates over a coaxial cable has variable frequency response caused by signal reflections and interference.  *Id.* at 40–41 (citing Ex. 1006, code (57), ¶¶ 7, 12–20, Fig. 1; Ex. 1002 ¶¶ 29–55, 128–138; Ex. 1007 ¶¶ 2–5, 14; Ex. 1018, 305–307).  According to Petitioner, implementing Mirfakhraei's

IPR2024-00431
Patent 7,295,518 B1

DMT bit-loading protocol would increase the data transmission rate in Afshary's coaxial cable network, and would also improve reliability and robustness of communications therein. *Id.* at 41–42 (citing Ex. 1007 ¶ 3; Ex. 1002 ¶¶ 29–55, 139). Although Mirfakhraei describes DMT bit loading for a conventional telephone line, Petitioner contends that a POSITA would have understood that its bit-loading scheme could be implemented over coaxial cable. *Id.* at 42 (citing Ex. 1010, 374; Ex. 1013, code (54), 2:30–5:39, Figs. 1–2; Ex. 1016, code (54), 1:9–16, 3:34–59, 6:66–7:46, Fig. 1; Ex. 1017, 74; Ex. 1018, 305–307, 312; Ex. 1002 ¶ 140).

Petitioner further asserts that integrating Mirfakhraei's DMT bit-loading protocol into Afshary's cable LAN adapter would entail incorporating Mirfakhraei's multi-carrier modulator and demodulator into an application specific integrated circuit ("ASIC"). *Id.* at 42–43 (citing Ex. 1007 ¶ 15, Fig. 1; Ex. 1002 ¶¶ 141–144). Petitioner contends that this implementation would enable Afshary's cable LAN adapter to communicate at higher data rates, and that it would be more robust and reliable and less affected by the harsh environment of a coaxial cable infrastructure, including interference and signal reflections. *Id.* at 43 (citing Ex. 1007 ¶ 2; Ex. 1018, 305–307, 312; Ex. 1002 ¶¶ 141–144). Petitioner asserts that the combination would improve power efficiency by using more available bandwidth for communicating, and using higher order modulation schemes to transmit more bits onto frequency channels that experience less noise and interference. *Id.* Petitioner asserts that this implementation is the combination of known elements according to known methods, or applying a known technique to a known device ready for the improvement, to yield predictable results. *Id.* at 43–44 (citing Ex. 1002 ¶¶ 145–146).

IPR2024-00431
Patent 7,295,518 B1

### a)   Frustration of Goals

Patent Owner argues that replacing Afshary's single carrier modulation with Mirfakhraei's multi-carrier modulation would frustrate Afshary's goal of providing a simple, low-cost home networking solution because it would add unwanted complexity, hardware cost, and operational costs to Afshary's network. PO Resp. 31–32 (citing Ex. 1006 ¶¶ 5–6, 37; Ex. 2001 ¶¶ 82–91). Patent Owner argues that Afshary's LAN adapters provide robust communication with cost-effective components without the need to update or change existing hardware. *Id.* at 32–33 (citing Ex. 1006 ¶¶ 28–42, Fig. 4; Ex. 2001 ¶¶ 84–87). According to Patent Owner, even if Afshary's process reflects a "trade-off" between cost and performance, Afshary decided to favor cost management. *Id.* at 33. Patent Owner asserts that a POSITA would not have been motivated to insert Mirfakhraei's components into Afshary's adapters due to added cost and complexity. *Id.* (citing Ex. 1002 ¶ 83). Patent Owner then points to particulars of Mifakhraei's system to support its assertion of added cost and complexity. *Id.* at 33–35 (citing Ex. 1007 ¶¶ 5, 14, 17–19; Ex. 2001 ¶¶ 88–91).

Petitioner criticizes Patent Owner's argument that because Afshary describes its coaxial cable LAN as "cost effective" a POSITA would not be motivated to add expensive components. Pet. Reply 16. Petitioner asserts that "courts reject this type of economic argument as irrelevant" and states that "many obvious modifications have some cost that is outweighed by the known benefit." *Id.* (citing *Orthopedic Equipment Co., Inc. v. U.S.*, 702 F.2d 1005, 1013 (Fed. Cir. 1983); *In re Farrenkopf*, 713 F.2d 714, 718 (Fed. Cir. 1983)). Petitioner asserts that the Board was correct in its initial determination that "Patent Owner's arguments at most establish that a

33

IPR2024-00431
Patent 7,295,518 B1

POSITA would have considered tradeoffs between cost and complexity and performance in making the combination." *Id.* (citing Inst. Dec. 26; *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 n.8 (Fed. Cir. 2000)). Petitioner further argues that Patent Owner's "assumption that Mirfakhraei's bit-loaded multi-carrier approach would necessarily add cost and complexity is unfounded" because the computational complexity of a multicarrier system can be significantly less than that of a single-carrier system, especially in networks that suffer from interference and/or reflections. *Id.* at 16–17 (citing Ex. 1018, 305–306; Ex. 1036 ¶ 39).

Patent Owner responds that Petitioner fails to establish any alleged benefits that would outweigh the negative impact to Afshary's expressed simplicity and cost concerns for multicarrier modulation. PO Sur-reply 4. Patent Owner argues that the technical evidence of its expert, Mr. Garrett, strongly favors Patent Owner in establishing that the combination would add complexity and costs contrary to Afshary's stated goal. *Id.* at 4–5 (citing Ex. 2001 ¶¶ 82–91).

Petitioner asserts that Patent Owner's arguments are premised on two false assumptions: "(1) that an Afshary-Mirfakhraei adapter is only capable of transmitting the same data to all other adapters at the same time . . . ; and (2) that transmissions on the Afshary-Mirfakhraei LAN would not include a mechanism to identify both the sender and recipient." Pet. Reply 18 (citing Ex. 2001 ¶ 104; Ex. 1032, 59:24–68:17; Ex. 1036 ¶¶ 47–51).

Petitioner asserts that Patent Owner's expert, Mr. Garrett, admitted that Afshary is not limited to broadcast transmissions, and contradicted himself regarding whether the alleged problem would exist in a non-broadcast scenario. *Id.* at 18–19 (citing Ex. 1032, 62:14–16, 67:17–69:14;

IPR2024-00431
Patent 7,295,518 B1

Ex. 1036 ¶ 47).  Petitioner further asserts that it was well known that LANs like Afshary's employed addressing techniques to identify a message sender and recipient, as Mr. Garrett admitted.  *Id.* at 19–20 (citing Ex. 1006 ¶ 41; Ex. 1034, 12–14, 150–151, 168–170, 184–186; Ex. 1033, 7–10, 275–282; Ex. 1031, 253–263; Ex. 1032, 45:19–46:12; Ex. 1036 ¶¶ 47–51; Ex. 2001 ¶ 123).

Petitioner further notes that the '518 patent does not describe how to configure its probing messages to avoid this alleged problem.  *Id.* at 20 (citing Ex. 1032, 45:21–49:16; Ex. 1036 ¶ 44; *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1327 n.3 (Fed. Cir. 2008) (patentee's argument that POSITA could not implement the combination was undermined by lack of description in patent itself)).

Petitioner further contends that Afshary's TDMA[5] regulates access to the shared coaxial cable medium in the same manner as the '518 patent's scheduler.  *Id.* at 20–21 (citing Ex. 1006 ¶ 34; Ex. 1001, 6:11–24, 9:42–49; Ex. 1032, 46:13–47:17, 48:4–49; Ex. 1036 ¶¶ 45, 52–53).  Petitioner argues that Mirfakhraei does not require a dedicated connection, and that the reference describes, but is not limited to, a communication medium that is twisted pair.  *Id.* at 21 (citing Ex. 1036 ¶ 53; Ex. 1007 ¶ 15).  Petitioner asserts that "a POSITA would have understood that Mirfakhraei's handshake process is indeed not a substitute for TDMA but instead would operate within the TDMA scheme used by Afshary, enabling any two adapters to exchange probe messages and responses, just like any other type of message that could be exchanged by the adapters."  *Id.* (citing Ex. 1036 ¶¶ 53–54).

---

[5] Time Division Multiple Access.  Ex. 1006 ¶ 34.

IPR2024-00431
Patent 7,295,518 B1

Having considered the parties' contentions and evidence, in our view, Patent Owner's arguments focus on Afshary's cost and complexity concerns, but overlook that Afshary also requires its system to be "robust." Ex. 1006 ¶ 37. Afshary recognizes there is a trade-off between these considerations, stating

> It is important for cable LAN adapter 32 to be screened from noise and hardy enough to work in any environment while remaining inexpensive. Thus, in order to keep costs low and the system robust, the architecture design of adapter 32 uses a digital modulation scheme such as Frequency Shift Keying (FSK) modulation or Binary Phase Shift Keying (BPSK) modulation.

*Id.* Although Patent Owner's expert, Mr. Garrett, points to the components of Mirfakhraei as supporting his contention that Petitioner's combination would add cost and complexity, he does not address Petitioner's evidence that multi-carrier modulation with bit loading can actually be less costly and complex by reducing the FFT size and the number of computations needed as compared to single carrier modulation. Ex. 1018, 305–306; Ex. 1036 ¶ 39.

Accordingly, Petitioner has shown preponderant evidence that the combination of Afshary and Mirfakhraei would not frustrate any of Afshary's stated goals.

### b)    *Incompatibility*

The parties present several contentions regarding whether the technologies of Mirfakhraei and Afshary are compatible, which we address below.

### (1)    *ASIC Redesign*

Patent Owner argues that a POSITA would not implement Mirfakhraei's multi-carrier modulator and demodulator in Afshary because

36

IPR2024-00431
Patent 7,295,518 B1

it would fundamentally change its ASIC's architecture.  PO Resp. 36 (citing Ex. 2001 ¶ 92).  Patent Owner asserts that Mirfakhraei operates in an "always on" fashion and operates at different frequencies than Afshary, and that adding Mirfakhraei's modulator and demodulator would require additional improvements in Afshary's baseband layer.  *Id.* at 37.

Patent Owner further argues that Petitioner's combination omits Mirfakhraei's controller 130, which is needed to implement its handshake process to achieve bit loading.  *Id.* at 37–39 (citing Ex. 1007 ¶¶ 20–23, Fig. 1; Ex. 1002 ¶¶ 142–144; Ex. 2001 ¶¶ 95–97; Ex. 2002, 63:6–8, 63:20–64:5, 65:21–66:12).  In addition, Patent Owner argues that Afshary "does not provide a synchronization mechanism that would overcome the shortcomings of Petitioner's combination."  *Id.* at 39 (citing Ex. 1006 ¶ 31; Ex. 2001 ¶¶ 98–99; Ex. 2002, 87:20–88:6).

Patent Owner further asserts that Petitioner's combination would require additional buffers, controls, and overhaul of the circuit board, and would need to reconcile broadband to analog conversion within the ASIC when transmitting data from the MAC layer.  *Id.* at 40 (citing Ex. 2001 ¶¶ 99–100).  According to Patent Owner, the work needed to create the ASIC would not motivate a POSITA to make the combination when Afshary was already complete and needed no improvements.  *Id.*

Petitioner contends that the technical difficulties that Patent Owner mentions, including circuitry level modification of an ASIC and details in data package encapsulations, are routine engineering tasks within the skillset of a POSITA that the '518 patent itself omits.  Pet. Reply 2, 21–23 (citing Ex. 1036 ¶¶ 43–46, 52, 55–56).  Petitioner further argues that Patent Owner provided no evidence that such changes are required, and that its expert,

IPR2024-00431
Patent 7,295,518 B1

Mr. Garrett, admitted there was "[n]o reason why" additional functionality could not be incorporated into Afshary's ASIC based on Mirfakhraei's teachings. *Id.* at 22 (citing Ex. 1032, 59:6–16) (alteration in original).

Patent Owner responds that Petitioner's reliance on the capabilities of a POSITA comes too late to address the "long list of modifications identified by Mr. Garrett." PO Sur-reply 10. Patent Owner argues that the '518 patent's claims have no effect on whether a POSITA would be motivated to combine Afshary and Mirfakhraei. *Id.* Patent Owner further argues that Petitioner consistently cites to the '518 patent "to fill gaps—a clear tactic of hindsight reconstruction." *Id.* at 10, 12–13 (citing Ex. 1001, 9:59–10:20, Fig. 7; Ex. 2006, 50:14–17, 50:25–51:2).

Patent Owner further argues that Petitioner failed to establish that Mirfakhraei's DMT bit loading scheme for a point-to-point network would properly characterize its bit loading scheme on Afshary's multi-point network that communicates across a coaxial splitter or how the signal-to-noise (SNR) ratio would be calculated. *Id.* at 11–12.

We do not agree with Patent Owner's arguments. Petitioner stated at the outset that "a POSITA would have understood that modifying Afshary's cable LAN adapter 32 to implement the DMT bit-loading protocol of Mirfakhraei would, for example, entail incorporating the functionality of Mirfakhraei's multi-carrier modulator and multi-carrier demodulator into an ASIC." Pet. 42; Ex. 1002 ¶¶ 52, 55–56, 141–144. Petitioner's Reply contentions were grounded in the Petition and responsive to Patent Owner's arguments in its Response, and hence are not new argument. *See Rembrandt Diagnostics, LP v. Alere, Inc.*, 76 F.4th 1376, 1385 (Fed. Cir. 2023).

IPR2024-00431
Patent 7,295,518 B1

When questioned during his deposition, Patent Owner's expert, Mr. Garrett, stated that there was "no reason why" additional functionality could not be incorporated into the controller of Afshary's ASIC but that "a lot of modifications [would be] required" to achieve Petitioner's combination. Ex. 1032, 58:18–59:16. Numerous modifications, however, does not necessarily mean it would be beyond the capability of a POSITA. In addition, as Petitioner notes, the '518 patent omits the details that Patent Owner would require of Petitioner's combination.

Accordingly, Petitioner has demonstrated preponderant evidence that a POSITA would have been able to implement Mirfakhraei's functionality in Afshary's ASIC. Patent Owner's arguments are unavailing.

*(2)    Point-to-Point Versus Multi-Point*

Patent Owner argues that Mirfakhraei's point-to-point bit loading scheme is incompatible with Afshary's multi-point communication network. PO Resp. 40–44. Patent Owner asserts Mirfakhraei is designed for a point-to-point communication network without variance of endpoints whereas Afshary uses splitters within a home network to reach multiple client endpoints which receive identical data. *Id.* at 41 (citing Ex. 1007 ¶¶ 6–7, 18, Fig. 1; Ex. 2001 ¶ 101; Ex. 2002, 78:6–16; Ex. 1002 ¶¶ 80–81).

Patent Owner argues that Mirfakhraei's bit loading on its point-to-point connection would not operate effectively when providing the same bit loading profile to multiple endpoints. *Id.* at 41–42 (citing Ex. 1007 ¶¶ 22–23, 31–32, 34; Ex. 2001 ¶¶ 103–105; Ex. 2002, 78:6–16). Patent Owner asserts that Petitioner could not explain how Mirfakhraei's handshake process would work in the combination. *Id.* at 42–43 (citing Ex. 1007 ¶¶ 20–23; Ex. 2001 ¶¶ 106–107; Ex. 2002, 57:18–60:11, 61:19–62:2).

IPR2024-00431
Patent 7,295,518 B1

Patent Owner further argues that, in Petitioner's combination, the transmitting node would not be able to differentiate reported characteristics for signal paths from the receiving nodes, and thus would have to calculate SNR for the entire house, which would result in sub-optimal bit loading on the signal paths between nodes and lead to less efficient data transfer than what Afshary already provides. *Id.* at 43–44 (citing Ex. 2001 ¶¶ 108–110).

Petitioner replies that each of the features Patent Owner alleges to be required in Petitioner's combination are not found in the '518 patent's claims and that the '518 patent is silent on implementation details. Pet. Reply 22 (citing Ex. 1036 ¶¶ 43–46, 56; *Muniauction*, 532 F.3d at 1327 n.3). Petitioner further contends that Patent Owner provides no evidence that such changes or additions would be required, nor does Patent Owner argue or provide any evidence that such changes were not within the capabilities of a POSITA or that a POSITA would not have a reasonable expectation of success in incorporating Mirfakhraei's techniques into Afshary's ASICs. *Id.* at 22–23 (citing Ex. 2001 ¶¶ 88–100; Ex. 1036 ¶¶ 45, 55–56).

We agree with Petitioner that the '518 patent does not describe how its LAN devices distinguish signal paths when reporting SNR and deciding bit loading for a particular path on a network. We find this lack of description to be evidence that the '518 patent's drafter thought that a POSITA would have understood how message addressing is performed on a multi-point network to provide appropriate bit loading on signal paths based on SNR. We find it inappropriate to hold Petitioner's combination to a higher standard of specificity than the '518 patent provides.

Furthermore, Petitioner's expert, Mr. Bertonis, correctly states that such addressing is a fundamental principle of how devices communicate

IPR2024-00431
Patent 7,295,518 B1

over a LAN of which a POSITA would be aware. Ex. 1036 ¶ 48. He further states that Afshary mentions "designated" adapters, implying Afshary employs addressing techniques. *Id.* ¶¶ 49–51 (citing Ex. 1006 ¶ 42). Patent Owner has not explained sufficiently what would have been difficult about using Mirfakhraei's multi-carrier bit loading in Afshary's LAN adapters, particularly when Afshary's LAN adapters and devices already use addressing and TDMA which would support communication of SNR and bit loading profiles between devices.

Accordingly, Petitioner presents preponderant evidence that Mirfakhraei's multi-carrier bit loading would be compatible with Afshary's multi-point network. Patent Owner's arguments are unavailing.

### *(3)    Different Frequencies*

Patent Owner further argues that Afshary operates on frequencies that are not used by Mirfakhraei. PO Resp. 44–48; PO Sur-reply 5. Specifically, Patent Owner contends that the operational range of Afshary is between 1000 to 2000 MHz to avoid interference with cable TV services below 950 MHz. PO Resp. 44–45 (citing Ex. 1006 ¶¶ 7, 12, 24–28, Fig. 3; Ex. 2001 ¶¶ 111–113, 115). Patent Owner states that Mirfakhraei's ADSL transceiver (i.e., modem) communicates over conventional telephone lines on the very frequencies that Afshary's adapters specifically avoid. *Id.* at 45–46 (citing Ex. 1006 ¶¶ 24–25; Ex. 1007 ¶¶ 2–3, 5, 15; Ex. 2001 ¶¶ 113–114). Patent Owner asserts that Mirfakhraei's ADSL system is adapted for long range transmission and functions over low frequency bands to avoid loss in signal characteristics over long distances. *Id.* at 46 (citing Ex. 2001 ¶¶ 113–114; Ex. 2002, 54:17–55:1). Patent Owner further argues that Afshary's in-home network includes an ADSL cable modem 30 operating below 950

41
**Appx41**

IPR2024-00431
Patent 7,295,518 B1

MHz whereas the LAN adapters operate at 1000–2000 MHz. *Id.* at 46–48 (citing Ex. 1006 ¶¶ 18, 25, Fig. 1; Ex. 2001 ¶¶ 116–117).

Petitioner responds that Patent Owner's "distinct frequency bands" argument is meritless. Pet. Reply 23–25. Specifically, Petitioner contends that a POSITA would have understood that Mirfakhraei's multi-carrier signals would be transmitted over Afshary's operating frequency range using Afshary's up-conversion and down-conversion techniques. *Id.* at 23–24 (citing Pet. 31–32, 54–56; Ex. 1006, code (57), ¶¶ 2, 7, 12, 24–25, 35–39, 41, Figs. 1, 3–4; Ex. 1007 ¶¶ 4, 18–19; Ex. 1036 ¶¶ 57–61).

We agree with Petitioner that any difference in the operating frequency ranges of Mirfakhraei and Afshary are not a barrier to their combination. Pet. 31–32, 54–56. Mirfakhraei's multi-carrier bit loading is not fundamentally different whether implemented in the lower frequency band that ADSL or cable TV services occupy (to the extent Mirfakhraei is limited to these ranges), or a higher frequency band used for home networks. Hence, we view Patent Owner's argument as one of bodily incorporation of Mirfakhraei's teachings into Afshary, which is an improper approach to obviousness. Pet. Reply 24; *Allied Erecting and Dismantling Co., Inc. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016).

In addition, we agree with Petitioner that Mirfakhraei's multi-carrier signals would be transmitted over Afshary's operating frequency range using its up-conversion and down-conversion techniques to translate signals to different frequencies. Pet. 31–32, 54–56; Pet. Reply 23–25.

Thus, Petitioner shows preponderant evidence that any differences in operating frequencies between Mirfakhraei and Afshary would not render them incompatible. Patent Owner's argument is unavailing.

IPR2024-00431
Patent 7,295,518 B1

### *(4)    Expert Experience*

Patent Owner argues that Petitioner's expert, Mr. Bertonis, has experience in *wireless* broadband technology relating to DOCSIS for communication over wireless paths. PO Resp. 48 (citing Ex. 2002, 11:17–13:4, 15:11–17, 17:16–18, 22:6–8, 22:18–23:3; Ex. 1002, Appx. A at 5). Patent Owner states that Mr. Bertonis admits that in these types of wireless schemes, modulation is not controlled by the device but by cable operators. *Id.* (citing Ex. 2002, 36:21–37:5). Patent Owner contends that, because of his alleged lack of knowledge in the coaxial field, Mr. Bertonis misses fundamental issues for his proposed combinations and analysis of the prior art. *Id.* at 49. Patent Owner argues that during Mr. Bertonis's deposition, it allegedly became clear that his interpretation of the prior art was based on a "cursory review at best," that he had no professional knowledge of multi-carrier modulation schemes, and that he spent years on a "hobby-type mission triggered by his friend's startup" learning about the technology that a POSITA would not have had. *Id.* at 50 (citing Ex. 2002, 42:11–18, 44:7–10; Ex. 2001 ¶ 54). Patent Owner further alleges that Mr. Bertonis has made significant sums of money by working with Petitioner, calling into question the helpfulness of his testimony. *Id.* at 50–51.

Patent Owner argues that, conversely, Patent Owner's expert, Mr. Garrett, has years of experience with coaxial cable and is "the sole expert with the requisite experience to opine about what an actual POSITA would and would not have found obvious, and is better positioned to provide helpful testimony." *Id.* at 49 (citing Ex. 2001 ¶¶ 8–13). Patent Owner asserts that Mr. Garrett is the "more relevant declarant" who states that "a

IPR2024-00431
Patent 7,295,518 B1

POSITA would not have made the proposed combination." *Id.* at 50 (citing Ex. 2001 ¶ 54).

Petitioner contends that Mr. Bertonis is well qualified to testify from the perspective of a POSITA. Pet. Reply 25–26. Petitioner states that "Mr. Bertonis's industry experience with coaxial cable and with multicarrier modulation is extensive." *Id.* at 25 (citing Ex. 1036 ¶¶ 62–63). Petitioner contends he began working with coaxial cable in 1976 and his work includes cable modulators, cable boxes, and headend equipment. *Id.* (citing Ex. 1002, Appx. A at 3; Ex. 2002, 81:9–85:8; Ex. 1036 ¶ 62). Petitioner further asserts that Mr. Bertonis began to study the DOCSIS cable standard in 1999 and followed it "fairly heavily" because it was important for his product he developed, similar to a cable system, to be compliant with the standard. *Id.* at 25–26.

Petitioner further disputes that Mr. Bertonis's opinions are biased due to past dealings with Petitioner. *Id.* at 26. Petitioner acknowledges that Mr. Bertonis's company sold product to Petitioner, but it was also sold to other major cable operators and occurred twenty-one years ago such that "it defies belief" that it would influence his testimony. *Id.* (citing Ex. 2002, 26:17–30; Ex. 1036 ¶ 64).

Petitioner asserts that Patent Owner's expert, Mr. Garrett, did not have "any industry experience with coaxial cable until almost 2008, almost 6 years *after* the relevant time period." *Id.* (citing Ex. 2001 ¶¶ 8–11, Appx. A, p. 81). Petitioner asserts that Mr. Garrett admitted he did not qualify as a POSITA in the relevant 2002 timeframe under his own standard, contrary to his declaration. *Id.* (citing Ex. 1032, 12:6–13:9; Ex. 2001 ¶ 40). Petitioner further states that Mr. Garrett left the communications industry for the

44

IPR2024-00431
Patent 7,295,518 B1

financial services industry over five years ago in 2019, contrary to the CV appended to his declaration. *Id.* (citing Ex. 1032, 13:10–14:15). Petitioner argues that "if either expert suffers from a lack of pertinent experience, it is Mr. Garrett." *Id.*

We determine that Mr. Bertonis and Mr. Garrett had at least the skill level of a POSITA at the time they submitted their declarations and testimony in this case. Ex. 1002 ¶¶ 4–15, Appx. A; Ex. 2001 ¶¶ 8–12, Appx. A; *cf Osseo Imaging, LLC v. Planmeca USA Inc.*, 116 F.4th 1335 1341 (Fed. Cir. 2024) ("An expert need not have acquired that skill level prior to the time of the invention to be able to testify from the vantage point of a person of ordinary skill in the art."). Accordingly, we see no reason to disregard the testimony of either on the basis that they do not have a POSITA's skill level.

### c)    Impermissible Hindsight

Patent Owner argues that the '518 patent is the only reference in this proceeding that discloses bit loading on a coaxial network, and that there is no evidence this would have been obvious. PO Resp. 51 (citing Ex. 2001 ¶¶ 118–119; *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1351 (Fed. Cir. 2001)). Patent Owner asserts that the Petition is "fraught with hindsight bias" and while the '518 patent "does not propose any new processing of signals, it is the only reference that recognized the issues of ISI in coaxial networks and addressed specific impairments that previously restricted high bandwidth communication between devices over ***on-premises coaxial cabling*** over coaxial splitters." *Id.* at 52 (citing *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1368 (Fed. Cir. 2013)). Patent Owner asserts that "in cases like this, it is incredibly

IPR2024-00431
Patent 7,295,518 B1

important to focus on what a POSITA would have been *motivated* to do, not simply what a POSITA would have been *able* to do." *Id.* (citing *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1068–69 (Fed. Cir. 2018)). Patent Owner asserts that Petitioner over-relies on "unsupported and conclusory expert opinions [which] is a clear sign of hindsight bias." *Id.* (citing *In Touch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014)).

Patent Owner argues that Petitioner relies on two alleged shortcomings of Afshary's coaxial cables: (1) variable frequency response of the cable medium; and (2) the addition of Mirfakhraei;s DMT adds reliability and robustness to communications with Afshary's system. *Id.* at 53 (citing Pet. 41–42). Patent Owner asserts that Afshary already solves each alleged shortcoming, and these are not impairments and do not support a motivation to improve Afshary and Mirfakhraei. *Id.*

### *(1) Variable Frequency Response*

Patent Owner argues that Afshary addresses the alleged impairment of "variable frequency response" by implementing filters to address reflection issues and thus would not need Mirfakhraei's multi-carrier bit loading to solve that problem. PO Resp. 54–56 (citing Pet. 41; Ex. 1006 ¶ 42; Ex. 1007 ¶ 3; Ex. 1002 ¶¶ 49–55, 128–138; Ex. 2001 ¶¶ 121–122). Patent Owner further contends that these filters are low-cost and thus consistent with Afshary's goal of a low-cost solution. *Id.* at 55–56 (citing Ex. 2001 ¶¶ 121–122).

Petitioner asserts that Patent Owner contradicts itself by arguing that Afshary does not suffer channel impairments but on the other hand uses various mechanisms (such as filters and error correct codes) to address

IPR2024-00431
Patent 7,295,518 B1

channel impairments. Pet. Reply 14 (citing PO Resp. 55, 58, 61–62). Petitioner states that Afshary's network suffers from the same channel impairments as does the '518 patent's network. *Id.* (citing Ex. 1036 ¶ 46).

Petitioner further argues that the use of certain techniques in Afshary to improve reliability does not remove the motivation to also use Mirfakhraei's bit-loaded multi-carrier modulation to further improve the transmission robustness and efficiency. *Id.* (citing *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380–81 (Fed. Cir. 2023) ("That [the two references] address the same problem and that [the second reference discloses] a known way to address that problem is precisely the reason that there's a motivation to combine under *KSR* and our precedent")).

Petitioner observes that communication systems typically employ multiple mechanisms to achieve an optimal result. *Id.* at 14–15 (citing Ex. 1036 ¶¶ 32–33). Petitioner further asserts that a POSITA would recognize that replacing Afshary's single-carrier modulation with Mirfakhraei's bit-loaded multi-carrier modulation is simply applying a known techniques to a known problem yielding an expected benefit, i.e., increased system efficiency and robustness. *Id.* at 15 (citing Ex. 1007 ¶¶ 2, 4, 14; Ex. 1036 ¶¶ 34–35). Petitioner further asserts that Asfary's filters at best only address reflections from LPF 18, not reflections from other sources. *Id.* (citing Ex. 1006 ¶ 42; Ex. 1036 ¶ 34).

Patent Owner replies that Petitioner's conclusory assertion that a multi-carrier system ***can*** be more efficient than a single-carrier system does not refute its expert's testimony that it ***would*** add complexity and costs to Afshary's network. PO Sur-reply 2–3. Patent Owner further argues that Petitioner conflates impairments between Afshary's network and its medium

47

IPR2024-00431
Patent 7,295,518 B1

while avoiding Afshary's disclosure that coaxial cables are "a very clear, clean medium" and a POSITA would not turn to Mirfakhraei's network that uses telephone lines to improve Afshary. *Id.* at 3.  Patent Owner argues that Afshary's network uses filters to address channel impairments. *Id.*  Patent Owner reiterates that a POSITA would not have been motivated to insert Mirfakhraei's bit-loaded multi-carrier modulation because Afshary already provides a reliable and robust system. *Id.*

We disagree with Patent Owner's arguments.  In our view, a POSITA would understand that adding Mirfakhraei's multi-carrier modulation with bit loading to Afshary's network would enhance its robustness by providing noise immunity and greater bandwidth through added channels, and efficient use of those channels through bit loading.

That Mirfakhraei discloses using multi-carrier modulation with bit loading on telephone lines does not detract from a POSITA's understanding that the technique would improve Afshary's coaxial cable network by addressing impairments such as variable frequency response and signal attenuation using Mirfakhraei's technique.  Ex. 1036 ¶¶ 26, 33.  That these benefits come at some cost and complexity does not diminish that, at least in some cases, a POSITA would have deemed them desirable such as for robustness and reliability.  *Id.* ¶¶ 36–39.

Petitioner demonstrates by preponderant evidence that a POSITA would have seen the value of using Mirfakhraei's multi-carrier modulation with bit loading in Afshary's coaxial network.

### (2)    *Robust and Reliable System*

In addition, Patent Owner argues that Afshary already achieved a robust and reliable communication system and did not need Mirfakhraei's

IPR2024-00431
Patent 7,295,518 B1

multi-carrier modulation scheme to improve Afshary's network.  PO Resp.
59–60 (citing Pet. 25, 41, 43, Ex. 1004 ¶ 72; Ex. 1006 ¶ 37; Ex. 1007 ¶ 3;
Ex. 1013, 26:4–20[6]; Ex. 1002 ¶¶ 49–55, 141–144; Ex. 2001 ¶¶ 125–133);
PO Sur-reply 3, 6–8.  Specifically, Patent Owner contends that Afshary
already has an efficient bit-loading scheme to improve available bandwidth
and thus would not need Mirfakhraei's multi-carrier bit loading.  PO Resp.
59–60.

Petitioner contends that the use of certain techniques in Afshary to
improve reliability does not remove the motivation to use Mirfakhraei's bit-
loaded multi-carrier modulation to further improve transmission robustness
and efficiency.  Pet. Reply 14 (citing *Intel*, 61 F.4th at 1380–81).

We agree with Petitioner that a POSITA would understand that adding
Mirfakhraei's bit-loaded multi-carrier modulation to Afshary's network
would enhance its robustness and reliability through noise immunity and
increased bandwidth used efficiently through bit-loading.  *See, e.g.*, Pet. 42;
Ex. 1036 ¶¶ 29–35.  A POSITA would have seen this improvement as
desirable at least in scenarios where the cost and complexity concerns that
Patent Owner mentions were outweighed by the desire for robustness and
reliability of network communications.

Accordingly, Petitioner presents preponderant evidence that a
POSITA would have been motivated not by hindsight but by a desire for
robustness and reliability of communications to make the combination of
Afshary and Mirfakhraei.

---

[6] Citation not found.

IPR2024-00431
Patent 7,295,518 B1

### *(3)    Harsh Environment*

Patent Owner asserts that Petitioner contends Afshary operates in a "harsh" environment as a reason to improve Afshary with Mirfakhraei but Afshary describes its coaxial medium as very clean.  PO Resp. 54 (citing Ex. 1006 ¶ 24; Ex. 2001 ¶¶ 121–124).  Patent Owner further asserts that "harshness" is "an umbrella term for issues that could affect *all* communication mediums and is far too generic to support the Petition's combination."  *Id.* (citing Ex. 2002, 113:9–120:21).

Patent Owner further asserts that Afshary's coaxial network is a clean medium and not a "harsh" one as Petitioner alleges.  *Id.* at 60–64 (citing Pet. 42; Ex. 1006 ¶¶ 5–6; Ex. 2001 ¶¶ 126–127).  Patent Owner contends that Afshary differentiates between coaxial cabling and telephone lines, and favors the former as a cleaner medium such that Petitioner relied on hindsight to arrive at the proposed combination.  *Id.* at 60–61 (citing Ex. 1006 ¶¶ 5–24, 27; Ex. 2001 ¶¶ 126–127).  Patent Owner argues that Petitioner disregards Afshary's disclosure in asserting coaxial cable is a "harsh" environment.  *Id.* at 61–62 (citing Pet. 41–42; Ex. 1006 ¶¶ 6, 24; Ex. 1002 ¶¶ 54, 127; Ex. 2001 ¶ 128; Ex. 1018).  Patent Owner further asserts that a POSITA would not look to improve transmission quality using an ADSL transceiver that operates over telephone lines like Mirfakhraei.  *Id.* at 62 (citing Ex. 2001 ¶ 128).

Petitioner alleges that Afshary's description of the coaxial cables as "a very clear, clean medium" refers to the cables, but not Afshary's network.  Pet. Reply 11 (citing Ex. 1006 ¶ 24).  Petitioner argues that a POSITA would have understood that Afshary's network includes components with imperfect connections and cabling that would introduce channel

IPR2024-00431
Patent 7,295,518 B1

impairments such as frequency-dependent attenuation and noise. *Id.* (citing Ex. 1010, 374–375, Fig. 1; Ex. 1018, 305; Ex. 1036 ¶ 25). Petitioner asserts that Mirfakhraei addresses frequency-dependent attenuation and other impairments. *Id.* at 11–12 (citing Ex. 1007 ¶¶ 2, 6; Ex. 1010, 375; Ex. 1018, 306; Ex. 1036 ¶¶ 26–27). Petitioner further contends that the motivation to combine Afshary and Mirfakhraei need not necessarily be what motivated the '518 patent's inventors. *Id.* at 12–13 (citing *Honeywell Int'l Inc. v. 3G Licensing, S.A.*, 124 F.4th 1345, 1353–54 (Fed. Cir. 2025)).

Patent Owner asserts that Petitioner did not address its arguments regarding why a POSITA would turn to a reference that uses telephone lines when Afshary "highlights issues with this medium," or why a POSITA would turn to Mirfakhraei when Afshary already addresses channel impairments. PO Sur-reply 5–6. Patent Owner further contends that Petitioner conflates Afshary's coaxial medium, which is clean, and the network, which suffers channel impairments addressed by its filters. *Id.* at 6 (citing Ex. 1006 ¶¶ 24, 42; Ex. 2001 ¶ 122).

We agree with Patent Owner that Afshary teaches that coaxial cables are a "very clear, clean medium" and that its comment concerning "harsh environment" pertains to AC power lines, not coaxial cable. Ex. 1006 ¶¶ 5 (Table 1), 24. Hence, Petitioner's assertion of motivation to combine by reason of coaxial cable presenting a "harsh environment" is not persuasive.

### (4)   *Power-Efficient Modulation*

Patent Owner asserts that Petitioner attempts to argue that Mirfakhraei's "DMT bit loading scheme" would improve Afshary by allowing more use of the bandwidths to transmit more bits onto frequency channels that experience less noise and/or interference. PO Resp. 64 (citing

IPR2024-00431
Patent 7,295,518 B1

Pet. 43; Ex. 1002 ¶¶ 141–144).  Patent Owner argues that Afshary's modulation scheme "already transmits data on channels with less noise and interference, and does so using optimal power for its architecture."  *Id.* at 64–65 (citing Ex. 2001 ¶¶ 124, 130; Ex. 1002 ¶¶ 141–146).

Specifically, Patent Owner alleges that Afshary uses signal carrier signaling as a robust, cost-effective method to provide high bandwidth in a "clean" medium, like coaxial cables, using FSK, BPSK, and QPSK to ensure efficient communication through the system.  *Id.* at 65 (citing Ex. 1006 ¶¶ 36–37; Ex. 2001 ¶ 131).  According to Patent Owner, Petitioner ignores Afshary's modulation schemes and their efficiencies in power consumption and data transmission.  *Id.*  Patent Owner argues that the combination of Afhsary and Mirfakhraei would not provide improved power efficiency by using more available bandwidth for communicating because the bit loading schemes are not tied to the specific SNRs profile of the channel to each specific endpoint in the proposed combination, either resulting in too many or too few bits for the given SNR profile leading to inefficiencies or data loss.  *Id.* at 65–67 (citing Ex. 2001 ¶¶ 132–133).

Petitioner contends that Mirfakhraei discusses bandwidth and power optimization, and that Mirfakhraei would have commended itself to an inventor's attention in considering the problem addressed by the '518 patent. Pet. Reply 9–10 (citing Ex. 1036 ¶¶ 23–24).  Petitioner argues that Afshary employs addressing techniques that would enable channel characterization on the specific communication paths between network devices, such that power optimization could be carried out on a channel-by-channel basis.  *Id.* at 10–20 (citing Ex. 1006 ¶ 41; Ex. 1036 ¶¶ 47–51; Ex. 2001 ¶ 123).

IPR2024-00431
Patent 7,295,518 B1

We agree with Petitioner's contentions that a POSITA would have understood that Mirfakhraei's multi-carrier bit loading techniques would be applied to Afshary such that power would be optimized on each of multiple channel frequencies rather than a single bit loading profile that is assigned to all network devices for communication, as Patent Owner argues. Ex. 1036 ¶¶ 47–51; Ex. 2001 ¶¶ 123–124, 130, 132–133. Petitioner correctly contends that this would be accomplished through the capability of Afshary's LAN adapters to address each other on the local cable network, as the term "designated . . . adapter" in Afshary implies. Ex. 1006 ¶ 41; Ex. 1036 ¶¶ 47–51. Alternatively, or in addition, Afshary's LAN adapters would communicate with scheduled time slots via TDMA. Ex. 1006 ¶ 34. Hence, we do not agree that Petitioner's combination would be inefficient in terms of its bit loading or power usage.

> d)    *Conclusion for Motivation to Combine with Reasonable Expectation of Success*

On this record, Petitioner has shown that a POSITA would have been motivated to combine Afshary and Mirfakhraei with a reasonable expectation of success. We determine that this motivation would not frustrate the '518 patent's goals; that the two references are not incompatible by reason of required ASIC redesign, or that Mirfakhraei discloses a point-to-point network while Afshary is multi-point, or that the two use different frequency bands. We determine that both Mr. Bertonis and Mr. Garrett qualify as POSITAs. We determine that Petitioner did not use impermissible hindsight with respect to the motivations to combine regarding variable frequency response, robustness and reliability, and

IPR2024-00431
Patent 7,295,518 B1

power-efficient modulation, but did use impermissible hindsight with respect to the "harsh environment" motivation as contrary to Afshary's teaching.

Accordingly, overall, we determine that Petitioner has presented preponderant evidence of motivations to combine Afshary and Mirfakhraei with a reasonable expectation of success for the reasons explained.

### 5. *Claim 1*

We now address Petitioner's contentions that claim 1 is disclosed by the combination of Afshary and Mirfakhraei. Pet. 28–51. Patent Owner does not dispute Petitioner's contentions. We conclude for claim 1 that Petitioner has shown preponderant evidence that claim 1 would have been obvious over Afshary and Mirfakhraei for the reasons that follow.

### a) *Preamble 1pre: Data Communication Network*

Petitioner contends that Afshary discloses a coaxial cable local area network (LAN) ("data communication network"). Pet. 28–29 (citing Ex. 1006 ¶¶ 2, 7, 12, 14, 19–23, 41, Figs. 1–2; Ex. 1002 ¶¶ 118–120).

We determine that Petitioner has shown preponderant evidence that Afshary discloses the preamble 1pre so we do not decide whether the preamble is limiting.

### b) *Limitation 1A: At Least Two Network Devices*

Limitations 1A recites "at least two network devices, each network device comprising a multi-carrier modulator for modulating data, an up converter for translating the modulated data to an RF carrier frequency, a down converter for translating an RF signal, and a multi-carrier demodulator for demodulating the translated RF signal to produce data."

IPR2024-00431
Patent 7,295,518 B1

Petitioner contends that Afshary discloses each feature of limitation 1A other than a modulator and demodulator that are multi-carrier, but asserts that such devices are disclosed by Mirfakhraei.  Pet. 29.

Petitioner contends that Afshary discloses cable LAN adapters 32 ("at least two network devices") within its coaxial LAN.  *Id.* at 30 (citing *id.* at § VI.A.1.a; Ex. 1006 ¶¶ 18–19, 21–23, 41, Figs. 1–2; Ex. 1002 ¶ 121).

Petitioner contends that Afshary discloses a modulator 96 and RF & Mixed Signal section 100, digital to analog converter (DAC) 108, up converter 112, local oscillator (LO) frequency synthesizer timing circuit 120, mixer 122, and power amplifier (PA) 116 (collectively, "up converter for translating the modulated data to an RF carrier frequency").  *Id.* at 31–32 (citing Ex. 1006 ¶¶ 38–39; Ex. 1002 ¶¶ 123–124).

Petitioner contends that Afshary discloses that these components operate to translate the modulated data from the Baseband section 90 to a 1300 MHz center frequency ("RF carrier frequency") and that the modulated data occupies a bandwidth of 5 MHz.  *Id.* at 31–32 (citing Ex. 1006 ¶¶ 25, 38–39; Ex. 1002 ¶¶ 123–124).  Petitioner asserts that the up-converted modulated data is transmitted as an RF signal to another cable LAN adapter 32 to facilitate communication between client devices.  *Id.* (citing Ex. 1006 ¶¶ 23, 26, 39, 41, Fig. 3; Ex. 1002 ¶¶ 123–124).

Petitioner further contends that, for receiving RF modulated data, the RF & Mixed Signal section 100 includes low noise amplifier (LNA) 118, LO 120, mixer 122, down converter 114, and analog to digital converter (ADC) 110 (collectively, "down converter for translating an RF signal").  *Id.* at 33 (citing Ex. 1006 ¶¶ 38–39, 41; Ex. 1002 ¶¶ 125–126).  Petitioner asserts that "Afshary teaches that these components operate to translate a

IPR2024-00431
Patent 7,295,518 B1

received RF signal to a lower frequency signal." *Id.* (citing Ex. 1006 ¶¶ 38–39, 41; Ex. 1002 ¶¶ 125–126). According to Petitioner, "Afshary teaches that the down-converted signal from the RF & Mixed Signal section 100 is demodulated by demodulator 98." *Id.* (citing Ex. 1006 ¶¶ 41–42; Ex. 1002 ¶¶ 125–126). Petitioner states that the "demodulated data from demodulator 98 is decoded and corrected by FEC decoder 94 to recover digital data that is provided to MAC & Client Interface section 80." *Id.* (citing Ex. 1006 ¶¶ 41–42; Ex. 1002 ¶¶ 125–126).

Petitioner asserts that "Figure 1 of Mirfakhraei . . . shows a transmitter 110 and a receiver 190 of a transceiver 100 that communicates using Mirfakhraei's DMT and a bit-loading scheme." *Id.* at 35 (citing Ex. 1007 ¶¶ 5–8, 14–15; Ex. 1002 ¶ 130). According to Petitioner, Mirfakhraei teaches that the transmitter 110 includes framer 113, tone ordering block 114, constellation mapper 115, Inverse Discrete Fourier Transform (IDFT) block 116, buffer 117, and TX handshake block 120 (collectively, "multi-carrier modulator for modulating data"). *Id.* at 35–36 (citing Ex. 1007 ¶¶ 15–19; Ex. 1002 ¶ 130).

Petitioner contends that "Mirfakhraei teaches that the receiver 190 includes time domain equalizer (TEQ) 180, buffer 197, Discrete Fourier Transform (DFT) block 196, frequency domain equalizer 195, slicer 194, deframer 193, and RX handshake block 170 (collectively, "multi-carrier demodulator for demodulating the translated RF signal to produce data")." *Id.* at 38–39 (citing Ex. 1007 ¶¶ 21–24; Ex. 1002 ¶ 135).

We determine that Petitioner has shown preponderant evidence that limitation 1A is disclosed by the combination of Afshary and Mirfakhraei.

IPR2024-00431
Patent 7,295,518 B1

### c) Limitation 1B: Cable Wiring

Limitation 1B recites "cable wiring comprising a splitter with a common port and a plurality of tap ports, and a plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices."

Petitioner contends that Afshary discloses cable LAN adapters 32 ("network devices") within the coaxial cable LAN. Pet. 45 (citing Ex. 1006 ¶¶ 18–19, 21–23, Figs. 1–2; Ex. 1002 ¶¶ 148–149). According to Petitioner, "Afshary explains that drop cable 10 is provided to splitter 22 within home 12." *Id.* (citing Ex. 1006 ¶¶ 16, 18–19; Ex. 1002 ¶¶ 148–149). Petitioner asserts that "Afshary teaches that 'drop cable 10 is split by splitter 22 into different cable wires 24, [with] each cable wire 24 being routed to different rooms in home 12.'" *Id.* at 45–46 (citing Ex. 1006 ¶ 18; Ex. 1002 ¶¶ 148–149) (alteration in original).

Referring to Afshary's Figure 1, Petitioner contends that the splitter 22 ("splitter") includes an input port ("common port") and multiple output ports ("plurality of tap ports"). *Id.* at 46 (citing Ex. 1006 ¶¶ 16, 18–19; Ex. 1001, 1:53–57, Fig. 1; Ex. 1002 ¶¶ 148–149). According to Petitioner, from the output ports, multiple cable wires 24 ("cable wiring" and "plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices") are connected to the cable LAN adapters 32. *Id.* at 46–47 (citing Ex. 1006 ¶¶ 16, 18–19; Ex. 1001, 1:53–57, Fig. 1; Ex. 1002 ¶¶ 148–150).

We determine that Petitioner has shown by preponderant evidence that limitation 1B is disclosed by Afshary.

IPR2024-00431
Patent 7,295,518 B1

> d) *Limitation 1C: Multi-Carrier Signaling*

Limitation 1C recites "whereby network devices communicate with each other through the cable wiring using multi-carrier signaling."

Petitioner contends that Afshary discloses cable LAN adapters 32 ("network devices") that communicate with each other via cable wire 24 ("cable wiring"). Pet. 47 (citing Ex. 1006 ¶¶ 16, 18–19, 21–23, Figs. 1–2; Ex. 1002 ¶ 151). Petitioner asserts that the cable LAN adapters 32 in the Afshary-Mirfakhraei system communicate with each other using the DMT bit-loading protocol taught by Mirfakhraei. *Id.* at 47–48 (citing Ex. 1007, code (54), ¶¶ 2–3, 5–8, 14–15, Fig. 1; Ex. 1002 ¶ 151). Petitioner alleges that "Mirfakhraei explains that DMT is a multi-carrier communication technique (claimed 'communicat[ing] … using multi-carrier signaling')." *Id.* at 48 (citing Ex. 1007, code (54), ¶¶ 2–3, 5–6, Fig. 1; Ex. 1002 ¶¶ 151–152) (alterations in original).

We determine that Petitioner has shown by preponderant evidence that limitation 1C is disclosed by the combination of Afshary and Mirfakhraei.

> e) *Limitation 1D: Probe Messages*

Limitation 1D recites "wherein network devices transmit probe messages through the cable wiring and analyze received probe message signals to determine channel characteristics and bit loading is selected based on the determined channel characteristics."

Petitioner asserts that "the Afshary-Mirfakhraei system implements the DMT bit loading scheme taught by Mirfakhraei." Pet. 48 (citing Ex. 1007, code (54), ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶ 153). Petitioner states that, "[t]o facilitate the DMT bit loading scheme, the cable

IPR2024-00431
Patent 7,295,518 B1

LAN adapters (claimed "network devices") of the Afshary-Mirfakhraei system include the TX handshake block 120 . . . and the RX handshake block 170 . . . to implement the 'bit-loading' process that characterizes the capabilities of sub-channels and determines the number of bits-per-symbol transmitted over the channel' as taught by Mirfakhraei." *Id.* (citing Ex. 1007, code (57), 14, ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶ 153).

According to Petitioner, Mirfakhraei discloses that TX handshake block 120 of a first transceiver generates and transmits handshake signals to a second transceiver ("transmit probe messages through the cable wiring"), with each handshake signal comprising a known signal (*e.g.*, a known signal pattern or a known pseudo-random signal).  Pet. 49–50 (citing Ex. 1007 ¶¶ 20–23; Ex. 1002 ¶ 154).  Petitioner asserts that "Mirfakhraei further teaches that RX handshake block 170 of the second transceiver estimates the SNR (claimed "channel characteristics") for each sub-channel based on received handshake signals (claimed "analyze received probe message signals").  *Id.* at 50 (citing Ex. 1007 ¶¶ 21–23; Ex. 1002 ¶ 154).

Regarding Mirfakhraei's bit-loading, Petitioner contends that Mirfakhraei discloses that "the size of a constellation map for a subchannel, and hence the number of bits represented by each transmitted signal, is based on the SNR of the subchannel." *Id.* (citing Ex. 1007 ¶¶ 4–8, 14, 17–18, Figs. 1–2; Ex. 1002 ¶¶ 29–55, 155).

According to Petitioner, Mirfakhraei discloses that "the RX handshake block 170 facilitates implementation of the bit loading process by comparing the received handshake signal to the known signal values that were transmitted." *Id.* (citing Ex. 1007 ¶¶ 5–8, 14, 20, 22–23, 25–32, Figs. 1–2; Ex. 1002 ¶ 155).  Petitioner asserts that, "[b]ased on the

IPR2024-00431
Patent 7,295,518 B1

comparison, SNR values for each sub-channel are determined." *Id.* (citing
Ex. 1007 ¶¶ 5–8, 14, 20, 22–23, 25–32, Figs. 1–2; Ex. 1002 ¶ 155).
Petitioner argues that the "appropriate bit-loadings for each sub-channel are
then determined based on the SNR values determined for each sub-channel
(claimed "bit loading is selected based on the determined channel
characteristics")." *Id.* at 50–51 (citing Ex. 1007 ¶¶ 5–8, 14, 17, 20, 22–23,
25–32, Figs. 1–2; Ex. 1002 ¶ 155).

Petitioner further contends that "[s]ub-channels having higher SNRs
are assigned higher order modulation constellations." *Id.* at 51 (citing
Ex. 1007 ¶¶ 5–8, 14, 17, 20, 22–23, 25–32, Figs. 1–2; Ex. 1002 ¶ 155).
According to Petitioner, "[s]ub-channels having lower SNRs are assigned
lower order modulation constellations." *Id.* Petitioner states that "[f]or
example, a sub-channel with a higher SNR modulates data using a larger
QAM constellation such as 256-QAM, which enables each transmitted
QAM symbol to represent 8 bits, while a sub-channel with a lower SNR
modulates data using a smaller QAM constellation such as 16-QAM, which
enables each transmitted QAM symbol to represent 4 bits." *Id.* (citing
Ex. 1007 ¶¶ 4, 17–18, 23–24; Ex. 1002 ¶¶ 29–55, 155). Petitioner contends
that the "RX handshake block 170 of the second transceiver sends the
determined bit-loadings for each sub-channel to the first transceiver, which
then employs the bit-loadings in subsequent communications with the
second transceiver." *Id.* (citing Ex. 1007 ¶¶ 5–8, 14, 20, 22–23, 25–32,
Figs. 1–2; Ex. 1002 ¶¶ 29–55, 153–156).

We determine that Petitioner has presented preponderant evidence that
limitation 1D is disclosed by the combination of Afshary and Mirfakhraei.

IPR2024-00431
Patent 7,295,518 B1

*f)      Conclusion for Claim 1*

We determine that Petitioner has shown preponderant evidence that a POSITA would have combined Afshary and Mirfakhraei with a reasonable expectation of success notwithstanding Patent Owner's arguments to the contrary.  Petitioner has further demonstrated that each limitation is disclosed by the combination of Afshary and Mirfakhraei.  Accordingly, Petitioner has shown that claim 1 of the '518 patent would have been obvious over the combination of Afshary and Mirfakhraei.

*6.      Claim 2*

Claim 2 depends from claim 1 and recites "wherein a network device comprises a means for determining signal activity and selects a frequency band for operation that is not used by other services."

Petitioner contends that Mirfakhraei's receiver includes DFT block 196 that receives data samples from ADC 160.  Pet. 52 (citing Ex. 1007, code (57), ¶¶ 15, 19, 24, Fig. 1; Ex. 1002 ¶¶ 157–158).  According to Petitioner, Mirfakhraei explains that "discrete Fourier transform (DFT) block 196 performs a discrete Fourier transform on the filtered time-domain samples … to determine frequency components associated with the sub-channels" (corresponding to the function of "determining signal activity" for the term "means for determining signal activity").  *Id.* (citing Ex. 1007 ¶ 24; Ex. 1002 ¶¶ 157–158; Ex. 1001, 8:4–8, 8:27–39, 11:14–18, Fig. 6) (alteration in original).

In the combination, Petitioner contends that Afshary's cable LAN adapter 32 would incorporate the portion of Mirfakhraei's receiving including DFT block 196 which performs a DFT, equivalent to an FFT, on samples from the ADC converter (corresponding to the structure of the

IPR2024-00431
Patent 7,295,518 B1

"means for determining signal activity"). *Id.* at 53–54 (citing Ex. 1006 ¶¶ 38–42, Fig. 4; Ex. 1007 ¶¶ 15, 21, 24, Fig. 1; Ex. 1001, 8:4–8, 8:27–39, 8:65–9:4; Ex. 1002 ¶¶ 157–160; Ex. 1019, 100–109; Ex. 1020, 554–561; Ex. 1021, 581–585).

Petitioner further contends that "in the Afshary-Mirfakhraei system, each cable LAN adapter selects a frequency band for operation so as to not interference with conventional cable TV service (claimed 'selects a frequency band for operation that is not used by other services')." *Id.* at 54–55 (citing Ex. 1006, code (57) ¶¶ 2, 7, 12, 24–25, 39, Figs. 1, 3; Ex. 1002 ¶ 161).

Although Patent Owner does not dispute Petitioner's contentions for claim 2, we nonetheless determine that Petitioner has not shown preponderant evidence that claim 2 would have been obvious. From the '518 patent's description, we determine frequency band selection to refer to a band in which the channels or sub-channels supporting communication would exist, not the selection of channels or sub-channels for bit loading within a frequency band. *See, e.g.*, Ex. 1001, 11:8–12:6. The Afshary-Mirkfakhraei combination does not disclose a network device with the capability to select between frequency bands (as opposed to channels or sub-channels within a frequency band).

Accordingly, we determine that Petitioner has not shown preponderant evidence that claim 2 would have been obvious.

### 7. Claim 3

Claim 3 depends from claim 1 and recites "wherein the network shares the cable wiring with a cable television service and the network

IPR2024-00431
Patent 7,295,518 B1

device up converter translates the modulated data to an RF carrier frequency above the frequency used by the cable television service."

Petitioner contends that Afshary discloses a coaxial cable LAN that shares the coaxial cable wire 24 with existing cable services, including a conventional cable TV service. Pet. 56 (citing *id.* § VI.A; Ex. 1006, code (57), ¶¶ 2, 7, 12, 24–25, 39, Figs. 1, 3; Ex. 1002 ¶ 163). Petitioner asserts that Afshary's RF & Mixed Signal section 100 translates modulated data of the coaxial cable LAN to an RF carrier frequency that ensures that the operating frequency range of the coaxial cable LAN is above and does not overlap the operating frequency range of the conventional cable TV service. *Id.* at 56–57 (citing Ex. 1006 ¶¶ 2, 17, 24–25, 37–39; Ex. 1002 ¶ 163.

Patent Owner argues that Mirfakhraei operates over the exact frequencies Afshary seeks to avoid. PO Resp. 67–68 (citing Ex. 1006 ¶¶ 24–25; Ex. 1007 ¶¶ 5, 15; Ex. 2001 ¶¶ 134–137). Patent Owner asserts that there is no basis to support that Mirfakhraei's modulation scheme would work at higher frequencies, and that Petitioner's expert testimony is unsupported by preponderant evidence. *Id.* at 68–69 (citing Ex. 1006 ¶¶ 26; Ex. 1007 ¶¶ 2–3; Ex. 2001 ¶¶ 56, 138–140, 163–164; *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 294 (Fed. Cir. 1985) (expert testimony based on a lack of factual support offers little probative value)).

Petitioner responds that Patent Owner "ignores that a POSITA would have the skill to modify Afshary's RF & Mixed Signal section 100 to up-convert a signal to virtually any carrier frequency and therefore frequency range." Pet. Reply 24–25 (citing Ex. 1036 ¶¶ 60–61).

IPR2024-00431
Patent 7,295,518 B1

We agree with Petitioner that, in the Afshary-Mirfakhraei combination, Afshary's LAN adapters up convert modulated data via their up converters to an RF carrier frequency that is above the frequency used by the cable television service. Pet. 56–57; Ex. 1006, code (57) ¶¶ 2, 7, 12, 17, 24–25, 37–39, Figs. 1, 3; Ex. 1002 ¶ 163. Mr. Bertonis's testimony is well supported by the evidence. Ex. 1036 ¶¶ 60–61.

We determine that Petitioner has shown preponderant evidence that claim 3 would have been obvious over the Afshary-Mirfakhraei combination.

### 8.    *Claim 4*

Claim 4 is similar to claim 1 and incorporates means-plus-function limitations discussed in § II.B. Reviewing Petitioner's contentions for claim 4 (Pet. 57–68), for which Patent Owner does not present any arguments specific to its limitations, we determine that Petitioner has shown preponderant evidence that claim 4 would have been obvious over the combination of Afshary and Mirfakhraei.

### a)    *Preamble 4pre: Network Device*

Preamble 4pre recites "A network device for communicating data to other network devices over a coaxial wiring system comprising a splitter and a plurality of cable segments connected between the splitter and the network devices, the network device comprising."

Petitioner contends that Afshary discloses a LAN over coaxial cable ("coaxial wiring system") that includes cable LAN adapters ("network device for communicating data to other network devices"). Pet. 57–58 (citing Ex. 1006, code (57), ¶¶ 2, 7, 12, 14, 18–23, Figs. 1–2; Ex. 1002 ¶¶ 165–166). Petitioner further asserts that Afshary's cable LAN includes

64

IPR2024-00431
Patent 7,295,518 B1

splitters and multiple cable wires connected between the splitters and LAN adapters ("plurality of cable segments connected between the splitter and the network devices"). *Id.*

We determine that Petitioner has shown preponderant evidence that Afshary discloses preamble 4pre and thus do not decide whether it is limiting.

### b)    *Limitation 4A: Data Modulator*

Limitation 4A recites "a data modulator to produce a multicarrier modulated signal."

Petitioner contends that "the cable LAN adapters of the Afshary-Mirfakhraei system would include the functionality of Mirfakhraei's multi-carrier modulator to implement the DMT bit loading scheme taught by Mirfakhraei." Pet. 59 (citing Ex. 1007, code (57), ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶ 167). Petitioner asserts that "Mirfakhraei teaches a transmitter 110 that includes framer 113, tone ordering block 114, constellation mapper 115, IDFT block 116, buffer 117, and TX handshake block 120 (collectively, claimed 'data modulator to produce a multicarrier modulated signal') that generate a multi-carrier modulated signal based on Mirfakhraei's DMT bit-loading scheme." *Id.* (citing Ex. 1007 ¶¶ 14–19, Fig. 1; Ex. 1002 ¶ 167). Petitioner further argues that "Mirfakhraei teaches that these components of transmitter 110 operate to generate 'a discrete multi-tone (DMT) communication signal' (claimed 'multicarrier modulated signal')." *Id.* at 59–60 (citing Ex. 1007, code (57), ¶¶ 1–3, 5–8, 14–25, Figs. 1–2; Ex. 1002 ¶¶ 167–168).

IPR2024-00431
Patent 7,295,518 B1

We determine that Petitioner has demonstrated by preponderant evidence that limitation 4A is disclosed by the Afshary-Mirfakhraei combination. *Id.* at 60 (citing Ex. 1002 ¶¶ 167–168).

> c)    *Limitation 4B: Demodulator*

Limitation 4B recites "a demodulator for multicarrier modulated signal to produce data."

Petitioner asserts that "the cable LAN adapters of the Afshary-Mirfakhraei system would include the functionality of Mirfakhraei's multi-carrier demodulator to implement the DMT bit loading scheme taught by Mirfakhraei." Pet. 60–61 (citing Ex. 1007, code (57), ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶ 169). According to Petitioner, "Mirfakhraei teaches that the receiver 190 includes RX handshake block 170, TEQ 180, buffer 197, DFT block 196, frequency domain equalizer 195, slicer 194, and deframer 193 (collectively, claimed 'demodulator for multicarrier modulated signal to produce data')." *Id.* at 61 (citing Ex. 1007 ¶¶ 21–24; Ex. 1002 ¶ 169). Petitioner further asserts that "Mirfakhraei explains that these components operate to recover a data bit stream (claimed 'produce[d] data[]') from different QAM symbols transmitted on each subcarrier of a multicarrier modulated signal." *Id.* at 61–62 (citing Ex. 1007 ¶ 24, Fig. 1; Ex. 1002 ¶¶ 169–170).

We determine that Petitioner has shown preponderant evidence that limitation 4B is disclosed by the Afshary-Mirfakhraei combination.

> d)    *Limitation 4C: Means for Producing and Transmitting*

Limitation 4c recites "means for producing and transmitting a probe message."

IPR2024-00431
Patent 7,295,518 B1

Petitioner asserts that "each cable LAN adapter 32 in the Afshary-Mirfakhraei system would use Mirfakhraei's handshake signals to facilitate implementation of the DMT bit loading scheme described by Mirfakhraei." Pet. 63 (citing Ex. 1007, code (57), ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶ 171). Petitioner asserts that Mirfakhraei's TX handshake block 120 generates a handshake signal that is a "known pseudo-random signal" or known signal pattern (corresponding to the function of "producing and transmitting a probe message" of the term "means for producing and transmitting a probe message"). *Id.* (citing Ex. 1007 ¶¶ 20–22; Ex. 1002 ¶ 171).

Petitioner contends that "Mirfakhraei teaches that TX handshake block 120 may be implemented in software by a host computer" and that "a POSITA would understand that a host computer implementing the TX handshake block 120 in software would entail executing software on a processor (corresponding to the structure of a 'processor' for the term 'means for producing and transmitting a probe message')." *Id.* at 64–65. Petitioner further contends that "the TX handshake block 120, when implemented by executing software on a processor, performs an algorithm that includes generating a signal known to a remote transceiver and transmitting the known signal to the remote transceiver (corresponding to the algorithm of '(a) generating a signal known to a receiving device; and (b) transmitting the known signal,' identified as the algorithm performed by the corresponding structure of a 'processor')." *Id.* at 64–65 (citing Ex. 1007, code (57), ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶¶ 171–173).

We determine that Petitioner has presented preponderant evidence that the Afshary-Mirfakhraei combination discloses limitation 4C.

IPR2024-00431
Patent 7,295,518 B1

>    *e)*    *Limitation 4D: Means for Receiving and Analyzing*

Limitation 4D recites "means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data."

Petitioner contends that "each cable LAN adapter 32 in the Afshary-Mirfakhraei system would implement the DMT bit loading scheme described by Mirfakhraei." Pet. 65 (citing Ex. 1007, code (57), ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶ 174). Petitioner asserts that "each cable LAN adapter 32 includes the RX handshake block 170 . . . [that] receives a handshake signal from a TX handshake block 120 from another cable LAN adapter 32." *Id.* (citing Ex. 1007, code (57), ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶¶ 22, 174). According to Petitioner, "Mirfakhraei teaches that the RX handshake block 170 compares the received handshake signal to the known values that were transmitted to estimate the SNR for each sub-channel, which are then used to determine the appropriate bit loadings for each sub-channel (corresponding to the function of 'receiving and analyzing a probe message to determine a bit loading profile used to transmit data' of the term 'means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data')." *Id.* at 66 (citing Ex. 1007 ¶¶ 25–32, Figs. 1–2; Ex. 1002 ¶ 174).

Petitioner asserts that "Mirfakhraei teaches that RX handshake block 170 may be implemented in software by a host computer" and a "POSITA would understand that a host computer implementing the RX handshake block 170 in software would entail executing software on a processor (corresponding to the structure of a 'processor' for the term 'means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data')." *Id.* at 67–68 (citing Ex. 1007 ¶ 15, Fig. 1; Ex. 1002

IPR2024-00431
Patent 7,295,518 B1

¶ 175).  Petitioner further contends that "the RX handshake block 170, when implemented by executing software on a processor, performs an algorithm that includes receiving a known signal from a remote transceiver, determining SNR levels for each subchannel based on the received known signal, and determining the bit-loading for each subchannel based on the determined SNR level for each subchannel (corresponding to the algorithm of '(a) receiving a known signal; (b) determining a SNR for each subchannel based on the received known signal; and (c) determining a bit loading for each subchannel based on the determined SNR for the subchannel,' identified as the algorithm performed by the corresponding structure of a 'processor')."  *Id.* at 68 (citing Ex. 1007, code (57), ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶¶ 174–175).

We determine that Petitioner has shown preponderant evidence that the Afshary-Mirfakhraei combination discloses limitation 4D.

### f)    *Conclusion for Claim 4*

Petitioner has shown preponderant evidence that a POSITA would have been motivated to combine Afshary and Mirfakhraei with a reasonable expectation of success.  Petitioner has further demonstrated that each limitation of claim 4 is disclosed by the combination.

Accordingly, Petitioner has shown by a preponderance of the evidence that claim 4 would have been obvious over the Afshary-Mirfakhraei combination.

### E.  *Ground B: Obviousness over Afshary, Mirfakhraei, and Welles*

Petitioner asserts that claim 2 is obvious over the combination of Afshary, Mirfakhraei, and Welles in ground B.  Pet. 68–73.  Patent Owner relies on its arguments for claim 1, from which claim 2 depends.

IPR2024-00431
Patent 7,295,518 B1

### 1. Welles (Ex. 1022)

Welles relates to a communication system for communication between utility meters in a local area network and a central database. Ex. 1022, code (57). Transmitters in utility meters transmit meter data over power lines to a receiver in another meter, and the receiver communicates those data measurements to a central database. *Id.* Meter 110 includes envelope detectors 192, 194 which are used to determine signal quality and whether the power line transceiver 150 should lock onto the signal. *Id.* at 6:18–50.

Welles discloses that noise and signals in the range from 10 to 100 KHz present difficulties for communication. *Id.* at 5:51–64. The patent uses frequency pairs in this range to communicate, and receiver 300 and CPU 900 may detect spurious data or noise in portions of the frequency range and select alternative operational frequencies within that range for transmission. *Id.*

### 2. Motivation to Combine

We have already addressed the motivation to combine Afshary and Mirfakhraei (§ II.D.4). Petitioner contends that a POSITA would have combined Welles' envelope detector to determine signal activity over a frequency range to determine whether it adversely affected by interference or noise. Pet. 70. Petitioner asserts that Welles's envelope detector is a simple diode and its inclusion in the Afshary-Mirfakhraei combination would provide a simple and straightforward way to determine whether a range of frequencies would be suitable for communication. *Id.* at 70–71 (citing Ex. 1022, 5:5–6:17, 7:2–11; Ex. 1002 ¶¶ 56, 179–180). Petitioner asserts that Welles's envelope detector would be useful in achieving

IPR2024-00431
Patent 7,295,518 B1

Afhsary's goal of ensuring that existing services provided over the same communication medium are not disturbed by local network communications. *Id.* at 70–73 (citing Ex. 1006, code (57), ¶¶ 2, 7, 21–28, Fig. 3; Ex. 1002 ¶¶ 56, 84, 95–102, 178–183; Ex. 1022, 1:15–17, 2:4–9, 5:5–16, 5:23–35, 7:1–11; Ex. 1002 ¶¶ 56, 95–102, 181–183).

### 3. *Claim 2*

Claims 2 depends from claim 1 and recites "wherein a network device comprises a means for determining signal activity and selects a frequency band for operation that is not used by other services."

Petitioner contends that "Welles teaches that its transceiver uses its envelope detector to determine if a range of frequencies is already in use so as to select a frequency range of operation not occupied by communication from other transceivers or systems." Pet. 72–73 (citing Ex. 1022, 5:5–7:11, Figs. 1–2, 4; Ex. 1002 ¶ 183).

While we agree with Petitioner that Welles's envelope detector detects signal activity, we do not agree that it, at least not alone, "selects a frequency band for operation that is not used by other services." Rather it appears that the receiver 300 (which includes envelope detectors 192, 194) and CPU 900 together perform that function.

Hence, we determine that Petitioner has not demonstrated preponderant evidence that Welles's envelope detector, standing alone, teaches or suggests claim 2.[7]

---

[7] Although Petitioner cites evidence in Welles that the receiver and CPU select a frequency band free of interference and noise for communication, we limit our Decision to the Petition contentions. *SAS Institute, Inc. v. Iancu*, 584 U.S. 357, 365 (2018).

IPR2024-00431
Patent 7,295,518 B1

## III.   CONCLUSION

In light of the foregoing, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 3, and 4, but not claim 2, are unpatentable as obvious over Afshary and Mirfakhraei (ground A).  We determine that claim 2 is not unpatentable as obvious over Afshary, Mirfakhraei, and Welles (ground B).

## IV.   ORDER

For the foregoing reasons, it is

ORDERED that pursuant to 35 U.S.C. § 318(a), claims 1, 3, and 4, but not claim 2, of the '518 patent have been shown to be unpatentable; and

FURTHER ORDERED that any party seeking judicial review must comply with the notice and service requirements of 37 C.F.R. § 90.2.[8]

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–4 | 102 | Afshary, Mirfakhraei | 1, 3–4 | 2 |

---

[8] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner's attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding.  *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2024-00431
Patent 7,295,518 B1

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 2 | 103(a) | Afshary, Mirfakhraei, Welles | | 2 |
| **Overall Outcome** | | | 1, 3–4 | 2 |

IPR2024-00431
Patent 7,295,518 B1

FOR PETITIONER:

Frederic M. Meeker
Paul T. Qualey
Christopher McKee
Wesley Jones
BANNER & WITCOFF, LTD.
fmeeker@bannerwitcoff.com
pqualey@bannerwitcoff.com
cmckee@bannerwitcoff.com
wjones@bannerwitcoff.com


FOR PATENT OWNER:

Jason A. Engel
Erik J. Halverson
Jared Lund
K&L GATES LLP
jason.engel.PTAB@klgates.com
erik.halverson@klgates.com
jared.lund@klgates.com

US007295518B1

(12) **United States Patent**
Monk et al.

(10) **Patent No.:**     **US 7,295,518 B1**
(45) **Date of Patent:**     **Nov. 13, 2007**

(54) **BROADBAND NETWORK FOR COAXIAL CABLE USING MULTI-CARRIER MODULATION**

(75) Inventors: **Anton Monk**, San Diego, CA (US); **Brett Bernath**, San Diego, CA (US); **Itzhak Gurantz**, San Diego, CA (US); **Ladd El Wardani**, La Jolla, CA (US); **Ron Porat**, La Jolla, CA (US)

(73) Assignee: **Entropic Communications Inc.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1108 days.

(21) Appl. No.: **10/322,834**

(22) Filed: **Dec. 18, 2002**

**Related U.S. Application Data**

(63) Continuation of application No. 10/230,687, filed on Aug. 29, 2002, now abandoned.

(60) Provisional application No. 60/385,361, filed on Jun. 3, 2002, provisional application No. 60/363,420, filed on Mar. 12, 2002, provisional application No. 60/316, 820, filed on Aug. 30, 2001.

(51) **Int. Cl.**
**H04L 12/26** (2006.01)
**H04N 7/173** (2006.01)
(52) **U.S. Cl.** .................... **370/235**; 370/208; 370/230.1; 725/127; 375/260

(58) **Field of Classification Search** ........ 370/204–208, 370/230, 230.1, 235–238; 725/126, 127, 725/133; 375/260, 261, 267, 320, 332, 471
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,886,181 B1 * 4/2005 Dodds et al. ................ 725/119

OTHER PUBLICATIONS

John A.C. Bingham, "Multiccarrier Modulation for Data Transmission; An idea whose time has come", IEEE Communication Magazine, vol. 28, No. 5, pp. 5-14, May 1990.*

* cited by examiner

*Primary Examiner*—Afsar Qureshi
(74) *Attorney, Agent, or Firm*—Michael W. Landry

(57) **ABSTRACT**

A broadband local area data network uses coaxial cable wiring for interconnection of terminal devices. Orthogonal frequency division multiplexing (OFDM) with bit loading is used to overcome channel impairments and provide a path for terminal devices to transmit to and receive from other terminal devices. Probe messages are sent between devices to characterize the communication channel and determine optimum bit loading. The data network shares the cable spectrum with other services and uses frequency bands not used by other services. Adaptive power control can be used to maintain signal to noise ratio in a communication between terminal devices. Frequency coordination can be used to avoid interference between the LAN communications and other services transmitted on the cable.

**4 Claims, 10 Drawing Sheets**



Appx75

Comcast, Ex. 1001



Fig. 1
Prior Art



Fig. 2

Appx77



Fig. 3



Fig. 4



Fig. 5



Fig. 6

Appx82

8



Fig. 7



Fig. 8



Fig. 9



Fig. 10

US 7,295,518 B1

# BROADBAND NETWORK FOR COAXIAL CABLE USING MULTI-CARRIER MODULATION

## RELATED APPLICATIONS

This application is a continuation application of U.S. patent application Ser. No. 10/230,687 filed Aug. 29, 2002 entitled "Broadband Network for Coaxial Cable Using Multi-carrier Modulation" now abandoned, which claims priority to U.S. provisional patent application No. 60/316,820, filed Aug. 30, 2001 entitled "Broadband Local Area Network Using Coaxial Cable"; U.S. provisional patent application No. 60/363,420 filed Mar. 12, 2002 entitled "Method of bit and energy loading to reduce interference effects in devices sharing a communication medium"; and U.S. provisional patent application No. 60/385,361, filed Jun. 3, 2002 entitled "Power loading to reduce interference effects in devices sharing a communication medium", each of which is incorporated herein by reference.

Related application: "Network interface and broadband local area network using coaxial cable" Ser. No. 09/910,412 filed Jul. 21, 2001, incorporated herein by reference.

## TECHNICAL FIELD

This invention relates to broadband communication networks and specifically to communications using coaxial cable building wiring.

## BACKGROUND

In a coaxial cable based local area network (LAN), communication between nodes occurs over a shared coaxial cable. When the coaxial cable used for the LAN is shared with a community aerial television or cable TV (CATV) service the signals must be separated to avoid interference. The LAN signal can use one band of frequencies and the cable TV service can use a different band. A typical cable TV configuration for a home is shown in FIG. 1. Signal splitters are used to distribute downstream signals from the point of entry (POE) to the various terminals in the home, which can include cable converter boxes, televisions, and cable modems, generally referred to as customer premise equipment (CPE). Each terminal device may have the ability to transmit as well as receive. The upstream signals transmitted by the terminal device flows through the signal splitters back to the POE and into the cable plant and are received by the head end. The signal splitters are functioning as signal combiners for upstream signals. Devices communicating with the head end generally do not communicate with each other.

Signal splitters are commonly used in home and other building type coaxial cable wiring. They have an input port and multiple output ports. The input port can also be considered a common port. The output ports can also be considered tap ports. Splitters are generally passive devices and can be constructed using lumped element circuits with discrete transformers, inductors, capacitors, and resistors. Splitters can also be constructed using strip line or micros-trip circuits. A typical two-way splitter splits the power equally between the two output ports if each port is terminated equally. Thus each output would have a power level 3 dB lower than the input. Ideally, a splitter transfers all power from the input port to the output ports. In a practical implementation there is a modest power loss in the splitter due to impedance mismatches, non-zero resistances, dissi-pative losses in circuit elements, and other non-ideal properties. These losses amount to approximately 0.5 dB, thus a practical two-way splitter provides −3.5 dB power level to each output.

Splitters are generally bi-directional; they can also function as signal combiners, which sum the power from multiple ports into a single output. The ports used as outputs in a splitter configuration become inputs ports for the combining configuration. The common port becomes the output port.

A splitter may have 3 or more tap ports. There is typically an N-way splitter at the point of entry of a building that distributes the incoming CATV signal to each room of the building. The N-way splitter also combines the signals from each room, providing a return path for devices such as cable modems to transmit back to the cable head-end.

Splitters can be designed with power dividing ratios that are not equal. Instead of a 3 dB loss to each port, one port can have, for example 1.15 dB loss, and the other 6 dB. This corresponds to 75%/25% coupling. This type of splitter could be used to balance signal power at all terminal devices when there are multiple levels of signal splitters. A branch that terminates directly to a terminal device would be connected to a higher loss tap port. A branch that contains additional splitters would be connected to a lower loss tap port, which provides extra power to compensate for the loss of additional splitters.

Another characteristic of interest in signal splitters is the isolation between output ports. The isolation is typically between 10 dB and 40 dB. This isolation attenuates signals communicating between tap ports. The signal splitter/combiner is therefore directional, power flows to and from the common port to the tap ports, but power is attenuated between tap ports.

In a conventional cable TV or cable modem use, this isolation is desirable because terminal devices do not communicate with each other, they only communicate through the POE with the cable head-end. In a LAN system, terminal devices must communicate directly with each other, therefore attenuation between tap ports in the signal splitters results in an undesirable signal loss. Presenting a further problem to terminal to terminal communications is the variation in attenuation in different branches of the building wiring. All terminal devices are not connected directly to the main splitter, but may be connected at a secondary splitter, for example in a room. The level of attenuation between different pairs of terminal devices needing to communicate may vary by 10 to 40 dB or more.

Several buildings may be connected to one splitter at the street. Although the isolation of this splitter is high, some coupling between taps occurs, allowing transmission from one building to another. This is a source of interference between LANs in neighboring buildings.

Another approach to overcoming the splitter inter-port isolation is to replace the main splitter at the building POE with a symmetric power splitter/combiner. In a symmetric splitter, power entering any port is divided among the other ports. A symmetric splitter/combiner is not directional. This type of splitter has 3 dB or more additional loss compared to a directional signal splitter. The additional loss is greater depending on the number of tap ports. A power amplifier may be required to boost the signal to compensate for this loss. A bi-directional device, such as a cable modem, requires a reverse path so the amplifier needs to be bi-directional. Another disadvantage to this approach is that installation is required; each coax connected to the existing N-way directional splitter must be disconnected and moved

**Appx86**

US 7,295,518 B1

3

to the new splitter. Another disadvantage of this approach is that power must be available for the amplifier, which is not generally present in the area a typical main splitter is located.

Imperfect terminations at connections create micro reflections within the cable wiring. The dominant main signal and reflected signal combine in the channel. A reflection anywhere in the wiring produces a multipath signal in some or all wiring branches that creates inter-symbol interference (ISI). The multipath signal has a delay and amplitude difference relative to the main signal. In the frequency domain, a reflection produces ripples in the response of the channel, creating amplitude variations across the pass band. In the time domain, ISI is seen as an impairment to the shape of the digital signal pulses. ISI will degrade the bit error rate (BER) performance of the communication channel. To overcome the effects of reflections, an adaptive equalizer is commonly used in the terminal device receiver. This creates a filter response that restores a flat frequency response impaired by the multipath signal.

The signals transmitted by LAN devices can create interference with televisions and set top boxes even though the LAN signals are out of band of these receivers, due to down conversion and signal mixing in the receivers.

Broadband networks are described in U.S. Pat. No. 5,889,765 "Bi-directional communications Network" issued to Gibbs, U.S. Pat. Nos. 5,940,387 and 6,005,861 "Home Multimedia Network Architecture" issued to Humpleman, U.S. Pat. No. 5,870,513 "Bi-directional Cable Network with a Mixing Tap or Suppressing Undesirable Noise in Signals From a Remote End of the Network" issued to Williams, U.S. Pat. No. 5,805,591 Subscriber Network Interface issued to Naboulsi, U.S. Pat. No. 6,008,368 "Ethernet Transport Facility Over Digital Subscriber Lines issued to Rubinstain", U.S. Pat. No. 6,137,793 "Reverse Path Multiplexer for Use in High Speed Data Transmissions" issued to Gorman, and U.S. Pat. No. 6,091,932 "Bidirectional Point to Multipoint Network Using Multicarrier Modulation" issued to Langlais, each of which is incorporated herein by reference.

Gibbs discloses a broadband network overlaid with the cable service frequencies using dynamically allocated TDMA protocols. Humpleman patents disclose a home network using an active network interface unit to couple the home network to the external network. Williams discloses a method of reducing noise accumulated in the frequency bands used by an upstream signal. Naboulsi discloses an active network interface for an asynchronous transfer mode (ATM) network. Rubinstain discloses a method of transporting Ethernet over twisted pair lines. Gorman discloses an active reverse path multiplexer for communication between the cable head-end and subscriber cable modems. Langlais discloses a two-way data transmission system for communicating between an upstream and downstream unit using OFDM.

U.S. Pat. No. 6,091,932 "Bidirectional point to multipoint network using multicarrier modulation", incorporated herein by reference, discloses various techniques for implementing OFDM communication. This reference discloses the use of OFDM for communicating between a terminal device and the cable head-end.

U.S. Pat. No. 6,292,651 "Communication system with multicarrier transport distribution network between a head end terminal and remote units" incorporated herein by reference discloses communication between a cable head end and remote units and discloses techniques using OFDM for such communication. U.S. Pat. No. 5,959,967 "Digital

4

transmission system", incorporated herein by reference, issued to Humphrey discloses an OFDM transmission system used to communicate over a twisted pair loop. U.S. Pat. No. 5,371,548 "System for transmission of digital data using orthogonal frequency division multiplexing", incorporated herein by reference, issued to Williams discloses an OFDM system for data transmission during the vertical blanking interval of a television signal. U.S. Pat. No. 5,488,632 "Transmission and reception in a hostile interference environment", incorporated herein by reference, issued to Mason discloses additional techniques for implementing an OFDM modulator and demodulator. U.S. Pat. No. 3,488,445 "Orthogonal Frequency Multiplex Data Transmission System", incorporated herein by reference, issued to Chang and U.S. Pat. No. 3,511,936 "Multiply Orthogonal System for Transmitting Data Signals Through Frequency Overlapping Channels", incorporated herein by reference, disclose OFDM data transmission techniques.

A reflected signal and an attenuated signal passing through a splitter port creates a multipath environment. The received power level of the direct signal relative to the reflected signals can vary between equal levels to one signal being substantially greater than the other. The multipath environment impairs the ability to achieve high data rates in a communication network. The signal reflections and tap port isolation of splitters existing in a typical cable TV wiring configuration presents a problem to shared usage of the cable for a LAN system. The prior art references address communicating between a cable head end and in-home units but do not address the impairments present in the home wiring that restricts high bandwidth communication between devices within the home.

SUMMARY OF THE INVENTION

The present invention uses a form of multi-carrier modulation, orthogonal frequency division multiplex (OFDM), to transmit digital data signals through the coaxial cable wiring installed in homes. Communication is achieved through splitters and signal impairments caused by reflections and attenuation are overcome. Bit loading, along with power loading, adaptive power control, and frequency coordination can be used individually or in combination to implement a network that overcomes the problem of multipath and high attenuation in building cable wiring that would restrict the ability of terminal devices to communicate with each other.

Channel probing messages formed using a predetermined bit sequence and length are transmitted between network devices to estimate the channel characteristics, including the multipath characteristics and a profile of the signal to noise ratio over the frequency band of interest. The probe messages are transmitted using robust modulation, for example QPSK, to insure the message can be received. The probe messages are transmitted without bit loading, that is all carriers have the same robust modulation and all carriers have the same power. The receiving device processes the probe messages as received and determines the impairment present at each carrier frequency. Based on the estimate of the channel, bit loading is applied to increase the modulation order at carriers with high signal to noise ratio and lower the modulation order at carriers with low signal to noise ratio.

Power loading of the individual carriers forming the OFDM signal allows the data network signal to minimize interference to the other services using the cable. Selective avoidance of specific carrier frequencies avoids interference from the other services to the network signal.

**Appx87**

13

US 7,295,518 B1

5

The data network established allows point-to-point communication between any two devices connected to the network and point-to-multipoint communication for broadcast or multicast of data messages. The data network overlays cable or satellite services and uses parts of the frequency spectrum not used by these other services.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a diagram showing a prior art coaxial signal distribution plan.

FIG. 2 is a diagram showing a signal distribution plan according to the present invention.

FIG. 3 shows a representative frequency allocation between network services and other services on a coaxial wiring system, including the use by two different networks.

FIG. 4 shows a representative frequency allocation between cable service upstream/downstream signals and an overlaid local area network.

FIG. 5 shows a block diagram of an OFDM modulator in accordance with the present invention.

FIG. 6 shows a block diagram of an OFDM demodulator in accordance with the present invention.

FIG. 7 shows an example of a bit loading probe message in accordance with the present invention.

FIG. 8 shows a multipath signal created by a splitter.

FIG. 9 shows a time domain and frequency domain plot of a signal experiencing multipath.

FIG. 10 shows a bit loaded OFDM waveform in accordance with the present invention overlaid on an impaired frequency response.

DETAILED DESCRIPTION OF THE
INVENTION

Referring to FIG. 2, LAN modem 270 provides modulation and demodulation of the waveform transmitted over the cable. LAN modem 270 has an interface to communicate with a LAN device 280, which is the source or destination of data transmitted over the LAN. LAN device 280 can be, for example, a personal computer (PC). LAN device 282 can be, for example, a modulator to produce a signal for driving a TV through a signal combiner. Network interface 210 is optional, it provides an additional signal coupling path between wiring branches if needed and is described more fully in co-pending application Ser. No. 09/910,412 "Network interface and broadband local area network using coaxial cable". Additional networks can be connected to taps in the cable plant. The networks can reside in the same or different building.

LAN devices 280 and 282 can be used for digital video services or data services. LAN device 282, for example, can extract digital video data from a transport stream, such as an MPEG stream, transmitted over the network and decode the transport stream to produce an analog video signal suitable for connection to a standard TV set.

Existing devices, such as TV 240 and cable modem 250 connected to PC 260, use frequency bands distinct from the frequency band used by the LAN and therefore operate in a normal manner.

The frequencies used by the LAN can be located above the standard cable use frequencies, which extend to 550 MHz, 750 MHz, or 850 MHz. Other frequency plans can be used, for example where a block of frequencies is available in the middle of the cable band. The filter cut-off frequencies are selected according to the frequencies bands used. Satellite systems generally use frequencies above 950 MHz to

6

communicate the received signal from the out door unit (ODU) to the integrated receiver decoder (IRD) set top box. A LAN would use frequencies below 950 MHz in this case.

Referring to FIG. 3, more than one network can occupy the frequency band used for network services. The amount of spectrum used by a particular network depends on the data bandwidth needed for the service provided. FIG. 4 shows the spectrum used by cable upstream and downstream signals with a network signal using the spectrum above the cable band.

The present invention can use a time division duplex (TDD) protocol for communications. In a TDD system, receive and transmit data are communicated during different time intervals, generally using the same frequency. The advantage of using TDD is that the transceiver design is simplified. Different users share a common frequency channel through the use of time division multiple access (TDMA). In a TDMA system each user transmits during a different time interval. Users are assigned one or more slots of predetermined length in a framing structure that contains multiple slots. All users are synchronized by a beacon message broadcast on the network. The beacon message provides a common time reference to the users and can include other network management information.

Some building wiring possesses reflections due to mismatched impedances and inter-port coupling in splitters to provide sufficient signal path between terminal devices for communication. Loss from one terminal device to another is in the range of approximately 25 dB to 50 dB. In a coaxial cable environment signal-to-noise ratio (SNR) is generally high. To be useful the SNR is preferably in the range of 8 to greater than 30 dB.

Individual terminal devices will receive different power levels that vary according to the signal loss experienced between the transmitting device and the receiving device. An automatic gain control (AGC) circuit in the receiver levels the power presented to the intermediate frequency (IF) or base band processing sections. The AGC measures received power, at an RF, IF, or base band signal point and controls an amplifier to produce a constant level at the measurement point, or some other predetermined processing point.

Adaptive Power Control

The signal loss between terminal devices may be unknown and variable. In the present invention, an adaptive transmit power level is used to control the power level received by a terminal device. This function can be implemented in each terminal device or as part of the network management function provided by a central controller. An AGC circuit in the receiver can correct the residual variations in the signal power level.

An originating terminal device transmits a channel probing message to a responding terminal device for the purpose of determining received power level. The responding device measures the power and communicates a reply message containing the received power level. This message exchange can be transmitted using a robust modulation such as BPSK or QPSK, where the main messaging could be transmitted using higher order modulation, for example multilevel QAM.

Alternatively, the power measurement messaging can be transmitted using FM, which in not sensitive to power levels. Soft clipping in the RF, IF, and base band circuits may occur. This levels the signal and produces some harmonic content that is removed by low-pass filters and allows demodulation and decoding of the message.

7

The originating terminal device transmits the channel probing message at a predetermined power level. Alternatively, the message can embed a data field that indicates the transmitted power of the message. Using either source of information, the responding terminal device can adapt its transmitted power during the response to provide a desired power level at the originating device. By evaluating the received power measurement data in the response message, the originating device has a direct evaluation of the signal loss due to the channel. The power level of subsequent transmissions by the originating device to a responding device is set according to the channel loss measurement. An acknowledgement message is sent from the originating device to the responding device to conclude the communication establishment sequence.

In one embodiment, the power measurement can be made by observing the AGC control level, which represents the received power level.

OFDM Waveform Modulator and Demodulator

Multi-tone modulation uses a set of modulating carriers that are integer multiples of a common frequency and the symbol period is the inverse of the common frequency. Multi-tone modulation is also called discrete multi-tone (DMT) and orthogonal frequency division multiplexing (OFDM). OFDM utilizes quadrature phase shift keying (QPSK) and multi-level quadrature amplitude modulation (QAM) wherein each OFDM carrier can be modulated by an amplitude/phase-varying signal. QPSK is composed a sine and a cosine wave of identical frequency with phase modulation applied to each carrier independently. QAM is composed of sine and cosine waves with phase modulation and amplitude modulation. QPSK is an m-ary QAM signal with m=2. These signals can be represented using complex numbers. To modulate, data bits are encoded into a number of m-ary QAM constellations, which then modulate the respective carriers. The carriers are summed together for transmission over the channel. Each carrier is independent and can be independently decoded in the receiver. All carriers are related in frequency, being an integer multiple of a base frequency.

Micro reflections tend to have a time displacement relative to the main signal ranging from several nanoseconds to a few microseconds. If the time displacement is longer than an information symbol period ISI is created when the reflected signal from a prior symbol arrives during a later symbol. In OFDM, the user data bits generated at a high rate are distributed over many carriers, each with a lower data rate and therefore longer symbol period. At a symbol period longer than the multipath delay, the main and reflected signals arrive at a receiver during the same symbol reducing the effects of ISI. For example, if a data rate of 100 mbps is modulated using QPSK, which provides 2 bits per symbol; the symbol period is 20 nS. Using OFDM with 100 carriers, the data rate of each carrier is 1 mbps. With QPSK modulation the symbol period for each carrier is 2 uS.

OFDM processes all carriers as a block using a time to frequency transform. Furthermore, a cyclic prefix is added to the beginning of each OFDM symbol and transmitted to simulate periodicity. The cyclic prefix is created by replicating data from the end of the block at the beginning of the block. The length of the cyclic prefix is a function of the multipath time displacement. By adding a cyclic prefix to the transmitted data the OFDM signal is robust in a multipath environment by providing a guard interval between sym-

8

bols. Hence, OFDM provides a mechanism to overcome the frequency selective channel impairments present in coaxial building wiring.

The OFDM waveform is generated by applying an inverse discrete Fourier transform (IDFT) to a complex vector that results in a real valued time domain sequence. The time domain sequence is applied to an up converter to place the waveform at the proper RF frequency.

Bit loading is a method of allocating a higher order signal constellation to carriers that have higher signal to noise ratio and a lower order constellation to carriers that have lower signal to noise ratio. Higher SNR channels can support higher data capacity. Frequency bins occupying parts of the channel where the SNR is high can be used to transmit more bits. Each carrier may be modulated with a different order constellation, where higher SNR frequencies can bear a higher order constellation, and the resulting closer spacing of the constellation points. Frequencies with the lower SNR use lower order constellations such as QPSK. U.S. Pat. No. 6,438,174 "Multi-carrier transmission systems" incorporated herein by reference, discloses discrete multi-tone modulation and a technique for bit loading applied to point-to-point twisted pair wiring. U.S. Pat. No. 6,259,746 "Method for allocating data and power in a discrete multi-tone communication system" discloses a technique for bit loading applied to discrete multi-tone modulation.

The frequency channels in OFDM may be called frequency bins or simply bins. The power in individual frequency bins can be adjusted to compensate for insertion loss that varies as a function of frequency. The power level in regions of the channel can be altered by scaling the complex valued vector for the bins where power adjustment is needed before applying the inverse Fourier transform. In order to avoid interference with certain bands in the RF spectrum, the power level of certain bins can be reduced to zero.

An OFDM receiver uses a discrete Fourier transform (DFT) to convert the modulated signal back into data. The OFDM receiver receives all the carriers at once and performs the transform on a block of data points.

Various types of forward error correction can be applied to transmitted data blocks, such as Reed-Solomon and convolutional coding. Interleaving can be applied to data blocks to increase the robustness of the error correction. De-interleaving and error correction coding are applied in the receiver to recover the transmitted data without errors.

An OFDM receiver may also employ time domain equalization (TEQ), frequency domain equalization (FEQ), or both. Equalizers can be adaptive and may be of the decision feedback (DFE) type or decision directed type such as least mean square (LMS) algorithm.

FIG. 5 shows a block diagram of a representative OFDM modulator according to the present invention. Data input is optionally coded with check bits by error correction coder 510 to facilitate error correction in the receiver. QAM encoder 520 divides the input data into many bit streams and applies a QAM symbol mapping to each bit stream. The bit streams correspond to the carriers. Symbol mapping maps a short sequence of bit, from 2 for QPSK to 8 for 256-QAM, into an I and Q amplitude value. The I and Q amplitude values output from QAM encoder 520 are modified by power adjustment table 530, which adjusts the amplitude levels to effect the power level of each carrier in the transmitted signal. The values in power adjustment table 530 are empirically derived or analytically derived and set to levels that avoid interference with other devices. Inverse Fast Fourier Transform (IFFT) 540 performs a frequency domain to time domain transformation that converts the

US 7,295,518 B1

complex series of frequency amplitude values into a time sequence. The IFFT output array is converted to a serial data stream by a parallel to serial converter **542** as part of IFFT **540**. The digital time sequence is converted to an analog representation by digital to analog (DAC) **550**. The analog signal is translated to a suitable carrier frequency by up converter **560**. The time sequence can be either real valued or complex valued samples. In the case of complex values, DAC **550** would be a dual DAC and up converter **560** would be a quadrature modulator. An amplifier provides the appropriate overall power for the signal to be inserted into the communications medium.

Power adjustment table **530** may also be used to influence the order of modulation generated by QAM encoder **520** for each of the carriers. Higher power level carriers can support higher order of modulation and lower power levels require lower order modulation. The selection of QAM modulation order is bit loading, the selection of carrier power is power loading. The power profile used to avoid interference can alter both the power in each carrier and the number of bits transmitted in each symbol of each carrier.

FIG. **6** is a block diagram of a representative demodulator for use with the present invention. The inverse of the modulator operations are performed to reproduce digital data. Not shown are operations of carrier and symbol timing recovery, which can be performed using techniques well known in the art.

Multi-carrier system architecture is covered in *ADSL/ VDSL Principles* by DR. Dennis J. Rauchmayer, Macmillan Technical Publishing, 1999 and *DSL Simulation Techniques and Standards Development for Digital Subscriber Line Systems* by Dr. Walter Y. Chen, Macmillan Technology Publishing, 1998, incorporated herein by reference.

Channel Probing Message

Channel probing messages are transmitted between network devices to estimate the channel characteristics. The channel probe uses a predetermined bit sequence which in known by the receiving device. By passing a known data sequence through the channel, the response of the channel can be determined, including multipath and SNR profile.

Probe packets are sent by devices upon command from a cycle master. This request for transmission of a probe message may be periodic or as part of scheduled activity. A probe packet is analyzed by the receiving node, a bit loading profile is computed, and the bit loading information is transmitted back to the sending node. The sending node then uses the requested bit loading until a new bit loading is requested by the receiving node.

In a symmetric channel the receiving device can determine bit loading for transmitted it own messages based on channel characteristics measured from a received probe message. The bit loading is valid for sending messages to the device that transmitted the probe message. In a non-symmetric channel, the receiving device must communicate the results of the analysis, either as raw data or as a bit loading profile, back to the sending device for the sending device to modify the transmission parameters.

FIG. **7** shows an example of a bit loading probe message **700**, comprised of a preamble **710**, channel estimation training sequence **720**, and a bit loading training sequence **730**. The preamble portion **710** of the message **700** is used to compute an estimate of the carrier frequency offset and sample timing offset. The preamble **710** is 2 OFDM symbols in length transmitted in time domain as 512 bits. The channel estimation training sequence **720** is 8 OFDM symbols transmitted in the frequency domain with 256 carriers using

QPSK modulation and is used to compute the transfer function of the channel. From the transfer function, equalizer coefficients are computed and loaded the taps of an equalizer. The remaining portion of the probe message is processed with the benefit of equalization on the signal.

The bit loading training sequence **730** is 80 symbols transmitted in the frequency domain using BPSK modulation and is used to compute the actual bit loading needed for data traffic. The bit loading training sequence provides for averaging over a large number of symbols. The SNR in each frequency bin is calculated and the bit loading profile is generated. Determination of a channel response, multipath, and SNR profile from a known signal is well known in the art. The data pattern chosen for the preamble and training sequences can be a pseudo-random data sequence of the specified length. A preferred pattern for the preamble uses a selected pattern for the first half of the preamble and a bit inversion of the selected pattern for the second half of the preamble. This pattern provides desirable auto-correlation properties.

Schmidl, et al. "Robust Frequency and Timing Synchronization for OFDM", IEEE Transactions on Communications, vol. 45, No. 12, pp. 1613-1621 (1997) and Minn, et al. "On Timing Offset Estimation for OFDM Systems", IEEE Communications Letters, Vol. 4, No. 7, pp. 242-244, incorporated herein by reference, describe techniques for forming and processing sequences to synchronize receivers to data transmissions over frequency-selective channels.

The signal processing and computations performed on signal samples needed for modulating, demodulating, channel estimation, and other operations can be performed by dedicated hardware resources or by a programmed signal processor. A typical system will utilize both hardware and software techniques to perform the needed signal processing. Signal processing circuitry can be integrated into a single system on a chip (SOC), partitioned into several chips, or programmed into a field programmable gate array (FPGA).

FIG. **8** shows a schematic representation of a splitter **810** with a signal burst **820** of power P entering splitter port A. The signal burst will couple to port B with attenuation of, for example, 20 dB producing signal P**1**. The signal burst will also couple to port C with a loss of 3.5 dB and pass up the wiring branch to a point that produces some reflection with a particular attenuation. The reflected signal will pass down the wiring branch to splitter port C and couple to port B with a power level of P**2**. The resulting signal **830** present at port B will be a signal burst of power P**1** followed by the echo of power P**2**. Depending on the level of the reflection and the isolation from port A to port B, the first signal burst arriving at port B can be higher or lower in power than the second signal burst arriving. The time displacement of the two arrivals is dependant upon the cable length of the wiring branch connected to port C.

FIG. **9** shows a time domain plot of two signal bursts, one arriving at time **0** and the other arriving at time t.sub.e. The corresponding frequency domain plot shows nulls in the spectrum with a separation of 1/t.sub.e. This diagram shows the effect of two time displaced signals arriving at a single point and the effect on the frequency response of the signal.

FIG. **10** shows a bit loaded OFDM waveform in accordance with the present invention overlaid on an impaired frequency response. The band used to transmit the OFDM signal is segmented into frequency bins of width f.sub.b. Each frequency bin is encoded with a QAM constellation of 4, 16, 64, or 256 points. The level of response through the channel at each frequency bin, which corresponds to the

Appx90

16

US 7,295,518 B1

**11**

SNR, determines the order of modulation used. The higher the channel response in a particular bin, the more information is encoded by using a higher density constellation. Frequencies bins located at deep nulls may have insufficient SNR to support a useful signal and are not used. No signal is transmitted in these bins.

Frequency Coordination

When a terminal device is powered up, it scans the available frequency band to determine if there is communication activity occurring and determine the frequencies that are already in use. This activity can be originating from a network in the same building as the terminal device, another building where the signal is leaking through the tap, or from cable or satellite services sharing the cable. The scan can be done using the same receiver signal path that is used for data communication. An FFT performed on an array of data samples taken from the A/D converter provide information about signal activity in the channel. The LO can be changed to sweep the scan over wider frequency band than a single FFT. The step size can be from less than 1 MHz to 10 MHz or more, and depends on the frequency spacing established for the network.

Alternatively to the FFT approach, detection of activity can be achieved by measuring the received signal power with an envelope detector, which can be done using digital samples or an AM detector using a diode and filter circuit. Another approach to envelope detection is monitoring an automatic gain control (AGC) level that represents the received signal strength.

Another approach to activity detection is to fully demodulate the received signal and decode the data stream. Using this technique, the terminal can recognize a network or device identifier contained in the data frames to decide if the activity is from a desired network or undesired network. If a desired network is detected, the terminal will attempt to gain access. If an undesired network is detected the frequency band used will be logged as unusable. The network or device ID can be transmitted in a base coding modulation, such as QPSK. This allows the scanning terminal to synchronize to and decode enough information to identify the activity without knowing the specific modulation used in the terminal specific and payload portions of the frame.

Once a clear area of the available frequency band is determined, the network controller node can begin transmitting network access information to allow other devices to gain access to the network within the home.

An alternative to frequency coordination between networks is to insert a blocking filter at the POE of the home. This prevents egress of signals from the home and ingress of signals from other homes. The filter is a low pass or band

**12**

pass filter that allows CATV signals to pass unaffected and blocks the frequencies used by the network. An additional benefit is to insure privacy of the network data. The communication activity scan would then detect any cable or satellite services and use other frequency bands for the network.

What is claimed is:

1. A data communication network comprising:

at least two network devices, each network device comprising a multi-carrier modulator for modulating data, an up converter for translating the modulated data to an RF carrier frequency, a down converter for translating an RF signal, and a multi-carrier demodulator for demodulating the translated RF signal to produce data; and

cable wiring comprising a splitter with a common port and a plurality of tap ports, and a plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices;

whereby network devices communicate with each other through the cable wiring using multi-carrier signaling;

wherein network devices transmit probe messages through the cable wiring and analyze received probe message signals to determine channel characteristics and bit loading is selected based on the determined channel characteristics.

2. The data communication network of claim **1** wherein a network device comprises a means for determining signal activity and selects a frequency band for operation that is not used by other services.

3. The data communication network of claim **1** wherein the network shares the cable wiring with a cable television service and the network device up converter translates the modulated data to an RF carrier frequency above the frequency used by the cable television service.

4. A network device for communicating data to other network devices over a coaxial wiring system comprising a splitter and a plurality of cable segments connected between the splitter and the network devices, the network device comprising:

a data modulator to produce a multicarrier modulated signal;

a demodulator for multicarrier modulated signal to produce data;

means for producing and transmitting a probe message; and

means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data.

\* \* \* \* \*

**Appx91**

17

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Federal Circuit Rule 32(b) because this brief contains 9,932 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft® Word in 14-point Times New Roman font.

Dated:  May 18, 2026     By:  */s/ Erik J. Halverson*
              Erik J. Halverson