**Volume I of II (Appx1 - Appx1181)**

**No. 2025-2146**

# United States Court of Appeals For the Federal Circuit

ENTROPIC COMMUNICATIONS, LLC,
*Appellant*

v.

JOHN A. SQUIRES, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,
*Intervenor*

Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. IPR2024-00431.

## JOINT APPENDIX

October 5, 2026

Jason A. Engel
Erik J. Halverson
Jared R. Lund
K&L GATES LLP
70 W. Madison St., Suite 3100
Chicago, IL 60602
(312) 781-7166
jason.engel@klgates.com
erik.halverson@klgates.com
jared.lund@klgates.com

*Counsel for Appellant*
*Entropic Communications, LLC*

*[additional counsel on inside cover]*

Austin P. Mayron
*Deputy Solicitor*

Robert J. McManus
*Senior IP Legal Counsel*

Kevin K. McNish
*Senior Counsel for Patent Law and Litigation*

Peter J. Sawert
Omar F. Amin
*Associate Solicitors*

OFFICE OF THE SOLICITOR
U.S. PATENT AND TRADEMARK OFFICE
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313
(571) 272-9035

*Attorneys for the Director of the U.S. Patent and Trademark Office*

## TABLE OF CONTENTS


| Paper/ Exhibit No. | Description | Appendix No. |
|---|---|---|
| **VOLUME I OF II** | | |
| **Decisions and Orders** | | |
| 32 | Final Written Decision - 35 U.S.C. §318(a) IPR2024-00431, 9/5/2025 | Appx1 |
| **Patents** | | |
| 1001 | U.S. Patent No. 7,295,518 B1 to Monk et al., 11/13/2007 | Appx75 |
| **Certified List** | | |
| Required document per Rule 30(a)(1)(a)(i) | Certified List of Materials from the USPTO for IPR2024-00431 | Appx92 |
| **Docket for IPR2024-00431** | | |
| 2 | Petition for *Inter Partes* Review of U.S. Patent No. 7,295,518, 2/15/2024 | Appx189 |
| 8 | Decision Granting Institution of *Inter Partes* Review, 9/6/2024 | Appx344 |
| 13 | Excerpts from Patent Owner's Response, 12/18/2024 | Appx406 |
| 18 | Excerpts from Petitioner's Reply to Patent Owner's Response, 3/12/2025 | Appx500 |
| 23 | Excerpts from Patent Owner's Sur-Reply, 4/25/2025 | Appx551 |
| 33 | Excerpts from Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit | Appx676 |

| Paper/ Exhibit No. | Description | Appendix No. |
|---|---|---|
| **Petitioner's Exhibits for IPR2024-00431** | | |
| 1002 | Excerpts from Expert Declaration of James Bertonis | Appx767 |
| 1005 | Excerpts from Certified Prosecution History of U.S. Appl. No. 10/230,687 | Appx1030 |
| 1006 | U.S. Patent Application Publication No. 2006/0218593 to Afshary et al. | Appx1071 |
| 1007 | European Patent Application Publication No. 1 087 586 A2 to Mirfakhraei | Appx1081 |
| 1008 | U.S. Patent Application Publication No. 2001/0031016 to Seagraves | Appx1093 |
| 1009 | Excerpts from Bingham, John A.C., "Multicarrier Modulation for Data Transmission: An Idea Whose Time Has Come," *IEEE Communication Magazine*, vol. 28, no. 5, May 1990 | Appx1108 |
| 1014 | Excerpts from R. Baines, "Line Code Debates," *Electronic Design*, vol. 45, no. 6, March 1997 | Appx1160 |
| 1015 | Excerpts from Esvelt, M., "A multicarrier modem architecture for VDSL," 1997 | Appx1164 |
| **VOLUME II OF II** | | |
| 1025 | Excerpts from Attachment 18 to Expert Declaration of Sylvia Hall-Ellis, Ph.D. | Appx1401 |
| 1029 | U.S. Patent No. 6,438,174 to Isaksson et al. | Appx2112 |

| Paper/ Exhibit No. | Description | Appendix No. |
|---|---|---|
| 1031 | Excerpts from Rauschmayer, Dennis, *ADSL/VDSL Principles, A Practical and Precise Study of Asymmetric Digital Subscriber Lines and Very High Speed Digital Subscriber Lines*, Macmillan Technical Publishing, 1999 | Appx2178 |
| 1033 | Excerpts from Tanenbaum, Andrew S., *Computer Networks,* 3rd ed., Prentice Hall PTR, 1996 | Appx2393 |
| 1034 | Excerpts from Brebner, Gordon, *Computers in Communication*, 1st ed., McGraw-Hill International (UK) Limited, 1997 | Appx2465 |
| 1036 | Excerpts from Reply Declaration of James G. Bertonis In Support of Petitioner's Reply | Appx2613 |
| **Patent Owner's Exhibits for IPR2024-00431** | | |
| 2001 | Excerpts from Declaration of Mr. Albert Garrett | Appx2760 |
| 2006 | Excerpts from Deposition Testimony of Mr. James Bertonis (April 11, 2025) | Appx3097 |
| **Additional Documents** | | |
| 35 | Decision Denying Petitioner's Request on Rehearing of the Final Written Decision (January 15, 2026) | Appx3227 |

Trials@uspto.gov
571.272.7822

Paper 32
Entered: September 5, 2025

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

COMCAST CABLE COMMUNICATIONS, LLC,
Petitioner,

v.

ENTROPIC COMMUNICATIONS, LLC,
Patent Owner.

---

IPR2024-00431
Patent 7,295,518 B1

---

Before JON M. JURGOVAN, SCOTT B. HOWARD, and
AARON W. MOORE, *Administrative Patent Judges*.

JURGOVAN, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining Some Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

I. INTRODUCTION ........................................................................ 4
A. Background and Summary ................................................................ 4
B. Real Parties in Interest ................................................................ 4
C. Related Matters ........................................................................ 5
D. The ’518 Patent ........................................................................ 6
E. Challenged Claims ...................................................................... 8
F. Evidence of Record ..................................................................... 10
G. The Asserted Challenges to Patentability ............................................... 11
II. ANALYSIS AND DISCUSSION ............................................................. 11
*A. Legal Standards for Obviousness* ....................................................... 11
*B. Claim Construction* .................................................................... 12
1. “means for determining signal activity” ................................................ 13
2. “means for producing and transmitting a probe message” ................................. 13
3. “means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data” ... 14
4. Claim Construction Conclusion .......................................................... 14
*C. Level of Ordinary Skill in the Art* .................................................... 15
*D. Ground A: Obviousness over Afshary and Mirfakhraei* .................................... 16
1. Afshary (Ex. 1006) ..................................................................... 17
2. Mirfakhraei (Ex. 1007) ................................................................. 19
3. Whether Mirfakhraei is Analogous Art ................................................... 20
a) Field of Endeavor ...................................................................... 21
b) Reasonable Pertinence .................................................................. 27
4. Motivation to Combine .................................................................. 31
5. Claim 1 ................................................................................ 54
6. Claim 2 ................................................................................ 61
7. Claim 3 ................................................................................ 62
8. Claim 4 ................................................................................ 64
*E. Ground B: Obviousness over Afshary, Mirfakhraei, and Welles* ........................... 69
1. Welles (Ex. 1022) ...................................................................... 70

2. Motivation to Combine ........................................................ 70
3. Claim 2 ........................................................................... 71
III. CONCLUSION ........................................................................ 72
IV. ORDER ................................................................................. 72

# I. INTRODUCTION

## *A. Background and Summary*

Comcast Cable Communications, LLC ("Petitioner") filed a Petition requesting inter partes review ("IPR") of claims 1–4 of U.S. Patent No. 7,295,518 B1 (Ex. 1001, "the '518 patent"). Paper 2 ("Petition" or "Pet."). Entropic Communications, LLC ("Patent Owner") filed a Preliminary Response to the Petition. Paper 6. We instituted *inter partes* review. Paper 8 ("Institution Decision" or "Inst. Dec.").

Patent Owner filed a Response (Paper 13, "PO Resp."), Petitioner filed a Reply (Paper 18, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 23, "PO Sur-reply"). An oral hearing was conducted, and the transcript is in the record, along with the demonstratives. Paper 31 (Transcript); Ex. 1039 (Petitioner's Demonstratives); Ex. 2007 (Patent Owner's Demonstratives).

We have jurisdiction under 35 U.S.C. § 6. This Final Written Decision is entered pursuant to 35 U.S.C. § 318(a). Having reviewed the complete trial record, we determine that Petitioner has shown, by a preponderance of the evidence, that the challenged claims 1, 3, and 4 are unpatentable but not claim 2.

## *B. Real Parties in Interest*

Petitioner identifies Comcast Corporation, Comcast Cable Communications, LLC, and Comcast Cable Communications Management, LLC as real parties-in-interest. Pet. v (Petitioner's Mandatory Notices).

Patent Owner identifies itself as the real party-in-interest. Paper 3, 1 (Patent Owner's Mandatory Notices).

### *C. Related Matters*

Petitioner and Patent Owner ("the parties") identify the following as matters related to this proceeding:

*Entropic Communications, LLC v. DirecTV, LLC,* Case No. 2-23-cv-05253 (C.D. Cal.);

*Entropic Communications, LLC v. DISH Network Corporation*, Case No. 2-23-cv-01043 (C.D. Cal.);

*Entropic Communications, LLC v. Cox Communications, Inc.*, Case No. 2-23-cv-01047 (C.D. Cal.); and

*Entropic Communications, LLC v. Comcast Corporation.*, Case No. 2-23-cv-01048 (C.D. Cal).

Pet. v–vi (Petitioner's Mandatory Notices); Paper 3, 1 (Patent Owner's Mandatory Notices).

Patent Owner identifies the following as patents and patent applications related to this proceeding: U.S. Patent No. 7,154,957; U.S. Patent No. 7,499,397; U.S. Patent No. 7,573,822; U.S. Patent No. 7,594,249; U.S. Patent No. 7,889,759; U.S. Patent No. 8,411,565; U.S. Patent No. 8,588,250; U.S. Patent No. 9,112,803; U.S. Patent No. 9,860,144; U.S. Patent Application No. 10/230,687; U.S. Patent Application No. 10/776,796; U.S. Patent Application No. 10/778,505; U.S. Patent Application No. 12/538,339; U.S. Patent Application No. 15/860,400; U.S. Provisional Application No. 60/288,967; U.S. Provisional Application No. 60/316,820; U.S. Provisional Application No. 60/363,420; U.S. Provisional Application No. 60/385,361; and U.S. Patent Application No. 90/019,247. Paper 3, 2–3.

Patent Owner also identifies several *inter partes* reviews against Patent Owner's patents: U.S. Patent No. 7,889,759 (IPR2024-00452);

U.S. Patent No. 8,223,775 (IPR2024-00446); U.S. Patent No. 10,135,682 (IPR2024-00445); U.S. Patent No. 10,135,682 (IPR2024-00444); U.S. Patent No. 9,825,826 (IPR2024-00442); U.S. Patent No. 8,284,690 (IPR2024-00430); U.S. Patent No. 8,792,008 (IPR2024-00441); U.S. Patent No. 11,399,206 (IPR2024-00440); U.S. Patent No. 11,399,206 (IPR2024-00439); U.S. Patent No. 11,399,206 (IPR2024-00438); U.S. Patent No. 11,381,866 (IPR2024-00437); U.S. Patent No. 11,381,866 (IPR2024-00436); U.S. Patent No. 11,381,866 (IPR2024-00435); U.S. Patent No. 9,210,362 (IPR2024-00434); U.S. Patent No. 9,210,362 (IPR2024-00433); and U.S. Patent No. 9,210,362 (IPR2024-00432). Paper 3, 3–4.

### *D. The ’518 Patent*

The ’518 patent is titled “Broadband Network for Coaxial Cable using Multi-Carrier Modulation.” Ex. 1001, code (54). The patent discloses a broadband local area network that uses coaxial cable wiring for interconnecting terminal devices. *Id.* at code (57). Orthogonal frequency division multiplexing (OFDM) with bit loading is used to overcome channel impairments to provide a path for terminal devices to transmit to and receive from other terminal devices. *Id.* Probe messages are used to characterize the channel between terminal devices to determine the optimum bit loading for the channel. *Id.*

Figure 2 of the ’518 patent is shown below.




Fig. 2

Figure 2 depicts “a signal distribution plan” of the ’518 patent. *Id.* at 5:12–13. LAN modem 270 modulates and demodulates a waveform transmitted over the cable, and has an interface to communicate with LAN device 280, which is the source or destination of data transmitted over the LAN. *Id.* at 5:36–40. LAN device 280 can be a personal computer (PC) and LAN device 282 can be a modulator to produce a signal for driving a TV through a signal combiner. *Id.* at 5:40–43.

LAN devices 280 and 282 can be used for digital video or data services. *Id.* at 5:51–52. LAN device 282 can extract digital video data from a transport stream and produce a signal for a standard TV set. *Id.* at 5:52–56. Existing devices, such as TV 240, cable modem 250, and PC 260, use frequency bands distinct from the frequency band used by the LAN and

operate in the normal manner. *Id.* at 5:57–60. The frequencies used by the LAN can be located above the standard cable frequencies. *Id.* at 5:61–63.

The ’518 patent describes multi-tone modulation as including discrete multi-tone (DMT) and OFDM. *Id.* at 7:20–27. The ’518 patent states that OFDM uses quadrature phase shift keying (QPSK) and multi-level quadrature amplitude modulation (QAM) in which each OFDM carrier is modulated using an amplitude/phase-varying signal. The modulated carriers are then summed together for transmission over the channel. *Id.* at 7:39–40.

The ’518 patent describes bit loading as a method of allocating higher order signal constellations to carriers that have higher signal to noise ratio, and lower order constellations to carriers that have lower signal to noise ratio. *Id.* at 8:9–26.

The ’518 patent further describes the use of probe messages transmitted between network devices to estimate channel characteristics. *Id.* at 9:35–41. The probe messages have a known bit sequence that can be used by the receiving device to a bit loading profile to send back to the transmitting device to use if the channel is asymmetric, or the receiving device may calculate a bit loading profile for its own use if the channel is symmetric. *Id.* at 9:42–58.

### *E. Challenged Claims*

Claims 1 and 4 are independent, and claims 2–3 depend from claim 1. Claim 1 is set forth below with Petitioner’s limitation identifiers indicated in brackets.

> **[1pre]** A data communication network comprising:
>
> **[1A]** at least two network devices, each network device comprising a multi-carrier modulator for modulating data, an up converter for translating the modulated data to an RF carrier

> frequency, a down converter for translating an RF signal, and a multi-carrier demodulator for demodulating the translated RF signal to produce data; and
>
> **[1B]** cable wiring comprising a splitter with a common port and a plurality of tap ports, and a plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices;
>
> **[1C]** whereby network devices communicate with each other through the cable wiring using multi-carrier signaling;
>
> **[1D]** wherein network devices transmit probe messages through the cable wiring and analyze received probe message signals to determine channel characteristics and bit loading is selected based on the determined channel characteristics.

Ex. 1001, 12:8–26.

Claim 4 is set forth below with Petitioner's identifiers:

> **[4pre]** A network device for communicating data to other network devices over a coaxial wiring system comprising a splitter and a plurality of cable segments connected between the splitter and the network devices, the network device comprising:
>
> **[4A]** a data modulator to produce a multicarrier modulated signal;
>
> **[4B]** a demodulator for multicarrier modulated signal to produce data;
>
> **[4C]** means for producing and transmitting a probe message; and
>
> **[4D]** means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data.

*Id.* at 12:36–48.

### *F. Evidence of Record*

Petitioner relies upon the following prior art references[1]:

| Name | Reference | Date | Exhibit No. |
|---|---|---|---|
| Afshary | US 2006/0218593 A1 | Filed Sept. 30, 1998; Published Sep. 28, 2006 | 1006 |
| Mirfakhraei | EP 1 087 586 A2 | Filed Sept. 22, 2000 ; Published Mar. 28, 2001 | 1007 |
| Welles | US 6,737,984 B1 | Filed Mar. 10, 2000; Issued May 18, 2004 | 1022 |

Petitioner also supports its challenges with declarations from Mr. James Bertonis. Ex. 1002; Ex. 1036. Patent Owner relies on a declaration from Mr. Albert Garrett. Ex. 2001. Deposition testimony of the declarants is in the record. Ex. 2002; Ex. 2006; Ex. 1032. Other evidence is present in the record as well.

[1] Petitioner states that all of the prior art references were filed, issued, or published before the ’518 patent’s earliest alleged priority date of August 30, 2001. Pet. 8, 11, 15. Petitioner contends that all of these references are prior art under 35 U.S.C. §§ 102(a) and (e) (pre-Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011)). *Id.* Patent Owner does not refute these assertions.

### *G. The Asserted Challenges to Patentability*

Petitioner asserts the following challenges to patentability:

| Ground | Challenged Claim(s) | 35 U.S.C. §[2] | Reference(s)/Basis |
|---|---|---|---|
| A | 1–4 | 103(a) | Afshary, Mirfakhaei |
| B | 2 | 103(a) | Afshary, Mirfakhaei, Welles |

Pet. 17.

## II. ANALYSIS AND DISCUSSION

In this section, we discuss Petitioner's challenges to claims 1–4 of the '518 patent and Patent Owner's arguments against Petitioner's contentions. For the reasons that follow, we determine that Petitioner has demonstrated that claims 1, 3, and 4 of the '518 patent are unpatentable as obvious, but not claim 2.

### *A. Legal Standards for Obviousness*

A patent claim is unpatentable as obvious under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the claimed subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the claimed invention pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of

[2] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011), amended 35 U.S.C. §§ 102 and 103, effective March 16, 2013. Because the application from which the '518 patent issued was effectively filed before this date, the pre-AIA versions of §§ 102 and 103 apply.

the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) where present, objective evidence of nonobviousness. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17–18 (1966).

### *B. Claim Construction*

We construe the challenged claims under the same standard used by a federal court in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100(b). This standard is articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) and its progeny, and includes "construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b).

Petitioner contends that three claim terms presumptively invoke means-plus-function under pre-AIA § 112 ¶ 6 through the use of the words "means for." Pet. 23. Petitioner asserts that all other claim terms should be given their ordinary and customary meaning under § 282(b). *Id.* at 24 (citing 37 C.F.R. § 42.100(b)).

Patent Owner does not dispute Petitioner's constructions because "the claims containing these terms are not part of any infringement allegation in any district court case." PO Resp. 70 (citing Ex. 2001 ¶ 57). Patent Owner asserts that "as no argument advanced by Patent Owner or Petitioner hinges on the construction of these terms, no construction is necessary." *Id.*

Because an assessment of whether the prior art discloses a means-plus-function limitation depends not only on the presence of the recited function but also the structure that performs that function as described in the

patent's specification, we address Petitioner's undisputed contentions for the means-plus-function limitations below.

### *1. "means for determining signal activity"*

Petitioner contends that the claimed function of "determining signal activity" does not require further construction. Pet. 24 (citing Ex. 1001, claim 2; Ex. 1002 ¶¶ 108–109). As to the corresponding structure, Petitioner asserts that the '518 patent describes different approaches for determining signal activity. *Id.* Petitioner states that one approach is to perform a Fast Fourier Transform (FFT) on data samples from an analog-to-digital converter (ADC) using the same receiver signal path that is used for data communication. *Id.* at 24–25 (citing Ex. 1001, 8:51–9:27, 11:7–23; Ex. 1002 ¶¶ 109–110).

Petitioner contends that another approach is to measure received signal power with an envelope detector. *Id.* at 25 (citing Ex. 1001, 11:23–29; Ex. 1002 ¶ 110). Petitioner asserts that the envelope detector is another corresponding structure for "determining signal activity." *Id.* (citing Ex. 1002 ¶ 110).

### *2. "means for producing and transmitting a probe message"*

Petitioner contends that the claimed function of "producing and transmitting a probe message" does not require further construction. Pet. 25 (citing Ex. 1001, claim 4; Ex. 1002 ¶¶ 111–112). As to the corresponding structure, Petitioner contends that a probe message is a signal "known by the receiving device" that is used "to estimate the channel characteristics" such as SNR.[3] *Id.* (citing Ex. 1001, 4:48–62, 7:22–42, 8:9–35, 9:36–10:20;

---

[3] Signal-to-noise ratio. Ex. 1001, 6:30.

Ex. 1002 ¶¶ 111–112). Petitioner contends that the corresponding structure for "producing and transmitting a probe message" is a processor. *Id.* at 26 (citing Ex. 1002 ¶¶ 111–112). Petitioner contends that "[t]o the extent the identified structure of a processor requires an algorithm for performing the recited function, the algorithm is: (a) generating a signal known to a receiving device; and (b) transmitting the known signal." *Id.* (citing Ex. 1001, code (57), 4:48–62, 9:35–10:38, Fig. 7; Ex. 1002 ¶¶ 111–112).

*3. "means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data"*

Petitioner asserts that the claimed function for this term, which is "receiving and analyzing a probe message to determine a bit loading profile used to transmit data," requires no further construction for purposes of this IPR. Pet. 27 (citing Ex. 1001, claim 4; Ex. 1002 ¶¶ 113–114). Petitioner further asserts that the corresponding structure for this function is a processor. *Id.* (citing Ex. 1001, 10:29–38; Ex. 1002 ¶¶ 113–114). Petitioner contends that, "[t]o the extent the identified structure of a processor requires an algorithm for performing the recited function, the algorithm is: (a) receiving a known signal; (b) determining a SNR for each subchannel based on the received known signal; and (c) determining a bit loading for each subchannel based on the determined SNR for the subchannel. *Id.* (citing Ex. 1001, code (57), 4:48–62, 8:9–26, 9:17–19, 9:35–10:38, 10:61–11:6, Fig. 7; Ex. 1002 ¶¶ 113–114).

*4. Claim Construction Conclusion*

Petitioner's constructions for the means-plus-function limitations are reasonable and Patent Owner does not dispute them. Accordingly, we agree with and will use those constructions in this Decision. For the remaining

claim terms, we apply the ordinary and customary meaning. 37 C.F.R. § 42.100(b).

### *C. Level of Ordinary Skill in the Art*

Petitioner contends as follows:

> In relation to the ’518 patent, a person of ordinary skill in the art (“POSITA”) would have had a bachelor’s degree in electrical engineering, computer engineering, or a similar discipline, and three to four years of experience working in signal processing and/or communication systems/networks. Additional education may substitute for experience, and significant work experience may substitute for formal education.

Pet. 23 (citing Ex. 1002 ¶¶ 103–105).

Patent Owner states the following:

> A POSITA would have at least a bachelor’s degree in electrical engineering, computer engineering, or an equivalent field with at least two years of experience with coaxial cables. . . . Experience with coaxial networking is central to the patent’s field of work. *Id*. The title, claims, abstract, background, and detailed description all refer to coaxial cable. . . . As referenced in the summary of the invention, the use of terms such as “coaxial cable wiring” in connection with “splitters” confirms that the summary of the invention section refers to a coaxial network. . . . Claim 1’s use of a “splitter with a common port and a plurality of tap ports” also confirms the coaxial network.

PO Resp. 10–11 (citing Ex. 1001, codes (54, 57), 1:27–29, 4:36–40, 5:14–16, Fig. 3, claim 1; Ex. 2001 ¶¶ 37–43).

Patent Owner’s proposal to limit a POSITA’s education and experience to “broadband networks over coaxial cables” is too narrow. Although Patent Owner points to various parts of the ’518 patent as supporting its restrictive proposal, other parts of the patent are not so limited. For example, the patent’s technical field and summary are not limited to coaxial cable, and the patent discusses twisted pair wiring and

satellite communications as media that can be used. *See, e.g.*, Ex. 1001, 1:27–29, 3:33–35, 3:49–50, 3:67–4:3, 5:61–6:3, 8:20–23, 9:28–33.

Accordingly, we adopt the following level of ordinary skill in the art for use in this Decision:

> A POSITA would have a bachelor's degree in electrical engineering, computer engineering, or a related field, and two to four years of experience with broadband communication networks. Additional professional experience could substitute for education, and additional education could substitute for professional experience.

We find that this skill level is consistent with the problems and solutions identified in the '518 patent and the prior art references asserted by Petitioner. In addition, we find the adopted skill level consistent with the education and experience that a POSITA would have had. *See In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) (citing *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986)) (citing factors to consider when determining level of ordinary skill in the art).

### *D. Ground A: Obviousness over Afshary and Mirfakhraei*

Petitioner contends that claims 1–4 would have been obvious over the combination of Afshary and Mirfakhraei. Pet. 28–68. Patent Owner disputes Petitioner's contentions. PO Resp. 11–70. We address below the disclosures of Afshary and Mirfakhraei, the parties' contentions on whether Mirfakhraei is analogous art, the motivation to combine, and the parties' contentions regarding obviousness of these claims. We determine that claims 1, 3, and 4 would have been obvious over the combination, but not claim 2.

*1. Afshary (Ex. 1006)*

Afshary is titled “Digital Coaxial Cable LAN.” Ex. 1006, code (54). Afshary relates to networking and data distribution through a coaxial cable that takes advantage of the operating frequency spectrum of the coaxial cable so as not to interfere with client data. *Id.* ¶ 2.

Afshary’s Figure 1 is shown below.



FIG. 1

Figure 1 shows an in-home coaxial cable LAN. *Id.* ¶ 8. Drop cable 10 enters home 12 after tapping main trunk 14 through splitter 15 within distribution box 16. *Id.* ¶ 14. Low pass filter (LPF) 18 is installed upstream of the in-home cable LAN network and downstream of low pass filter 20 supplied by a cable service company. *Id.* LPF 18 maintains security for the cable LAN by preventing signals generated within the cable LAN from getting back to the public cable network where they may also interfere operations of the cable service company. *Id.* ¶¶ 15–16.

Splitter 22 divides the signal on cable 10 into different cable wires 24 which are routed to different rooms in home 12 where they connect with devices such as television (TV) 28, set top box (STB) (or cable modem) 30, and personal computer (PC) 36. *Id.* ¶ 18. These client devices are connected to cable wires 24 with cable LAN adapters 32. *Id.* ¶ 19.

Afshary's Figure 3 is shown below.




FIG. 3

Figure 3 shows an operating frequency of the client data and adapter signal. *Id.* ¶ 10. The lower region from 0–950 MHz is where conventional cable TV, digital cable TV, and cable modem services are offered. *Id.* ¶ 25. The cable LAN signal is located within the higher range of 1000–2000 MHz at a center frequency of 1300 MHz, and thus does not interfere with conventional services. *Id.* ¶¶ 25, 28.

Afshary's Figure 4 is shown below.




FIG. 4

Figure 4 shows an architecture of a cable LAN adapter. *Id.* ¶ 11. Modulator 96 modulates data from a client device using a modulation scheme such as Quadrature Phase Shift Keying (QPSK) digital modulation. *Id.* ¶¶ 26, 35–41. Radio Frequency (RF) and Mixed Signal section 100 up-converts the modulated data to an RF frequency. *Id.* ¶¶ 38–39. RF data signals received by the cable LAN adapter are down-converted by RF and Mixed Signal section 100 and demodulated by demodulator 98 for transmission to a client device. *Id.* ¶¶ 38–42.

*2. Mirfakhraei (Ex. 1007)*

Mirfakhraei is titled "Bit loading Process for Multicarrier Communications." Ex. 1007, code (54). Mirfakhraei relates to modems and transceivers that use multiple carrier frequencies for information transmissions. *Id.* ¶ 1. Mirfakhraei's modems use discrete multi-tone (DMT) modulation and bit-loading to increase transmission rates. *Id.* ¶¶ 3, 5.

Mirfakhraei discloses that "[f]or data transmission, a sending modem breaks transmitted data into packets for simultaneous transmission on separate sub-channels and independently modulates communication signals

for the sub-channels according to the data carried on each sub-channel." *Id.* ¶ 3. For data reception, the "receiving modem separates sub-channel signals according to carrier frequency, demodulates the separate sub-channel signals, and reassembles the data." *Id.*

Mirfakhraei discloses a bit-loading process that determines noise for each sub-channel of the DMT signal. *Id.* ¶ 5. The process determines target loadings to provide a desired error rate at the measured noise. *Id.* The process rounds target loadings to integers; and determines whether the proposed loadings provide a desired error rate. *Id.* If not, the process selects one or more sub-channels with a negative difference between target and proposed loadings, and for each selected sub-channel decreases the proposed loading by 1. *Id.* Gains of channels with decreased loadings are decreased for improved power efficiency. *Id.*

Mirfakhraei discloses a handshake process in which one transceiver transmits a handshake signal to a remote receiver when establishing a connection or retraining. *Id.* ¶ 20. The handshake signal includes a pattern that the remote transceiver requests or indicates a pattern for the remote transceiver to transmit to the one transceiver. *Id.* SNRs for the sub-channels can be determined from these handshake signals. *Id.* ¶ 22.

*3. Whether Mirfakhraei is Analogous Art*

Prior art references apply to the obviousness inquiry only when they are analogous to the claims challenged. *In re Clay*, 966 F.2d 656, 658 (Fed. Cir. 1992); *In re Bigio*, 381 F.3d 1320, 1325 (Fed. Cir. 2004). A prior art reference is analogous when (1) the reference is from the same field of endeavor as the claims; or (2) the reference is reasonably pertinent to the particular problem with which the inventor was involved. *Corephotonics*,

*Ltd. v. Apple, Inc.*, 84 F.4th 990, 1004 (Fed. Cir. 2023); *Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1379 (Fed. Cir. 2019); *In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1378 (Fed. Cir. 2007). "The Supreme Court's decision in *KSR* . . . directs us to construe the scope of analogous art broadly." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1238 (Fed. Cir. 2010).

*a) Field of Endeavor*

Patent Owner initially asserts that the '518 patent's field of endeavor is an "on-premises broadband network implemented over existing cables." PO Resp. 12, 16–17 (citing Ex. 1001, codes (54, 57), 1:25–29, 1:33–4:33; Ex. 2001 ¶¶ 58–59). In its Sur-reply, however, Patent Owner revises the '518 patent's field of endeavor as "on-premises local area broadband ***coaxial cable networks*** and even more specific to communication between network devices over the tap-ports of a coaxial splitter." PO Sur-reply 20. According to Patent Owner, "[e]very aspect" including the title, abstract, technical field, background, and claims supports this definition of the '518 patent's field of endeavor. *Id.*

Patent Owner argues that Mirfakhraei's field of endeavor is "an out-of-home, point-to-point system that communicates over conventional telephone lines" using "DSL connections over twisted pair." PO Resp. 15–16, 20–21 (citing Ex. 1007 ¶¶ 2–6, 14–15, 19; Ex. 2001 ¶¶ 61, 71–72), 18. Patent Owner asserts that Mirfakhraei does not discuss broadband networks, or existing on-premises coaxial cables, coaxial splitters, or multi-path reflections which are "all key to the '518 patent." *Id.* at 16, 21. In addition, Patent Owner alleges that Mirfakhraei's bit-loading processes would not work with the signal splitters present in a coaxial environment. *Id.* at 16.

Patent Owner contends that that twisted pair wiring used in telephone lines only transmits low frequencies and thus is used in simple, point-to-point networks, whereas coaxial cables, being shielded, can support larger, high-frequency bandwidths. *Id.* at 19 (citing Ex. 2001 ¶¶ 63–69; Ex. 2003, 82; Ex. 2004). Patent Owner states that the frequency response of coaxial cables is chaotic due to transmission-line effects such as reflections, with sharp increases in attenuation at specific frequencies. *Id.* at 19–20 (citing Ex. 2001 ¶ 70; Ex. 2003, 67[4]). Patent Owner states that these effects occur even in the much shorter cable lengths used in homes as compared to longer telephone lines. *Id.* at 20.

Patent Owner criticizes the Petition for not undertaking any analysis of Mirfakhraei's field of endeavor or comparing it to that of the '518 patent. *Id.* at 21. Patent Owner asserts, however, that the Petition "appears to agree" that the '518 patent is directed to communications using coaxial building wiring. *Id.* at 17–18 (citing Pet. 2; Ex. 1001, 1:28–29, 1:33–35; Ex. 1002 ¶¶ 59–61).

Patent Owner also alleges that the Institution Decision made its own findings apart from those in the Petition, oversimplified Mirfakhraei's field of endeavor, relied on Mirfakhraei's boilerplate language, and did not appreciate that Mirfakhraei's "communication signal" in claim 1 implies transmission over conventional telephone wires, as described in its specification. *Id.* at 16, 22–23 (citing Ex. 1007 ¶¶ 21, claim 1; Ex. 2001 ¶ 62; Inst. Dec. 20–21).

---

[4] Citation not found.

In addition, Patent Owner draws comparisons between *Wang Labs.* and the present case, arguing that this precedent binds us to decide the field of endeavor issue in its favor. *Id.* at 23–24 (citing *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 864–865 (Fed. Cir. 1993) (prior art references not in same field of endeavor merely because they relate to computer memories)).

Patent Owner criticizes Petitioner's expert, Mr. Bertonis, for his alleged "results-oriented approach" and inconsistency in how he considered the title, field, and claims of the '518 patent to conclude it was not limited to co-axial cable, and the same parts of Mirfakhraei to conclude it was not limited to telephone lines (twisted pair). PO Sur-reply 20–22. Patent Owner also asserts that Petitioner failed to apply *Airbus*'s holistic approach by ignoring certain parts of the '518 patent, and that Petitioner mischaracterized Patent Owner's proposed field of endeavor for the '518 patent, which Patent Owner did not limit to use of probe messages in adaptive bit-loading. *Id.* at 21–22. In addition, Patent Owner alleges that Petitioner attempted to broaden the '518 patent's field of endeavor and improperly conflated the two prongs of the analogous art test, revealing that Petitioner is using improper hindsight reconstruction in its analysis. *Id.* at 22–23.

Patent Owner further asserts that Petitioner's uses of the '518 patent's references to non-coaxial references amounts to improper hindsight and ignores the '518 patent's claims and the district court's confirmation that claim 1 relates to a coaxial network. *Id.* at 23 (citing Pet. Reply 5). Patent Owner alleges that Petitioner does not dispute Patent Owner's evidence showing that Mirfakhraei is directed to conventional telephone line (twisted pair) communications, and instead uses broad boilerplate language that does

not outweigh the entirety of Mirfakhraei's disclosure, which does not mention coaxial cables. *Id.* at 24. Patent Owner asserts that Petitioner thus broadly characterizes the field of endeavor as "network communications" to capture the non-analogous Mirfakhraei reference. *Id.*

Petitioner asserts that the field of endeavor is "network communications." Pet. Reply 3 (citing Ex. 1002 ¶ 88; Ex. 1036 ¶ 2). Petitioner argues that this is supported by the '518 patent and Mirfakhraei consistent with the holistic approach of *Airbus*. *Id.* at 2–8. Petitioner asserts that Petitioner improperly narrowed the field of endeavor, and contends that Mirfakhraei's disclosure is not limited to twisted pair telephone lines. *Id.*

As previously stated, we determine that the '518 patent's field of endeavor is "broadband communication networks." *See* § II.C, *supra*. This is made clear from the '518 patent's technical field which states "[t]his invention relates to *broadband communication networks* and specifically to communications using coaxial cable building wiring." Ex. 1001, 1:27–29 (emphasis added). We choose the '518 patent's broader statement of the field ("broadband communication networks") because the field of endeavor is "not limited to the specific point of novelty, the narrowest possible conception of the field, or the particular focus within a given field." *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1001 (Fed. Cir. 2016); Pet. Reply 3. Mirfakhraei shares this field of endeavor with the '518 patent.

Although Patent Owner argues that Petitioner failed to conduct an analysis for the field of endeavor, the Federal Circuit has cautioned that a petition may show analogousness even if it does not explicitly identify it as such. *Netflix, Inc. v. DIVX, LLC*, 80 F.4th 1352, 1359–1360 (Fed. Cir. 2023)

(Board abused its discretion in determining Netflix failed to articulate a field of endeavor).

The Petition indicated, for example, that Mirfakhraei's receiver (specifically, its time domain equalizer) samples and filters a signal described as *broadband*. *See, e.g.*, Pet. 38–40 (citing Ex. 1007 ¶ 24). The Petition further mentions Mirfakhraei's handshake procedure to implement bit-loading between *network* devices. *See, e.g.*, *id.* at 48 (citing Ex. 1007, code (57) ¶¶ 2–3, 5–8, 14–25, Figs. 1–3). In substance, the Petition identifies Mirfakhraei's field of endeavor as "broadband communication networks."

Patent Owner argues that Mirfakhraei's field of endeavor is limited to twisted pair or DSL. PO Resp. 15–16, 20–21. Mirfakhraei discloses various forms of DSL including ADSL and HDSL (collectively referred to as "xDSL"), and states that its bit loading processes can be implemented with an "xDSL transceiver." Ex. 1007 ¶¶ 3, 9–10, 14–15, 18, 26–28. However, Mirfakhraei does not preclude the use of its disclosed processes in other types of networks. *Id.* ¶¶ 6–9, claim 14; Pet. Reply 6–7.

For example, Mirfakhraei's "Summary" describes its DMT bit-loading processes, and then concludes by stating that "[o]ther embodiments of the invention include xDSL transceiver implementing any of the process disclosed herein." Ex. 1007 ¶ 9. This implies that the processes described in the "Summary" encompass other types of transceivers and networks that are not xDSL. *Id.* ¶¶ 6–8. Similarly, Mirfakhraei's claim 14 recites "[a]n ADSL transceiver that performs the process of any one of the preceding claims" such that the processes recited in the preceding claims are not so limited.

Furthermore, the ’518 patent’s background mentions several patents relating to “broadband networks” including one that concerns DSL. Ex. 1001, 3:33–35. In our view, the ’518 patent’s mentioning this patent is evidence that broadband DSL technologies are in the same field of endeavor as the ’518 patent.

Regarding Patent Owner’s contention that the ’518 patent’s field of endeavor is limited to “on-premises” or “local” networks, as Petitioner observes, there is no such limitation in the claims (although it is mentioned elsewhere in the patent). Pet. Reply 4. Even if we agreed with this assertion (we do not), Mirfakhraei discloses that its bit-loading processes use local networks. Ex. 1007 ¶¶ 6, 16.

We do not belabor Patent Owner’s criticisms of the Institution Decision (we are beyond the preliminary stage of this proceeding) other than to state we disagree with them. We address, however, Patent Owner’s assertion that “communication signal” in the Mirfakhraei’s claims limits them to communications over telephone lines because Mirfakhraei’s description mentions this. PO Resp. 16, 22–23; Ex. 1007 ¶ 21. Other parts of Mirfakhraei, such as its title, abstract, technical field, summary, and claims (except for paragraph 9 and claim 14), are set forth broadly and indicate an intention not to limit Mirfakhraei’s bit-loading processes to telephone lines, twisted pair, or DSL. Pet. Reply 6–7; Ex. 1007, codes (54, 57), ¶¶ 1, 5–8, claims 1–13 and 15–18.

Patent Owner’s reliance on *Wang Labs* is misplaced, as Petitioner argues. *See* Pet. Reply 8. In that case, the Federal Circuit determined that an asserted patent related to a compact memory module for personal computers was not in the same field of endeavor as prior art relating to a

memory module for a larger, more costly industrial controller in which space was not an issue. *Wang Labs.*, 993 F.2d at 864–865. Expert testimony established that the industrial memory module could not be used in a personal computer. *Id.* at 864. In contrast, the ’518 patent and Mirfakhraei are directed to the same field of endeavor—broadband communication networks—and their network devices are agnostic, at least above the physical layer, to the mediums used to convey signals between them.

As to Patent Owner’s assertion that Mirfakhraei’s bit loading would not work with the splitters used for coaxial cables, Petitioner relies on Afshary to explain how this would be done. *See, e.g.*, Pet. 8–9, 45–47. In any case, this argument does not relate to the field of endeavor, but to the reasonable expectation of success in combining prior art references.

Petitioner’s statement of the field of endeavor as “communication networks” is too broad in light of the ’518 patent for the reasons explained.

We conclude that Petitioner has shown by preponderant evidence that Mirfakhraei is in the same field of endeavor as the ’518 patent, i.e., “broadband communication networks.” Mirfakhraei is thus analogous art because it is in the same field of endeavor as the ’518 patent.

*b) Reasonable Pertinence*

Patent Owner argues that Mirfakhraei is not reasonably pertinent to the problems addressed by the ’518 patent. PO Resp. 24–29. Patent Owner asserts that the ’518 patent solves impairments specific to on-premises communication between network devices over existing coaxial cable wiring and splitters, whereas Mirfakhraei addresses synchronization for “point-to-point” communication within a twisted pair system without these splitters or

the micro-reflections that they cause. *Id.* at 24 (citing Ex. 1001, 4:36–47; Ex. 2001 ¶¶ 73, 79; Ex. 2002, 78:6–16).

Patent Owner asserts that the ’518 patent addresses signal impairments specific to on-premises coaxial cabling including (1) inter-port isolation from communicating across splitters; (2) variable signal attenuation caused by different channel paths, and (3) imperfect connection points at splitters, which cause micro-reflections. *Id.* at 25 (citing Ex. 1001, 2:27–48, 3:5–16, 4:23–25, 4:36–47; Ex. 2001 ¶¶ 75–76).

Patent Owner states that "[s]uch impairments are the result of using a preexisting coaxial network and are not present in every type of wired network." *Id.* Patent Owner asserts that splitters in coaxial networks have isolated ports forming imperfect connections which cause inter-port isolation and reflections not found in other network types. *Id.* According to Patent Owner, the varying signal paths between devices causes variable signal attenuation. *Id.* Patent Owner asserts that the ’518 patent overcomes these issues that previously restricted network devices from communicating with each other. *Id.* at 26 (citing Ex. 1001, 4:36–47; Ex. 2001 ¶ 76).

Patent Owner states that Petitioner's expert, Mr. Bertonis, testified that attenuation characteristics apply to any medium while acknowledging that intersymbol interference ("ISI") is specific to reflections caused by insertion points in coaxial networks created by amplifiers and splitters, confirming that problem and solution of the ’518 patent is specific to the use of splitters in a coaxial LAN environment. *Id.* (citing Ex. 2002, 118:21–119:10, 120:18–21).

Petitioner contends that Mirfakhraei is reasonably pertinent to the problems that the ’518 patent addresses. Pet. Reply 8–11. Petitioner states

that the Institution Decision recognized that variable attenuation and signal noise are problems shared by the ’518 patent and Mirfakhraei and that the solution of multi-carrier modulation with bit-loading is agnostic to whether impairments are caused by coax splitters or other features. *Id.* at 9 (citing Ex. 1001, 4:37–40, 4:42–46, 7:49–50, 8:9–12; Ex. 1036 ¶¶ 23–24).

Petitioner further contends that, like the ’518 patent, Mirfakhraei seeks to improve network communication efficiency using the same solution—multi-carrier modulation with bit-loading—in the face of similar channel impairments (including frequency-dependent attenuation). *Id.* at 9–10. Specifically, Petitioner states that Mirfakhraei seeks to increase data transmission rate, select optimal symbol sets, and optimize bandwidth and power to address similar problems using the same solution. *Id.* (citing Ex. 1007 ¶¶ 3–4, 14, 34–35; Ex. 1036 ¶¶ 23–24). Petitioner asserts that “[t]he focus of the problem, commonly addressed by the ’518 patent and Mirfakhraei, is finding ways to most effectively deal with encountered transmission impairments, whatever their cause.” *Id.* at 10. Petitioner asserts that “Mirfakhraei would have commended itself to an inventor’s attention in considering the problem addressed by the ’518 patent.” *Id.* (citing *Clay*, 966 F.2d at 659).

Petitioner argues that Patent Owner “seeks to exclude Mirfakhraei as analogous art under both the field of endeavor and reasonable pertinence prongs for essentially the same reason: that Mirfakhraei is allegedly focused on a twisted-pair telephone line rather than coaxial cable network.” *Id.* at 10 (citing PO Resp. 18–21, 24–29). Petitioner asserts that Patent Owner’s approach conflates the field of endeavor and reasonable pertinence inquiries and is improper under Federal Circuit precedent. *Id.* at 8–9 (citing *Donner*

*Tech. v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1361 (Fed. Cir. 2020); *In re ICON Health*, 496 F.3d at 1380).

Patent Owner responds that the ’518 patent “solves impairments specific to on-premises communications between network devices ***over existing coaxial cable wiring***.” PO Sur-reply 15. Patent Owner argues that the “Reply continues to ignore the coaxial context, including the claim language, which is directed toward communication between network devices through tap ports of a splitter.” *Id.* (citing Ex. 1001, 1:27–29, 4:28–33, claim 1; Ex. 2001 ¶ 47). Patent Owner further argues that Petitioner applies the wrong framework for the reasonable-pertinence inquiry by focusing on the solution rather than the problem addressed by the ’518 patent. *Id.* (citing Ex. 2001 ¶¶ 71–72, 79; Ex. 2002, 78:6–16; Ex. 1036 ¶¶ 23–24; *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016)).

Having considered the parties’ contentions, we determine that Mirfakhraei is analogous art to the ’518 patent at least because the two address the common problems of variable attenuation and noise on signals transmitted in broadband communication networks. Ex. 1001, 2:41–44, 3:11–16, 4:37–62, 6:45–46, 8:9–35; Ex. 1007, code (57), ¶¶ 2, 6. The ’518 patent and Mirfakhraei address these problems, at least in part, through the use of the same solution—multicarrier modulation (OFDM or DMT) with bit loading. Ex. 1001, code (57), 4:37–62, 8:9–26; Ex. 1007, code (57), ¶¶ 5–8, 14, 22, 25–28, 31, 35, claims 1, 13, 15, 18.

Although Patent Owner focuses on the differences in transmission media discussed in the ’518 patent (coaxial cable with splitters) compared to Mirfakhraei (twisted pair telephone lines), the two types of media suffer the

same problems of variable attenuation and noise no matter that the sources of those problems might be somewhat different. Mirfakhraei discloses that conventional telephone lines suffer frequency-dependent attenuation that distorts communication signals having large bandwidths. Ex. 1007 ¶ 2. In the ’518 patent, similar problems stem from differing coaxial cable lengths in homes or buildings causing variable attenuation, and the fact that the splitters used in such networks were originally designed to prevent communication across the tap ports with high impedances that cause micro-reflections leading to frequency-variable noise (e.g., ISI). *See, e.g.*, Ex. 1001, 2:28–48, 4:37–47; Ex. 1007 ¶ 2.

Nonetheless, these problems are fundamentally the same, and the fact that Mirfakhraei and the ’518 patent address them using the same solution—multicarrier modulation with bit loading—is further evidence they are reasonably pertinent to one another.

Accordingly, Petitioner has shown by preponderant evidence that Mirfakhraei is reasonably pertinent to the problems addressed by the ’518 patent. Mirfakhraei is thus analogous art as reasonably pertinent to the problems that the ’518 patent addresses.

*4. Motivation to Combine*

Petitioner contends that a POSITA would have been motivated to combine Afshary and Mirfakhraei for several reasons. Pet. 40–45. Petitioner asserts that a POSITA would understand that Afshary’s network operates over a coaxial cable has variable frequency response caused by signal reflections and interference. *Id.* at 40–41 (citing Ex. 1006, code (57), ¶¶ 7, 12–20, Fig. 1; Ex. 1002 ¶¶ 29–55, 128–138; Ex. 1007 ¶¶ 2–5, 14; Ex. 1018, 305–307). According to Petitioner, implementing Mirfakhraei’s

DMT bit-loading protocol would increase the data transmission rate in Afshary's coaxial cable network, and would also improve reliability and robustness of communications therein. *Id.* at 41–42 (citing Ex. 1007 ¶ 3; Ex. 1002 ¶¶ 29–55, 139). Although Mirfakhraei describes DMT bit loading for a conventional telephone line, Petitioner contends that a POSITA would have understood that its bit-loading scheme could be implemented over coaxial cable. *Id.* at 42 (citing Ex. 1010, 374; Ex. 1013, code (54), 2:30–5:39, Figs. 1–2; Ex. 1016, code (54), 1:9–16, 3:34–59, 6:66–7:46, Fig. 1; Ex. 1017, 74; Ex. 1018, 305–307, 312; Ex. 1002 ¶ 140).

Petitioner further asserts that integrating Mirfakhraei's DMT bit-loading protocol into Afshary's cable LAN adapter would entail incorporating Mirfakhraei's multi-carrier modulator and demodulator into an application specific integrated circuit ("ASIC"). *Id.* at 42–43 (citing Ex. 1007 ¶ 15, Fig. 1; Ex. 1002 ¶¶ 141–144). Petitioner contends that this implementation would enable Afshary's cable LAN adapter to communicate at higher data rates, and that it would be more robust and reliable and less affected by the harsh environment of a coaxial cable infrastructure, including interference and signal reflections. *Id.* at 43 (citing Ex. 1007 ¶ 2; Ex. 1018, 305–307, 312; Ex. 1002 ¶¶ 141–144). Petitioner asserts that the combination would improve power efficiency by using more available bandwidth for communicating, and using higher order modulation schemes to transmit more bits onto frequency channels that experience less noise and interference. *Id.* Petitioner asserts that this implementation is the combination of known elements according to known methods, or applying a known technique to a known device ready for the improvement, to yield predictable results. *Id.* at 43–44 (citing Ex. 1002 ¶¶ 145–146).

*a) Frustration of Goals*

Patent Owner argues that replacing Afshary's single carrier modulation with Mirfakhraei's multi-carrier modulation would frustrate Afshary's goal of providing a simple, low-cost home networking solution because it would add unwanted complexity, hardware cost, and operational costs to Afshary's network. PO Resp. 31–32 (citing Ex. 1006 ¶¶ 5–6, 37; Ex. 2001 ¶¶ 82–91). Patent Owner argues that Afshary's LAN adapters provide robust communication with cost-effective components without the need to update or change existing hardware. *Id.* at 32–33 (citing Ex. 1006 ¶¶ 28–42, Fig. 4; Ex. 2001 ¶¶ 84–87). According to Patent Owner, even if Afshary's process reflects a "trade-off" between cost and performance, Afshary decided to favor cost management. *Id.* at 33. Patent Owner asserts that a POSITA would not have been motivated to insert Mirfakhraei's components into Afshary's adapters due to added cost and complexity. *Id.* (citing Ex. 1002 ¶ 83). Patent Owner then points to particulars of Mifakhraei's system to support its assertion of added cost and complexity. *Id.* at 33–35 (citing Ex. 1007 ¶¶ 5, 14, 17–19; Ex. 2001 ¶¶ 88–91).

Petitioner criticizes Patent Owner's argument that because Afshary describes its coaxial cable LAN as "cost effective" a POSITA would not be motivated to add expensive components. Pet. Reply 16. Petitioner asserts that "courts reject this type of economic argument as irrelevant" and states that "many obvious modifications have some cost that is outweighed by the known benefit." *Id.* (citing *Orthopedic Equipment Co., Inc. v. U.S.*, 702 F.2d 1005, 1013 (Fed. Cir. 1983); *In re Farrenkopf*, 713 F.2d 714, 718 (Fed. Cir. 1983)). Petitioner asserts that the Board was correct in its initial determination that "Patent Owner's arguments at most establish that a

POSITA would have considered tradeoffs between cost and complexity and performance in making the combination." *Id.* (citing Inst. Dec. 26; *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 n.8 (Fed. Cir. 2000)). Petitioner further argues that Patent Owner's "assumption that Mirfakhraei's bit-loaded multi-carrier approach would necessarily add cost and complexity is unfounded" because the computational complexity of a multicarrier system can be significantly less than that of a single-carrier system, especially in networks that suffer from interference and/or reflections. *Id.* at 16–17 (citing Ex. 1018, 305–306; Ex. 1036 ¶ 39).

Patent Owner responds that Petitioner fails to establish any alleged benefits that would outweigh the negative impact to Afshary's expressed simplicity and cost concerns for multicarrier modulation. PO Sur-reply 4. Patent Owner argues that the technical evidence of its expert, Mr. Garrett, strongly favors Patent Owner in establishing that the combination would add complexity and costs contrary to Afshary's stated goal. *Id.* at 4–5 (citing Ex. 2001 ¶¶ 82–91).

Petitioner asserts that Patent Owner's arguments are premised on two false assumptions: "(1) that an Afshary-Mirfakhraei adapter is only capable of transmitting the same data to all other adapters at the same time . . . ; and (2) that transmissions on the Afshary-Mirfakhraei LAN would not include a mechanism to identify both the sender and recipient." Pet. Reply 18 (citing Ex. 2001 ¶ 104; Ex. 1032, 59:24–68:17; Ex. 1036 ¶¶ 47–51).

Petitioner asserts that Patent Owner's expert, Mr. Garrett, admitted that Afshary is not limited to broadcast transmissions, and contradicted himself regarding whether the alleged problem would exist in a non-broadcast scenario. *Id.* at 18–19 (citing Ex. 1032, 62:14–16, 67:17–69:14;

Ex. 1036 ¶ 47). Petitioner further asserts that it was well known that LANs like Afshary's employed addressing techniques to identify a message sender and recipient, as Mr. Garrett admitted. *Id.* at 19–20 (citing Ex. 1006 ¶ 41; Ex. 1034, 12–14, 150–151, 168–170, 184–186; Ex. 1033, 7–10, 275–282; Ex. 1031, 253–263; Ex. 1032, 45:19–46:12; Ex. 1036 ¶¶ 47–51; Ex. 2001 ¶ 123).

Petitioner further notes that the '518 patent does not describe how to configure its probing messages to avoid this alleged problem. *Id.* at 20 (citing Ex. 1032, 45:21–49:16; Ex. 1036 ¶ 44; *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1327 n.3 (Fed. Cir. 2008) (patentee's argument that POSITA could not implement the combination was undermined by lack of description in patent itself)).

Petitioner further contends that Afshary's TDMA[5] regulates access to the shared coaxial cable medium in the same manner as the '518 patent's scheduler. *Id.* at 20–21 (citing Ex. 1006 ¶ 34; Ex. 1001, 6:11–24, 9:42–49; Ex. 1032, 46:13–47:17, 48:4–49; Ex. 1036 ¶¶ 45, 52–53). Petitioner argues that Mirfakhraei does not require a dedicated connection, and that the reference describes, but is not limited to, a communication medium that is twisted pair. *Id.* at 21 (citing Ex. 1036 ¶ 53; Ex. 1007 ¶ 15). Petitioner asserts that "a POSITA would have understood that Mirfakhraei's handshake process is indeed not a substitute for TDMA but instead would operate within the TDMA scheme used by Afshary, enabling any two adapters to exchange probe messages and responses, just like any other type of message that could be exchanged by the adapters." *Id.* (citing Ex. 1036 ¶¶ 53–54).

[5] Time Division Multiple Access. Ex. 1006 ¶ 34.

Having considered the parties' contentions and evidence, in our view, Patent Owner's arguments focus on Afshary's cost and complexity concerns, but overlook that Afshary also requires its system to be "robust." Ex. 1006 ¶ 37. Afshary recognizes there is a trade-off between these considerations, stating

> It is important for cable LAN adapter 32 to be screened from noise and hardy enough to work in any environment while remaining inexpensive. Thus, in order to keep costs low and the system robust, the architecture design of adapter 32 uses a digital modulation scheme such as Frequency Shift Keying (FSK) modulation or Binary Phase Shift Keying (BPSK) modulation.

*Id.* Although Patent Owner's expert, Mr. Garrett, points to the components of Mirfakhraei as supporting his contention that Petitioner's combination would add cost and complexity, he does not address Petitioner's evidence that multi-carrier modulation with bit loading can actually be less costly and complex by reducing the FFT size and the number of computations needed as compared to single carrier modulation. Ex. 1018, 305–306; Ex. 1036 ¶ 39.

Accordingly, Petitioner has shown preponderant evidence that the combination of Afshary and Mirfakhraei would not frustrate any of Afshary's stated goals.

*b) Incompatibility*

The parties present several contentions regarding whether the technologies of Mirfakhraei and Afshary are compatible, which we address below.

*(1) ASIC Redesign*

Patent Owner argues that a POSITA would not implement Mirfakhraei's multi-carrier modulator and demodulator in Afshary because

it would fundamentally change its ASIC's architecture. PO Resp. 36 (citing Ex. 2001 ¶ 92). Patent Owner asserts that Mirfakhraei operates in an "always on" fashion and operates at different frequencies than Afshary, and that adding Mirfakhraei's modulator and demodulator would require additional improvements in Afshary's baseband layer. *Id.* at 37.

Patent Owner further argues that Petitioner's combination omits Mirfakhraei's controller 130, which is needed to implement its handshake process to achieve bit loading. *Id.* at 37–39 (citing Ex. 1007 ¶¶ 20–23, Fig. 1; Ex. 1002 ¶¶ 142–144; Ex. 2001 ¶¶ 95–97; Ex. 2002, 63:6–8, 63:20–64:5, 65:21–66:12). In addition, Patent Owner argues that Afshary "does not provide a synchronization mechanism that would overcome the shortcomings of Petitioner's combination." *Id.* at 39 (citing Ex. 1006 ¶ 31; Ex. 2001 ¶¶ 98–99; Ex. 2002, 87:20–88:6).

Patent Owner further asserts that Petitioner's combination would require additional buffers, controls, and overhaul of the circuit board, and would need to reconcile broadband to analog conversion within the ASIC when transmitting data from the MAC layer. *Id.* at 40 (citing Ex. 2001 ¶¶ 99–100). According to Patent Owner, the work needed to create the ASIC would not motivate a POSITA to make the combination when Afshary was already complete and needed no improvements. *Id.*

Petitioner contends that the technical difficulties that Patent Owner mentions, including circuitry level modification of an ASIC and details in data package encapsulations, are routine engineering tasks within the skillset of a POSITA that the '518 patent itself omits. Pet. Reply 2, 21–23 (citing Ex. 1036 ¶¶ 43–46, 52, 55–56). Petitioner further argues that Patent Owner provided no evidence that such changes are required, and that its expert,

Mr. Garrett, admitted there was "[n]o reason why" additional functionality could not be incorporated into Afshary's ASIC based on Mirfakhraei's teachings. *Id.* at 22 (citing Ex. 1032, 59:6–16) (alteration in original).

Patent Owner responds that Petitioner's reliance on the capabilities of a POSITA comes too late to address the "long list of modifications identified by Mr. Garrett." PO Sur-reply 10. Patent Owner argues that the '518 patent's claims have no effect on whether a POSITA would be motivated to combine Afshary and Mirfakhraei. *Id.* Patent Owner further argues that Petitioner consistently cites to the '518 patent "to fill gaps—a clear tactic of hindsight reconstruction." *Id.* at 10, 12–13 (citing Ex. 1001, 9:59–10:20, Fig. 7; Ex. 2006, 50:14–17, 50:25–51:2).

Patent Owner further argues that Petitioner failed to establish that Mirfakhraei's DMT bit loading scheme for a point-to-point network would properly characterize its bit loading scheme on Afshary's multi-point network that communicates across a coaxial splitter or how the signal-to-noise (SNR) ratio would be calculated. *Id.* at 11–12.

We do not agree with Patent Owner's arguments. Petitioner stated at the outset that "a POSITA would have understood that modifying Afshary's cable LAN adapter 32 to implement the DMT bit-loading protocol of Mirfakhraei would, for example, entail incorporating the functionality of Mirfakhraei's multi-carrier modulator and multi-carrier demodulator into an ASIC." Pet. 42; Ex. 1002 ¶¶ 52, 55–56, 141–144. Petitioner's Reply contentions were grounded in the Petition and responsive to Patent Owner's arguments in its Response, and hence are not new argument. *See Rembrandt Diagnostics, LP v. Alere, Inc.*, 76 F.4th 1376, 1385 (Fed. Cir. 2023).

When questioned during his deposition, Patent Owner's expert, Mr. Garrett, stated that there was "no reason why" additional functionality could not be incorporated into the controller of Afshary's ASIC but that "a lot of modifications [would be] required" to achieve Petitioner's combination. Ex. 1032, 58:18–59:16. Numerous modifications, however, does not necessarily mean it would be beyond the capability of a POSITA. In addition, as Petitioner notes, the '518 patent omits the details that Patent Owner would require of Petitioner's combination.

Accordingly, Petitioner has demonstrated preponderant evidence that a POSITA would have been able to implement Mirfakhraei's functionality in Afshary's ASIC. Patent Owner's arguments are unavailing.

*(2) Point-to-Point Versus Multi-Point*

Patent Owner argues that Mirfakhraei's point-to-point bit loading scheme is incompatible with Afshary's multi-point communication network. PO Resp. 40–44. Patent Owner asserts Mirfakhraei is designed for a point-to-point communication network without variance of endpoints whereas Afshary uses splitters within a home network to reach multiple client endpoints which receive identical data. *Id.* at 41 (citing Ex. 1007 ¶¶ 6–7, 18, Fig. 1; Ex. 2001 ¶ 101; Ex. 2002, 78:6–16; Ex. 1002 ¶¶ 80–81).

Patent Owner argues that Mirfakhraei's bit loading on its point-to-point connection would not operate effectively when providing the same bit loading profile to multiple endpoints. *Id.* at 41–42 (citing Ex. 1007 ¶¶ 22–23, 31–32, 34; Ex. 2001 ¶¶ 103–105; Ex. 2002, 78:6–16). Patent Owner asserts that Petitioner could not explain how Mirfakhraei's handshake process would work in the combination. *Id.* at 42–43 (citing Ex. 1007 ¶¶ 20–23; Ex. 2001 ¶¶ 106–107; Ex. 2002, 57:18–60:11, 61:19–62:2).

Patent Owner further argues that, in Petitioner's combination, the transmitting node would not be able to differentiate reported characteristics for signal paths from the receiving nodes, and thus would have to calculate SNR for the entire house, which would result in sub-optimal bit loading on the signal paths between nodes and lead to less efficient data transfer than what Afshary already provides. *Id.* at 43–44 (citing Ex. 2001 ¶¶ 108–110).

Petitioner replies that each of the features Patent Owner alleges to be required in Petitioner's combination are not found in the '518 patent's claims and that the '518 patent is silent on implementation details. Pet. Reply 22 (citing Ex. 1036 ¶¶ 43–46, 56; *Muniauction*, 532 F.3d at 1327 n.3). Petitioner further contends that Patent Owner provides no evidence that such changes or additions would be required, nor does Patent Owner argue or provide any evidence that such changes were not within the capabilities of a POSITA or that a POSITA would not have a reasonable expectation of success in incorporating Mirfakhraei's techniques into Afshary's ASICs. *Id.* at 22–23 (citing Ex. 2001 ¶¶ 88–100; Ex. 1036 ¶¶ 45, 55–56).

We agree with Petitioner that the '518 patent does not describe how its LAN devices distinguish signal paths when reporting SNR and deciding bit loading for a particular path on a network. We find this lack of description to be evidence that the '518 patent's drafter thought that a POSITA would have understood how message addressing is performed on a multi-point network to provide appropriate bit loading on signal paths based on SNR. We find it inappropriate to hold Petitioner's combination to a higher standard of specificity than the '518 patent provides.

Furthermore, Petitioner's expert, Mr. Bertonis, correctly states that such addressing is a fundamental principle of how devices communicate

over a LAN of which a POSITA would be aware. Ex. 1036 ¶ 48. He further states that Afshary mentions "designated" adapters, implying Afshary employs addressing techniques. *Id.* ¶¶ 49–51 (citing Ex. 1006 ¶ 42). Patent Owner has not explained sufficiently what would have been difficult about using Mirfakhraei's multi-carrier bit loading in Afshary's LAN adapters, particularly when Afshary's LAN adapters and devices already use addressing and TDMA which would support communication of SNR and bit loading profiles between devices.

Accordingly, Petitioner presents preponderant evidence that Mirfakhraei's multi-carrier bit loading would be compatible with Afshary's multi-point network. Patent Owner's arguments are unavailing.

*(3) Different Frequencies*

Patent Owner further argues that Afshary operates on frequencies that are not used by Mirfakhraei. PO Resp. 44–48; PO Sur-reply 5. Specifically, Patent Owner contends that the operational range of Afshary is between 1000 to 2000 MHz to avoid interference with cable TV services below 950 MHz. PO Resp. 44–45 (citing Ex. 1006 ¶¶ 7, 12, 24–28, Fig. 3; Ex. 2001 ¶¶ 111–113, 115). Patent Owner states that Mirfakhraei's ADSL transceiver (i.e., modem) communicates over conventional telephone lines on the very frequencies that Afshary's adapters specifically avoid. *Id.* at 45–46 (citing Ex. 1006 ¶¶ 24–25; Ex. 1007 ¶¶ 2–3, 5, 15; Ex. 2001 ¶¶ 113–114). Patent Owner asserts that Mirfakhraei's ADSL system is adapted for long range transmission and functions over low frequency bands to avoid loss in signal characteristics over long distances. *Id.* at 46 (citing Ex. 2001 ¶¶ 113–114; Ex. 2002, 54:17–55:1). Patent Owner further argues that Afshary's in-home network includes an ADSL cable modem 30 operating below 950

MHz whereas the LAN adapters operate at 1000–2000 MHz. *Id.* at 46–48 (citing Ex. 1006 ¶¶ 18, 25, Fig. 1; Ex. 2001 ¶¶ 116–117).

Petitioner responds that Patent Owner's "distinct frequency bands" argument is meritless. Pet. Reply 23–25. Specifically, Petitioner contends that a POSITA would have understood that Mirfakhraei's multi-carrier signals would be transmitted over Afshary's operating frequency range using Afshary's up-conversion and down-conversion techniques. *Id.* at 23–24 (citing Pet. 31–32, 54–56; Ex. 1006, code (57), ¶¶ 2, 7, 12, 24–25, 35–39, 41, Figs. 1, 3–4; Ex. 1007 ¶¶ 4, 18–19; Ex. 1036 ¶¶ 57–61).

We agree with Petitioner that any difference in the operating frequency ranges of Mirfakhraei and Afshary are not a barrier to their combination. Pet. 31–32, 54–56. Mirfakhraei's multi-carrier bit loading is not fundamentally different whether implemented in the lower frequency band that ADSL or cable TV services occupy (to the extent Mirfakhraei is limited to these ranges), or a higher frequency band used for home networks. Hence, we view Patent Owner's argument as one of bodily incorporation of Mirfakhraei's teachings into Afshary, which is an improper approach to obviousness. Pet. Reply 24; *Allied Erecting and Dismantling Co., Inc. v. Genesis Attachments, LLC*, 825 F.3d 1373, 1381 (Fed. Cir. 2016).

In addition, we agree with Petitioner that Mirfakhraei's multi-carrier signals would be transmitted over Afshary's operating frequency range using its up-conversion and down-conversion techniques to translate signals to different frequencies. Pet. 31–32, 54–56; Pet. Reply 23–25.

Thus, Petitioner shows preponderant evidence that any differences in operating frequencies between Mirfakhraei and Afshary would not render them incompatible. Patent Owner's argument is unavailing.

*(4) Expert Experience*

Patent Owner argues that Petitioner's expert, Mr. Bertonis, has experience in ***wireless*** broadband technology relating to DOCSIS for communication over wireless paths. PO Resp. 48 (citing Ex. 2002, 11:17–13:4, 15:11–17, 17:16–18, 22:6–8, 22:18–23:3; Ex. 1002, Appx. A at 5). Patent Owner states that Mr. Bertonis admits that in these types of wireless schemes, modulation is not controlled by the device but by cable operators. *Id.* (citing Ex. 2002, 36:21–37:5). Patent Owner contends that, because of his alleged lack of knowledge in the coaxial field, Mr. Bertonis misses fundamental issues for his proposed combinations and analysis of the prior art. *Id.* at 49. Patent Owner argues that during Mr. Bertonis's deposition, it allegedly became clear that his interpretation of the prior art was based on a "cursory review at best," that he had no professional knowledge of multi-carrier modulation schemes, and that he spent years on a "hobby-type mission triggered by his friend's startup" learning about the technology that a POSITA would not have had. *Id.* at 50 (citing Ex. 2002, 42:11–18, 44:7–10; Ex. 2001 ¶ 54). Patent Owner further alleges that Mr. Bertonis has made significant sums of money by working with Petitioner, calling into question the helpfulness of his testimony. *Id.* at 50–51.

Patent Owner argues that, conversely, Patent Owner's expert, Mr. Garrett, has years of experience with coaxial cable and is "the sole expert with the requisite experience to opine about what an actual POSITA would and would not have found obvious, and is better positioned to provide helpful testimony." *Id.* at 49 (citing Ex. 2001 ¶¶ 8–13). Patent Owner asserts that Mr. Garrett is the "more relevant declarant" who states that "a

POSITA would not have made the proposed combination." *Id.* at 50 (citing Ex. 2001 ¶ 54).

Petitioner contends that Mr. Bertonis is well qualified to testify from the perspective of a POSITA. Pet. Reply 25–26. Petitioner states that "Mr. Bertonis's industry experience with coaxial cable and with multicarrier modulation is extensive." *Id.* at 25 (citing Ex. 1036 ¶¶ 62–63). Petitioner contends he began working with coaxial cable in 1976 and his work includes cable modulators, cable boxes, and headend equipment. *Id.* (citing Ex. 1002, Appx. A at 3; Ex. 2002, 81:9–85:8; Ex. 1036 ¶ 62). Petitioner further asserts that Mr. Bertonis began to study the DOCSIS cable standard in 1999 and followed it "fairly heavily" because it was important for his product he developed, similar to a cable system, to be compliant with the standard. *Id.* at 25–26.

Petitioner further disputes that Mr. Bertonis's opinions are biased due to past dealings with Petitioner. *Id.* at 26. Petitioner acknowledges that Mr. Bertonis's company sold product to Petitioner, but it was also sold to other major cable operators and occurred twenty-one years ago such that "it defies belief" that it would influence his testimony. *Id.* (citing Ex. 2002, 26:17–30; Ex. 1036 ¶ 64).

Petitioner asserts that Patent Owner's expert, Mr. Garrett, did not have "any industry experience with coaxial cable until almost 2008, almost 6 years *after* the relevant time period." *Id.* (citing Ex. 2001 ¶¶ 8–11, Appx. A, p. 81). Petitioner asserts that Mr. Garrett admitted he did not qualify as a POSITA in the relevant 2002 timeframe under his own standard, contrary to his declaration. *Id.* (citing Ex. 1032, 12:6–13:9; Ex. 2001 ¶ 40). Petitioner further states that Mr. Garrett left the communications industry for the

financial services industry over five years ago in 2019, contrary to the CV appended to his declaration. *Id.* (citing Ex. 1032, 13:10–14:15). Petitioner argues that "if either expert suffers from a lack of pertinent experience, it is Mr. Garrett." *Id.*

We determine that Mr. Bertonis and Mr. Garrett had at least the skill level of a POSITA at the time they submitted their declarations and testimony in this case. Ex. 1002 ¶¶ 4–15, Appx. A; Ex. 2001 ¶¶ 8–12, Appx. A; *cf Osseo Imaging, LLC v. Planmeca USA Inc.*, 116 F.4th 1335 1341 (Fed. Cir. 2024) ("An expert need not have acquired that skill level prior to the time of the invention to be able to testify from the vantage point of a person of ordinary skill in the art."). Accordingly, we see no reason to disregard the testimony of either on the basis that they do not have a POSITA's skill level.

*c) Impermissible Hindsight*

Patent Owner argues that the '518 patent is the only reference in this proceeding that discloses bit loading on a coaxial network, and that there is no evidence this would have been obvious. PO Resp. 51 (citing Ex. 2001 ¶¶ 118–119; *McGinley v. Franklin Sports, Inc.*, 262 F.3d 1339, 1351 (Fed. Cir. 2001)). Patent Owner asserts that the Petition is "fraught with hindsight bias" and while the '518 patent "does not propose any new processing of signals, it is the only reference that recognized the issues of ISI in coaxial networks and addressed specific impairments that previously restricted high bandwidth communication between devices over ***on-premises coaxial cabling*** over coaxial splitters." *Id.* at 52 (citing *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1368 (Fed. Cir. 2013)). Patent Owner asserts that "in cases like this, it is incredibly

important to focus on what a POSITA would have been ***motivated*** to do, not simply what a POSITA would have been ***able*** to do." *Id.* (citing *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1068–69 (Fed. Cir. 2018)). Patent Owner asserts that Petitioner over-relies on "unsupported and conclusory expert opinions [which] is a clear sign of hindsight bias." *Id.* (citing *In Touch Techs., Inc. v. VGO Commc'ns, Inc.*, 751 F.3d 1327, 1352 (Fed. Cir. 2014)).

Patent Owner argues that Petitioner relies on two alleged shortcomings of Afshary's coaxial cables: (1) variable frequency response of the cable medium; and (2) the addition of Mirfakhraei;s DMT adds reliability and robustness to communications with Afshary's system. *Id.* at 53 (citing Pet. 41–42). Patent Owner asserts that Afshary already solves each alleged shortcoming, and these are not impairments and do not support a motivation to improve Afshary and Mirfakhraei. *Id.*

*(1) Variable Frequency Response*

Patent Owner argues that Afshary addresses the alleged impairment of "variable frequency response" by implementing filters to address reflection issues and thus would not need Mirfakhraei's multi-carrier bit loading to solve that problem. PO Resp. 54–56 (citing Pet. 41; Ex. 1006 ¶ 42; Ex. 1007 ¶ 3; Ex. 1002 ¶¶ 49–55, 128–138; Ex. 2001 ¶¶ 121–122). Patent Owner further contends that these filters are low-cost and thus consistent with Afshary's goal of a low-cost solution. *Id.* at 55–56 (citing Ex. 2001 ¶¶ 121–122).

Petitioner asserts that Patent Owner contradicts itself by arguing that Afshary does not suffer channel impairments but on the other hand uses various mechanisms (such as filters and error correct codes) to address

channel impairments. Pet. Reply 14 (citing PO Resp. 55, 58, 61–62). Petitioner states that Afshary's network suffers from the same channel impairments as does the '518 patent's network. *Id.* (citing Ex. 1036 ¶ 46).

Petitioner further argues that the use of certain techniques in Afshary to improve reliability does not remove the motivation to also use Mirfakhraei's bit-loaded multi-carrier modulation to further improve the transmission robustness and efficiency. *Id.* (citing *Intel Corp. v. PACT XPP Schweiz AG*, 61 F.4th 1373, 1380–81 (Fed. Cir. 2023) ("That [the two references] address the same problem and that [the second reference discloses] a known way to address that problem is precisely the reason that there's a motivation to combine under *KSR* and our precedent")).

Petitioner observes that communication systems typically employ multiple mechanisms to achieve an optimal result. *Id.* at 14–15 (citing Ex. 1036 ¶¶ 32–33). Petitioner further asserts that a POSITA would recognize that replacing Afshary's single-carrier modulation with Mirfakhraei's bit-loaded multi-carrier modulation is simply applying a known techniques to a known problem yielding an expected benefit, i.e., increased system efficiency and robustness. *Id.* at 15 (citing Ex. 1007 ¶¶ 2, 4, 14; Ex. 1036 ¶¶ 34–35). Petitioner further asserts that Asfary's filters at best only address reflections from LPF 18, not reflections from other sources. *Id.* (citing Ex. 1006 ¶ 42; Ex. 1036 ¶ 34).

Patent Owner replies that Petitioner's conclusory assertion that a multi-carrier system ***can*** be more efficient than a single-carrier system does not refute its expert's testimony that it ***would*** add complexity and costs to Afshary's network. PO Sur-reply 2–3. Patent Owner further argues that Petitioner conflates impairments between Afshary's network and its medium

while avoiding Afshary's disclosure that coaxial cables are "a very clear, clean medium" and a POSITA would not turn to Mirfakhraei's network that uses telephone lines to improve Afshary. *Id.* at 3. Patent Owner argues that Afshary's network uses filters to address channel impairments. *Id.* Patent Owner reiterates that a POSITA would not have been motivated to insert Mirfakhraei's bit-loaded multi-carrier modulation because Afshary already provides a reliable and robust system. *Id.*

We disagree with Patent Owner's arguments. In our view, a POSITA would understand that adding Mirfakhraei's multi-carrier modulation with bit loading to Afshary's network would enhance its robustness by providing noise immunity and greater bandwidth through added channels, and efficient use of those channels through bit loading.

That Mirfakhraei discloses using multi-carrier modulation with bit loading on telephone lines does not detract from a POSITA's understanding that the technique would improve Afshary's coaxial cable network by addressing impairments such as variable frequency response and signal attenuation using Mirfakhraei's technique. Ex. 1036 ¶¶ 26, 33. That these benefits come at some cost and complexity does not diminish that, at least in some cases, a POSITA would have deemed them desirable such as for robustness and reliability. *Id.* ¶¶ 36–39.

Petitioner demonstrates by preponderant evidence that a POSITA would have seen the value of using Mirfakhraei's multi-carrier modulation with bit loading in Afshary's coaxial network.

*(2) Robust and Reliable System*

In addition, Patent Owner argues that Afshary already achieved a robust and reliable communication system and did not need Mirfakhraei's

multi-carrier modulation scheme to improve Afshary's network. PO Resp. 59–60 (citing Pet. 25, 41, 43, Ex. 1004 ¶ 72; Ex. 1006 ¶ 37; Ex. 1007 ¶ 3; Ex. 1013, 26:4–20[6]; Ex. 1002 ¶¶ 49–55, 141–144; Ex. 2001 ¶¶ 125–133); PO Sur-reply 3, 6–8. Specifically, Patent Owner contends that Afshary already has an efficient bit-loading scheme to improve available bandwidth and thus would not need Mirfakhraei's multi-carrier bit loading. PO Resp. 59–60.

Petitioner contends that the use of certain techniques in Afshary to improve reliability does not remove the motivation to use Mirfakhraei's bit-loaded multi-carrier modulation to further improve transmission robustness and efficiency. Pet. Reply 14 (citing *Intel*, 61 F.4th at 1380–81).

We agree with Petitioner that a POSITA would understand that adding Mirfakhraei's bit-loaded multi-carrier modulation to Afshary's network would enhance its robustness and reliability through noise immunity and increased bandwidth used efficiently through bit-loading. *See, e.g.*, Pet. 42; Ex. 1036 ¶¶ 29–35. A POSITA would have seen this improvement as desirable at least in scenarios where the cost and complexity concerns that Patent Owner mentions were outweighed by the desire for robustness and reliability of network communications.

Accordingly, Petitioner presents preponderant evidence that a POSITA would have been motivated not by hindsight but by a desire for robustness and reliability of communications to make the combination of Afshary and Mirfakhraei.

---

[6] Citation not found.

*(3) Harsh Environment*

Patent Owner asserts that Petitioner contends Afshary operates in a "harsh" environment as a reason to improve Afshary with Mirfakhraei but Afshary describes its coaxial medium as very clean. PO Resp. 54 (citing Ex. 1006 ¶ 24; Ex. 2001 ¶¶ 121–124). Patent Owner further asserts that "harshness" is "an umbrella term for issues that could affect ***all*** communication mediums and is far too generic to support the Petition's combination." *Id.* (citing Ex. 2002, 113:9–120:21).

Patent Owner further asserts that Afshary's coaxial network is a clean medium and not a "harsh" one as Petitioner alleges. *Id.* at 60–64 (citing Pet. 42; Ex. 1006 ¶¶ 5–6; Ex. 2001 ¶¶ 126–127). Patent Owner contends that Afshary differentiates between coaxial cabling and telephone lines, and favors the former as a cleaner medium such that Petitioner relied on hindsight to arrive at the proposed combination. *Id.* at 60–61 (citing Ex. 1006 ¶¶ 5–24, 27; Ex. 2001 ¶¶ 126–127). Patent Owner argues that Petitioner disregards Afshary's disclosure in asserting coaxial cable is a "harsh" environment. *Id.* at 61–62 (citing Pet. 41–42; Ex. 1006 ¶¶ 6, 24; Ex. 1002 ¶¶ 54, 127; Ex. 2001 ¶ 128; Ex. 1018). Patent Owner further asserts that a POSITA would not look to improve transmission quality using an ADSL transceiver that operates over telephone lines like Mirfakhraei. *Id.* at 62 (citing Ex. 2001 ¶ 128).

Petitioner alleges that Afshary's description of the coaxial cables as "a very clear, clean medium" refers to the cables, but not Afshary's network. Pet. Reply 11 (citing Ex. 1006 ¶ 24). Petitioner argues that a POSITA would have understood that Afshary's network includes components with imperfect connections and cabling that would introduce channel

impairments such as frequency-dependent attenuation and noise. *Id.* (citing Ex. 1010, 374–375, Fig. 1; Ex. 1018, 305; Ex. 1036 ¶ 25). Petitioner asserts that Mirfakhraei addresses frequency-dependent attenuation and other impairments. *Id.* at 11–12 (citing Ex. 1007 ¶¶ 2, 6; Ex. 1010, 375; Ex. 1018, 306; Ex. 1036 ¶¶ 26–27). Petitioner further contends that the motivation to combine Afshary and Mirfakhraei need not necessarily be what motivated the '518 patent's inventors. *Id.* at 12–13 (citing *Honeywell Int'l Inc. v. 3G Licensing, S.A.*, 124 F.4th 1345, 1353–54 (Fed. Cir. 2025)).

Patent Owner asserts that Petitioner did not address its arguments regarding why a POSITA would turn to a reference that uses telephone lines when Afshary "highlights issues with this medium," or why a POSITA would turn to Mirfakhraei when Afshary already addresses channel impairments. PO Sur-reply 5–6. Patent Owner further contends that Petitioner conflates Afshary's coaxial medium, which is clean, and the network, which suffers channel impairments addressed by its filters. *Id.* at 6 (citing Ex. 1006 ¶¶ 24, 42; Ex. 2001 ¶ 122).

We agree with Patent Owner that Afshary teaches that coaxial cables are a "very clear, clean medium" and that its comment concerning "harsh environment" pertains to AC power lines, not coaxial cable. Ex. 1006 ¶¶ 5 (Table 1), 24. Hence, Petitioner's assertion of motivation to combine by reason of coaxial cable presenting a "harsh environment" is not persuasive.

*(4) Power-Efficient Modulation*

Patent Owner asserts that Petitioner attempts to argue that Mirfakhraei's "DMT bit loading scheme" would improve Afshary by allowing more use of the bandwidths to transmit more bits onto frequency channels that experience less noise and/or interference. PO Resp. 64 (citing

Pet. 43; Ex. 1002 ¶¶ 141–144). Patent Owner argues that Afshary's modulation scheme "already transmits data on channels with less noise and interference, and does so using optimal power for its architecture." *Id.* at 64–65 (citing Ex. 2001 ¶¶ 124, 130; Ex. 1002 ¶¶ 141–146).

Specifically, Patent Owner alleges that Afshary uses signal carrier signaling as a robust, cost-effective method to provide high bandwidth in a "clean" medium, like coaxial cables, using FSK, BPSK, and QPSK to ensure efficient communication through the system. *Id.* at 65 (citing Ex. 1006 ¶¶ 36–37; Ex. 2001 ¶ 131). According to Patent Owner, Petitioner ignores Afshary's modulation schemes and their efficiencies in power consumption and data transmission. *Id.* Patent Owner argues that the combination of Afhsary and Mirfakhraei would not provide improved power efficiency by using more available bandwidth for communicating because the bit loading schemes are not tied to the specific SNRs profile of the channel to each specific endpoint in the proposed combination, either resulting in too many or too few bits for the given SNR profile leading to inefficiencies or data loss. *Id.* at 65–67 (citing Ex. 2001 ¶¶ 132–133).

Petitioner contends that Mirfakhraei discusses bandwidth and power optimization, and that Mirfakhraei would have commended itself to an inventor's attention in considering the problem addressed by the '518 patent. Pet. Reply 9–10 (citing Ex. 1036 ¶¶ 23–24). Petitioner argues that Afshary employs addressing techniques that would enable channel characterization on the specific communication paths between network devices, such that power optimization could be carried out on a channel-by-channel basis. *Id.* at 10–20 (citing Ex. 1006 ¶ 41; Ex. 1036 ¶¶ 47–51; Ex. 2001 ¶ 123).

We agree with Petitioner's contentions that a POSITA would have understood that Mirfakhraei's multi-carrier bit loading techniques would be applied to Afshary such that power would be optimized on each of multiple channel frequencies rather than a single bit loading profile that is assigned to all network devices for communication, as Patent Owner argues. Ex. 1036 ¶¶ 47–51; Ex. 2001 ¶¶ 123–124, 130, 132–133. Petitioner correctly contends that this would be accomplished through the capability of Afshary's LAN adapters to address each other on the local cable network, as the term "designated . . . adapter" in Afshary implies. Ex. 1006 ¶ 41; Ex. 1036 ¶¶ 47–51. Alternatively, or in addition, Afshary's LAN adapters would communicate with scheduled time slots via TDMA. Ex. 1006 ¶ 34. Hence, we do not agree that Petitioner's combination would be inefficient in terms of its bit loading or power usage.

*d) Conclusion for Motivation to Combine with Reasonable Expectation of Success*

On this record, Petitioner has shown that a POSITA would have been motivated to combine Afshary and Mirfakhraei with a reasonable expectation of success. We determine that this motivation would not frustrate the '518 patent's goals; that the two references are not incompatible by reason of required ASIC redesign, or that Mirfakhraei discloses a point-to-point network while Afshary is multi-point, or that the two use different frequency bands. We determine that both Mr. Bertonis and Mr. Garrett qualify as POSITAs. We determine that Petitioner did not use impermissible hindsight with respect to the motivations to combine regarding variable frequency response, robustness and reliability, and

power-efficient modulation, but did use impermissible hindsight with respect to the "harsh environment" motivation as contrary to Afshary's teaching.

Accordingly, overall, we determine that Petitioner has presented preponderant evidence of motivations to combine Afshary and Mirfakhraei with a reasonable expectation of success for the reasons explained.

*5. Claim 1*

We now address Petitioner's contentions that claim 1 is disclosed by the combination of Afshary and Mirfakhraei. Pet. 28–51. Patent Owner does not dispute Petitioner's contentions. We conclude for claim 1 that Petitioner has shown preponderant evidence that claim 1 would have been obvious over Afshary and Mirfakhraei for the reasons that follow.

*a) Preamble 1pre: Data Communication Network*

Petitioner contends that Afshary discloses a coaxial cable local area network (LAN) ("data communication network"). Pet. 28–29 (citing Ex. 1006 ¶¶ 2, 7, 12, 14, 19–23, 41, Figs. 1–2; Ex. 1002 ¶¶ 118–120).

We determine that Petitioner has shown preponderant evidence that Afshary discloses the preamble 1pre so we do not decide whether the preamble is limiting.

*b) Limitation 1A: At Least Two Network Devices*

Limitations 1A recites "at least two network devices, each network device comprising a multi-carrier modulator for modulating data, an up converter for translating the modulated data to an RF carrier frequency, a down converter for translating an RF signal, and a multi-carrier demodulator for demodulating the translated RF signal to produce data."

Petitioner contends that Afshary discloses each feature of limitation 1A other than a modulator and demodulator that are multi-carrier, but asserts that such devices are disclosed by Mirfakhraei. Pet. 29.

Petitioner contends that Afshary discloses cable LAN adapters 32 ("at least two network devices") within its coaxial LAN. *Id.* at 30 (citing *id.* at § VI.A.1.a; Ex. 1006 ¶¶ 18–19, 21–23, 41, Figs. 1–2; Ex. 1002 ¶ 121).

Petitioner contends that Afshary discloses a modulator 96 and RF & Mixed Signal section 100, digital to analog converter (DAC) 108, up converter 112, local oscillator (LO) frequency synthesizer timing circuit 120, mixer 122, and power amplifier (PA) 116 (collectively, "up converter for translating the modulated data to an RF carrier frequency"). *Id.* at 31–32 (citing Ex. 1006 ¶¶ 38–39; Ex. 1002 ¶¶ 123–124).

Petitioner contends that Afshary discloses that these components operate to translate the modulated data from the Baseband section 90 to a 1300 MHz center frequency ("RF carrier frequency") and that the modulated data occupies a bandwidth of 5 MHz. *Id.* at 31–32 (citing Ex. 1006 ¶¶ 25, 38–39; Ex. 1002 ¶¶ 123–124). Petitioner asserts that the up-converted modulated data is transmitted as an RF signal to another cable LAN adapter 32 to facilitate communication between client devices. *Id.* (citing Ex. 1006 ¶¶ 23, 26, 39, 41, Fig. 3; Ex. 1002 ¶¶ 123–124).

Petitioner further contends that, for receiving RF modulated data, the RF & Mixed Signal section 100 includes low noise amplifier (LNA) 118, LO 120, mixer 122, down converter 114, and analog to digital converter (ADC) 110 (collectively, "down converter for translating an RF signal"). *Id.* at 33 (citing Ex. 1006 ¶¶ 38–39, 41; Ex. 1002 ¶¶ 125–126). Petitioner asserts that "Afshary teaches that these components operate to translate a

received RF signal to a lower frequency signal." *Id.* (citing Ex. 1006 ¶¶ 38–39, 41; Ex. 1002 ¶¶ 125–126). According to Petitioner, "Afshary teaches that the down-converted signal from the RF & Mixed Signal section 100 is demodulated by demodulator 98." *Id.* (citing Ex. 1006 ¶¶ 41–42; Ex. 1002 ¶¶ 125–126). Petitioner states that the "demodulated data from demodulator 98 is decoded and corrected by FEC decoder 94 to recover digital data that is provided to MAC & Client Interface section 80." *Id.* (citing Ex. 1006 ¶¶ 41–42; Ex. 1002 ¶¶ 125–126).

Petitioner asserts that "Figure 1 of Mirfakhraei . . . shows a transmitter 110 and a receiver 190 of a transceiver 100 that communicates using Mirfakhraei's DMT and a bit-loading scheme." *Id.* at 35 (citing Ex. 1007 ¶¶ 5–8, 14–15; Ex. 1002 ¶ 130). According to Petitioner, Mirfakhraei teaches that the transmitter 110 includes framer 113, tone ordering block 114, constellation mapper 115, Inverse Discrete Fourier Transform (IDFT) block 116, buffer 117, and TX handshake block 120 (collectively, "multi-carrier modulator for modulating data"). *Id.* at 35–36 (citing Ex. 1007 ¶¶ 15–19; Ex. 1002 ¶ 130).

Petitioner contends that "Mirfakhraei teaches that the receiver 190 includes time domain equalizer (TEQ) 180, buffer 197, Discrete Fourier Transform (DFT) block 196, frequency domain equalizer 195, slicer 194, deframer 193, and RX handshake block 170 (collectively, "multi-carrier demodulator for demodulating the translated RF signal to produce data")." *Id.* at 38–39 (citing Ex. 1007 ¶¶ 21–24; Ex. 1002 ¶ 135).

We determine that Petitioner has shown preponderant evidence that limitation 1A is disclosed by the combination of Afshary and Mirfakhraei.

*c) Limitation 1B: Cable Wiring*

Limitation 1B recites "cable wiring comprising a splitter with a common port and a plurality of tap ports, and a plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices."

Petitioner contends that Afshary discloses cable LAN adapters 32 ("network devices") within the coaxial cable LAN. Pet. 45 (citing Ex. 1006 ¶¶ 18–19, 21–23, Figs. 1–2; Ex. 1002 ¶¶ 148–149). According to Petitioner, "Afshary explains that drop cable 10 is provided to splitter 22 within home 12." *Id.* (citing Ex. 1006 ¶¶ 16, 18–19; Ex. 1002 ¶¶ 148–149). Petitioner asserts that "Afshary teaches that 'drop cable 10 is split by splitter 22 into different cable wires 24, [with] each cable wire 24 being routed to different rooms in home 12.'" *Id.* at 45–46 (citing Ex. 1006 ¶ 18; Ex. 1002 ¶¶ 148–149) (alteration in original).

Referring to Afshary's Figure 1, Petitioner contends that the splitter 22 ("splitter") includes an input port ("common port") and multiple output ports ("plurality of tap ports"). *Id.* at 46 (citing Ex. 1006 ¶¶ 16, 18–19; Ex. 1001, 1:53–57, Fig. 1; Ex. 1002 ¶¶ 148–149). According to Petitioner, from the output ports, multiple cable wires 24 ("cable wiring" and "plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices") are connected to the cable LAN adapters 32. *Id.* at 46–47 (citing Ex. 1006 ¶¶ 16, 18–19; Ex. 1001, 1:53–57, Fig. 1; Ex. 1002 ¶¶ 148–150).

We determine that Petitioner has shown by preponderant evidence that limitation 1B is disclosed by Afshary.

*d) Limitation 1C: Multi-Carrier Signaling*

Limitation 1C recites "whereby network devices communicate with each other through the cable wiring using multi-carrier signaling."

Petitioner contends that Afshary discloses cable LAN adapters 32 ("network devices") that communicate with each other via cable wire 24 ("cable wiring"). Pet. 47 (citing Ex. 1006 ¶¶ 16, 18–19, 21–23, Figs. 1–2; Ex. 1002 ¶ 151). Petitioner asserts that the cable LAN adapters 32 in the Afshary-Mirfakhraei system communicate with each other using the DMT bit-loading protocol taught by Mirfakhraei. *Id.* at 47–48 (citing Ex. 1007, code (54), ¶¶ 2–3, 5–8, 14–15, Fig. 1; Ex. 1002 ¶ 151). Petitioner alleges that "Mirfakhraei explains that DMT is a multi-carrier communication technique (claimed 'communicat[ing] … using multi-carrier signaling')." *Id.* at 48 (citing Ex. 1007, code (54), ¶¶ 2–3, 5–6, Fig. 1; Ex. 1002 ¶¶ 151–152) (alterations in original).

We determine that Petitioner has shown by preponderant evidence that limitation 1C is disclosed by the combination of Afshary and Mirfakhraei.

*e) Limitation 1D: Probe Messages*

Limitation 1D recites "wherein network devices transmit probe messages through the cable wiring and analyze received probe message signals to determine channel characteristics and bit loading is selected based on the determined channel characteristics."

Petitioner asserts that "the Afshary-Mirfakhraei system implements the DMT bit loading scheme taught by Mirfakhraei." Pet. 48 (citing Ex. 1007, code (54), ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶ 153). Petitioner states that, "[t]o facilitate the DMT bit loading scheme, the cable

LAN adapters (claimed "network devices") of the Afshary-Mirfakhraei system include the TX handshake block 120 . . . and the RX handshake block 170 . . . to implement the 'bit-loading' process that characterizes the capabilities of sub-channels and determines the number of bits-per-symbol transmitted over the channel' as taught by Mirfakhraei." *Id.* (citing Ex. 1007, code (57), 14, ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶ 153).

According to Petitioner, Mirfakhraei discloses that TX handshake block 120 of a first transceiver generates and transmits handshake signals to a second transceiver ("transmit probe messages through the cable wiring"), with each handshake signal comprising a known signal (*e.g.*, a known signal pattern or a known pseudo-random signal). Pet. 49–50 (citing Ex. 1007 ¶¶ 20–23; Ex. 1002 ¶ 154). Petitioner asserts that "Mirfakhraei further teaches that RX handshake block 170 of the second transceiver estimates the SNR (claimed "channel characteristics") for each sub-channel based on received handshake signals (claimed "analyze received probe message signals"). *Id.* at 50 (citing Ex. 1007 ¶¶ 21–23; Ex. 1002 ¶ 154).

Regarding Mirfakhraei's bit-loading, Petitioner contends that Mirfakhraei discloses that "the size of a constellation map for a subchannel, and hence the number of bits represented by each transmitted signal, is based on the SNR of the subchannel." *Id.* (citing Ex. 1007 ¶¶ 4–8, 14, 17–18, Figs. 1–2; Ex. 1002 ¶¶ 29–55, 155).

According to Petitioner, Mirfakhraei discloses that "the RX handshake block 170 facilitates implementation of the bit loading process by comparing the received handshake signal to the known signal values that were transmitted." *Id.* (citing Ex. 1007 ¶¶ 5–8, 14, 20, 22–23, 25–32, Figs. 1–2; Ex. 1002 ¶ 155). Petitioner asserts that, "[b]ased on the

comparison, SNR values for each sub-channel are determined." *Id.* (citing Ex. 1007 ¶¶ 5–8, 14, 20, 22–23, 25–32, Figs. 1–2; Ex. 1002 ¶ 155). Petitioner argues that the "appropriate bit-loadings for each sub-channel are then determined based on the SNR values determined for each sub-channel (claimed "bit loading is selected based on the determined channel characteristics")." *Id.* at 50–51 (citing Ex. 1007 ¶¶ 5–8, 14, 17, 20, 22–23, 25–32, Figs. 1–2; Ex. 1002 ¶ 155).

Petitioner further contends that "[s]ub-channels having higher SNRs are assigned higher order modulation constellations." *Id.* at 51 (citing Ex. 1007 ¶¶ 5–8, 14, 17, 20, 22–23, 25–32, Figs. 1–2; Ex. 1002 ¶ 155). According to Petitioner, "[s]ub-channels having lower SNRs are assigned lower order modulation constellations." *Id.* Petitioner states that "[f]or example, a sub-channel with a higher SNR modulates data using a larger QAM constellation such as 256-QAM, which enables each transmitted QAM symbol to represent 8 bits, while a sub-channel with a lower SNR modulates data using a smaller QAM constellation such as 16-QAM, which enables each transmitted QAM symbol to represent 4 bits." *Id.* (citing Ex. 1007 ¶¶ 4, 17–18, 23–24; Ex. 1002 ¶¶ 29–55, 155). Petitioner contends that the "RX handshake block 170 of the second transceiver sends the determined bit-loadings for each sub-channel to the first transceiver, which then employs the bit-loadings in subsequent communications with the second transceiver." *Id.* (citing Ex. 1007 ¶¶ 5–8, 14, 20, 22–23, 25–32, Figs. 1–2; Ex. 1002 ¶¶ 29–55, 153–156).

We determine that Petitioner has presented preponderant evidence that limitation 1D is disclosed by the combination of Afshary and Mirfakhraei.

*f) Conclusion for Claim 1*

We determine that Petitioner has shown preponderant evidence that a POSITA would have combined Afshary and Mirfakhraei with a reasonable expectation of success notwithstanding Patent Owner's arguments to the contrary. Petitioner has further demonstrated that each limitation is disclosed by the combination of Afshary and Mirfakhraei. Accordingly, Petitioner has shown that claim 1 of the '518 patent would have been obvious over the combination of Afshary and Mirfakhraei.

*6. Claim 2*

Claim 2 depends from claim 1 and recites "wherein a network device comprises a means for determining signal activity and selects a frequency band for operation that is not used by other services."

Petitioner contends that Mirfakhraei's receiver includes DFT block 196 that receives data samples from ADC 160. Pet. 52 (citing Ex. 1007, code (57), ¶¶ 15, 19, 24, Fig. 1; Ex. 1002 ¶¶ 157–158). According to Petitioner, Mirfakhraei explains that "discrete Fourier transform (DFT) block 196 performs a discrete Fourier transform on the filtered time-domain samples … to determine frequency components associated with the sub-channels" (corresponding to the function of "determining signal activity" for the term "means for determining signal activity"). *Id.* (citing Ex. 1007 ¶ 24; Ex. 1002 ¶¶ 157–158; Ex. 1001, 8:4–8, 8:27–39, 11:14–18, Fig. 6) (alteration in original).

In the combination, Petitioner contends that Afshary's cable LAN adapter 32 would incorporate the portion of Mirfakhraei's receiving including DFT block 196 which performs a DFT, equivalent to an FFT, on samples from the ADC converter (corresponding to the structure of the

"means for determining signal activity"). *Id.* at 53–54 (citing Ex. 1006 ¶¶ 38–42, Fig. 4; Ex. 1007 ¶¶ 15, 21, 24, Fig. 1; Ex. 1001, 8:4–8, 8:27–39, 8:65–9:4; Ex. 1002 ¶¶ 157–160; Ex. 1019, 100–109; Ex. 1020, 554–561; Ex. 1021, 581–585).

Petitioner further contends that "in the Afshary-Mirfakhraei system, each cable LAN adapter selects a frequency band for operation so as to not interference with conventional cable TV service (claimed 'selects a frequency band for operation that is not used by other services')." *Id.* at 54–55 (citing Ex. 1006, code (57) ¶¶ 2, 7, 12, 24–25, 39, Figs. 1, 3; Ex. 1002 ¶ 161).

Although Patent Owner does not dispute Petitioner's contentions for claim 2, we nonetheless determine that Petitioner has not shown preponderant evidence that claim 2 would have been obvious. From the '518 patent's description, we determine frequency band selection to refer to a band in which the channels or sub-channels supporting communication would exist, not the selection of channels or sub-channels for bit loading within a frequency band. *See, e.g.*, Ex. 1001, 11:8–12:6. The Afshary-Mirkfakhraei combination does not disclose a network device with the capability to select between frequency bands (as opposed to channels or sub-channels within a frequency band).

Accordingly, we determine that Petitioner has not shown preponderant evidence that claim 2 would have been obvious.

*7. Claim 3*

Claim 3 depends from claim 1 and recites "wherein the network shares the cable wiring with a cable television service and the network

device up converter translates the modulated data to an RF carrier frequency above the frequency used by the cable television service."

Petitioner contends that Afshary discloses a coaxial cable LAN that shares the coaxial cable wire 24 with existing cable services, including a conventional cable TV service. Pet. 56 (citing *id.* § VI.A; Ex. 1006, code (57), ¶¶ 2, 7, 12, 24–25, 39, Figs. 1, 3; Ex. 1002 ¶ 163). Petitioner asserts that Afshary's RF & Mixed Signal section 100 translates modulated data of the coaxial cable LAN to an RF carrier frequency that ensures that the operating frequency range of the coaxial cable LAN is above and does not overlap the operating frequency range of the conventional cable TV service. *Id.* at 56–57 (citing Ex. 1006 ¶¶ 2, 17, 24–25, 37–39; Ex. 1002 ¶ 163.

Patent Owner argues that Mirfakhraei operates over the exact frequencies Afshary seeks to avoid. PO Resp. 67–68 (citing Ex. 1006 ¶¶ 24–25; Ex. 1007 ¶¶ 5, 15; Ex. 2001 ¶¶ 134–137). Patent Owner asserts that there is no basis to support that Mirfakhraei's modulation scheme would work at higher frequencies, and that Petitioner's expert testimony is unsupported by preponderant evidence. *Id.* at 68–69 (citing Ex. 1006 ¶¶ 26; Ex. 1007 ¶¶ 2–3; Ex. 2001 ¶¶ 56, 138–140, 163–164; *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 294 (Fed. Cir. 1985) (expert testimony based on a lack of factual support offers little probative value)).

Petitioner responds that Patent Owner "ignores that a POSITA would have the skill to modify Afshary's RF & Mixed Signal section 100 to up-convert a signal to virtually any carrier frequency and therefore frequency range." Pet. Reply 24–25 (citing Ex. 1036 ¶¶ 60–61).

We agree with Petitioner that, in the Afshary-Mirfakhraei combination, Afshary's LAN adapters up convert modulated data via their up converters to an RF carrier frequency that is above the frequency used by the cable television service. Pet. 56–57; Ex. 1006, code (57) ¶¶ 2, 7, 12, 17, 24–25, 37–39, Figs. 1, 3; Ex. 1002 ¶ 163. Mr. Bertonis's testimony is well supported by the evidence. Ex. 1036 ¶¶ 60–61.

We determine that Petitioner has shown preponderant evidence that claim 3 would have been obvious over the Afshary-Mirfakhraei combination.

*8. Claim 4*

Claim 4 is similar to claim 1 and incorporates means-plus-function limitations discussed in § II.B. Reviewing Petitioner's contentions for claim 4 (Pet. 57–68), for which Patent Owner does not present any arguments specific to its limitations, we determine that Petitioner has shown preponderant evidence that claim 4 would have been obvious over the combination of Afshary and Mirfakhraei.

*a) Preamble 4pre: Network Device*

Preamble 4pre recites "A network device for communicating data to other network devices over a coaxial wiring system comprising a splitter and a plurality of cable segments connected between the splitter and the network devices, the network device comprising."

Petitioner contends that Afshary discloses a LAN over coaxial cable ("coaxial wiring system") that includes cable LAN adapters ("network device for communicating data to other network devices"). Pet. 57–58 (citing Ex. 1006, code (57), ¶¶ 2, 7, 12, 14, 18–23, Figs. 1–2; Ex. 1002 ¶¶ 165–166). Petitioner further asserts that Afshary's cable LAN includes

splitters and multiple cable wires connected between the splitters and LAN adapters ("plurality of cable segments connected between the splitter and the network devices"). *Id.*

We determine that Petitioner has shown preponderant evidence that Afshary discloses preamble 4pre and thus do not decide whether it is limiting.

*b) Limitation 4A: Data Modulator*

Limitation 4A recites "a data modulator to produce a multicarrier modulated signal."

Petitioner contends that "the cable LAN adapters of the Afshary-Mirfakhraei system would include the functionality of Mirfakhraei's multi-carrier modulator to implement the DMT bit loading scheme taught by Mirfakhraei." Pet. 59 (citing Ex. 1007, code (57), ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶ 167). Petitioner asserts that "Mirfakhraei teaches a transmitter 110 that includes framer 113, tone ordering block 114, constellation mapper 115, IDFT block 116, buffer 117, and TX handshake block 120 (collectively, claimed 'data modulator to produce a multicarrier modulated signal') that generate a multi-carrier modulated signal based on Mirfakhraei's DMT bit-loading scheme." *Id.* (citing Ex. 1007 ¶¶ 14–19, Fig. 1; Ex. 1002 ¶ 167). Petitioner further argues that "Mirfakhraei teaches that these components of transmitter 110 operate to generate 'a discrete multi-tone (DMT) communication signal' (claimed 'multicarrier modulated signal')." *Id.* at 59–60 (citing Ex. 1007, code (57), ¶¶ 1–3, 5–8, 14–25, Figs. 1–2; Ex. 1002 ¶¶ 167–168).

We determine that Petitioner has demonstrated by preponderant evidence that limitation 4A is disclosed by the Afshary-Mirfakhraei combination. *Id.* at 60 (citing Ex. 1002 ¶¶ 167–168).

*c) Limitation 4B: Demodulator*

Limitation 4B recites "a demodulator for multicarrier modulated signal to produce data."

Petitioner asserts that "the cable LAN adapters of the Afshary-Mirfakhraei system would include the functionality of Mirfakhraei's multi-carrier demodulator to implement the DMT bit loading scheme taught by Mirfakhraei." Pet. 60–61 (citing Ex. 1007, code (57), ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶ 169). According to Petitioner, "Mirfakhraei teaches that the receiver 190 includes RX handshake block 170, TEQ 180, buffer 197, DFT block 196, frequency domain equalizer 195, slicer 194, and deframer 193 (collectively, claimed 'demodulator for multicarrier modulated signal to produce data')." *Id.* at 61 (citing Ex. 1007 ¶¶ 21–24; Ex. 1002 ¶ 169). Petitioner further asserts that "Mirfakhraei explains that these components operate to recover a data bit stream (claimed 'produce[d] data[]') from different QAM symbols transmitted on each subcarrier of a multicarrier modulated signal." *Id.* at 61–62 (citing Ex. 1007 ¶ 24, Fig. 1; Ex. 1002 ¶¶ 169–170).

We determine that Petitioner has shown preponderant evidence that limitation 4B is disclosed by the Afshary-Mirfakhraei combination.

*d) Limitation 4C: Means for Producing and Transmitting*

Limitation 4c recites "means for producing and transmitting a probe message."

Petitioner asserts that "each cable LAN adapter 32 in the Afshary-Mirfakhraei system would use Mirfakhraei's handshake signals to facilitate implementation of the DMT bit loading scheme described by Mirfakhraei." Pet. 63 (citing Ex. 1007, code (57), ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶ 171). Petitioner asserts that Mirfakhraei's TX handshake block 120 generates a handshake signal that is a "known pseudo-random signal" or known signal pattern (corresponding to the function of "producing and transmitting a probe message" of the term "means for producing and transmitting a probe message"). *Id.* (citing Ex. 1007 ¶¶ 20–22; Ex. 1002 ¶ 171).

Petitioner contends that "Mirfakhraei teaches that TX handshake block 120 may be implemented in software by a host computer" and that "a POSITA would understand that a host computer implementing the TX handshake block 120 in software would entail executing software on a processor (corresponding to the structure of a 'processor' for the term 'means for producing and transmitting a probe message')." *Id.* at 64–65. Petitioner further contends that "the TX handshake block 120, when implemented by executing software on a processor, performs an algorithm that includes generating a signal known to a remote transceiver and transmitting the known signal to the remote transceiver (corresponding to the algorithm of '(a) generating a signal known to a receiving device; and (b) transmitting the known signal,' identified as the algorithm performed by the corresponding structure of a 'processor')." *Id.* at 64–65 (citing Ex. 1007, code (57), ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶¶ 171–173).

We determine that Petitioner has presented preponderant evidence that the Afshary-Mirfakhraei combination discloses limitation 4C.

*e) Limitation 4D: Means for Receiving and Analyzing*

Limitation 4D recites "means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data."

Petitioner contends that "each cable LAN adapter 32 in the Afshary-Mirfakhraei system would implement the DMT bit loading scheme described by Mirfakhraei." Pet. 65 (citing Ex. 1007, code (57), ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶ 174). Petitioner asserts that "each cable LAN adapter 32 includes the RX handshake block 170 . . . [that] receives a handshake signal from a TX handshake block 120 from another cable LAN adapter 32." *Id.* (citing Ex. 1007, code (57), ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶¶ 22, 174). According to Petitioner, "Mirfakhraei teaches that the RX handshake block 170 compares the received handshake signal to the known values that were transmitted to estimate the SNR for each sub-channel, which are then used to determine the appropriate bit loadings for each sub-channel (corresponding to the function of 'receiving and analyzing a probe message to determine a bit loading profile used to transmit data' of the term 'means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data')." *Id.* at 66 (citing Ex. 1007 ¶¶ 25–32, Figs. 1–2; Ex. 1002 ¶ 174).

Petitioner asserts that "Mirfakhraei teaches that RX handshake block 170 may be implemented in software by a host computer" and a "POSITA would understand that a host computer implementing the RX handshake block 170 in software would entail executing software on a processor (corresponding to the structure of a 'processor' for the term 'means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data')." *Id.* at 67–68 (citing Ex. 1007 ¶ 15, Fig. 1; Ex. 1002

¶ 175). Petitioner further contends that "the RX handshake block 170, when implemented by executing software on a processor, performs an algorithm that includes receiving a known signal from a remote transceiver, determining SNR levels for each subchannel based on the received known signal, and determining the bit-loading for each subchannel based on the determined SNR level for each subchannel (corresponding to the algorithm of '(a) receiving a known signal; (b) determining a SNR for each subchannel based on the received known signal; and (c) determining a bit loading for each subchannel based on the determined SNR for the subchannel,' identified as the algorithm performed by the corresponding structure of a 'processor')." *Id.* at 68 (citing Ex. 1007, code (57), ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶¶ 174–175).

We determine that Petitioner has shown preponderant evidence that the Afshary-Mirfakhraei combination discloses limitation 4D.

*f) Conclusion for Claim 4*

Petitioner has shown preponderant evidence that a POSITA would have been motivated to combine Afshary and Mirfakhraei with a reasonable expectation of success. Petitioner has further demonstrated that each limitation of claim 4 is disclosed by the combination.

Accordingly, Petitioner has shown by a preponderance of the evidence that claim 4 would have been obvious over the Afshary-Mirfakhraei combination.

*E. Ground B: Obviousness over Afshary, Mirfakhraei, and Welles*

Petitioner asserts that claim 2 is obvious over the combination of Afshary, Mirfakhraei, and Welles in ground B. Pet. 68–73. Patent Owner relies on its arguments for claim 1, from which claim 2 depends.

*1. Welles (Ex. 1022)*

Welles relates to a communication system for communication between utility meters in a local area network and a central database. Ex. 1022, code (57). Transmitters in utility meters transmit meter data over power lines to a receiver in another meter, and the receiver communicates those data measurements to a central database. *Id.* Meter 110 includes envelope detectors 192, 194 which are used to determine signal quality and whether the power line transceiver 150 should lock onto the signal. *Id.* at 6:18–50.

Welles discloses that noise and signals in the range from 10 to 100 KHz present difficulties for communication. *Id.* at 5:51–64. The patent uses frequency pairs in this range to communicate, and receiver 300 and CPU 900 may detect spurious data or noise in portions of the frequency range and select alternative operational frequencies within that range for transmission. *Id.*

*2. Motivation to Combine*

We have already addressed the motivation to combine Afshary and Mirfakhraei (§ II.D.4). Petitioner contends that a POSITA would have combined Welles' envelope detector to determine signal activity over a frequency range to determine whether it adversely affected by interference or noise. Pet. 70. Petitioner asserts that Welles's envelope detector is a simple diode and its inclusion in the Afshary-Mirfakhraei combination would provide a simple and straightforward way to determine whether a range of frequencies would be suitable for communication. *Id.* at 70–71 (citing Ex. 1022, 5:5–6:17, 7:2–11; Ex. 1002 ¶¶ 56, 179–180). Petitioner asserts that Welles's envelope detector would be useful in achieving

Afhsary's goal of ensuring that existing services provided over the same communication medium are not disturbed by local network communications. *Id.* at 70–73 (citing Ex. 1006, code (57), ¶¶ 2, 7, 21–28, Fig. 3; Ex. 1002 ¶¶ 56, 84, 95–102, 178–183; Ex. 1022, 1:15–17, 2:4–9, 5:5–16, 5:23–35, 7:1–11; Ex. 1002 ¶¶ 56, 95–102, 181–183).

*3. Claim 2*

Claims 2 depends from claim 1 and recites "wherein a network device comprises a means for determining signal activity and selects a frequency band for operation that is not used by other services."

Petitioner contends that "Welles teaches that its transceiver uses its envelope detector to determine if a range of frequencies is already in use so as to select a frequency range of operation not occupied by communication from other transceivers or systems." Pet. 72–73 (citing Ex. 1022, 5:5–7:11, Figs. 1–2, 4; Ex. 1002 ¶ 183).

While we agree with Petitioner that Welles's envelope detector detects signal activity, we do not agree that it, at least not alone, "selects a frequency band for operation that is not used by other services." Rather it appears that the receiver 300 (which includes envelope detectors 192, 194) and CPU 900 together perform that function.

Hence, we determine that Petitioner has not demonstrated preponderant evidence that Welles's envelope detector, standing alone, teaches or suggests claim 2.[7]

[7] Although Petitioner cites evidence in Welles that the receiver and CPU select a frequency band free of interference and noise for communication, we limit our Decision to the Petition contentions. *SAS Institute, Inc. v. Iancu*, 584 U.S. 357, 365 (2018).

## III. CONCLUSION

In light of the foregoing, we determine that Petitioner has shown by a preponderance of the evidence that claims 1, 3, and 4, but not claim 2, are unpatentable as obvious over Afshary and Mirfakhraei (ground A). We determine that claim 2 is not unpatentable as obvious over Afshary, Mirfakhraei, and Welles (ground B).

## IV. ORDER

For the foregoing reasons, it is

ORDERED that pursuant to 35 U.S.C. § 318(a), claims 1, 3, and 4, but not claim 2, of the ’518 patent have been shown to be unpatentable; and

FURTHER ORDERED that any party seeking judicial review must comply with the notice and service requirements of 37 C.F.R. § 90.2.[8]

In summary:

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 1–4 | 102 | Afshary, Mirfakhraei | 1, 3–4 | 2 |

[8] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this Decision, we draw Patent Owner’s attention to the April 2019 Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. *See* 84 Fed. Reg. 16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

| Claims | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not shown Unpatentable |
|---|---|---|---|---|
| 2 | 103(a) | Afshary, Mirfakhraei, Welles | | 2 |
| **Overall Outcome** | | | 1, 3–4 | 2 |

FOR PETITIONER:

Frederic M. Meeker
Paul T. Qualey
Christopher McKee
Wesley Jones
BANNER & WITCOFF, LTD.
fmeeker@bannerwitcoff.com
pqualey@bannerwitcoff.com
cmckee@bannerwitcoff.com
wjones@bannerwitcoff.com

FOR PATENT OWNER:

Jason A. Engel
Erik J. Halverson
Jared Lund
K&L GATES LLP
jason.engel.PTAB@klgates.com
erik.halverson@klgates.com
jared.lund@klgates.com

US007295518B1

(12) **United States Patent**
**Monk et al.**

(10) **Patent No.: US 7,295,518 B1**
(45) **Date of Patent: Nov. 13, 2007**

(54) **BROADBAND NETWORK FOR COAXIAL CABLE USING MULTI-CARRIER MODULATION**

(75) Inventors: **Anton Monk**, San Diego, CA (US); **Brett Bernath**, San Diego, CA (US); **Itzhak Gurantz**, San Diego, CA (US); **Ladd El Wardani**, La Jolla, CA (US); **Ron Porat**, La Jolla, CA (US)

(73) Assignee: **Entropic Communications Inc.**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1108 days.

(21) Appl. No.: **10/322,834**

(22) Filed: **Dec. 18, 2002**

**Related U.S. Application Data**

(63) Continuation of application No. 10/230,687, filed on Aug. 29, 2002, now abandoned.

(60) Provisional application No. 60/385,361, filed on Jun. 3, 2002, provisional application No. 60/363,420, filed on Mar. 12, 2002, provisional application No. 60/316,820, filed on Aug. 30, 2001.

(51) **Int. Cl.**
***H04L 12/26*** (2006.01)
***H04N 7/173*** (2006.01)

(52) **U.S. Cl.** .................. **370/235**; 370/208; 370/230.1; 725/127; 375/260

(58) **Field of Classification Search** ........ 370/204–208, 370/230, 230.1, 235–238; 725/126, 127, 725/133; 375/260, 261, 267, 320, 332, 471
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,886,181 B1 * 4/2005 Dodds et al. ............... 725/119

OTHER PUBLICATIONS

John A.C. Bingham, "Multiccarrier Modulation for Data Transmission; An idea whose time has come", IEEE Communication Magazine, vol. 28, No. 5, pp. 5-14, May 1990.*

* cited by examiner

*Primary Examiner*—Afsar Qureshi
(74) *Attorney, Agent, or Firm*—Michael W. Landry

(57) **ABSTRACT**

A broadband local area data network uses coaxial cable wiring for interconnection of terminal devices. Orthogonal frequency division multiplexing (OFDM) with bit loading is used to overcome channel impairments and provide a path for terminal devices to transmit to and receive from other terminal devices. Probe messages are sent between devices to characterize the communication channel and determine optimum bit loading. The data network shares the cable spectrum with other services and uses frequency bands not used by other services. Adaptive power control can be used to maintain signal to noise ratio in a communication between terminal devices. Frequency coordination can be used to avoid interference between the LAN communications and other services transmitted on the cable.

**4 Claims, 10 Drawing Sheets**






Fig. 1
Prior Art


224
222
220
Customer Premises
Network Interface
210
Splitter
230
TV
Splitter
232
Splitter
231
LAN Modem
LAN Device
282
Combiner
TV
270
280
LAN Modem
LAN Device
Cable Modem
250
PC
260
TV
240

Fig. 2




Frequency Usage on a Coax System

Fig. 3




Fig. 4


Data
510
Error Correction Coding
520
QAM Encoding and Pre-emphasis
530
Power Adjustment Table
540
IFTT
542
P/S
550
DAC
560
UP Conversion
Lo
RF

Fig. 5




Fig. 6


710
Preamble
2 Symbols
512 Bits
QPSK
720
Channel Est. Training Seq.
8 Symbols
OFDM / QPSK
730
Bit loading Training Sequence
80 Symbols
OFDM / BPSK

Fig. 7




Fig. 8




Fig. 9




Fig. 10

# BROADBAND NETWORK FOR COAXIAL CABLE USING MULTI-CARRIER MODULATION

## RELATED APPLICATIONS

This application is a continuation application of U.S. patent application Ser. No. 10/230,687 filed Aug. 29, 2002 entitled "Broadband Network for Coaxial Cable Using Multi-carrier Modulation" now abandoned, which claims priority to U.S. provisional patent application No. 60/316,820, filed Aug. 30, 2001 entitled "Broadband Local Area Network Using Coaxial Cable"; U.S. provisional patent application No. 60/363,420 filed Mar. 12, 2002 entitled "Method of bit and energy loading to reduce interference effects in devices sharing a communication medium"; and U.S. provisional patent application No. 60/385,361, filed Jun. 3, 2002 entitled "Power loading to reduce interference effects in devices sharing a communication medium", each of which is incorporated herein by reference.

Related application: "Network interface and broadband local area network using coaxial cable" Ser. No. 09/910,412 filed Jul. 21, 2001, incorporated herein by reference.

## TECHNICAL FIELD

This invention relates to broadband communication networks and specifically to communications using coaxial cable building wiring.

## BACKGROUND

In a coaxial cable based local area network (LAN), communication between nodes occurs over a shared coaxial cable. When the coaxial cable used for the LAN is shared with a community aerial television or cable TV (CATV) service the signals must be separated to avoid interference. The LAN signal can use one band of frequencies and the cable TV service can use a different band. A typical cable TV configuration for a home is shown in FIG. **1**. Signal splitters are used to distribute downstream signals from the point of entry (POE) to the various terminals in the home, which can include cable converter boxes, televisions, and cable modems, generally referred to as customer premise equipment (CPE). Each terminal device may have the ability to transmit as well as receive. The upstream signals transmitted by the terminal device flows through the signal splitters back to the POE and into the cable plant and are received by the head end. The signal splitters are functioning as signal combiners for upstream signals. Devices communicating with the head end generally do not communicate with each other.

Signal splitters are commonly used in home and other building type coaxial cable wiring. They have an input port and multiple output ports. The input port can also be considered a common port. The output ports can also be considered tap ports. Splitters are generally passive devices and can be constructed using lumped element circuits with discrete transformers, inductors, capacitors, and resistors. Splitters can also be constructed using strip line or microstrip circuits. A typical two-way splitter splits the power equally between the two output ports if each port is terminated equally. Thus each output would have a power level 3 dB lower than the input. Ideally, a splitter transfers all power from the input port to the output ports. In a practical implementation there is a modest power loss in the splitter due to impedance mismatches, non-zero resistances, dissipative losses in circuit elements, and other non-ideal properties. These losses amount to approximately 0.5 dB, thus a practical two-way splitter provides −3.5 dB power level to each output.



Splitters are generally bi-directional; they can also function as signal combiners, which sum the power from multiple ports into a single output. The ports used as outputs in a splitter configuration become inputs ports for the combining configuration. The common port becomes the output port.

A splitter may have 3 or more tap ports. There is typically an N-way splitter at the point of entry of a building that distributes the incoming CATV signal to each room of the building. The N-way splitter also combines the signals from each room, providing a return path for devices such as cable modems to transmit back to the cable head-end.

Splitters can be designed with power dividing ratios that are not equal. Instead of a 3 dB loss to each port, one port can have, for example 1.15 dB loss, and the other 6 dB. This corresponds to 75%/25% coupling. This type of splitter could be used to balance signal power at all terminal devices when there are multiple levels of signal splitters. A branch that terminates directly to a terminal device would be connected to a higher loss tap port. A branch that contains additional splitters would be connected to a lower loss tap port, which provides extra power to compensate for the loss of additional splitters.

Another characteristic of interest in signal splitters is the isolation between output ports. The isolation is typically between 10 dB and 40 dB. This isolation attenuates signals communicating between tap ports. The signal splitter/combiner is therefore directional, power flows to and from the common port to the tap ports, but power is attenuated between tap ports.

In a conventional cable TV or cable modem use, this isolation is desirable because terminal devices do not communicate with each other, they only communicate through the POE with the cable head-end. In a LAN system, terminal devices must communicate directly with each other, therefore attenuation between tap ports in the signal splitters results in an undesirable signal loss. Presenting a further problem to terminal to terminal communications is the variation in attenuation in different branches of the building wiring. All terminal devices are not connected directly to the main splitter, but may be connected at a secondary splitter, for example in a room. The level of attenuation between different pairs of terminal devices needing to communicate may vary by 10 to 40 dB or more.

Several buildings may be connected to one splitter at the street. Although the isolation of this splitter is high, some coupling between taps occurs, allowing transmission from one building to another. This is a source of interference between LANs in neighboring buildings.

Another approach to overcoming the splitter inter-port isolation is to replace the main splitter at the building POE with a symmetric power splitter/combiner. In a symmetric splitter, power entering any port is divided among the other ports. A symmetric splitter/combiner is not directional. This type of splitter has 3 dB or more additional loss compared to a directional signal splitter. The additional loss is greater depending on the number of tap ports. A power amplifier may be required to boost the signal to compensate for this loss. A bi-directional device, such as a cable modem, requires a reverse path so the amplifier needs to be bi-directional. Another disadvantage to this approach is that installation is required; each coax connected to the existing N-way directional splitter must be disconnected and moved

to the new splitter. Another disadvantage of this approach is that power must be available for the amplifier, which is not generally present in the area a typical main splitter is located.

Imperfect terminations at connections create micro reflections within the cable wiring. The dominant main signal and reflected signal combine in the channel. A reflection anywhere in the wiring produces a multipath signal in some or all wiring branches that creates inter-symbol interference (ISI). The multipath signal has a delay and amplitude difference relative to the main signal. In the frequency domain, a reflection produces ripples in the response of the channel, creating amplitude variations across the pass band. In the time domain, ISI is seen as an impairment to the shape of the digital signal pulses. ISI will degrade the bit error rate (BER) performance of the communication channel. To overcome the effects of reflections, an adaptive equalizer is commonly used in the terminal device receiver. This creates a filter response that restores a flat frequency response impaired by the multipath signal.

The signals transmitted by LAN devices can create interference with televisions and set top boxes even though the LAN signals are out of band of these receivers, due to down conversion and signal mixing in the receivers.

Broadband networks are described in U.S. Pat. No. 5,889,765 "Bi-directional communications Network" issued to Gibbs, U.S. Pat. Nos. 5,940,387 and 6,005,861 "Home Multimedia Network Architecture" issued to Humpleman, U.S. Pat. No. 5,870,513 "Bi-directional Cable Network with a Mixing Tap or Suppressing Undesirable Noise in Signals From a Remote End of the Network" issued to Williams, U.S. Pat. No. 5,805,591 Subscriber Network Interface issued to Naboulsi, U.S. Pat. No. 6,008,368 "Ethernet Transport Facility Over Digital Subscriber Lines issued to Rubinstain", U.S. Pat. No. 6,137,793 "Reverse Path Multiplexer for Use in High Speed Data Transmissions" issued to Gorman, and U.S. Pat. No. 6,091,932 "Bidirectional Point to Multipoint Network Using Multicarrier Modulation" issued to Langlais, each of which is incorporated herein by reference.

Gibbs discloses a broadband network overlaid with the cable service frequencies using dynamically allocated TDMA protocols. Humpleman patents disclose a home network using an active network interface unit to couple the home network to the external network. Williams discloses a method of reducing noise accumulated in the frequency bands used by an upstream signal. Naboulsi discloses an active network interface for an asynchronous transfer mode (ATM) network. Rubinstain discloses a method of transporting Ethernet over twisted pair lines. Gorman discloses an active reverse path multiplexer for communication between the cable head-end and subscriber cable modems. Langlais discloses a two-way data transmission system for communicating between an upstream and downstream unit using OFDM.

U.S. Pat. No. 6,091,932 "Bidirectional point to multipoint network using multicarrier modulation", incorporated herein by reference, discloses various techniques for implementing OFDM communication. This reference discloses the use of OFDM for communicating between a terminal device and the cable head-end.

U.S. Pat. No. 6,292,651 "Communication system with multicarrier transport distribution network between a head end terminal and remote units" incorporated herein by reference discloses communication between a cable head end and remote units and discloses techniques using OFDM for such communication. U.S. Pat. No. 5,959,967 "Digital transmission system", incorporated herein by reference, issued to Humphrey discloses an OFDM transmission system used to communicate over a twisted pair loop. U.S. Pat. No. 5,371,548 "System for transmission of digital data using orthogonal frequency division multiplexing", incorporated herein by reference, issued to Williams discloses an OFDM system for data transmission during the vertical blanking interval of a television signal. U.S. Pat. No. 5,488,632 "Transmission and reception in a hostile interference environment", incorporated herein by reference, issued to Mason discloses additional techniques for implementing an OFDM modulator and demodulator. U.S. Pat. No. 3,488,445 "Orthogonal Frequency Multiplex Data Transmission System", incorporated herein by reference, issued to Chang and U.S. Pat. No. 3,511,936 "Multiply Orthogonal System for Transmitting Data Signals Through Frequency Overlapping Channels", incorporated herein by reference, disclose OFDM data transmission techniques.

A reflected signal and an attenuated signal passing through a splitter port creates a multipath environment. The received power level of the direct signal relative to the reflected signals can vary between equal levels to one signal being substantially greater than the other. The multipath environment impairs the ability to achieve high data rates in a communication network. The signal reflections and tap port isolation of splitters existing in a typical cable TV wiring configuration presents a problem to shared usage of the cable for a LAN system. The prior art references address communicating between a cable head end and in-home units but do not address the impairments present in the home wiring that restricts high bandwidth communication between devices within the home.

## SUMMARY OF THE INVENTION

The present invention uses a form of multi-carrier modulation, orthogonal frequency division multiplex (OFDM), to transmit digital data signals through the coaxial cable wiring installed in homes. Communication is achieved through splitters and signal impairments caused by reflections and attenuation are overcome. Bit loading, along with power loading, adaptive power control, and frequency coordination can be used individually or in combination to implement a network that overcomes the problem of multipath and high attenuation in building cable wiring that would restrict the ability of terminal devices to communicate with each other.

Channel probing messages formed using a predetermined bit sequence and length are transmitted between network devices to estimate the channel characteristics, including the multipath characteristics and a profile of the signal to noise ratio over the frequency band of interest. The probe messages are transmitted using robust modulation, for example QPSK, to insure the message can be received. The probe messages are transmitted without bit loading, that is all carriers have the same robust modulation and all carriers have the same power. The receiving device processes the probe messages as received and determines the impairment present at each carrier frequency. Based on the estimate of the channel, bit loading is applied to increase the modulation order at carriers with high signal to noise ratio and lower the modulation order at carriers with low signal to noise ratio.

Power loading of the individual carriers forming the OFDM signal allows the data network signal to minimize interference to the other services using the cable. Selective avoidance of specific carrier frequencies avoids interference from the other services to the network signal.

The data network established allows point-to-point communication between any two devices connected to the network and point-to-multipoint communication for broadcast or multicast of data messages. The data network overlays cable or satellite services and uses parts of the frequency spectrum not used by these other services.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a diagram showing a prior art coaxial signal distribution plan.

FIG. **2** is a diagram showing a signal distribution plan according to the present invention.

FIG. **3** shows a representative frequency allocation between network services and other services on a coaxial wiring system, including the use by two different networks.

FIG. **4** shows a representative frequency allocation between cable service upstream/downstream signals and an overlaid local area network.

FIG. **5** shows a block diagram of an OFDM modulator in accordance with the present invention.

FIG. **6** shows a block diagram of an OFDM demodulator in accordance with the present invention.

FIG. **7** shows an example of a bit loading probe message in accordance with the present invention.

FIG. **8** shows a multipath signal created by a splitter.

FIG. **9** shows a time domain and frequency domain plot of a signal experiencing multipath.

FIG. **10** shows a bit loaded OFDM waveform in accordance with the present invention overlaid on an impaired frequency response.

## DETAILED DESCRIPTION OF THE INVENTION

Referring to FIG. **2**, LAN modem **270** provides modulation and demodulation of the waveform transmitted over the cable. LAN modem **270** has an interface to communicate with a LAN device **280**, which is the source or destination of data transmitted over the LAN. LAN device **280** can be, for example, a personal computer (PC). LAN device **282** can be, for example, a modulator to produce a signal for driving a TV through a signal combiner. Network interface **210** is optional, it provides an additional signal coupling path between wiring branches if needed and is described more fully in co-pending application Ser. No. 09/910,412 "Network interface and broadband local area network using coaxial cable". Additional networks can be connected to taps in the cable plant. The networks can reside in the same or different building.

LAN devices **280** and **282** can be used for digital video services or data services. LAN device **282**, for example, can extract digital video data from a transport stream, such as an MPEG stream, transmitted over the network and decode the transport stream to produce an analog video signal suitable for connection to a standard TV set.

Existing devices, such as TV **240** and cable modem **250** connected to PC **260**, use frequency bands distinct from the frequency band used by the LAN and therefore operate in a normal manner.

The frequencies used by the LAN can be located above the standard cable use frequencies, which extend to 550 MHz, 750 MHz, or 850 MHz. Other frequency plans can be used, for example where a block of frequencies is available in the middle of the cable band. The filter cut-off frequencies are selected according to the frequencies bands used. Satellite systems generally use frequencies above 950 MHz to communicate the received signal from the out door unit (ODU) to the integrated receiver decoder (IRD) set top box. A LAN would use frequencies below 950 MHz in this case.



Referring to FIG. **3**, more than one network can occupy the frequency band used for network services. The amount of spectrum used by a particular network depends on the data bandwidth needed for the service provided. FIG. **4** shows the spectrum used by cable upstream and downstream signals with a network signal using the spectrum above the cable band.

The present invention can use a time division duplex (TDD) protocol for communications. In a TDD system, receive and transmit data are communicated during different time intervals, generally using the same frequency. The advantage of using TDD is that the transceiver design is simplified. Different users share a common frequency channel through the use of time division multiple access (TDMA). In a TDMA system each user transmits during a different time interval. Users are assigned one or more slots of predetermined length in a framing structure that contains multiple slots. All users are synchronized by a beacon message broadcast on the network. The beacon message provides a common time reference to the users and can include other network management information.

Some building wiring possesses reflections due to mismatched impedances and inter-port coupling in splitters to provide sufficient signal path between terminal devices for communication. Loss from one terminal device to another is in the range of approximately 25 dB to 50 dB. In a coaxial cable environment signal-to-noise ratio (SNR) is generally high. To be useful the SNR is preferably in the range of 8 to greater than 30 dB.

Individual terminal devices will receive different power levels that vary according to the signal loss experienced between the transmitting device and the receiving device. An automatic gain control (AGC) circuit in the receiver levels the power presented to the intermediate frequency (IF) or base band processing sections. The AGC measures received power, at an RF, IF, or base band signal point and controls an amplifier to produce a constant level at the measurement point, or some other predetermined processing point.

### Adaptive Power Control

The signal loss between terminal devices may be unknown and variable. In the present invention, an adaptive transmit power level is used to control the power level received by a terminal device. This function can be implemented in each terminal device or as part of the network management function provided by a central controller. An AGC circuit in the receiver can correct the residual variations in the signal power level.

An originating terminal device transmits a channel probing message to a responding terminal device for the purpose of determining received power level. The responding device measures the power and communicates a reply message containing the received power level. This message exchange can be transmitted using a robust modulation such as BPSK or QPSK, where the main messaging could be transmitted using higher order modulation, for example multilevel QAM.

Alternatively, the power measurement messaging can be transmitted using FM, which in not sensitive to power levels. Soft clipping in the RF, IF, and base band circuits may occur. This levels the signal and produces some harmonic content that is removed by low-pass filters and allows demodulation and decoding of the message.

The originating terminal device transmits the channel probing message at a predetermined power level. Alternatively, the message can embed a data field that indicates the transmitted power of the message. Using either source of information, the responding terminal device can adapt its transmitted power during the response to provide a desired power level at the originating device. By evaluating the received power measurement data in the response message, the originating device has a direct evaluation of the signal loss due to the channel. The power level of subsequent transmissions by the originating device to a responding device is set according to the channel loss measurement. An acknowledgement message is sent from the originating device to the responding device to conclude the communication establishment sequence.

In one embodiment, the power measurement can be made by observing the AGC control level, which represents the received power level.

OFDM Waveform Modulator and Demodulator

Multi-tone modulation uses a set of modulating carriers that are integer multiples of a common frequency and the symbol period is the inverse of the common frequency. Multi-tone modulation is also called discrete multi-tone (DMT) and orthogonal frequency division multiplexing (OFDM). OFDM utilizes quadrature phase shift keying (QPSK) and multi-level quadrature amplitude modulation (QAM) wherein each OFDM carrier can be modulated by an amplitude/phase-varying signal. QPSK is composed a sine and a cosine wave of identical frequency with phase modulation applied to each carrier independently. QAM is composed of sine and cosine waves with phase modulation and amplitude modulation. QPSK is an m-ary QAM signal with m=2. These signals can be represented using complex numbers. To modulate, data bits are encoded into a number of m-ary QAM constellations, which then modulate the respective carriers. The carriers are summed together for transmission over the channel. Each carrier is independent and can be independently decoded in the receiver. All carriers are related in frequency, being an integer multiple of a base frequency.

Micro reflections tend to have a time displacement relative to the main signal ranging from several nanoseconds to a few microseconds. If the time displacement is longer than an information symbol period ISI is created when the reflected signal from a prior symbol arrives during a later symbol. In OFDM, the user data bits generated at a high rate are distributed over many carriers, each with a lower data rate and therefore longer symbol period. At a symbol period longer than the multipath delay, the main and reflected signals arrive at a receiver during the same symbol reducing the effects of ISI. For example, if a data rate of 100 mbps is modulated using QPSK, which provides 2 bits per symbol; the symbol period is 20 nS. Using OFDM with 100 carriers, the data rate of each carrier is 1 mbps. With QPSK modulation the symbol period for each carrier is 2 uS.

OFDM processes all carriers as a block using a time to frequency transform. Furthermore, a cyclic prefix is added to the beginning of each OFDM symbol and transmitted to simulate periodicity. The cyclic prefix is created by replicating data from the end of the block at the beginning of the block. The length of the cyclic prefix is a function of the multipath time displacement. By adding a cyclic prefix to the transmitted data the OFDM signal is robust in a multipath environment by providing a guard interval between symbols. Hence, OFDM provides a mechanism to overcome the frequency selective channel impairments present in coaxial building wiring.

The OFDM waveform is generated by applying an inverse discrete Fourier transform (IDFT) to a complex vector that results in a real valued time domain sequence. The time domain sequence is applied to an up converter to place the waveform at the proper RF frequency.

Bit loading is a method of allocating a higher order signal constellation to carriers that have higher signal to noise ratio and a lower order constellation to carriers that have lower signal to noise ratio. Higher SNR channels can support higher data capacity. Frequency bins occupying parts of the channel where the SNR is high can be used to transmit more bits. Each carrier may be modulated with a different order constellation, where higher SNR frequencies can bear a higher order constellation, and the resulting closer spacing of the constellation points. Frequencies with the lower SNR use lower order constellations such as QPSK. U.S. Pat. No. 6,438,174 "Multi-carrier transmission systems" incorporated herein by reference, discloses discrete multi-tone modulation and a technique for bit loading applied to point-to-point twisted pair wiring. U.S. Pat. No. 6,259,746 "Method for allocating data and power in a discrete multi-tone communication system" discloses a technique for bit loading applied to discrete multi-tone modulation.

The frequency channels in OFDM may be called frequency bins or simply bins. The power in individual frequency bins can be adjusted to compensate for insertion loss that varies as a function of frequency. The power level in regions of the channel can be altered by scaling the complex valued vector for the bins where power adjustment is needed before applying the inverse Fourier transform. In order to avoid interference with certain bands in the RF spectrum, the power level of certain bins can be reduced to zero.

An OFDM receiver uses a discrete Fourier transform (DFT) to convert the modulated signal back into data. The OFDM receiver receives all the carriers at once and performs the transform on a block of data points.

Various types of forward error correction can be applied to transmitted data blocks, such as Reed-Solomon and convolutional coding. Interleaving can be applied to data blocks to increase the robustness of the error correction. De-interleaving and error correction coding are applied in the receiver to recover the transmitted data without errors.

An OFDM receiver may also employ time domain equalization (TEQ), frequency domain equalization (FEQ), or both. Equalizers can be adaptive and may be of the decision feedback (DFE) type or decision directed type such as least mean square (LMS) algorithm.

FIG. **5** shows a block diagram of a representative OFDM modulator according to the present invention. Data input is optionally coded with check bits by error correction coder **510** to facilitate error correction in the receiver. QAM encoder **520** divides the input data into many bit streams and applies a QAM symbol mapping to each bit stream. The bit streams correspond to the carriers. Symbol mapping maps a short sequence of bit, from 2 for QPSK to 8 for 256-QAM, into an I and Q amplitude value. The I and Q amplitude values output from QAM encoder **520** are modified by power adjustment table **530**, which adjusts the amplitude levels to effect the power level of each carrier in the transmitted signal. The values in power adjustment table **530** are empirically derived or analytically derived and set to levels that avoid interference with other devices. Inverse Fast Fourier Transform (IFFT) **540** performs a frequency domain to time domain transformation that converts the

complex series of frequency amplitude values into a time sequence. The IFFT output array is converted to a serial data stream by a parallel to serial converter **542** as part of IFFT **540**. The digital time sequence is converted to an analog representation by digital to analog (DAC) **550**. The analog signal is translated to a suitable carrier frequency by up converter **560**. The time sequence can be either real valued or complex valued samples. In the case of complex values, DAC **550** would be a dual DAC and up converter **560** would be a quadrature modulator. An amplifier provides the appropriate overall power for the signal to be inserted into the communications medium.

Power adjustment table **530** may also be used to influence the order of modulation generated by QAM encoder **520** for each of the carriers. Higher power level carriers can support higher order of modulation and lower power levels require lower order modulation. The selection of QAM modulation order is bit loading, the selection of carrier power is power loading. The power profile used to avoid interference can alter both the power in each carrier and the number of bits transmitted in each symbol of each carrier.

FIG. **6** is a block diagram of a representative demodulator for use with the present invention. The inverse of the modulator operations are performed to reproduce digital data. Not shown are operations of carrier and symbol timing recovery, which can be performed using techniques well known in the art.

Multi-carrier system architecture is covered in *ADSL/VDSL Principles* by DR. Dennis J. Rauchmayer, Macmillan Technical Publishing, 1999 and *DSL Simulation Techniques and Standards Development for Digital Subscriber Line Systems* by Dr. Walter Y. Chen, Macmillan Technology Publishing, 1998, incorporated herein by reference.

Channel Probing Message

Channel probing messages are transmitted between network devices to estimate the channel characteristics. The channel probe uses a predetermined bit sequence which in known by the receiving device. By passing a known data sequence through the channel, the response of the channel can be determined, including multipath and SNR profile.

Probe packets are sent by devices upon command from a cycle master. This request for transmission of a probe message may be periodic or as part of scheduled activity. A probe packet is analyzed by the receiving node, a bit loading profile is computed, and the bit loading information is transmitted back to the sending node. The sending node then uses the requested bit loading until a new bit loading is requested by the receiving node.

In a symmetric channel the receiving device can determine bit loading for transmitted it own messages based on channel characteristics measured from a received probe message. The bit loading is valid for sending messages to the device that transmitted the probe message. In a non-symmetric channel, the receiving device must communicate the results of the analysis, either as raw data or as a bit loading profile, back to the sending device for the sending device to modify the transmission parameters.

FIG. **7** shows an example of a bit loading probe message **700**, comprised of a preamble **710**, channel estimation training sequence **720**, and a bit loading training sequence **730**. The preamble portion **710** of the message **700** is used to compute an estimate of the carrier frequency offset and sample timing offset. The preamble **710** is 2 OFDM symbols in length transmitted in time domain as 512 bits. The channel estimation training sequence **720** is 8 OFDM symbols transmitted in the frequency domain with 256 carriers using QPSK modulation and is used to compute the transfer function of the channel. From the transfer function, equalizer coefficients are computed and loaded the taps of an equalizer. The remaining portion of the probe message is processed with the benefit of equalization on the signal.

The bit loading training sequence **730** is 80 symbols transmitted in the frequency domain using BPSK modulation and is used to compute the actual bit loading needed for data traffic. The bit loading training sequence provides for averaging over a large number of symbols. The SNR in each frequency bin is calculated and the bit loading profile is generated. Determination of a channel response, multipath, and SNR profile from a known signal is well known in the art. The data pattern chosen for the preamble and training sequences can be a pseudo-random data sequence of the specified length. A preferred pattern for the preamble uses a selected pattern for the first half of the preamble and a bit inversion of the selected pattern for the second half of the preamble. This pattern provides desirable auto-correlation properties.

Schmidl, et al. "Robust Frequency and Timing Synchronization for OFDM", IEEE Transactions on Communications, vol. 45, No. 12, pp. 1613-1621 (1997) and Minn, et al. "On Timing Offset Estimation for OFDM Systems", IEEE Communications Letters, Vol. 4, No. 7, pp. 242-244, incorporated herein by reference, describe techniques for forming and processing sequences to synchronize receivers to data transmissions over frequency-selective channels.

The signal processing and computations performed on signal samples needed for modulating, demodulating, channel estimation, and other operations can be performed by dedicated hardware resources or by a programmed signal processor. A typical system will utilize both hardware and software techniques to perform the needed signal processing. Signal processing circuitry can be integrated into a single system on a chip (SOC), partitioned into several chips, or programmed into a field programmable gate array (FPGA).

FIG. **8** shows a schematic representation of a splitter **810** with a signal burst **820** of power P entering splitter port A. The signal burst will couple to port B with attenuation of, for example, 20 dB producing signal P**1**. The signal burst will also couple to port C with a loss of 3.5 dB and pass up the wiring branch to a point that produces some reflection with a particular attenuation. The reflected signal will pass down the wiring branch to splitter port C and couple to port B with a power level of P**2**. The resulting signal **830** present at port B will be a signal burst of power P**1** followed by the echo of power P**2**. Depending on the level of the reflection and the isolation from port A to port B, the first signal burst arriving at port B can be higher or lower in power than the second signal burst arriving. The time displacement of the two arrivals is dependant upon the cable length of the wiring branch connected to port C.

FIG. **9** shows a time domain plot of two signal bursts, one arriving at time **0** and the other arriving at time t.sub.e. The corresponding frequency domain plot shows nulls in the spectrum with a separation of 1/t.sub.e. This diagram shows the effect of two time displaced signals arriving at a single point and the effect on the frequency response of the signal.

FIG. **10** shows a bit loaded OFDM waveform in accordance with the present invention overlaid on an impaired frequency response. The band used to transmit the OFDM signal is segmented into frequency bins of width f.sub.b. Each frequency bin is encoded with a QAM constellation of 4, 16, 64, or 256 points. The level of response through the channel at each frequency bin, which corresponds to the

SNR, determines the order of modulation used. The higher the channel response in a particular bin, the more information is encoded by using a higher density constellation. Frequencies bins located at deep nulls may have insufficient SNR to support a useful signal and are not used. No signal is transmitted in these bins.

Frequency Coordination

When a terminal device is powered up, it scans the available frequency band to determine if there is communication activity occurring and determine the frequencies that are already in use. This activity can be originating from a network in the same building as the terminal device, another building where the signal is leaking through the tap, or from cable or satellite services sharing the cable. The scan can be done using the same receiver signal path that is used for data communication. An FFT performed on an array of data samples taken from the A/D converter provide information about signal activity in the channel. The LO can be changed to sweep the scan over wider frequency band than a single FFT. The step size can be from less than 1 MHz to 10 MHz or more, and depends on the frequency spacing established for the network.

Alternatively to the FFT approach, detection of activity can be achieved by measuring the received signal power with an envelope detector, which can be done using digital samples or an AM detector using a diode and filter circuit. Another approach to envelope detection is monitoring an automatic gain control (AGC) level that represents the received signal strength.

Another approach to activity detection is to fully demodulate the received signal and decode the data stream. Using this technique, the terminal can recognize a network or device identifier contained in the data frames to decide if the activity is from a desired network or undesired network. If a desired network is detected, the terminal will attempt to gain access. If an undesired network is detected the frequency band used will be logged as unusable. The network or device ID can be transmitted in a base coding modulation, such as QPSK. This allows the scanning terminal to synchronize to and decode enough information to identify the activity without knowing the specific modulation used in the terminal specific and payload portions of the frame.

Once a clear area of the available frequency band is determined, the network controller node can begin transmitting network access information to allow other devices to gain access to the network within the home.

An alternative to frequency coordination between networks is to insert a blocking filter at the POE of the home. This prevents egress of signals from the home and ingress of signals from other homes. The filter is a low pass or band pass filter that allows CATV signals to pass unaffected and blocks the frequencies used by the network. An additional benefit is to insure privacy of the network data. The communication activity scan would then detect any cable or satellite services and use other frequency bands for the network.

What is claimed is:

**1**. A data communication network comprising:

at least two network devices, each network device comprising a multi-carrier modulator for modulating data, an up converter for translating the modulated data to an RF carrier frequency, a down converter for translating an RF signal, and a multi-carrier demodulator for demodulating the translated RF signal to produce data; and

cable wiring comprising a splitter with a common port and a plurality of tap ports, and a plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices;

whereby network devices communicate with each other through the cable wiring using multi-carrier signaling;

wherein network devices transmit probe messages through the cable wiring and analyze received probe message signals to determine channel characteristics and bit loading is selected based on the determined channel characteristics.

**2**. The data communication network of claim **1** wherein a network device comprises a means for determining signal activity and selects a frequency band for operation that is not used by other services.

**3**. The data communication network of claim **1** wherein the network shares the cable wiring with a cable television service and the network device up converter translates the modulated data to an RF carrier frequency above the frequency used by the cable television service.

**4**. A network device for communicating data to other network devices over a coaxial wiring system comprising a splitter and a plurality of cable segments connected between the splitter and the network devices, the network device comprising:

a data modulator to produce a multicarrier modulated signal;

a demodulator for multicarrier modulated signal to produce data;

means for producing and transmitting a probe message; and

means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data.

* * * * *

**UNITED STATES COURT OF APPEALS**
**FOR THE FEDERAL CIRCUIT**

**ENTROPIC COMMUNICATIONS, LLC,**
Patent Owner/Appellant

**Appeal No. 2025-2146**

**v.**

**COMCAST CABLE COMMUNICATIONS, LLC,**
Petitioner/Appellee

**Proceeding No.: IPR2024-00431**

## NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the Federal Circuit was timely filed on September 19, 2025, in the United States Patent and Trademark Office in connection with the above-identified *Inter Partes Review* (IPR) proceeding. Pursuant to 35 U.S.C. § 143, a Certified List is this day being forwarded to the Federal Circuit.

Date: November 4, 2025

Respectfully submitted,

Under Secretary of Commerce for Intellectual
Property and Director of the United States Patent
and Trademark Office

By: *Orchideh Rushenas*
Orchideh Rushenas
Paralegal Specialist
Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
Orchideh.Rushenas@uspto.gov
571-272-9035

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing NOTICE FORWARDING CERTIFIED LIST has been served, via electronic mail, on counsel for Appellant and Appellee on this 4th day of November, 2025, as follows:

Jason A. Engel
Erik J. Halverson
Jared R. Lund
K&L GATES LLP
jason.engel@klgates.com
erik.halverson@klgates.com
jared.lund@klgates.com

*Attorneys for Appellant*

Frederic M. Meeker
Paul T. Qualey
Christopher McKee
Wesley Jones
BANNER & WITCOFF, LTD.
fmeeker@bannerwitcoff.com
pqualey@bannerwitcoff.com
cmckee@bannerwitcoff.com
wjones@bannerwitcoff.com

*Attorneys for Appellee*

By: Orchideh Rushenas

Orchideh Rushenas
Paralegal Specialist
Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450
Orchideh.Rushenas@uspto.gov
571-272-9035

**U.S. DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**

November 4, 2025

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below:

**COMCAST CABLE COMMUNICATIONS, LLC,**
**Petitioner,**

**v.**

**ENTROPIC COMMUNICATIONS, LLC,**
**Patent Owner.**

**Case: IPR2024-00431**
**Patent 7,295,518 B1**

By authority of the
DIRECTOR OF THE UNITED STATES
PATENT AND TRADEMARK OFFICE

Orchideh Rushenas

*Certifying Officer*

## Prosecution History for IPR2024-00431

| Date | Document |
|---|---|
| 02/15/2024 | Petition for *Inter Partes* Review of U.S. Patent No. 7,295,518 |
| 02/15/2024 | Petitioner's Power of Attorney |
| 03/07/2024 | Patent Owner's Mandatory Notices |
| 03/07/2024 | Patent Owner's Power of Attorney |
| 03/08/2024 | Notice of Filing Date Accorded to Petition and Time for Filing Patent Owner Preliminary Response |
| 06/10/2024 | Patent Owner's Preliminary Response |
| 07/02/2024 | Petitioner's Updated Mandatory Notices |
| 09/06/2024 | Decision - Institute *Inter Partes* Review |
| 09/18/2024 | Scheduling Order |
| 09/20/2024 | Patent Owner's Objections to Petitioner's Evidence Filed with Petition |
| 09/27/2024 | Patent Owner's Notice of Deposition of James G. Bertonis |
| 11/11/2024 | Patent Owner's Notice of Stipulation to Modify Due Dates 1 and 2 |
| 12/18/2024 | Patent Owner's Response |
| 12/23/2024 | Petitioner's Objections to Exhibits in Patent Owner's Response |
| 02/10/2025 | Petitioner's Notice of Deposition of Albert Garrett |
| 03/04/2025 | Patent Owner's Updated Mandatory Notices |
| 03/04/2025 | Patent Owner's Updated Exhibit List |
| 03/12/2025 | Petitioner's Reply to Patent Owner's Response |
| 03/24/2024 | Patent Owner's Notice of Stipulation to Modify Due Date 3 |
| 03/24/2025 | Patent Owner's Notice of Remote Deposition of James G. Bertonis |
| 03/31/2025 | Panel Change Order – Conduct of Proceedings, *37 CFR § 42.5* |
| 04/25/2025 | Petitioner's Request for Oral Argument |
| 04/25/2025 | Patent Owner's Sur-Reply |
| 04/25/2025 | Patent Owner's Request for Oral Argument |
| 04/28/2025 | Petitioner's Updated Mandatory Notices |
| 04/28/2025 | Petitioner's Updated Exhibit List |
| 05/16/2025 | Order Setting Oral Argument - *37 CFR § 42.70* |
| 05/22/2025 | Patent Owner's LEAP Request GRANTED (Jared Lund) |
| 05/30/2025 | Patent Owner's Updated Exhibit List |
| 06/02/2025 | Petitioner's Updated Exhibit List |
| 08/20/2025 | Hearing Transcript |
| 09/05/2025 | PTAB Decision |
| 09/19/2025 | Patent Owner's Notice of Appeal to the U.S. Court of Appeals for the Federal Circuit |
| 10/06/2025 | Petitioner's Request for Rehearing |

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

COMCAST CABLE COMMUNICATIONS, LLC,
Petitioner,

v.

ENTROPIC COMMUNICATIONS, LLC,
Patent Owner.

Patent No. 7,295,518
Filing Date: December 18, 2002
Issue Date: November 13, 2007
Title: BROADBAND NETWORK FOR COAXIAL CABLE USING MULTI-CARRIER MODULATION

*Inter Partes* Review No.: IPR2024-00431

**PETITION FOR *INTER PARTES* REVIEW**
**UNDER 35 U.S.C. §§ 311-319 AND 37 C.F.R. § 42.100 *et seq*.**

# TABLE OF CONTENTS


MANDATORY NOTICES ....................................................................................v

I. INTRODUCTION ....................................................................................1

II. SUMMARY OF ARGUMENT ....................................................................................1

III. OVERVIEW OF THE ’518 PATENT ....................................................................................2

A. Brief Description ....................................................................................2

B. Prosecution History ....................................................................................5

C. Earliest Priority Date for the Claims ....................................................................................6

IV. OVERVIEW OF PRIOR ART ....................................................................................8

A. U.S. Patent Publication No. 2006/0218593 (“Afshary”) (Ex. 1006) ....................................................................................8

B. European Patent Publication No. 1087586A2 (“Mirfakhraei”) (Ex. 1007) ....................................................................................11

C. U.S. Patent No. 6,737,984 (“Welles”) (Ex. 1022) ....................................................................................15

V. IDENTIFICATION OF CHALLENGE PURSUANT TO 37 C.F.R. § 42.104(b) ....................................................................................17

A. Claims for Which Review is Requested and Grounds on Which Challenge Is Based ....................................................................................17

B. 314(a) Discretion Does Not Apply ....................................................................................17

1. *Fintiv* Discretionary Denial Unwarranted ....................................................................................17

2. *General Plastic* Discretionary Denial Unwarranted ....................................................................................18

C. § 325(d) Discretion Does Not Apply ....................................................................................22

D. Level of Ordinary Skill ....................................................................................23

E. Claim Construction ....................................................................................23

1. “means for determining signal activity” ....................................................................................24

2. “means for producing and transmitting a probe message” ....................................................................................25

3. “means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data” ....................................................................................26

VI. SPECIFIC GROUNDS FOR UNPATENTABILITY ....................................................................................27

A. Ground A: Claims 1-4 are Rendered Obvious by Afshary in View of Mirfakhraei ........ 28
1. Independent Claim 1 ........ 28
2. Dependent Claim 2 ........ 52
3. Dependent Claim 3 ........ 56
4. Independent Claim 4 ........ 57
B. Ground B: Claim 2 is Rendered Obvious by Afshary-Mirfakhraei in View of Welles ........ 68
1. Dependent Claim 2 ........ 69
VII. GROUNDS FOR STANDING & FEE PAYMENT ........ 73
VIII. CONCLUSION ........ 73
CERTIFICATION UNDER 37 CFR § 42.24(d) ........ 74
CERTIFICATE OF SERVICE ........ 75
CLAIM LISTING APPENDIX ........ 76

## EXHIBITS

| | |
|---|---|
| Ex. 1001: | U.S. Pat. No. 7,295,518 ("the '518 patent") |
| Ex. 1002: | Expert Declaration of James Bertonis |
| Ex. 1003: | *Reserved* |
| Ex. 1004: | Certified Prosecution History of the '518 patent |
| Ex. 1005: | Certified Prosecution History of the U.S. Appl. No. 10/230,687 ("the '687 application ") |
| Ex. 1006: | U.S. Pub. No. 2006/0218593 ("Afshary") |
| Ex. 1007: | EP Pub. No. 1087586A2 ("Mirfakhraei") |
| Ex. 1008: | U.S. Pub. No. 2001/0031016 ("Seagraves") |
| Ex. 1009: | Bingham, John A.C., "Multicarrier Modulation for Data Transmission: An Idea Whose Time Has Come," *IEEE Communication Magazine*, vol. 28, no. 5, pp. 5-14, May 1990 ("Bingham") |
| Ex. 1010: | Jacobsen, Krista S., "Synchronized Discrete Multi-Tone (SDMT) Modulation for Cable Modems: Making the Most of the Scarce Reverse Channel Bandwidth," IEEE, *WESCON/97 Conference Proceedings*, November 6, 1997 ("Jacobsen 97") |
| Ex. 1011: | Wu, Yiyan et al., "Orthogonal Frequency division Multiplexing: A Multi-Carrier Modulation Scheme," *IEEE Transactions on Consumer Electronics*, vol. 41, no. 3, August 1995 ("Wu") |
| Ex. 1012: | U.S. Pat. No. 6,807,146 ("McFarland") |
| Ex. 1013: | U.S. Pat. No. 6,456,653 ("Sayeed") |
| Ex. 1014: | R. Baines, "Line Code Debates," *Electronic Design*, vol. 45, no. 6, pp. 142-146, March 1997 ("Baines") |
| Ex. 1015: | Esvelt, M.B.P., "A multicarrier modem architecture for VDSL," 1997 ("Esvelt") |

| | |
|---|---|
| Ex. 1016: | U.S. Pat. No. 6,091,932 (“Langlais”) |
| Ex. 1017: | Sari, Hikmet, et al., “Extending the Capacity of Multiple Access Channels,” *IEEE communications Magazine*, vol. 38, no. 1, pp. 74-82, January 2000 (“Sari”) |
| Ex. 1018: | Jacobsen, Krista et al., “An Efficient Digital Modulation Scheme for Multimedia Transmission on the Cable Television Network,” *43rd Annual National Cable Television Association (NTCA) Convention and Exposition*, New Orleans, LA. 1994 (“Jacobsen 94”) |
| Ex. 1019: | Haykin, Simon, *Communication Systems*, 3rd ed., Wiley & Sons, 1994 (“Haykin”) |
| Ex. 1020: | Lathi, B.P., *Linear Systems and Signals*, Cambridge Press, 1992 (“Lathi”) |
| Ex. 1021: | Oppenheim, Alan V. *et al.*, *Discrete-Time Signal Processing*, Prentice Hall PTR, 1989 (“Oppenheim”) |
| Ex. 1022: | U.S. Patent No. 6,737,984 to Welles, II *et al*. (“Welles”) |
| Ex. 1023: | Couch II, Leon W., *Digital and Analog Communication Systems,* 4th ed., Macmillan Publishing Company, 1993 (“Couch”) |
| Ex. 1024: | Ciciora, Walter S. *Modern Cable Television Technology: Video, Voice, and Data Communications*. San Francisco, Calif: Morgan Kaufmann Publishers, 1999, Sections 4.1-4.3.3 (Chapter 4, pp. 161-192) (“Ciciora”) |

## MANDATORY NOTICES

**Real Parties in Interest (37 C.F.R. § 42.8(b)(1))**

The real parties-in-interest for this petition are (i) Comcast Corporation, (ii) Comcast Cable Communications, LLC, and (iii) Comcast Cable Communications Management, LLC. These entities are referenced below as "Comcast entity _" or as "Comcast entities __," where "__" is one of or more of (i)-(iii).

No unnamed entity is funding, controlling, or directing this Petition for *inter partes* review (IPR) of U.S. Patent No. 7,295,518 ("the '518 patent"), or otherwise has an opportunity to control or direct this Petition or Petitioner's participation in any resulting IPR.

**Related Matters (37 C.F.R. § 42.8(b)(2))**

The '518 patent is asserted against Comcast Corporation, Comcast Cable Communications, LLC, and Comcast Cable Communications Management, LLC, in the Central District of California in *Entropic Communications, LLC v. Comcast Corporation et al.*, 2-23-cv-01048 (C.D. Cal.) ("1048 CDCA Litigation"). The earliest date of service on any Comcast entity named in the 1048 CDCA Litigation was February 16, 2023. Petitioner is aware of the following additional litigation matters involving the '518 patent:

| Case | Filing Date |
|---|---|
| *Entropic Communications, LLC v. DirecTV, LLC f/k/a DirecTV, Inc. et al.*, 2-23-cv-05253 (CDCA) | July 1, 2023 |

| Case | Filing Date |
| --- | --- |
| *Entropic Communications, LLC v. Cox Communications, Inc. et al.*, 2-23-cv-01047 (CDCA) | February 10, 2023 |
| *Entropic Communications, LLC v. DISH Network Corporation et al.*, 2-23-cv-01043 (CDCA) | February 10, 2023 |
| *Entropic Communications, LLC v. Charter Communications, Inc.*, 2-23-cv-00050 (EDTX) – terminated pursuant to a settlement on December 13, 2023 | February 10, 2023 |
| *Entropic Communications, Inc. v. ViXS Systems, Inc. et al.*, 3-13-cv-01102 (SDCA) – terminated pursuant to a settlement on September 15, 2014 | May 8, 2013 |

A petition for *inter partes* review was filed against the ’518 patent by Dish Network L.L.C. on January 16, 2024, as IPR2024-00393.

**Lead and Back-Up Counsel (37 C.F.R. § 42.8(b)(3))**

Petitioner designates counsel listed below. A power of attorney for counsel is being concurrently filed.

| **Lead Counsel** | **Back-Up Counsel** |
|---|---|
| Frederic M. Meeker (Reg. No. 35,282)<br>fmeeker@bannerwitcoff.com<br><br>BANNER & WITCOFF, LTD.<br>1100 13th Street, NW<br>Suite 1200<br>Washington, DC 20005<br>Tel: (202) 824-3000<br>Fax: (202) 824-3001 | Paul T. Qualey (Reg. No. 45,027)<br>pqualey@bannerwitcoff.com<br><br>Christopher L. McKee (Reg. No. 32,384)<br>cmckee@bannerwitcoff.com<br><br>Wesley W. Jones (Reg. No. 56,552)<br>wjones@bannerwitcoff.com<br><br>BANNER & WITCOFF, LTD.<br>1100 13th Street, NW<br>Suite 1200<br>Washington, DC 20005<br>Tel: (202) 824-3000<br>Fax: (202) 824-3001 |


Please address all correspondence to counsel at this address shown above. Petitioner consents to electronic service by email at the following address and the above emails: ComcastIPRService@bannerwitcoff.com.

## I. INTRODUCTION

Comcast Cable Communications, LLC ("Petitioner") petitions for *inter partes* review and cancellation of claims 1-4 of U.S. Patent No. 7,295,518 ("the '518 patent") (Ex. 1001). This petition demonstrates the unpatentability for obviousness of the claims under 35 U.S.C. §103(a) (pre-AIA), and merits institution of trial under 35 U.S.C. §314(a).

## II. SUMMARY OF ARGUMENT

The '518 patent is directed to a coaxial cable local area network (LAN). The '518 patent purports to overcome impairments of the coaxial cable medium by using a multi-carrier modulation protocol, such as orthogonal frequency division multiplexing (OFDM) or discrete multi-tone (DMT). These multi-carrier modulation protocols use a set of modulated sub-carriers to transmit data, with each sub-carrier corresponding to a frequency channel. The '518 patent also describes the use of channel probe messages to estimate the signal to noise ratio (SNR) of each frequency channel. The '518 patent explains that bit-loading is used to vary the number of bits transmitted by a sub-carrier based on the SNR estimated for a corresponding frequency channel. Frequency channels with higher SNRs are assigned more bits for transmission using a higher order modulation scheme, while frequency channels with lower SNRs are assigned fewer bits for transmission using a lower order modulation scheme.

As set forth below, these features were known in the prior art, and claims 1-4 of the ’518 Patent are unpatentable and should be canceled.

## III. OVERVIEW OF THE ’518 PATENT

### A. Brief Description

The ’518 patent is directed to “communications using coaxial cable building wiring.” Ex. 1001, 1:28-29. Figure 2 (below) illustrates a cable LAN. Ex. 1001, 5:36-6:3. As shown, LAN modems (**orange**) are connected via coaxial cable (**blue**) and splitters (**pink**) to enable LAN devices (*e.g.*, PCs) (**green**) to communicate with one another. Ex. 1001, 5:36-6:3; Ex. 1002, ¶¶ 57-65.




Fig. 2

Ex. 1001, Fig. 2 (annotated)

The ’518 patent explains that the frequency spectrum of the coaxial cable may be shared by more than one network. Ex. 1001, Abstract, 1:33-40, 5:57-6:10, Figs. 1-2. Figure 4 (below) shows a first portion of the frequency spectrum used by existing cable services (*e.g.*, including a conventional cable TV (CATV) network) (**green**) and a second portion of the frequency spectrum used by the cable LAN (**red**). Ex. 1001, 6:4-10; Ex. 1002, ¶¶ 66-67.




Fig. 4

Ex. 1001, Fig. 4 (annotated)

The ’518 patent describes the use of multi-carrier modulation (or multi-tone modulation) techniques to address channel impairments present in coaxial building wiring. Ex. 1001, Abstract, 4:37-46, 7:22-8:50. The ’518 patent describes orthogonal frequency division multiplexing (OFDM) and discrete multi-tone (DMT)

as multi-carrier modulation techniques that employ a set of modulated carriers (or sub-carriers). Ex. 1001, 7:22-43, 8:27-28.[1] With OFDM and DMT, each carrier corresponds to a frequency channel (or frequency bin). Ex. 1001, 7:22-43. Each carrier is separately modulated based on a set of bits assigned to the carrier, using a modulation scheme such as Quadrature Phase Shift Keying (QPSK) or Quadrature Amplitude modulation (QAM). Ex. 1001, 7:22-43. The modulated carriers are then summed for transmission over the coaxial cable channel. Ex. 1001, 7:38-40; Ex. 1002, ¶ 68.

The ’518 patent also describes the use of bit-loading. Ex. 1001, 8:9-26, 10:11:6, Fig. 10. With bit-loading, carriers corresponding to frequency channels having lower signal to noise ratios (SNRs) modulate data using lower order signal constellations (*e.g.*, 16-QAM) while carriers corresponding to frequency channels having higher SNRs modulate data using higher order signal constellations (*e.g.*, 64-QAM). Ex. 1001, 8:9-26, 10:61-11:6, Fig. 10. Higher order signal constellations correspond to more bits per transmission than lower order constellations, so carriers with higher SNRs are allocated more bits for modulation and transmission while

---

[1] Petitioner’s expert James Bertonis explains relevant background technologies in his declaration. Ex. 1002, ¶¶ 29-56.

carriers with lower SNRs are allocated fewer bits for modulation and transmission. Ex. 1001, 8:9-26, 10:61-11:6, Fig. 10; Ex. 1002, ¶¶ 68-69.

The ’518 patent further describes determining the SNR for each carrier (or frequency channel/bin), collectively referred to as an SNR profile. Ex. 1001, 9:35-10:20. The ’518 patent describes the use of channel probe messages to build SNR profiles. Ex. 1001, 4:48-62, 9:35-10:20. To generate an SNR profile, a first LAN device transmits a channel probe message to a second LAN device. Ex. 1001, 9:35-49. The ’518 patent states that a probe message is “a predetermined bit sequence which [is] known by the receiving device.” Ex. 1001, 9:38-39, 10:6-20, Fig. 7. The receiving LAN device determines the SNR profile based on the received predetermined bit sequence, and then determines the bit-loading for each carrier based on the SNR profile. Ex. 1001, 4:48-62, 9:35-10:20. The receiving LAN device provides the determined bit-loadings back to the transmitting LAN device for use in subsequent communications with the receiving LAN device. Ex. 1001, 4:48-62, 9:35-10:20. The ’518 patent admits that determining an SNR profile “from a known signal is well known in the art.” Ex. 1001, 10:13-14; Ex. 1002, ¶¶ 67-74.

### B. Prosecution History

The ’518 patent was filed as application no. 10/322,834 (“the ’834 application”) on December 18, 2002. Ex. 1001; Ex. 1004, 2-41. Prosecution of the ’834 application was brief as no substantive Office Action was issued. *See generally*

Ex. 1004. The ’834 application was filed with 10 claims, with claims 1, 5, 8, and 10 being independent. Ex. 1004, 2-41. In response to a Restriction Requirement, Applicant elected claims 1-4 and 10 for prosecution and canceled claim 5-9. Ex. 1004, 61-66, 68-73. To gain allowance, Applicant agreed to the Examiner’s suggestion to amend claim 1 to include the limitations of claim 2, which correspond to element [1D]. Ex. 1004, 75-86, 82. In the Notice of Allowance, the Examiner stated:

> The prior art of record, Dodds et al. (US 6,886,181) and an article “Multicarrier Modulation for Data Transmission; An Idea Whose Time has Come”, by John A.C. Bingham, IEEE, alone or in combination, fails to disclose a network device for communicating data to other network devices by utilizing unique method step of determining channel characteristics and a bit loading profile used to transmit data by analyzing received probe message signals (claims 1 and 10).

Ex. 1004, 80; Ex. 1002, ¶¶ 75-78.

### C. Earliest Priority Date for the Claims

As noted in Section III.B, the ’518 patent was filed as the ’834 application on December 18, 2002. Ex. 1001; Ex. 1004, 2-41. The ’518 patent indicates that it is a continuation of application no. 10/230,687 (“the ’687 application”). Ex. 1001; Ex. 1004, 2-41. The ’834 application and the ’687 application, however, were not copending at the time the ’834 application was filed. Therefore, the ’518 patent

cannot claim priority to the ’687 application. 35 U.S.C § 120; 37 C.F.R § 1.78; MPEP § 201.11.[2]

The ’687 application was filed on August 29, 2002. Ex. 1005, 2-36. On October 1, 2002, a Notice to File Missing Parts was issued. Ex. 1005, 37-38. Applicant never responded to the Notice to File Missing Parts. Ex. 1005. Consequently, the ’687 application was abandoned as of December 2, 2002. 35 U.S.C. § 133; 37 C.F.R §§ 1.53, 1.135, 1.136; MPEP §§ 711.02, 711.04(a). To claim priority to the ’687 application, the ’834 application must have been filed prior to abandonment of the ’687 application. Because the ’834 application was filed after the ’687 application was abandoned, the ’834 application and the ’687 application were never copending. The lack of copendency prevents the ’518 patent from claiming priority to the ’687 application. 37 CFR § 1.78; MPEP § 201.11.

The ’518 patent also indicates that it claims priority to provisional application No. 60/385,361 (“the ’361 provisional application”), filed on June 3, 2002, provisional application No. 60/363,420 (“the ’420 provisional application”), filed on March 12, 2002, and provisional application No. 60/316,820 (“the ’820 provisional application”), filed on August 30, 2001. Ex. 1001. Because the ’518 patent cannot claim priority to the ’687 application, the ’518 patent cannot claim priority to the

[2] All citations in this sections are to MPEP, 8th ed., published August, 2001.

’820 provisional application as the ’518 patent was filed more than a year after the ’820 provisional application was filed. 35 U.S.C § 119; MPEP § 201.11.

Accordingly, the earliest possible date to which the ’518 patent may claim priority is March 12, 2002, the filing date of the ’420 provisional application. Each of the references relied on herein – Afshary, Mirfakhraei, and Welles – qualify as prior art to the ’518 patent even if the priority date of the ’518 patent is determined to be August 30, 2001, and the analysis provided herein does not depend on whether the priority date of the ’518 patent is determined to be March 12, 2002, or August 30, 2001.

## IV. OVERVIEW OF PRIOR ART

### A. U.S. Patent Publication No. 2006/0218593 (“Afshary”) (Ex. 1006)

Afshary was filed on January 3, 2006, as a continuation of U.S. Pat. App. No. 09/164,427, filed on September 30, 1998, and published on September 28, 2006. Afshary is prior art under pre-AIA 35 U.S.C. § 102(e) whether the priority date of the ’518 patent is determined to be March 12, 2002, or August 30, 2001. Ex. 1006.

Afshary relates to “networking and more particularly to data distribution through a coaxial cable.” Ex. 1006, ¶ 2. Afshary describes “a coaxial cable local area network (LAN) for communicating data between clients of the cable LAN.” Ex. 1006, ¶ 12, *see also id.*, Abstract, ¶¶ 2, 7, 12, 14, 19-23, 41, Figs. 1-2. Figure 1 (below) illustrates “an in-home coaxial cable LAN.” Ex. 1006, ¶ 14. Afshary

explains that the cable LAN includes cable LAN adapters 32 (**orange**) that enable client devices (**green**) – such as PCs 36 and 48 – to communicate with each other via coaxial cable wire 24 (**blue**) and splitters 22 and 38 (**purple**). Ex. 1006, ¶¶ 18-19, 21, 23, 41, Figs. 1-2; Ex. 1002, ¶¶ 79-83.




Ex. 1006, Fig. 1 (annotated)

Afshary explains that the cable LAN operates over a frequency range so as not to interfere with a frequency range used by conventional services, such as cable TV, provided over the same coaxial cable. Ex. 1006, ¶¶ 4, 5, 7, 24, 25-28, Fig. 3. As shown in Figure 3 (below), existing cable services are provided over an operating frequency range of 0-950 MHz (**green**) while the cable LAN is provided over a non-overlapping operating frequency range of 1000-2000 MHz (**red**). Ex. 1006, ¶¶ 24-

28. As an example, data is transmitted over the cable LAN with a center frequency of 1300 MHz and occupies a bandwidth of 5 MHz (**blue**). Ex. 1006, ¶ 25; Ex. 1002, ¶ 84.




FIG. 3

Ex. 1006, Fig. 3 (annotated)

Figure 4 of Afshary illustrates the architecture of a cable LAN adapter (**orange**). Ex. 1006, ¶ 29. Data from a client device is modulated by modulator 96 (**red**) using a modulation scheme such as Quadrature Phase Shift Keying (QPSK) digital modulation. Ex. 1006, ¶¶ 26, 35-41. Radio Frequency (RF) and Mixed Signal section 100 (**blue**) up-converts the modulated data to an RF frequency (*e.g.*, to an RF center frequency of 1300 MHz as shown in Figure 3). Ex. 1006, ¶¶ 38-39. RF data signals received by the cable LAN adapter are down-converted by the RF and Mixed Signal section 100 and then demodulated by demodulator 98 (**green**) to recover the original data. Ex. 1006, ¶¶ 38-42; Ex. 1002, ¶¶ 85-87.




Ex. 1006, Fig. 4 (annotated)

### B. European Patent Publication No. 1087586A2 ("Mirfakhraei") (Ex. 1007)

Mirfakhraei was published on March 28, 2001, and is prior art under pre-AIA 35 U.S.C. § 102(a) whether the priority date of the '518 patent is determined to be March 12, 2002, or August 30, 2001. Ex. 1007.

Mirfakhraei "relates to communications and communications systems such as modems and transceivers that use multiple carrier frequencies for information transmissions." Ex. 1007, ¶ 1. Mirfakhraei describes modems that use discrete multi-tone (DMT) and bit-loading to increase data transmission rates. Ex. 1007, Abstract, ¶¶ 2-3, 5-8; Ex. 1002, ¶¶ 88-89.

Mirfakhraei explains that DMT is a multi-carrier modulation technique that "simultaneously uses multiple carrier frequencies where each carrier frequency corresponds to a sub-channel." Ex. 1007, Abstract, ¶ 3. Mirfakhraei describes that

"[f]or data transmission, a sending modem breaks transmitted data into packets for simultaneous transmission on separate sub-channels and independently modulates communication signals for the sub-channels according to the data carried on each sub-channel." Ex. 1007, Abstract, ¶ 3. For reception, the "receiving modem separates sub-channel signals according to carrier frequency, demodulates the separate sub-channel signals, and reassembles the data." Ex. 1007, Abstract, ¶ 3; Ex. 1002, ¶ 90.

Mirfakhraei's modems employ "a 'bit-loading' process that characterizes the capabilities of sub-channels and determines the number of bits-per-symbol transmitted over the channel." Ex. 1007, ¶ 14. Mirfakhraei explains that with bit-loading, more bits are assigned to a sub-carrier having a higher SNR, which indicates a more reliable sub-channel. Ex. 1007, ¶¶ 4, 17-18, 23-24. In contrast, fewer bits are assigned to a sub-carrier having lower SNR, indicating a less reliable sub-channel. Ex. 1007, ¶¶ 4, 17-18, 23-24. The number of bits assigned to a sub-channel are modulated using quadrature amplitude modulation (QAM), such that each sub-carrier transmits a QAM symbol. Ex. 1007, ¶¶ 4, 17-18, 23-24. A sub-channel with a higher SNR uses a larger QAM constellation for modulating the number of bits assigned to the sub-channel. Ex. 1007, ¶¶ 4, 17-18, 23-24. A larger QAM constellation allows more bits per QAM symbol to be transmitted by a corresponding sub-carrier, resulting in higher bit-loading. Ex. 1007, ¶¶ 4, 17-18, 23-24. A sub-

channel with a lower SNR uses a smaller QAM constellation that is limited to transmitting fewer bits per QAM symbol on a corresponding sub-carrier, resulting in lower bit-loading. Ex. 1007, ¶¶ 4, 17-18, 23-24; Ex. 1002, ¶¶ 29-55, 91.

Figure 1 (below) illustrates a modem transceiver 100 that includes a transmitter 110 and a receiver 190. Ex. 1007, ¶¶ 14-15. To implement the DMT bit-loading protocol, the transmitter 110 includes TX handshake block 120 (**green**) and the receiver 190 includes RX handshake block 170 (**blue**). Ex. 1007, ¶¶ 2-3, 5-8, 14-25 14. Mirfakhraei explains that the TX handshake block 120 of a first transceiver generates and transmits a handshake signal to a second transceiver, with the handshake signal comprising a predetermined signal known to both the first and second transceivers (*e.g.*, a known signal pattern or a known pseudo-random signal). Ex. 1007, ¶¶ 20-22. The RX handshake block 170 of the second transceiver estimates the signal-to-noise ratio (SNR) for each sub-channel based on the received handshake signals. Ex. 1007, ¶¶ 21-23; Ex. 1002, ¶ 92.

Mirfakhraei explains that by comparing the received handshake signal to the known signal values that were transmitted, SNR values for each sub-channel are determined. Ex. 1007, ¶¶ 5-8, 14, 20, 22-23, 25-32, Figs. 1-2. Bit-loadings for each sub-channel are then determined based on the SNR values determined for each sub-channel. Ex. 1007, ¶¶ 5-8, 14, 17, 20, 22-23, 25-32, Figs. 1-2. The RX handshake block 170 of the second transceiver sends the determined bit-loadings for each sub-

channel to the first transceiver, which then employs the bit-loadings in subsequent communications with the second transceiver. Ex. 1007, ¶¶ 5-8, 14, 20, 22-23, 25-32, Figs. 1-2; Ex. 1002, ¶ 93.




Ex. 1007, Fig. 1 (annotated)

### C. U.S. Patent No. 6,737,984 ("Welles") (Ex. 1022)

Welles was filed on March 10, 2000, and issued on May 18, 2004. Ex. 1022. Welles is prior art under pre-AIA 35 U.S.C. § 102(e) whether the priority date of the '518 patent is determined to be March 12, 2002, or August 30, 2001. Ex. 1022.

Welles describes a LAN formed over power line cables that allows utility meters to communicate with each other. Ex. 1022, Abstract, 1:14-18, 1:56-2:9, 2:55-7:11, Figs. 1-2, 4. Welles explains that each utility meter includes a frequency shift keying (FSK) transceiver as shown in Figure 4 (below) to communicate data over a pair of frequencies (*e.g.*, a center frequency and a non-center frequency). The FSK transceiver includes a pair of envelope detectors – center frequency envelope detector 192 (**green**) and non-center frequency envelope detector 194 (**blue**). Ex. 1022, 4:5-16, 5:5-7:11; Ex. 1002, ¶¶ 94-98.

Welles explains that the pair of envelope detectors scan a range of frequencies to determine if the frequency range is in use by another FSK transceiver on the LAN or if the frequency range is affected by other interference or noise. Ex. 1022, 5:5-7:11. As an example, center frequency envelope detector 192 (**green**) measures the received signal power of a signal on power line 122 and compares it to a reference signal power level 157 using comparator 196. Ex. 1022, 5:5-7:11. If the received signal power exceeds the reference signal power level 157, an active signal is provided via signal quality output 166, which indicates that the corresponding

frequency is occupied or otherwise not available or suitable for use. Ex. 1022, 5:5-7:11. Welles' envelope detector and its techniques for using the envelope detector enable "the frequency spectrum [to be] scanned to find a clear frequency pair from which [the FSK transceiver] may transmit utility meter data using FSK modulation." Ex. 1022, 7:6-8; Ex. 1002, ¶¶ 99-102.




Ex. 1022, Fig. 4 (annotated)

# V. IDENTIFICATION OF CHALLENGE PURSUANT TO 37 C.F.R. § 42.104(b)

## A. Claims for Which Review is Requested and Grounds on Which Challenge Is Based

Petitioner requests review of claims 1–4 on the following grounds.

| Ground | References | Basis | Claims Challenged |
|---|---|---|---|
| A | Afshary in view of Mirfakhraei | §103 | 1-4 |
| B | Afshary in view of Mirfakhraei in further view of Welles | §103 | 2 |

None of this prior art was before the examiner during prosecution of the ’518 patent.

## B. 314(a) Discretion Does Not Apply

### 1. *Fintiv* Discretionary Denial Unwarranted

The *Fintiv* factors as set forth in the Director’s June 21, 2022 Guidance Memorandum do not warrant discretionary denial.

Factor one (court stay-related) appears neutral. Petitioner has filed IPR petitions challenging two of the twelve patents asserted in the District Court in case no. 2:23-cv-01048. If trial is instituted in one or more of those IPRs, Petitioner expects to request a stay.

Factor two (proximity of trial date) favors institution. Petitioner has filed a motion to dismiss, Patent Owner has filed an Amended Complaint, and Petitioner

will renew its Motion to Dismiss in order to seek dismissal of the operative complaint. Further, no trial date has been set.

Factor three (investment in parallel proceedings) favors institution. The investment by the District Court has been limited to considering motions to dismiss.

Factor four (issues overlap) strongly favors institution. The petition challenges all 4 claims in the ’518 patent while only claims 1 and 3 are asserted in the District Court.

Factor five (parties-related) does not warrant denial as Petitioner is a defendant in the District Court case.

Factor six (other circumstances including merits) favors institution. Petitioner presents compelling unpatentability challenges that merit institution.

#### 2. *General Plastic* Discretionary Denial Unwarranted

An unrelated party, Dish Network L.L.C., (“Dish”), filed a petition challenging claims 1 and 3 of the ’518 patent on January 16, 2024. Dish’s filing does not warrant a discretionary denial of this petition—filed less than a month later. The *General Plastic*[3] factors are addressed below.

[3] *General Plastic Industrial Co. Ltd. v. Cannon Kabushiki Kaisha*, No. IPR2016-01357, Paper 19 at 16 (PTAB Sept. 6, 2017) (precedential as to section II.B.4.i).

#### a. Factor One (whether the same petitioner previously filed a petition directed to the same claims of the same patent) favors institution

Dish is not the present petitioner. Nor does Dish's prior petition challenge the same claims as the instant petition. Moreover, petitioner Comcast and the prior petitioner Dish have no significant relationship to each other. They are unrelated competitor companies sued separately for alleged patent infringement based on their respective products/services. Further, counsel can (and does) represent that Comcast and Dish have not cooperated in any way in preparing their petitions. Thus, these parties have no relationship in their requested IPRs.

In these (and other) respects, the facts align with *Google LLC v. Uniloc 2017 LLC*, No. IPR2020-00396, 2020 WL 4463086, *4 (PTAB Aug, 3, 2020; Paper 11) (petitioners "have no relationship and offer competing products"; no cooperation in preparing the petitions). "[T]here is not a significant relationship between Petitioner and [Dish], and accordingly, the first *General Plastic* factor does not weigh in favor of denying institution." *Id.*, *5.

*Valve Corp. v. Elec. Scripting Prods., Inc.*, No. IPR2019-00062, Paper 11 at 9–10 (PTAB April 2, 2019) (precedential) is clearly distinguishable. There, the Board discretionarily denied a second petition filed by another petitioner largely because of the significant relationship found to exist between the petitioners (HTC and Valve). The petitioners were co-defendants accused of infringing the same

patent based on "HTC's ... devices that incorporate technology licensed from Valve." *Id.*

**b. Factor Two (knowledge of prior art asserted in second petition at the time first position was filed)**

That Comcast knew of the references it relies on here, at the time Dish filed its petition, at most "weighs slightly in favor of denying institution." This is even further reduced by the short time (less than a month) between the filing of the two petitions. *Google*, 2020 WL 4463086 at *6.

**c. Factor Three (timing in relation to preliminary response and institution decision in first IPR) favors institution**

As in *Google*, there can be "no dispute that the Petition was filed before the preliminary response was filed or the institution decision was issued" in the earlier proceeding. *Id.*

**d. Factor Four (elapsed time between when the petitioner learned of the prior art asserted in the second petition and the time of its filing) does not favor denial of institution**

Upon Entropic filing suit, Comcast undertook to diligently investigate the allegations, including the invalidity of the patents asserted. Patent invalidity searches and studies were undertaken, with the references relied upon herein ultimately being identified as material prior art.

Petitioner submits that the time taken to investigate invalidity, identify IPR challenge grounds and prepare the instant petition for filing was reasonable under

the circumstances, including the large number of patents asserted against Petitioner by Entropic (twelve). The situation here is a direct result of Patent Owner's litigation activity. *Cf., id.* at *7.

**e. Factor Five (explanation of the time elapsed between the filing of the multiple petitions directed to the same claims of the same patent) favors institution**

Dish's earlier petition challenges only claims 1 and 3 of the '518 patent. On the other hand, the instant petition challenges all 4 claims. Further, the time elapsed between the two petition filings (less than a month) is minimal. *Cf.*, *Google,* 2020 WL 4463086 at *6 (a "nearly three month lapse in time" is not unreasonable).

**f. Factor Six (Board's finite resources) and Seven (statutory time frame for Board to issue a final determination) do not favor denial of institution**

As in *Google*, the filing of two petitions by different petitioners here is the direct result of Patent Owner's litigation activity. The Board should be "mindful of potential prejudice to a second or subsequent petitioner if institution of review based on the second petition is denied and the proceeding involving the first petitioner is terminated." *Id.* at *7. The potential prejudice to Comcast is even greater here, where Dish's petition challenges only claims 1 and 3, while the instant petition challenges all claims 1-4.

Further, the grounds asserted in the respective petitions are distinct, and merit the Board's separate reviews. Each relies on different references.

Still further, the minimal amount of elapsed time between the two petition filings lends itself to the efficient conduct of proceedings on both, *e.g.*, potentially consolidation and concurrent issuance of final written decisions within the statutory time frame.

**C. § 325(d) Discretion Does Not Apply**

Considering the two-part framework discussed in *Advanced Bionics, LLC v. Med-El Elektromedizinische Geräte GMBH*, No. IPR2019-01469, Paper 6 at 8-9 (PTAB Feb. 13, 2020), the Board should not exercise its §325(d) discretion to deny institution. The grounds raised by this Petition do not present the same or substantially the same art or arguments as raised during prosecution. None of the references relied upon herein were considered during prosecution. No substantive office action was issued during prosecution. *See* Section III.B. The Examiner mentioned the Bingham article in the Notice of Allowance but did not apply this reference. Regardless, Afshary, Mirfakhraei, and Welles relied on herein differ substantially and materially from the Bingham article and were not before the Examiner.

Claim 1 was allowed after limitation [1D] – relating to transmitting and analyzing probe messages to determine channel characteristics and bit loading from the determined channel characteristics – was added to the claim. Claim 4 already recited limitations similar to limitation [1D] (*see* limitations [4C]-4[D]) but in means

plus function form. *See* Ex. 1004, 75-86, 82. The Examiner erred in allowing these claims at least because the Examiner was not made aware of Mirfakhraei, which teaches precisely this, as well as other claimed features (*see, e.g.,* § IV.B, *supra* and §§ VI.A.1.e, VI.A.4.d-e, *infra*).

### D. Level of Ordinary Skill

In relation to the ’518 patent, a person of ordinary skill in the art (“POSITA”) would have had a bachelor’s degree in electrical engineering, computer engineering, or a similar discipline, and three to four years of experience working in signal processing and/or communication systems/networks. Additional education may substitute for experience, and significant work experience may substitute for formal education. Ex. 1002, ¶¶ 103-105. As set forth in his attached declaration, James G. Bertonis at least meets the level of skill of a POSITA. Ex. 1002, ¶¶ 1-28.

### E. Claim Construction

The below three claim terms presumptively invoke pre-AIA §112 ¶ 6 through use of the words “means for,” and constructions are provided below in the event these are determined to be subject to §112 ¶ 6.[4] All other claim terms herein should

---

[4] No admission is made with respect to the sufficiency of the disclosures of corresponding structure/algorithm for satisfying 35 U.S.C. § 112, ¶ 2, or for compliance with 35 U.S.C. § 101.

be given their ordinary and customary meaning to a POSITA, consistent with the specification and prosecution history, as they would be given in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100(b). While Petitioners propose the below constructions, the challenged claims are invalid under any reasonable construction of all claim terms. Ex. 1002, ¶¶ 105-107.

#### 1. "means for determining signal activity"

The claimed function for this term is "determining signal activity," which does not require further construction for purposes of this IPR. Ex. 1001, claim 2; Ex. 1002, ¶¶ 108-109. The '518 patent describes at least four different approaches for determining signal activity. Ex. 1001, 11:7-43; Ex. 1002, ¶ 109. One approach is to perform an Fast Fourier Transform (FFT) on data samples from an A/D converter using the same receiver signal path that is used for data communication. Ex. 1001, 11:7-23; Ex. 1002, ¶ 109.

The '518 patent describes Figure 6 (below) as a receiver signal path used for data communication. Ex. 1001, 8:51-9:27; Ex. 1002, ¶ 109. As shown, the receiver signal path performs an FFT on data samples from an ADC. *Id.*; Ex. 1002, ¶ 109.




Ex. 1001, Fig. 6

Accordingly, one corresponding structure for "determining signal activity" is a receiver that performs an FFT on data samples from an A/D converter. Ex. 1002, ¶ 109.

Another approach is to measure received signal power with an envelope detector. Ex. 1001, 11:23-29; Ex. 1002, ¶ 110. Accordingly, another corresponding structure for "determining signal activity" is an envelope detector. Ex. 1002, ¶ 110.

**2. "means for producing and transmitting a probe message"**

The claimed function for this term is "producing and transmitting a probe message," which does not require further construction for purposes of this IPR. Ex. 1001, claim 4; Ex. 1002, ¶¶ 111-112. A probe message is a signal "known by the receiving device" that is used "to estimate the channel characteristics" such as SNR. Ex. 1001, 9:36-39; *see also id.*, 4:48-62, 7:22-42, 8:9-35, 9:40-10:20; Ex. 1002, ¶¶ 111-112. The '518 patent describes the structures that generate and transmit these signals as follows:

> The signal processing and computations performed on signal samples needed for modulating, demodulating, channel estimation, and other operations can be performed by dedicated hardware resources or by a programmed signal processor. A typical system will utilize both hardware and software techniques to perform the needed signal processing. Signal processing circuitry can be integrated into a single system on a chip (SOC), partitioned into several chips, or programmed into a field programmable gate array (FPGA).

Ex. 1001, 10:29-38; Ex. 1002, ¶¶ 111-112.

Accordingly, one corresponding structure for "producing and transmitting a probe message" is a processor. Ex. 1002, ¶¶ 111-112. To the extent the identified structure of a processor requires an algorithm for performing the recited function, the algorithm is: (a) generating a signal known to a receiving device; and (b) transmitting the known signal. Ex. 1001, Abstract, 4:48-62, 9:35-10:38, Fig. 7; Ex. 1002, ¶¶ 111-112.

#### 3. "means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data"

As discussed above, the '518 patent describes transmitting probe messages to estimate SNR. Ex. 1001, 7:22-42, 8:9-35, 9:34-10:20; Ex. 1002, ¶¶ 113-114. The '518 patent further describes determining a bit loading profile for transmitting data by calculating the SNR for each subchannel based on a received probe message. Ex. 1001, 8:9-26, 9:17-18, 9:34-10:20, 10:61-11:6, Fig. 10; Ex. 1002, ¶¶ 113-114. The

’518 patent admits that “[d]etermination of . . . [an] SNR profile from a known signal is well known in the art.” Ex. 1001, 10:12-14. The claimed function for this term is “receiving and analyzing a probe message to determine a bit loading profile used to transmit data,” which requires no further construction for purposes of this IPR. Ex. 1001, claim 4; Ex. 1002, ¶¶ 113-114. Based on the specification of the ’518 patent, as described above, one corresponding structure for this function is a processor. Ex. 1001, 10:29-38; Ex. 1002, ¶¶ 113-114. To the extent the identified structure of a processor requires an algorithm for performing the recited function, the algorithm is: (a) receiving a known signal; (b) determining a SNR for each subchannel based on the received known signal; and (c) determining a bit loading for each subchannel based on the determined SNR for the subchannel. Ex. 1001, Abstract, 4:48-62, 8:9-26, 9:17-19, 9:35-10:38, 10:61-11:6, Fig. 7; Ex. 1002, ¶¶ 113-114.

## VI. SPECIFIC GROUNDS FOR UNPATENTABILITY

Claims 1-4 are unpatentable under §103(a), because the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a POSITA. *See, KSR Int’l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). Consideration of the *Graham* factors underlying the question of obviousness leads inexorably to a conclusion of obviousness for all claims. *See, Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### A. Ground A: Claims 1-4 are Rendered Obvious by Afshary in View of Mirfakhraei

As set forth below, Afshary in view of Mirfakhraei renders obvious claims 1-4. Ex. 1002, ¶¶ 115-175.

#### 1. Independent Claim 1

##### a. [1pre]: "A data communication network comprising:"

To the extent the preamble [1pre][5] is limiting, Afshary teaches it. Ex. 1002, ¶¶ 118-120. As discussed above in Section IV.A, Afshary discloses a coaxial cable local area network (LAN) (claimed "data communication network") and states that "[t]he invention relates to a coaxial cable local area network (LAN) for digitally communicating client generated data between clients of the cable LAN." Ex. 1006, ¶ 7; *see id.*, Abstract, ¶¶ 2, 12, 14, 19-23, 41, Figs. 1-2; Ex. 1002, ¶ 119. Figure 1 (below) shows the "in-home coaxial cable LAN" disclosed by Afshary. Ex. 1006, ¶ 14; Ex. 1002, ¶ 119. Afshary teaches that the cable LAN includes cable LAN adapters 32 (**orange**) that enable client devices – such as PCs 36 and 48 (**green**) – to communicate with each other via coaxial cable wire 24 (**blue**). Ex. 1006, ¶¶ 18-19, 21, 23, 41, Figs. 1-2; Ex. 1002, ¶ 119.

---

[5] The claims appear and are labelled in the Claims Listing Appendix.




FIG. 1

Ex. 1006, Fig. 1 (annotated)

Therefore, Afshary teaches [1pre]. Ex. 1002, ¶¶ 118-120.

**b. [1A] "at least two network devices, each network device comprising a multi-carrier modulator for modulating data, an up converter for translating the modulated data to an RF carrier frequency, a down converter for translating an RF signal, and a multi-carrier demodulator for demodulating the translated RF signal to produce data; and"**

Afshary discloses each feature of [1A] other than a modulator that is multi-carrier and a demodulator that is multi-carrier, which are disclosed by Mirfakhraei. As explained below, a POSITA would have found it obvious to incorporate Mirfakhraei's multi-carrier modulation and bit-loading techniques into Afshary's

coaxial cable LAN to improve its data transmission rate and reliability, as such techniques were well known for mitigating impairments typical of coaxial cables.

Afshary's Network Devices

As shown in Figure 1 (below), Afshary discloses cable LAN adapters 32 (**orange**) (claimed "at least two network devices") within its coaxial cable LAN. Ex. 1006, ¶¶ 18-19, 21-23, 41, Figs. 1-2; Ex. 1002, ¶ 121. As discussed above for [1pre] (Section VI.A.1.a), Afshary teaches that the cable LAN adapters 32 enable client devices – such as PCs 36 and 48 (**green**) – to communicate with each other via coaxial cable 24 (**blue**). Ex. 1006, ¶¶ 18-19, 21, 23, 41, Figs. 1-2; Ex. 1002, ¶ 121.




Ex. 1006, Fig. 1 (annotated)

Afshary's Modulator and Up-Converter

Figure 4 (below) of Afshary shows the architecture of a cable LAN adapter 32. Ex. 1006, ¶ 29; Ex. 1002, ¶ 122. Afshary explains that digital data originating from the Media Access Control (MAC) & Client Interface section 80 is encoded and modulated by Baseband section 90. Ex. 1006, ¶¶ 30, 35; Ex. 1002, ¶ 122. Specifically, Afshary teaches that the digital data is encoded by Forward Error Correction (FEC) encoder 92 and then modulated by modulator 96 (**red**) using a modulation scheme such as Quadrature Phase Shift Keying (QPSK) digital modulation. Ex. 1006, ¶¶ 26, 35-41; Ex. 1002, ¶ 122.

FIG. 4




Ex. 1006, Fig. 4 (annotated)

The modulated data from modulator 96 is provided to the RF & Mixed Signal section 100. Ex. 1006, ¶¶ 38-39; Ex. 1002, ¶ 123. To transmit the modulated data over RF frequencies, the RF & Mixed Signal section 100 includes digital to analog

converter (DAC) 108, up converter 112, local oscillator (LO) frequency synthesizer timing circuit 120, mixer 122, and power amplifier (PA) 116 (**dashed purple**) (collectively, claimed "up converter for translating the modulated data to an RF carrier frequency"). Ex. 1006, ¶¶ 38-39; Ex. 1002, ¶¶ 123-124. Afshary teaches that these components operate to translate the modulated data from the Baseband section 90 to a 1300 MHz center frequency (**red**) (claimed "RF carrier frequency") and that the modulated data occupies a bandwidth of 5 MHz (**dark blue**) as shown in Figure 3 (below). Ex. 1006, ¶¶ 25, 38-39; Ex. 1002, ¶¶ 123-124. The up-converted modulated data is transmitted as an RF signal to another cable LAN adapter 32 to facilitate communication between client devices. Ex. 1006, ¶¶ 23, 26, 39, 41; Ex. 1002, ¶¶ 123-124.



FIG. 3

Ex. 1006, Fig. 3 (annotated)

<u>Afshary's Demodulator and Down-Converter</u>

Referring back to Figure 4, for receiving RF modulated data, the RF & Mixed Signal section 100 includes low noise amplifier (LNA) 118, LO 120, mixer 122, down converter 114, and analog to digital converter (ADC) 110 (**dashed orange**) (collectively, claimed "down converter for translating an RF signal"). Ex. 1006, ¶¶ 38-39, 41; Ex. 1002, ¶¶ 125-126. Afshary teaches that these components operate to translate a received RF signal to a lower frequency signal. Ex. 1006, ¶¶ 38-39, 41; Ex. 1002, ¶¶ 125-126. Afshary teaches that the down-converted signal from the RF & Mixed Signal section 100 is demodulated by demodulator 98 (**green**). Ex. 1006, ¶¶ 41-42; Ex. 1002, ¶¶ 125-126. The demodulated data from demodulator 98 is decoded and corrected by FEC decoder 94 to recover digital data that is provided to MAC & Client Interface section 80. Ex. 1006, ¶¶ 41-42; Ex. 1002, ¶¶ 125-126.

Mirfakhraei's Multi-Carrier Modulation and Bit-Loading Techniques

While Afshary describes the cable LAN adapter 32 as using a single carrier modulation technique (*e.g.*, modulating data using QPSK and then up-converting the modulated data to a single RF carrier frequency), multiple carrier modulation techniques and their benefits were well known, as evident from Mirfakhraei. Ex. 1006, ¶¶ 26, 35-41; Ex. 1007, Abstract ¶¶ 1-3, 5; Ex. 1008, ¶ 5; Ex. 1009, p. 5; Ex. 1010, pp. 374-376; Ex. 1011, pp. 392-395; Ex. 1018, pp. 305-307, 312; Ex. 1002, ¶ 127.

Mirfakhraei describes modem transceivers that communicate using a Discrete Multi-Tone (DMT) protocol that provides increased data rates over single carrier communication protocols. Ex. 1007, Abstract, ¶¶ 1-3, 5-8, 14-25, Figs. 1-2; Ex. 1002, ¶ 128. Mirfakhraei explains that DMT, like OFDM, is a multi-carrier communication protocol that uses multiple carriers to transmit and receive modulated data. Ex. 1007, Abstract, ¶¶ 2-5; Ex. 1008, ¶ 5; Ex. 1009, p. 5; Ex. 1010, pp. 374-376; Ex. 1011, pp. 392-294; Ex. 1012, Abstract, 1:10-59, Figs. 1-2; Ex. 1013, Abstract, 2:30-5:39, Figs. 1-2; Ex. 1014, p. 142; Ex. 1015, pp. 5-8, Figs. 4, 9; Ex. 1002, ¶ 128. Mirfakhraei provides an overview of DMT and explains the relationship between multiple carriers and subchannels as follows:

> A DMT protocol simultaneously uses multiple carrier frequencies where each carrier frequency corresponds to a subchannel. Each signal for a sub-channel has relatively narrow bandwidths (e.g., 4 kHz) to reduce distortion within the sub-channel signal. For data transmission, a sending modem breaks transmitted data into packets for simultaneous transmission on separate sub-channels and independently modulates communication signals for the sub-channels according to the data carried on each sub-channel. The receiving modem separates sub-channel signals according to carrier frequency, demodulates the separate sub-channel signals, and reassembles the data.

Ex. 1007, ¶ 3; Ex. 1002, ¶ 128.

Mirfakhraei further explains that its modem transceivers employ "a 'bit-loading' process that characterizes the capabilities of sub-channels and determines the number of bits-per-symbol transmitted over the channel." Ex. 1007, ¶ 14; Ex. 1002, ¶ 129. In contrast to having each subcarrier transmit QAM symbols representing the same number of bits, Mirfakhraei's bit-loading process enables each subcarrier to transmit QAM symbols that represent different numbers of bits based on the signal to noise ratio (SNR) determined for each subcarrier, thereby increasing data transmission rate. Ex. 1007, ¶¶ 4, 6, 14, 17-19, 22-25; Ex. 1002, ¶ 54-55, 129. A subcarrier with a higher SNR is assigned a larger symbol set (or constellation map, e.g., based on 256-QAM), while a subcarrier with a lower SNR is assigned a smaller symbol set (e.g., based on 16-QAM). Ex. 1007, ¶¶ 4, 6, 17-19; Ex. 1002, ¶¶ 29-55, 129; Ex. 1024, pp. 175-182. Each symbol in a larger symbol set that is transmitted by a carrier represents more bits compared to each symbol in a smaller symbol set. *Id*.

Mirfakhraei's Multi-Carrier Modulator

Figure 1 of Mirfakhraei (below) shows a transmitter 110 and a receiver 190 of a transceiver 100 that communicates using Mirfakhraei's DMT and a bit-loading scheme. Ex. 1007, ¶¶ 5-8, 14-15; Ex. 1002, ¶ 130. Mirfakhraei teaches that the transmitter 110 includes framer 113, tone ordering block 114, constellation mapper 115, Inverse Discrete Fourier Transform (IDFT) block 116, buffer 117, and TX

handshake block 120 (collectively, claimed "multi-carrier modulator for modulating data"). Ex. 1007, ¶¶ 15-19; Ex. 1002, ¶ 130.




Ex. 1007, Fig. 1 (annotated)

Mirfakhraei explains that after an initial encoding of data by encoder 112, "framer 113 breaks the encoded data stream from encoder 112 into bit sets" and that "[e]ach bit set is assigned to a sub-channel for transmission and corresponds to a

symbol to be transmitted on the assigned sub-channel." Ex. 1007, ¶ 17; Ex. 1002, ¶ 131. The number of bits in each bit set is dictated by the bit loading determined for a corresponding sub-channel. Ex. 1007, ¶ 17; Ex. 1002, ¶ 131. Tone ordering block 114 then "orders the bit sets by sub-channel for a constellation mapper 115." Ex. 1007, ¶ 17; Ex. 1002, ¶ 131.

Next, "[f]or each bit set, constellation mapper 115 determines a QAM symbol associated with the bit set for the quadrature amplitude modulation (QAM) of the assigned sub-channel." Ex. 1007, ¶ 18; Ex. 1002, ¶ 132. The set of possible QAM symbols that can be transmitted on a particular sub-channel is determined by the bit-loading determined for the sub-channel. Ex. 1007, ¶ 17; Ex. 1002, ¶ 132. A sub-channel with a higher SNR uses a larger QAM constellation that allows more bits per QAM symbol to be transmitted by a corresponding sub-carrier (higher bit-loading), while a sub-channel with a lower SNR uses a smaller QAM constellation that is limited to transmitting fewer bits per QAM symbol on a corresponding sub-carrier (lower bit-loading). Ex. 1007, ¶¶ 4, 17-18, 23-24; Ex. 1002, ¶¶ 29-55, 132. For example, a sub-channel with a higher SNR may modulate data using a larger QAM constellation such as 256-QAM, which enables each transmitted QAM symbol to represent 8 bits. Ex. 1007, ¶¶ 4, 17-18, 23-24; Ex. 1002, ¶¶ 29-55, 132. A sub-channel with a lower SNR, on the other hand, may modulate data using a

smaller QAM constellation such as 16-QAM, which enables each transmitted QAM symbol to represent 4 bits. Ex. 1007, ¶¶ 4, 17-18, 23-24; Ex. 1002, ¶¶ 29-55, 132.

Mirfakhraei explains that a "DMT symbol includes one QAM symbol per sub-channel" and teaches that each DMT symbol is converted by IDFT block 116 to a sequence of time-domain samples that define the transmitted signal for a symbol period. Ex. 1007, ¶¶ 18-19; Ex. 1002, ¶ 133. The buffer 117 receives the time-domain samples and provides them to DAC 140 which converts the samples to an analog signal for transmission. Ex. 1007, ¶ 19; Ex. 1002, ¶ 133.

TX handshake block 120 transmits a handshake signal used to calculate the SNR for each subchannel which is then used to determine the bit-loading for each subchannel. Ex. 1007, ¶¶ 14, 18, 20; Ex. 1002, ¶ 134. Accordingly, Mirfakhraei teaches that these components of the transmitter 110 operate to implement its DMT bit-loading protocol by generating different QAM symbols representing different numbers of bits for each subcarrier based on the SNR determined for each subcarrier. Ex. 1007, ¶¶ 3, 5-8, 17-26; Ex. 1002, ¶ 134.

Mirfakhraei's Multi-Carrier Demodulator

Mirfakhraei teaches that the receiver 190 includes time domain equalizer (TEQ) 180, buffer 197, Discrete Fourier Transform (DFT) block 196, frequency domain equalizer 195, slicer 194, deframer 193, and RX handshake block 170

(collectively, claimed "multi-carrier demodulator for demodulating the translated RF signal to produce data"). Ex. 1007, ¶¶ 21-24; Ex. 1002, ¶ 135.




Ex. 1007, Fig. 1 (annotated)

TEQ 180 filters samples of a received signal from ADC 160 and stores the filtered samples in buffer 197. Ex. 1007, ¶¶ 21-24; Ex. 1002, ¶¶ 136-137. The DFT block 196 performs a discrete Fourier transform on the filtered time-domain samples

stored in buffer 197 that correspond to a received DMT symbol. Ex. 1007, ¶¶ 21-24; Ex. 1002, ¶ 137. Mirfakhraei explains that performing the discrete Fourier transform on the filtered time-domain samples enables the receiver 190 to "determine frequency components associated with the sub-channels." Ex. 1007, ¶ 24; Ex. 1002, ¶ 137. Mirfakhraei teaches that the slicer 194 determines the QAM symbols for each sub-channel based on the filtered frequency components of each sub-channel provided by the frequency domain equalizer 195. Ex. 1007, ¶ 24; Ex. 1002, ¶ 137. The deframer 193 then "converts the QAM symbols into a bit stream" which is then decoded to provide the final recovered data. Ex. 1007, ¶ 24; Ex. 1002, ¶ 137.

The RX handshake block 170 calculates the SNR for all subchannels, based on a received handshake signal, which are then used to determine the bit-loadings for each subchannel. Ex. 1007, ¶¶ 14, 18, 20-23; Ex. 1002, ¶ 138. Accordingly, Mirfakhraei teaches that these components of the receiver 190 operate to implement its DMT bit-loading protocol by recovering an original bit stream from the different QAM symbols representing different numbers of bits transmitted on each subcarrier. Ex. 1007, ¶¶ 3, 5-8, 17-26; Ex. 1002, ¶ 138.

<u>Combining Afshary and Mirfakhraei</u>

Afshary's network operates over a coaxial cable which a POSITA would understand is a harsh medium for communication. Ex. 1006, Abstract, ¶¶ 7, 12-20,

Fig. 1; Ex. 1002, ¶¶ 49-55. A POSITA would understand that Mirfakhraei's DMT bit loading scheme is well suited to address typical impairments of coaxial cables, notably the variable frequency response of the cable medium. Ex. 1002, ¶¶ 49-55, 128-138; Ex. 1018, pages 305-307. By using multiple narrowband subcarriers, as opposed to a single wideband carrier used by Afshary, a POSITA would understand that Mirfakhraei's DMT bit loading scheme is less susceptible to the variable frequency response of the cable medium, including the variable frequency response caused by interference and signal reflections. Ex. 1007, ¶ 3; Ex. 1002, ¶¶ 49-55, 128-138. Further, by separately modulating the narrowband subcarriers, such that subcarriers with higher SNRs use higher order signal constellations (*e.g.*, 256-QAM) and subcarriers with lower SNRs use lower order signal constellations (*e.g.,* 16-QAM), a POSITA would understand that the collective data rate across all subcarriers would be increased, as opposed to requiring each subcarrier to use the same signal constellation. Ex. 1007, Abstract, ¶¶ 2-5, 14; Ex. 1002, ¶¶ 29-55, 128-138.

Accordingly, a POSITA would have been motivated to modify Afshary's cable LAN adapter, which operates over a harsh coaxial cable medium, to implement the DMT bit-loading protocol of Mirfakhraei, which is well-suited to mitigate the impairments of a coaxial cable medium, because the result would be a coaxial cable network that is less susceptible the variable frequency response of the coaxial cable

environment, thereby enabling the data transmission rate of Afshary's coaxial cable network to be increased, as taught by Mirfakhraei. Ex. 1007, ¶ 3; Ex. 1002, ¶¶ 29-55, 139. Further, implementing Mirfakhraei's DMT bit-loading protocol would improve the reliability and robustness of the communications within Afshary's coaxial cable network. Ex. 1002, ¶ 139. While Mirfakhraei describes its DMT bit-loading scheme in relation to communication over a conventional telephone line, a POSITA would have understood that Mirfakhraei's DMT bit-loading scheme could be implemented over a variety of mediums, including coaxial cable. Ex. 1010, p. 374; Ex. 1013, Abstract, 2:30-5:39, Figs. 1-2; Ex. 1016, Abstract, 1:9-16, 3:34-59, 6:66-7:46, Fig. 1; Ex. 1017, pp. 74; Ex. 1018, pp. 305-307, 312; Ex. 1002, ¶ 140.

A POSITA would have understood that modifying Afshary's cable LAN adapter 32 to implement the DMT bit-loading protocol of Mirfakhraei would entail incorporating the functionality of the above-identified components of Mirfakhraei's transmitter 110 and receiver 190. Ex. 1002, ¶¶ 141-144. As an example, Afshary describes the Baseband section 90 of its cable LAN adapter 32 as being implemented on an application specific integrated circuit (ASIC) 78. Ex. 1006, ¶¶ 30, 32, 35, Fig. 4; Ex. 1002, ¶¶ 141-144. Mirfakhraei describes the components of its transmitter 110 and receiver 190 as being implemented in hardware, software, or a combination of hardware and software. Ex. 1007, ¶ 15, Fig. 1; Ex. 1002, ¶¶ 141-144. Accordingly, a POSITA would have understood that modifying Afshary's cable

LAN adapter 32 to implement the DMT bit-loading protocol of Mirfakhraei, for example, would entail incorporating the functionality of Mirfakhraei's multi-carrier modulator and multi-carrier demodulator into an ASIC (*e.g.*, ASIC 78). As a result, Afshary's cable LAN adapter would be able to transmit data at higher data rates. Ex. 1002, ¶¶ 141-144. Additionally, data transmissions between the cable LAN adapters would be more robust and reliable because they would be less affected by the harsh environment of a coaxial cable infrastructure, including outside interference and signal reflections. Ex. 1007, ¶ 2; Ex. 1018, pp. 305-307, 312; Ex. 1002, ¶¶ 141-144. Further, the power efficiency of the resulting Afshary-Mirfakhraei system would also be improved by using more available bandwidth for communicating, and using higher order modulation schemes to transmit more bits onto frequency channels that experience less noise and/or interference. Ex. 1002, ¶¶ 141-144.

A POSITA would have understood that combining the teachings of Afshary and Mirfakhraei is nothing more than an obvious combination of known elements (Afshary's cable LAN adapter and Mirfakhraei's multi-carrier DMT modulator and multi-carrier DMT demodulator) according to known methods (incorporating the functionality of Mirfakhraei's multi-carrier DMT modulator and multi-carrier DMT demodulator into Afshary's cable LAN adapter – for example, by incorporating this functionality into an ASIC such as Afshary's ASIC 78) to yield predictable results (Afshary's cable LAN adapter transmits and receives data using Mirfakhraei's DMT

protocol and bit loading to provide increased data rates and robust communications within Afshary's coaxial cable LAN). Ex. 1002, ¶ 145. Moreover, in doing so, a POSITA would have had a reasonable expectation of success because the proposed implementation of Afshary and Mirfakhraei would be well within the standard skill set of a POSITA and the resulting benefits of communicating over coaxial cable wiring using bit-loading and multi-carrier modulation were well known. Ex. 1002, ¶ 145.

A POSITA would have also understood that combining the teachings of Afshary and Mirfakhraei is nothing more than applying a known technique (the DMT bit-loading protocol of Mirfakhraei) to a known device (Afshary's cable LAN adapter) ready for improvement to yield a predictable result (Afshary's cable LAN adapter enables communication over a coaxial cable LAN using the DMT bit-loading protocol of Mirfakhraei, thereby improving data rates and susceptibility to coaxial cable channel impairments). Ex. 1002, ¶ 146. Afshary's cable LAN adapter enables communication between devices over a coaxial cable LAN but does not include a multi-carrier modulator or multi-carrier demodulator. Ex. 1002, ¶ 146. Mirfakhraei discloses a multi-carrier communication protocol that uses bit-loading to improve data throughput and communication robustness. Ex. 1002, ¶ 146. A POSITA would have recognized that modifying Afshary's cable LAN adapter 32 (*e.g.*, the ASIC 78 providing baseband single-carrier modulation and demodulation)

to incorporate the functionality of Mirfakhraei's multi-carrier modulator and multi-carrier demodulator that implement Mirfakhraei's DMT bit-loading protocol (*e.g.*, by incorporating the DMT bit-loading protocol of Mirfakhraei's transceiver into the ASIC 78) would provide the predictable result of Afshary's cable LAN adapter communicating using multi-carrier DMT modulation with bit-loading as taught by Mirfakhraei. Ex. 1002, ¶ 146. Further, a POSITA would have recognized that modifying Afshary's cable LAN adapter in this manner would have resulted in increased data throughput and more reliable communications within the harsh coaxial cable environment. Ex. 1002, ¶ 146.

Therefore, Afshary in view of Mirfakhraei teaches [1A]. Ex. 1002, ¶¶ 121-147.

**c. [1B]: "cable wiring comprising a splitter with a common port and a plurality of tap ports, and a plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices;"**

As discussed for [1A] (Section VI.A.1.b), Figure 1 (below) of Afshary shows cable LAN adapters 32 (**orange**) within the coaxial cable LAN. Ex. 1006, ¶¶ 18-19, 21-23, Figs. 1-2; Ex. 1002, ¶¶ 148-149. Afshary explains that drop cable 10 is provided to splitter 22 within home 12. Ex. 1006, ¶¶ 16, 18-19; Ex. 1002, ¶¶ 148-149. Afshary teaches that "drop cable 10 is split by splitter 22 into different cable wires 24, [with] each cable wire 24 being routed to different rooms in home 12."

Ex. 1006, ¶ 18; Ex. 1002, ¶¶ 148-149. As shown in Figure 1, the splitter 22 (**green**) (claimed "splitter") includes an input port (**red**) (claimed "common port") and multiple output ports (**purple**) (claimed "plurality of tap ports"). Ex. 1006, ¶¶ 16, 18-19; Ex. 1001, 1:53-57, Fig. 1; Ex. 1002, ¶¶ 148-149. From the output ports, multiple cable wires 24 (**blue**) (claimed "cable wiring" and claimed "plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices") are connected to the cable LAN adapters 32 (*e.g.*, the cable LAN adapter 32 within office 34 and the cable LAN adapter 32 within living room 26). Ex. 1006, ¶¶ 16, 18-19; Ex. 1001, 1:53-57, Fig. 1; Ex. 1002, ¶¶ 148-149.




FIG. 1

Ex. 1006, Fig. 1 (annotated)

Therefore, Afshary in view of Mirfakhraei teaches [1B]. Ex. 1002, ¶¶ 148-150.

**d. [1C]: "whereby network devices communicate with each other through the cable wiring using multi-carrier signaling;"**

As discussed for [1pre]-[1B] (Sections VI.A.1.a-c), Afshary teaches that cable LAN adapters 32 (claimed "network devices") communicate with each other via cable wire 24 (claimed "cable wiring"). Ex. 1006, ¶¶ 16, 18-19, 21-23, Figs. 1-2; Ex. 1002, ¶ 151. Further, as explained for [1A], the cable LAN adapters 32 in the

Afshary-Mirfakhraei system communicate with each other using the DMT bit-loading protocol taught by Mirfakhraei. Ex. 1007, Abstract, ¶¶ 2-3, 5-8, 14-15, Fig. 1; Ex. 1002, ¶ 151. As noted for [1A], Mirfakhraei explains that DMT is a multi-carrier communication technique (claimed "communicat[ing] … using multi-carrier signaling"). Ex. 1007, Abstract, ¶¶ 2-3, 5-6, Fig. 1; Ex. 1002, ¶ 151.

Therefore, Afshary in view of Mirfakhraei teaches [1C]. Ex. 1002, ¶¶ 151-152.

#### e. [1D]: "wherein network devices transmit probe messages through the cable wiring and analyze received probe message signals to determine channel characteristics and bit loading is selected based on the determined channel characteristics."

As discussed for [1A] (Section VI.A.1.b), the Afshary-Mirfakhraei system implements the DMT bit loading scheme taught by Mirfakhraei. Ex. 1007, Abstract, ¶¶ 2-3, 5-8, 14-25, Figs. 1-3; Ex. 1002, ¶ 153. To facilitate the DMT bit loading scheme, the cable LAN adapters (claimed "network devices") of the Afshary-Mirfakhraei system include the TX handshake block 120 (**green**) and the RX handshake block 170 (**blue**) to implement the "'bit-loading' process that characterizes the capabilities of sub-channels and determines the number of bits-per-symbol transmitted over the channel" as taught by Mirfakhraei. Ex. 1007, ¶ 14, *see also id.*, Abstract, ¶¶ 2-3, 5-8, 14-25, Figs. 1-3; Ex. 1002, ¶ 153.




Ex. 1007, Fig. 1 (annotated)

<u>Mirfakhraei's Handshake Signals</u>

The '518 patent describes a probe message as a known signal transmitted from a first device to a second device that is used to estimate SNRs for different frequency channels. Ex. 1001, 9:35-10:37. Mirfakhraei describes and uses its handshake signals in the exact same manner. Ex. 1007, ¶¶ 20-23; Ex. 1002, ¶ 154. As explained by Mirfakhraei, the TX handshake block 120 of a first transceiver generates and transmits handshake signals to a second transceiver (claimed "transmit probe

messages through the cable wiring"), with each handshake signal comprising a known signal (*e.g.*, a known signal pattern or a known pseudo-random signal). Ex. 1007, ¶ 20, *see also* ¶ 22; Ex. 1002, ¶ 154. Mirfakhraei further teaches that RX handshake block 170 of the second transceiver estimates the SNR (claimed "channel characteristics") for each sub-channel based on received handshake signals (claimed "analyze received probe message signals"). Ex. 1007, ¶¶ 21-23; Ex. 1002, ¶ 154.

<u>Mirfakhraei's Bit-Loading</u>

The '518 patent describes bit-loading as selecting a modulation order or constellation size for a subchannel (or subcarrier) based on the SNR for the subchannel. Ex. 1001, 4:37-62, 8:9-39, 9:17-19, 9:35-10:20, 10:61-11:6, Fig. 10; Ex. 1002, ¶ 155. Mirfakhraei teaches the same—in particular, that the size of a constellation map for a subchannel, and hence the number of bits represented by each transmitted signal, is based on the SNR of the subchannel. Ex. 1007, ¶¶ 4-8, 14, 17-18, Figs. 1-2; Ex. 1002, ¶¶ 29-55, 155.

Mirfakhraei teaches that the RX handshake block 170 facilitates implementation of the bit loading process by comparing the received handshake signal to the known signal values that were transmitted. Ex. 1007, ¶¶ 5-8, 14, 20, 22-23, 25-32, Figs. 1-2; Ex. 1002, ¶ 155. Based on the comparison, SNR values for each sub-channel are determined. Ex. 1007, ¶¶ 5-8, 14, 20, 22-23, 25-32, Figs. 1-2; Ex. 1002, ¶ 155. The appropriate bit-loadings for each sub-channel are then

determined based on the SNR values determined for each sub-channel (claimed "bit loading is selected based on the determined channel characteristics"). Ex. 1007, ¶¶ 5-8, 14, 17, 20, 22-23, 25-32, Figs. 1-2; Ex. 1002, ¶ 155.

Sub-channels having higher SNRs are assigned higher order modulation constellations. Ex. 1007, ¶¶ 5-8, 14, 17, 20, 22-23, 25-32, Figs. 1-2; Ex. 1002, ¶ 155. Sub-channels having lower SNRs are assigned lower order modulation constellations. *Id*. For example, a sub-channel with a higher SNR modulates data using a larger QAM constellation such as 256-QAM, which enables each transmitted QAM symbol to represent 8 bits, while a sub-channel with a lower SNR modulates data using a smaller QAM constellation such as 16-QAM, which enables each transmitted QAM symbol to represent 4 bits. Ex. 1007, ¶¶ 4, 17-18, 23-24; Ex. 1002, ¶¶ 29-55, 155. The RX handshake block 170 of the second transceiver sends the determined bit-loadings for each sub-channel to the first transceiver, which then employs the bit-loadings in subsequent communications with the second transceiver. Ex. 1007, ¶¶ 5-8, 14, 20, 22-23, 25-32, Figs. 1-2; Ex. 1002, ¶¶ 29-55, 155.

Therefore, Afshary in view of Mirfakhraei teaches [1D], and Afshary in view of Mirfakhraei teaches claim 1. Ex. 1002, ¶¶ 153-156.

### 2. Dependent Claim 2

#### a. "The data communication network of claim 1 wherein a network device comprises a means for determining signal activity and selects a frequency band for operation that is not used by other services."

As discussed for [1A] (Section VI.A.1.b), Mirfakhraei's receiver includes DFT block 196 (**red**) that receives data samples from ADC 160 (**green**). Ex. 1007, Abstract, ¶¶ 15, 19, 24, Fig. 1; Ex. 1002, ¶¶ 157-158. Mirfakhraei explains that "discrete Fourier transform (DFT) block 196 performs a discrete Fourier transform on the filtered time-domain samples … to determine frequency components associated with the sub-channels" (corresponding to the function of "determining signal activity" for the term "means for determining signal activity"). Ex. 1007, ¶ 24; Ex. 1002, ¶¶ 157-158. As acknowledged by the '518 patent, performing a Fourier transform on samples from an A/D converter performs the function of determining signal activity because, as also taught by Mirfakhraei, the result determines the frequency components within each subchannel which directly indicate signal activity within each subchannel. Ex. 1001, 8:4-8, 8:27-39, 11:14-18, Fig. 6; Ex. 1007, ¶ 24; Ex. 1002, ¶¶ 157-158.




Ex. 1007, Fig. 1 (annotated)

As further discussed for [1A], in the Afshary-Mirfakhraei data communications network, the receiver of Afshary's cable LAN adapter 32 would incorporate the portion of Mirfakhraei's receiver that includes DFT block 196 and the DFT block 196 would perform a DFT on samples received from an ADC converter (corresponding to the structure of "a receiver that performs an FFT on data samples from an A/D converter" for the term "means for determining signal activity"), as both Afshary and Mirfakhraei teach demodulators within receiver

signal paths that operate on data samples provided by an ADC. Ex. 1006, ¶¶ 38-42, Fig. 4; Ex. 1007, ¶¶ 15, 21, 24, Fig. 1; Ex. 1002, ¶¶ 157-158.

A POSITA would understand that a Fast Fourier Transform (FFT) is a manner of efficiently performing a Discrete Fourier Transform (DFT) and that a DFT is substantially equivalent to an FFT. Ex. 1001, 8:4-8, 8:27-39, 8:65-9:4 (recognizing the equivalency between the FFT and DFT in performing a Fourier transform); Ex. 1019, pp. 100-109; Ex. 1020, pp. 554-561; Ex. 1021, pp. 581-585; Ex. 1002, ¶ 159. Accordingly, a POSITA would understand that to the extent a receiver that performs a DFT on data samples from an A/D converter is not identical to a receiver that performs an FFT on data samples from an A/D converter, it is substantially equivalent, because each performs the same function of determining signal activity (*e.g.*, by determining frequency components over a frequency range based on the Fourier transform). Ex. 1002, ¶ 159. Therefore, Afshary in view of Mirfakhraei teaches the "means for determining signal activity" as required for claim 2. Ex. 1002, ¶¶ 159-160.

Further, as discussed above in Section IV.A, Afshary teaches a coaxial cable LAN that shares the coaxial cable wire 24 with a conventional cable TV service. Ex. 1006, Abstract, ¶¶ 2, 7, 12, 24-25, 39, Figs. 1, 3; Ex. 1002, ¶ 161. As shown in Figure 3 (below), Afshary explains that existing cable services, including a conventional cable TV service, are provided over an operating frequency range of

0-950 MHz (**green**) and that the coaxial cable LAN is provided over a non-overlapping operating frequency range of 1000-2000 MHz (**red**). Ex. 1006, ¶ 25; Ex. 1002, ¶ 161. Afshary teaches that its RF & Mixed Signal section 100 translates modulated data of the coaxial cable LAN to an RF carrier frequency of 1300 MHz to ensure that the operating frequency range of the coaxial cable LAN is above and does not overlap the operating frequency range of the conventional cable TV service. Ex. 1006, ¶¶ 24-25, 39; Ex. 1002, ¶ 161. As shown below, upconverted modulated data of the cable LAN occupies a bandwidth of 5 MHz (**blue**) within the operating frequency range of 1000-2000 MHz. Ex. 1006, ¶¶ 24-25, 39; Ex. 1002, ¶ 161. Accordingly, in the Afshary-Mirfakhraei system, each cable LAN adapter selects a frequency band for operation so as to not interference with conventional cable TV service (claimed "selects a frequency band for operation that is not used by other services"). Ex. 1002, ¶ 161.




FIG. 3

Ex. 1006, Fig. 3 (annotated)

Therefore, Afshary in view of Mirfakhraei teaches claim 2. Ex. 1002, ¶¶ 157-162.

### 3. Dependent Claim 3

#### a. "The data communication network of claim 1 wherein the network shares the cable wiring with a cable television service and the network device up converter translates the modulated data to an RF carrier frequency above the frequency used by the cable television service."

As discussed above in Section IV.A, and as discussed for [1B] and claim 2 (Sections VI.A.1.b, VI.A.2), Afshary discloses a coaxial cable LAN that shares the coaxial cable wire 24 with existing cable services, including a conventional cable TV service. Ex. 1006, Abstract, ¶¶ 2, 7, 12, 24-25, 39, Figs. 1, 3; Ex. 1002, ¶ 163. As shown in Figure 3 (below), Afshary explains that the conventional cable TV service, along with perhaps other conventional cable services such as digital TV and cable modem services, is provided over an operating frequency range of 0-950 MHz and that the coaxial cable LAN is provided over a non-overlapping operating frequency range of 1000-2000 MHz. Ex. 1006, ¶ 25; Ex. 1002, ¶ 163.

Afshary teaches that the RF & Mixed Signal section 100 translates modulated data of the coaxial cable LAN to an RF carrier frequency that ensures that the operating frequency range of the coaxial cable LAN is above and does not overlap the operating frequency range of the conventional cable TV service. Ex. 1006, ¶¶ 2, 17, 24-25, 37-39; Ex. 1002, ¶ 163. As an example, Afshary teaches that the RF &

Mixed Signal section 100 translates modulated data to a 1300 MHz center frequency (**red**) and that the modulated data occupies a bandwidth of 5 MHz (**dark blue**), which does not overlap the operating frequency of the conventional cable services (**dashed green**) that include the cable TV service, as shown in Figure 3 (below). Ex. 1006, ¶¶ 25, 38-39; Ex. 1002, ¶ 163.



FIG. 3

Ex. 1006, Fig. 3 (annotated)

Therefore, Afshary in view of Mirfakhraei teaches claim 3. Ex. 1002, ¶¶ 163-164.

**4. Independent Claim 4**

**a. [4pre]: "A network device for communicating data to other network devices over a coaxial wiring system comprising a splitter and a plurality of cable segments connected between the splitter and the network devices, the network device comprising:"**

As discussed for [1pre]-[1A] (Sections VI.A.1.a-b), Afshary discloses a LAN over coaxial cable (**blue**) (claimed "coaxial wiring system") that includes cable LAN

adapters (**orange**) (claimed "network device for communicating data to other network devices"). Ex. 1006, Abstract, ¶¶ 2, 7, 12, 14, 18-23, Figs. 1-2; Ex. 1002, ¶ 165. As discussed for [1B] (Section VI.A.1.c), Afshary explains that the coaxial cable LAN includes splitter 22 (**green**) and multiple cable wires 24 (**blue**) connected between the splitter 22 and the cable LAN adapters 32 (*e.g.*, the cable LAN adapter 32 within office 34 and the cable LAN adapter 32 within living room 26) (claimed "plurality of cable segments connected between the splitter and the network devices"). Ex. 1006, ¶¶ 16, 18-19, 21-23, Fig. 1; Ex. 1001, 1:53-57, Fig. 1; Ex. 1002, ¶ 165.




Ex. 1006, Fig. 1 (annotated)

Therefore, Afshary teaches [4pre]. Ex. 1002, ¶¶ 165-166.

**b. [4A] "a data modulator to produce a multicarrier modulated signal;"**

As discussed for [1A] (Section VI.A.1.b), the cable LAN adapters of the Afshary-Mirfakhraei system would include the functionality of Mirfakhraei's multi-carrier modulator to implement the DMT bit loading scheme taught by Mirfakhraei. Ex. 1007, Abstract, ¶¶ 2-3, 5-8, 14-25, Figs. 1-3; Ex. 1002, ¶ 167. As further discussed for [1A], Mirfakhraei teaches a transmitter 110 that includes framer 113, tone ordering block 114, constellation mapper 115, IDFT block 116, buffer 117, and TX handshake block 120 (collectively, claimed "data modulator to produce a multicarrier modulated signal") that generate a multi-carrier modulated signal based on Mirfakhraei's DMT bit-loading scheme. Ex. 1007, ¶¶ 14-19, Fig. 1; Ex. 1002, ¶ 167. Mirfakhraei teaches that these components of transmitter 110 operate to generate "a discrete multi-tone (DMT) communication signal" (claimed "multicarrier modulated signal"). Ex. 1007, ¶ 5; *see id.*, Abstract, ¶¶ 1-3, 5-8, 14-25, Figs. 1-2; Ex. 1002, ¶ 167.




Ex. 1007, Fig. 1 (annotated)

Therefore, Afshary in view of Mirfakhraei teaches [4A]. Ex. 1002, ¶¶ 167-168.

**c. [4B] "a demodulator for multicarrier modulated signal to produce data;"**

As discussed for [1A] (Section VI.A.1.b), the cable LAN adapters of the Afshary-Mirfakhraei system would include the functionality of Mirfakhraei's multi-

carrier demodulator to implement the DMT bit loading scheme taught by Mirfakhraei. Ex. 1007, Abstract, ¶¶ 2-3, 5-8, 14-25, Figs. 1-3; Ex. 1002, ¶ 169. As further discussed for [1A], Mirfakhraei teaches that the receiver 190 includes RX handshake block 170, TEQ 180, buffer 197, DFT block 196, frequency domain equalizer 195, slicer 194, and deframer 193 (collectively, claimed "demodulator for multicarrier modulated signal to produce data"). Ex. 1007, ¶¶ 21-24; Ex. 1002, ¶ 169. Mirfakhraei explains that these components operate to recover a data bit stream (claimed "produce[d] data]") from different QAM symbols transmitted on each subcarrier of a multicarrier modulated signal. Ex. 1007, ¶ 24; Ex. 1002, ¶ 169.




Ex. 1007, Fig. 1 (annotated)

Therefore, Afshary in view of Mirfakhraei teaches [4B]. Ex. 1002, ¶¶ 169-170.

#### d. [4C] "means for producing and transmitting a probe message; and"

As discussed for [1D] (Section VI.A.1.e), each cable LAN adapter 32 in the Afshary-Mirfakhraei system would use Mirfakhraei's handshake signals to facilitate implementation of the DMT bit loading scheme described by Mirfakhraei. Ex. 1007, Abstract, ¶¶ 2-3, 5-8, 14-25, Figs. 1-3; Ex. 1002, ¶ 171. Accordingly, in the Afshary-Mirfakhraei system, to implement the DMT bit loading scheme, each cable LAN adapter includes the TX handshake block 120 (**green**). Ex. 1007, Abstract, ¶¶ 2-3, 5-8, 14-25, Figs. 1-3; Ex. 1002, ¶ 171. Mirfakhraei explains that "TX handshake block 120 … generates time domain samples for a handshake signal sent to a remote transceiver" and that the handshake signal is a "known pseudo-random signal" or known signal pattern (corresponding to the function of "producing and transmitting a probe message" of the term "means for producing and transmitting a probe message"). Ex. 1007, ¶¶ 20-22; Ex. 1002, ¶ 171.




Ex. 1007, Fig. 1 (annotated)

Mirfakhraei teaches that TX handshake block 120 may be implemented in software by a host computer. Ex. 1007, ¶ 15, Fig. 1; Ex. 1002, ¶ 172. A POSITA would understand that a host computer implementing the TX handshake block 120 in software would entail executing software on a processor (corresponding to the structure of a "processor" for the term "means for producing and transmitting a probe message"). Ex. 1007, ¶ 15, Fig. 1; Ex. 1002, ¶ 172. Further, the TX handshake block 120, when implemented by executing software on a processor, performs an algorithm that includes generating a signal known to a remote transceiver and

transmitting the known signal to the remote transceiver (corresponding to the algorithm of "(a) generating a signal known to a receiving device; and (b) transmitting the known signal," identified as the algorithm performed by the corresponding structure of a "processor"). Ex. 1007, Abstract, ¶¶ 2-3, 5-8, 14-25, Figs. 1-3; Ex. 1002, ¶ 172. Accordingly, Afshary in view of Mirfakhraei teaches the "means for producing and transmitting a probe message" as required by [4C]. Ex. 1002, ¶ 172.

Therefore, Afshary in view of Mirfakhraei teaches [4C]. Ex. 1002, ¶¶ 171-173.

#### e. [4D] "means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data."

As discussed for [1D] and [4C] (Sections VI.A.1.e, VI.A.4.d), each cable LAN adapter 32 in the Afshary-Mirfakhraei system would implement the DMT bit loading scheme described by Mirfakhraei. Ex. 1007, Abstract, ¶¶ 2-3, 5-8, 14-25, Figs. 1-3; Ex. 1002, ¶ 174. Accordingly, in the Afshary-Mirfakhraei system, to implement the DMT bit loading scheme, each cable LAN adapter 32 includes the RX handshake block 170 (**blue**). Ex. 1007, Abstract, ¶¶ 2-3, 5-8, 14-25, Figs. 1-3; Ex. 1002, ¶ 174. Mirfakhraei teaches that the RX handshake block 170 receives a handshake signal from a TX handshake block 120 from another cable LAN adapter 32. Ex. 1007, ¶ 22; Ex. 1002, ¶ 174. The handshake signal is a known signal. Ex.

1007, Abstract, ¶¶ 2-3, 5-8, 14-25, Figs. 1-3; Ex. 1002, ¶ 174. Mirfakhraei teaches that the RX handshake block 170 compares the received handshake signal to the known values that were transmitted to estimate the SNR for each sub-channel, which are then used to determine the appropriate bit loadings for each sub-channel (corresponding to the function of "receiving and analyzing a probe message to determine a bit loading profile used to transmit data" of the term "means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data"). Ex. 1007, ¶¶ 25-32, Figs. 1-2; Ex. 1002, ¶ 174. The '518 patent admits that "[d]etermination of… [an] SNR profile from a known signal is well known in the art." Ex. 1001, 10:12-14; Ex. 1002, ¶ 174.




Ex. 1007, Fig. 1 (annotated)

Mirfakhraei teaches that RX handshake block 170 may be implemented in software by a host computer. Ex. 1007, ¶ 15, Fig. 1; Ex. 1002, Ex. 1002, ¶ 175. A POSITA would understand that a host computer implementing the RX handshake block 170 in software would entail executing software on a processor (corresponding to the structure of a "processor" for the term "means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data"). Ex. 1007,

¶ 15, Fig. 1; Ex. 1002, ¶ 175. Further, the RX handshake block 170, when implemented by executing software on a processor, performs an algorithm that includes receiving a known signal from a remote transceiver, determining SNR levels for each subchannel based on the received known signal, and determining the bit-loading for each subchannel based on the determined SNR level for each subchannel (corresponding to the algorithm of "(a) receiving a known signal; (b) determining a SNR for each subchannel based on the received known signal; and (c) determining a bit loading for each subchannel based on the determined SNR for the subchannel," identified as the algorithm performed by the corresponding structure of a "processor"). Ex. 1007, Abstract, ¶¶ 2-3, 5-8, 14-25, Figs. 1-3; Ex. 1002, ¶ 175. Accordingly, Afshary in view of Mirfakhraei teaches the "means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data" as required by [4D]. Ex. 1002, ¶ 175.

Therefore, Afshary in view of Mirfakhraei teaches [4D], and Afshary in view of Mirfakhraei teaches claim 4. Ex. 1002, ¶¶ 174-175.

### B. Ground B: Claim 2 is Rendered Obvious by Afshary-Mirfakhraei in View of Welles

As set forth below, Afshary-Mirfakhraei in view of Welles renders obvious claim 2. Ex. 1002, ¶¶ 176-183.

### 1. Dependent Claim 2

#### a. "The data communication network of claim 1 wherein a network device comprises a means for determining signal activity and selects a frequency band for operation that is not used by other services."

To the extent it is argued that Afshary-Mirfakhraei does not teach a "means for determining signal activity," Welles does. Ex. 1002, ¶ 177.

As discussed above in Section IV.C, Welles teaches a LAN communication system over power line cables. Ex. 1022, Abstract, 1:14-18, 1:56-2:9, 2:55-3:8, Figs. 1-2, 4; Ex. 1002, ¶ 178. Welles teaches the use of an envelope detector (*e.g.*, envelope detector 192) by a transceiver of the LAN to measure the received power of a signal, which is then compared to a reference signal power level (corresponding to the function of "determining signal activity" for the term "means for determining signal activity"). Ex. 1022, 5:5-7:11, Figs. 1-2, 4; Ex. 1002, ¶ 178. Welles teaches that when the output of the envelope detector exceeds the reference signal power level, the power line is determined to be in use by another transceiver of the LAN. Ex. 1022, 5:23-35, 6:18-51, Fig. 4; Ex. 1002, ¶ 178. Welles teaches that a large frequency range may be scanned using the envelope detector to determine a clear frequency range that may be used for communication, to avoid noise or interference from other transceivers or systems. Ex. 1022, 5:5-6:17, 7:2-11; Ex. 1002, ¶ 178.

Afshary explains a need to operate a cable LAN over a frequency range of a coaxial cable that is not used by other existing services that also operate over the

coaxial cable. Ex. 1006, Abstract, ¶¶ 2, 7, 21-28, Fig. 3; Ex. 1002, ¶ 84. Welles discloses the use of an envelope detector to detect signal activity over a range of frequencies, to determine whether the range of frequencies is already being used by another communication device or is affected by other sources of interference or noise. Ex. 1022, 1:15-17, 2:4-9, 5:5-16, 5:23-35, 7:1-11; Ex. 1002, ¶¶ 56, 95-102. A POSITA would understand that Welles' envelope detector enables signal activity over a range of frequencies to be determined, so that a clear range of frequencies for operation would be established, thereby ensuring that existing services provided over the same communication medium are not disturbed, which is a goal of Afshary. Ex. 1002, ¶¶ 56, 178-183.

Accordingly, a POSITA would have been motivated to modify the Afshary-Mirfakhraei cable LAN adapter (which operates over a coaxial cable medium that is shared by other services) to include Welles' envelope detector (which is capable of detecting signal activity over a frequency range to determine if the frequency range is occupied by another service or adversely affected by interference or noise) because doing so would provide a simple and straightforward manner to determine whether a range of frequencies would be suitable for communication (*e.g.*, would not disturb existing services provided over the same communication medium), as taught by Welles. Ex. 1022, 5:5-6:17, 7:2-11; Ex. 1002, ¶¶ 56, 179-180. A POSITA would understand that Welles' envelope detector would include a simple diode and

filter circuit and that such an envelope detector would facilitate the detection of signal activity over a range of frequencies, as taught by Welles. Ex. 1022, 5:5-7:11, Figs. 1-2, 4; Ex. 1006, Abstract, ¶¶ 2, 7, 14-28, Fig. 3; Ex. 1019, pp. 129-131; Ex. 1023, pp. 281-282; Ex. 1002, ¶¶ 56, 179-180. In doing so, a clear range of frequencies for communication would be determined, as desired by Afshary and Welles. Ex. 1022, 5:5-7:11, Figs. 1-2, 4; Ex. 1002, ¶¶ 56, 179-180.

A POSITA would have understood that combining the teachings of Welles and Afshary-Mirfakhraei is nothing more than an obvious combination of known elements (Afshary-Mirfakhraei's cable LAN adapter and Welles' envelope detector) according to known methods (modifying Afshary-Mirfakhraei's cable LAN adapter to include Welles' envelope detector – for example, by incorporating Welles' envelope detector and its functionality to detect signal activity over a range of frequencies into an ASIC such as Afshary's ASIC 78) to yield predictable results (Afshary-Mirfakhraei-Welles' cable LAN adapter detects signal activity over a range of frequencies by measuring received signal power to detect a clear frequency range for operation). Ex. 1002, ¶ 181. Moreover, in doing so, a POSITA would have had a reasonable expectation of success because the proposed implementation of Afshary-Mirfakhraei-Welles would be well within the standard skill set of a POSITA. Ex. 1002, ¶ 181.

A POSITA would have also understood that combining the teachings of Afshary-Mirfakhraei and Welles is nothing more than applying a known technique (using an envelope detector to measure power to detect signal activity) to a known device (Afshary-Mirfakhraei's cable LAN adapter) ready for improvement to yield a predictable result (Afshary-Mirfakhraei's cable LAN adapter would implement Welles's techniques for detecting signal activity using an envelope detector to ensure a clear range of frequencies may be used for communication). Ex. 1002, ¶ 182. A POSITA would have understood that the result would have been a low cost and effective way to further Afshary's goal of ensuring its cable LAN does not disturb, and is not disturbed by, other services using the same coaxial cable for communications, thereby improving the Afshary-Mirfakhraei system. Ex. 1002, ¶ 182. Therefore, Afshary-Mirfakhraei-Welles teaches the "means for determining signal activity" as required for claim 2; Ex. 1002, ¶ 182.

As discussed above for claim 2 (Section VI.A.2), Afshary teaches a "network device… [that] selects a frequency band for operation that is not used by other services." Ex. 1002, ¶ 183. Welles also teaches this feature. As discussed above, Welles teaches that its transceiver uses its envelope detector to determine if a range of frequencies is already in use so as to select a frequency range of operation not occupied by communication from other transceivers or systems. Ex. 1022, 5:5-7:11,

Figs. 1-2, 4; Ex. 1002, ¶ 183. Accordingly, Afshary-Mirfakhraei-Welles teaches this feature, and renders claim 2 obvious. Ex. 1002, ¶¶ 176-183.

## VII. GROUNDS FOR STANDING & FEE PAYMENT

Petitioner hereby certifies that the ’518 patent is available for, and Petitioner is not barred or estopped from requesting, *inter partes* review challenging claims 1-4.

Pursuant to 37 C.F.R. § 42.103, the undersigned authorizes the charge of any required fees to Deposit Account No. 19-0733.

## VIII. CONCLUSION

*Inter partes* review should be instituted and claims 1-4 canceled.

Dated: February 15, 2024

By: /Frederic M. Meeker/

Frederic M. Meeker
Reg. No. 35,282
Banner & Witcoff, Ltd.
1100 13th Street, NW
Suite 1200
Washington, DC 20005
(202) 824-3000
fmeeker@bannerwitcoff.com

**CERTIFICATION UNDER 37 CFR § 42.24(d)**

Under the provisions of 37 CFR § 42.24(d), the undersigned hereby certifies that the word count for the foregoing Petition for Inter Partes Review totals 13,030 which is less than the 14,000 allowed under 37 CFR § 42.24(a)(1)(i). This total includes 13,005 words as counted by the Word Count feature of Microsoft Word and 25 words used in annotations.

Pursuant to 37 C.F.R. § 42.24(a)(1), this count does not include the table of contents, the table of authorities, mandatory notices under § 42.8, the certificate of service, this certification of word count, the claims listing appendix, or appendix of exhibits.

BANNER & WITCOFF, LTD

Dated: February 15, 2024

By: /Frederic M. Meeker/

Frederic M. Meeker
Reg. No. 35,282
Banner & Witcoff, Ltd.
1100 13th Street, NW
Suite 1200
Washington, DC 20005
(202) 824-3000
fmeeker@bannerwitcoff.com

**CERTIFICATE OF SERVICE**

Pursuant to 37 C.F.R. § 42.105, I hereby certify that I caused a true and correct copy of this Petition for *Inter Partes* Review in connection with U.S. Patent No. 7,295,518 and supporting evidence to be served via FedEx Priority Overnight on February 15, 2024, on the following:

**23446 - MCANDREWS HELD & MALLOY, LTD**
500 WEST MADISON STREET
SUITE 3400
CHICAGO, IL 60661
UNITED STATES

Dated: February 15, 2024 By: /Frederic M. Meeker/

Frederic M. Meeker
Reg. No. 35,282

# CLAIM LISTING APPENDIX

U.S. Pat. No. 7,295,518

| Designation | Claim Language |
|---|---|
| Claim 1 | |
| [1pre] | A data communication network comprising: |
| [1A] | at least two network devices, each network device comprising a multi-carrier modulator for modulating data, an up converter for translating the modulated data to an RF carrier frequency, a down converter for translating an RF signal, and a multi-carrier demodulator for demodulating the translated RF signal to produce data; and |
| [1B] | cable wiring comprising a splitter with a common port and a plurality of tap ports, and a plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices; |
| [1C] | whereby network devices communicate with each other through the cable wiring using multi-carrier signaling; |
| [1D] | wherein network devices transmit probe messages through the cable wiring and analyze received probe message signals to determine channel characteristics and bit loading is selected based on the determined channel characteristics. |
| Claim 2 | |
| 2 | The data communication network of claim 1 wherein a network device comprises a means for determining signal activity and selects a frequency band for operation that is not used by other services. |
| Claim 3 | |
| 3 | The data communication network of claim 1 wherein the network shares the cable wiring with a cable television service and the network device up converter translates the modulated data to an RF carrier frequency above the frequency used by the cable television service. |
| Claim 4 | |
| [4pre] | A network device for communicating data to other network devices over a coaxial wiring system comprising a splitter and a plurality of cable segments connected between the splitter and the network devices, the network device comprising: |
| [4A] | a data modulator to produce a multicarrier modulated |

| Designation | Claim Language |
|---|---|
| | signal; |
| [4B] | a demodulator for multicarrier modulated signal to produce data; |
| [4C] | means for producing and transmitting a probe message; and |
| [4D] | means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data. |

Trials@uspto.gov
571.272.7822

Paper 8
Entered: September 6, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

COMCAST CABLE COMMUNICATIONS, LLC,
Petitioner,

v.

ENTROPIC COMMUNICATIONS, LLC,
Patent Owner.

IPR2024-00431
Patent 7,295,518 B1

Before LYNNE H. BROWNE, PATRICK R. SCANLON, and JON M. JURGOVAN, *Administrative Patent Judges*.

JURGOVAN, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
35 U.S.C. § 314

# I. INTRODUCTION

## *A. Background and Summary*

Comcast Cable Communications, LLC ("Petitioner") filed a Petition requesting inter partes review ("IPR") of claims 1–4 of U.S. Patent No. 7,295,518 B1 (Ex. 1001, "the '518 patent"). Paper 2 ("Petition" or "Pet."). Entropic Communications, LLC ("Patent Owner") filed a Preliminary Response to the Petition. Paper 6 ("Prelim. Resp.").

Under 35 U.S.C. § 314(a), an *inter partes* review may not be instituted unless the information presented in a petition and the preliminary response "shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." Upon consideration of the Petition and Preliminary Response, and accompanying exhibits and evidence, we determine Petitioner has established a reasonable likelihood that it would prevail with respect to at least one challenged claim in the *inter partes* review. Therefore, we grant institution of an *inter partes* review as to all of the challenged claims of the '518 patent on all challenges in the Petition.

## *B. Real Parties in Interest*

Petitioner identifies Comcast Corporation, Comcast Cable Communications, LLC, and Comcast Cable Communications Management, LLC as real parties-in-interest. Pet. v (Petitioner's Mandatory Notices).

Patent Owner identifies itself as the real party-in-interest. Paper 3, 1 (Patent Owner's Mandatory Notices).

## *C. Related Matters*

Petitioner and Patent Owner ("the parties") identify the following as matters related to this proceeding:

*Entropic Communications, LLC v. DirecTV, LLC*, Case No. 2-23-cv-05253 (C.D. Cal.);

*Entropic Communications, LLC v. DISH Network Corporation*, Case No. 2-23-cv-01043 (C.D. Cal.);

*Entropic Communications, LLC v. Cox Communications, Inc.*, Case No. 2-23-cv-01047 (C.D. Cal.); and

*Entropic Communications, LLC v. Comcast Corporation.*, Case No. 2-23-cv-01048 (C.D. Cal).

Pet. 1 (Petitioner's Mandatory Notices); Paper 3, 1 (Patent Owner's Mandatory Notices).

Patent Owner identifies the following as patents and patent applications related to this proceeding: U.S. Patent No. 7,154,957; U.S. Patent No. 7,499,397; U.S. Patent No. 7,573,822; U.S. Patent No. 7,594,249; U.S. Patent No. 7,889,759; U.S. Patent No. 8,411,565; U.S. Patent No. 8,588,250; U.S. Patent No. 9,112,803; U.S. Patent No. 9,860,144; U.S. Patent Application No. 10/230,687; U.S. Patent Application No. 10/776,796; U.S. Patent Application No. 10/778,505; U.S. Patent Application No. 12/538,339; U.S. Patent Application No. 15/860,400; U.S. Provisional Application No. 60/288,967; U.S. Provisional Application No. 60/316,820; U.S. Provisional Application No. 60/363,420; U.S. Provisional Application No. 60/385,361; and U.S. Patent Application No. 90/019,247. Paper 3, 2–3.

Patent Owner also identifies several *inter partes* reviews against Patent Owner's patents: U.S. Patent No. 7,889,759 (IPR2024-00452); U.S. Patent No. 8,223,775 (IPR2024-00446); U.S. Patent No. 10,135,682 (IPR2024-00445); U.S. Patent No. 10,135,682 (IPR2024-00444); U.S. Patent No. 9,825,826 (IPR2024-00442); U.S. Patent No. 8,284,690

(IPR2024-00430); U.S. Patent No. 8,792,008 (IPR2024-00441); U.S. Patent No. 11,399,206 (IPR2024-00440); U.S. Patent No. 11,399,206 (IPR2024-00439); U.S. Patent No. 11,399,206 (IPR2024-00438); U.S. Patent No. 11,381,866 (IPR2024-00437); U.S. Patent No. 11,381,866 (IPR2024-00436); U.S. Patent No. 11,381,866 (IPR2024-00435); U.S. Patent No. 9,210,362 (IPR2024-00434); U.S. Patent No. 9,210,362 (IPR2024-00433); and U.S. Patent No. 9,210,362 (IPR2024-00432). Paper 3, 3–4.

### *D. The ’518 Patent*

The ’518 patent is titled "Broadband Network for Coaxial Cable using Multi-Carrier Modulation." Ex. 1001, code (54). The patent discloses a broadband local area network that uses coaxial cable wiring for interconnecting terminal devices. *Id.* at code (57). Orthogonal frequency division multiplexing (OFDM) with bit loading is used to overcome channel impairments to provide a path for terminal devices to transmit to and receive from other terminal devices. *Id.* Probe messages are used to characterize the channel between terminal devices to determine the optimum bit loading for the channel. *Id.*

Figure 2 of the '518 patent is shown below.




Fig. 2

Figure 2 depicts "a signal distribution plan" of the '518 patent. *Id.* at 5:12–13. LAN modem 270 modulates and demodulates a waveform transmitted over the cable, and has an interface to communicate with LAN device 280, which is the source or destination of data transmitted over the LAN. *Id.* at 5:36–40. LAN device 280 can be a personal computer (PC) and LAN device 282 can be a modulator to produce a signal for driving a TV through a signal combiner. *Id.* at 5:40–43.

LAN devices 280 and 282 can be used for digital video or data services. *Id.* at 5:51–52. LAN device 282 can extract digital video data from a transport stream and produce a signal for a standard TV set. *Id.* at 5:52–56. Existing devices, such as TV 240, cable modem 250, and PC 260, use frequency bands distinct from the frequency band used by the LAN and

operate in the normal manner. *Id.* at 5:57–60. The frequencies used by the LAN can be located above the standard cable frequencies. *Id.* at 5:61–63.

The '518 patent describes multi-tone modulation as including discrete multi-tone (DMT) and OFDM. *Id.* at 7:20–27. The '518 patent states that OFDM uses quadrature phase shift keying (QPSK) and multi-level quadrature amplitude modulation (QAM) in which each OFDM carrier is modulated using an amplitude/phase-varying signal. The modulated carriers are then summed together for transmission over the channel. *Id.* at 7:39–40.

The '518 patent describes bit loading as a method of allocating higher order signal constellations to carriers that have higher signal to noise ratio, and lower order constellations to carriers that have lower signal to noise ratio. *Id.* at 8:9–26.

The '518 patent further describes the use of probe messages transmitted between network devices to estimate channel characteristics. *Id.* at 9:35–41. The probe messages have a known bit sequence that can be used by the receiving device to a bit loading profile to send back to the transmitting device to use if the channel is asymmetric, or the receiving device may calculate a bit loading profile for its own use if the channel is symmetric. *Id.* at 9:42–58.

### *E. Challenged Claims*

Claim 1 is independent and claims 2–4 depend from claim 1. Claim 1 is set forth below with Petitioner's limitation identifiers indicated in brackets.

> **[1pre]** A data communication network comprising:
>
> **[1A]** at least two network devices, each network device comprising a multi-carrier modulator for modulating data, an up converter for translating the modulated data to an RF carrier

frequency, a down converter for translating an RF signal, and a multi-carrier demodulator for demodulating the translated RF signal to produce data; and

**[1B]** cable wiring comprising a splitter with a common port and a plurality of tap ports, and a plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices;

**[1C]** whereby network devices communicate with each other through the cable wiring using multi-carrier signaling;

**[1D]** wherein network devices transmit probe messages through the cable wiring and analyze received probe message signals to determine channel characteristics and bit loading is selected based on the determined channel characteristics.

Ex. 1001, 12:8–26.

### *F. Evidence of Record*

Petitioner relies upon the following prior art references[1]:

[1] Petitioner alleges that all of the prior art references were filed, issued, or published before the ’518 patent’s earliest alleged priority date of August 30, 2001. Pet. 3–4. Petitioner contends that all of these prior art references are prior art under 35 U.S.C. §§ 102(a) and (e) (pre-Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011)). *Id.* Patent Owner does not refute these assertions at this time.

| Name | Reference | Date | Exhibit No. |
|---|---|---|---|
| Ashfary | US 2006/0218593 A1 | Filed Sep. 30, 1998; Published Sep. 28, 2006 | 1006 |
| Mirfakhraei | EP 1 087 586 A2 | Filed Sep. 22, 2000; Published Mar. 28, 2001 | 1008 |
| Welles | US 6,737,984 B1 | Filed Mar. 10, 2000; Issued May 18, 2004 | 1022 |

Petitioner also supports its challenges with a declaration from James Bertonis. Ex. 1002. Patent Owner does not rely on any declarant to support its contentions at this time.

### *G. The Asserted Challenges to Patentability*

Petitioner asserts the following challenges to patentability:

| Ground | Challenged Claims | 35 U.S.C. §[2] | Reference(s) |
|---|---|---|---|
| A | 1–4 | 103(a) | Ashfary, Mirfakhaei |
| B | 2 | 103(a) | Ashfary, Mirfakhaei, Welles |

Pet. 17.

[2] The Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011), amended 35 U.S.C. §§ 102 and 103, effective March 16, 2013. Because the application from which the ’518 patent issued was effectively filed before this date, the pre-AIA versions of §§ 102 and 103 apply.

## II. ANALYSIS AND DISCUSSION

In this section, we discuss Petitioner's challenges to claims 1–4 of the '518 patent and Patent Owner's arguments against Petitioner's contentions. For the reasons that follow, we determine that Petitioner has presented a reasonable likelihood that at least one claim of the '518 patent is unpatentable.

### *A. Legal Standards for Obviousness*

A patent claim is unpatentable as obvious under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are such that the claimed subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the claimed invention pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) where present, objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

### *B. Level of Ordinary Skill in the Art*

Petitioner contends as follows:

> In relation to the '518 patent, a person of ordinary skill in the art ("POSITA") would have had a bachelor's degree in electrical engineering, computer engineering, or a similar discipline, and three to four years of experience working in signal processing and/or communication systems/networks. Additional education may substitute for experience, and significant work experience may substitute for formal education.

Pet. 23 (citing Ex. 1002 ¶¶ 103–105).

Patent Owner does not dispute Petitioner's proposed level of skill in the art, which is consistent with the prior art references asserted by Petitioner. *Okajima v. Bourdeau*, 261 F.3d 1350, 1354–55 (Fed. Cir. 2001) (the applied prior art may reflect an appropriate level of skill). Accordingly, we agree with and will use Petitioner's proposed level for this Decision.

### *C. Claim Construction*

We construe the challenged claims under the same standard used by a federal court in a civil action under 35 U.S.C. § 282(b). 37 C.F.R. § 42.100(b). This standard is articulated in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc) and its progeny, and includes "construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent." 37 C.F.R. § 42.100(b).

Petitioner contends that three claim terms presumptively invoke means-plus-function under pre-AIA § 112 ¶ 6 through the use of the words "means for." Pet. 23. Petitioner asserts that all other claim terms should be given their ordinary and customary meaning under § 282(b). Pet. 24 (citing 37 C.F.R. § 42.100(b)). We address Petitioner's contentions for the means-plus-function limitations below.

#### *1. "means for determining signal activity"*

Petitioner contends that the claimed function of "determining signal activity" does not require further construction. Pet. 24 (citing Ex. 1001, claim 2; Ex. 1002 ¶¶ 108–109). As to the corresponding structure, Petitioner asserts that the '518 patent describes different approaches for determining signal activity. *Id.* Petitioner states that one approach is to perform a Fast

Fourier Transform (FFT) on data samples from an analog-to-digital converter (ADC) using the same receiver signal path that is used for data communication. *Id.* at 24–25 (citing Ex. 1001, 8:51–9:27, 11:7–23; Ex. 1002 ¶¶ 109–110).

Petitioner contends that another approach is to measure received signal power with an envelope detector. *Id.* at 25 (citing Ex. 1001, 11:23–29; Ex. 1002 ¶ 110). Petitioner asserts that the envelope detector is another corresponding structure for "determining signal activity." *Id.* (citing Ex. 1002 ¶ 110).

*2. "means for producing and transmitting a probe message"*

Petitioner contends that the claimed function of "producing and transmitting a probe message" does not require further construction. Pet. 25 (citing Ex. 1001, claim 4; Ex. 1002 ¶¶ 111–112). As to the corresponding structure, Petitioner contends that a probe message is a signal "known by the receiving device" that is used "to estimate the channel characteristics" such as SNR.[3] *Id.* (citing Ex. 1001, 4:48–62, 7:22–42, 8:9–35, 9:36–10:20; Ex. 1002 ¶¶ 111–112). Petitioner contends that the corresponding structure for "producing and transmitting a probe message" is a processor. *Id.* at 26 (citing Ex. 1002 ¶¶ 111–112). Petitioner contends that "[t]o the extent the identified structure of a processor requires an algorithm for performing the recited function, the algorithm is: (a) generating a signal known to a receiving device; and (b) transmitting the known signal. *Id.* (citing Ex. 1001, code (57), 4:48–62, 9:35–10:38, Fig. 7; Ex. 1002 ¶¶ 111–112).

[3] Signal-to-noise ratio. Ex. 1001, 6:30.

*3. "means for receiving and analyzing a probe message to determine a bit loading profile used to transmit data"*

Petitioner asserts that the claimed function for this term, which is "receiving and analyzing a probe message to determine a bit loading profile used to transmit data," requires no further construction for purposes of this IPR. Pet. 27 (citing Ex. 1001, claim 4; Ex. 1002 ¶¶ 113–114). Petitioner further asserts that the corresponding structure for this function is a processor. *Id.* (citing Ex. 1001, 10:29–38; Ex. 1002 ¶¶ 113–114). Petitioner contends that, "[t]o the extent the identified structure of a processor requires an algorithm for performing the recited function, the algorithm is: (a) receiving a known signal; (b) determining a SNR for each subchannel based on the received known signal; and (c) determining a bit loading for each subchannel based on the determined SNR for the subchannel. *Id.* (citing Ex. 1001, code (57), 4:48–62, 8:9–26, 9:17–19, 9:35–10:38, 10:61–11:6, Fig. 7; Ex. 1002 ¶¶ 113–114).

*4. Claim Construction Conclusion*

Petitioner's constructions for the means-plus-function limitations are reasonable and Patent Owner does not dispute them. Accordingly, we agree with and will use those constructions in this Decision. For the remaining claim terms, we apply the ordinary and customary meaning. 37 C.F.R. § 42.100(b).

*D. Ground A: Obviousness over Ashfary and Mirfakhraei*

Petitioner contends that claims 1–4 would have been obvious over the combination of Ashfary and Mirfakhraei. Pet. 28–68. Patent Owner disputes Petitioner's contentions. Prelim. Resp. 10–45. We address below the disclosures of Ashfary and Mirfakhraei, the motivation to combine, and the parties' contentions concerning these claims.

*1. Ashfary (Ex. 1006)*

Ashfary is titled "Digital Coaxial Cable LAN." Ex. 1006, code (54). Ashfary relates to networking and data distribution through a coaxial cable that takes advantage of the operating frequency spectrum of the coaxial cable so as not to interfere with client data. *Id.* ¶ 2.

Ashfary's Figure 1 is shown below.




FIG. 1

Figure 1 shows an in-home coaxial cable LAN. *Id.* ¶ 8. Drop cable 10 enters home 12 after tapping main trunk 14 through splitter 15 within distribution box 16. *Id.* ¶ 14. Low pass filter (LPF) 18 is installed upstream of the in-home cable LAN network and downstream of low pass filter 20 supplied by a cable service company. *Id.* LPF 18 maintains security for the cable LAN by preventing signals generated within the cable LAN from getting back to the public cable network where they may also interfere operations of the cable service company. *Id.* ¶¶ 15–16.

Splitter 22 divides the signal on cable 10 into different cable wires 24 which are routed to different rooms in home 12 where they connect with devices such as television (TV) 28, set top box (STB) (or cable modem) 30, and personal computer (PC) 36. *Id.* ¶ 18. These client devices are connected to cable wires 24 with cable LAN adapters 32. *Id.* ¶ 19.

Ashfary's Figure 3 is shown below.




FIG. 3

Figure 3 shows an operating frequency of the client data and adapter signal. *Id.* ¶ 10. The lower region from 0–950 MHz is where conventional cable TV, digital cable TV, and cable modem services are offered. *Id.* ¶ 25. The cable LAN signal is located within the higher range of 1000–2000 MHz at a center frequency of 1300 MHz, and thus does not interfere with conventional services. *Id.* ¶¶ 25, 28.

Ashfary's Figure 4 is shown below.




FIG. 4

Figure 4 shows an architecture of a cable LAN adapter. *Id.* ¶ 11. Modulator 96 modulates data from a client device using a modulation scheme such as Quadrature Phase Shift Keying (QPSK) digital modulation. *Id.* ¶¶ 26, 35–41. Radio Frequency (RF) and Mixed Signal section 100 up-converts the modulated data to an RF frequency. *Id.* ¶¶ 38–39. RF data signals received by the cable LAN adapter are down-converted by RF and Mixed Signal section 100 and demodulated by demodulator 98 for transmission to a client device. *Id.* ¶¶ 38–42.

*2. Mirfakhraei (Ex. 1007)*

Mirfakhraei is titled "Bitloading Process for Multicarrier Communications." Ex. 1007, code (54). Mirfakhraei relates to modems and transceivers that use multiple carrier frequencies for information transmissions. *Id.* ¶ 1. Mirfakhraei's modems use discrete multi-tone (DMT) modulation and bit-loading to increase transmission rates. *Id.* ¶¶ 3, 5.

Mirfakhraei discloses that "[f]or data transmission, a sending modem breaks transmitted data into packets for simultaneous transmission on separate sub-channels and independently modulates communication signals

for the sub-channels according to the data carried on each sub-channel." *Id.* ¶ 3. For data reception, the "receiving modem separates sub-channel signals according to carrier frequency, demodulates the separate sub-channel signals, and reassembles the data." *Id.*

Mirfakhraei discloses a bit-loading process that determines noise for each sub-channel of the DMT signal. *Id.* ¶ 5. The process determines target loadings to provide a desired error rate at the measured noise. *Id.* The process rounds target loadings to integers; and determines whether the proposed loadings provide a desired error rate. *Id.* If not, the process selects one or more sub-channels with a negative difference between target and proposed loadings, and for each selected sub-channel decreases the proposed loading by 1. *Id.* Gains of channels with decreased loadings are decreased for improved power efficiency. *Id.*

Mirfakhraei discloses a handshake process in which one transceiver transmits a hand-shake signal to a remote receiver when establishing a connection or retraining. *Id.* ¶ 20. The handshake signal includes a pattern that the remote transceiver requests or indicates a pattern for the remote transceiver to transmit to the one transceiver. *Id.* SNRs for the sub-channels can be determined from these handshake signals. *Id.* ¶ 22.

*3. Motivation to Combine*

Petitioner contends that a POSITA would have been motivated to combine Afshary and Mirfakhraei for several reasons. Pet. 40–45. Petitioner asserts that a POSITA would understand that Ashfary's network operates over a coaxial cable which is a "harsh medium for communication" that has variable frequency response caused by interference and signal reflections. *Id.* (citing Ex. 1006, code (57), ¶¶ 7, 12–20, Fig. 1; Ex. 1002

¶¶ 29–55, 128–138; Ex. 1007 ¶ 2–5, 14; Ex. 1018, 305–307). According to Petitioner, implementing Mirfakhraei's DMT bit-loading protocol would increase the data transmission rate in Ashfary's coaxial cable network, and would also improve reliability and robustness of communications therein. *Id.* at 41–42 (citing Ex. 1007 ¶ 3; Ex. 1002 ¶¶ 29–55, 139). Although Mirfakhraei describes DMT bit loading for a conventional telephone line, Petitioner contends that a POSITA would have understood that its bit-loading scheme could be implemented over coaxial cable. *Id.* at 42 (citing Ex. 1010, 374; Ex. 1013, code (54), 2:30–5:39, Figs. 1–2; Ex. 1016, code (54), 1:9–16, 3:34–59, 6:66–7:46, Fig. 1; Ex. 1017, 74; Ex. 1018, 305–307, 312; Ex. 1002 ¶ 140).

Petitioner further notes that Ashfary describes the baseband section of its cable LAN adapter as implemented on an application specific integrated circuit (ASIC), and that Mirfakhraei describes its transmitter and receiver as implemented in hardware, software, or a combination of the two. *Id.* (citing Ex. 1007 ¶ 15, Fig. 1; Ex. 1002 ¶¶ 141–144). Petitioner asserts that implementing the DMT bit-loading protocol of Mirfakhraei into Ashfary's cable LAN adapter would entail incorporating Mirfakhraei's multi-carrier modulator and demodulator into an ASIC. *Id.* at 42–43. Petitioner contends that this implementation would enable Ashfary's cable LAN adapter to communicate at higher data rates, and that it would be more robust and reliable and less affected by the harsh environment of a coaxial cable infrastructure, including interference and signal reflections. *Id.* at 43 (citing Ex. 1002 ¶¶ 141–144; Ex. 1007 ¶ 2; Ex. 1018, 205–207, 312; Ex. 1002 ¶¶ 141–144). Petitioner asserts that power efficiency would also be improved by using more available bandwidth for communicating, and using

higher order modulations schemes to transmit more bits onto frequency channels that experience less noise and interference. *Id.* (citing Ex. 1002 ¶¶ 141–144).

Petitioner further asserts that

> A POSITA would have understood that combining the teachings of Afshary and Mirfakhraei is nothing more than an obvious combination of known elements (Afshary's cable LAN adapter and Mirfakhraei's multi-carrier DMT modulator and multi-carrier DMT demodulator) according to known methods (incorporating the functionality of Mirfakhraei's multi-carrier DMT modulator and multi-carrier DMT demodulator into Afshary's cable LAN adapter – for example, by incorporating this functionality into an ASIC such as Afshary's ASIC 78) to yield predictable results (Afshary's cable LAN adapter transmits and receives data using Mirfakhraei's DMT protocol and bit loading to provide increased data rates and robust communications within Afshary's coaxial cable LAN).

Pet. 43–44 (citing Ex. 1002 ¶ 145). Petitioner argues that "a POSITA would have had a reasonable expectation of success because the proposed implementation of Afshary and Mirfakhraei would be well within the standard skill set of a POSITA and the resulting benefits of communicating over coaxial cable wiring using bit-loading and multi-carrier modulation were well known." *Id.* at 44 (citing Ex. 1002 ¶ 145).

Petitioner further contends that

> A POSITA would have also understood that combining the teachings of Afshary and Mirfakhraei is nothing more than applying a known technique (the DMT bit-loading protocol of Mirfakhraei) to a known device (Afshary's cable LAN adapter) ready for improvement to yield a predictable result (Afshary's cable LAN adapter enables communication over a coaxial cable LAN using the DMT bit-loading protocol of Mirfakhraei,

> thereby improving data rates and susceptibility to coaxial cable channel impairments).

Pet. 44 (citing Ex. 1002 ¶ 146). Petitioner asserts that combining Mirfakhraei's bit-loading and multi-carrier modulation and demodulation into Ashfary's cable LAN adapter would provide the predictable result of increased data throughput and more reliable communications in the harsh coaxial cable environment. *Id.* at 45 (citing Ex. 1002 ¶ 146).

*4. Patent Owner Arguments*

We now address Patent Owner's arguments against Petitioner's motivation to combine.

*a) Non-Analogous Art*

Patent Owner asserts that Mirfakhraei is not analogous art to the '518 patent. Prelim. Resp. 21–27 (citing *In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011); *In re Clay*, 966 F.2d 656, 658–59 (Fed. Cir. 1992)). Specifically, Patent Owner asserts that Mirfakhraei does not share the same field of endeavor as the '518 patent. *Id.* at 22. Patent Owner argues that the '518 patent's field of endeavor is on-premises local area broadband coaxial cable network. Patent Owner argues that Mirfakhraei "has nothing to do with broadband networks, coaxial cables, or local area networks" because its field is multi-carrier network communications using a DSL transmission outside the home over conventional telephone lines which are "twisted pair" copper wires. *Id.* at 22–23.

Patent Owner contends that, to determine the field of endeavor, one looks to the "background of invention" and "field of the invention" sections of a patent. Pet. 23 (citing *Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1380–1381 n.8 (Fed. Cir. 2019)). Patent Owner also contends that the

patent's title, claim preamble, and function or structure of the claimed inventions are relevant. *Id.* Patent Owner asserts that these factors establish that the '518 patent's field of endeavor is "an on-premises local area broadband coaxial cable network." *Id.* at 23–24 (citing Ex. 1001, code (54), 1:27–29, 1:33–4:33, claim 1). Patent Owner asserts that Petitioner agrees that "[t]he '518 patent is directed to a coaxial cable local area network (LAN)." *Id.* at 24 (citing Pet. 1; Ex. 1:27–29; Ex. 1002 ¶ 58).

Patent Owner argues that Mirfakhraei does not mention "coaxial cables" and mentions "broadband signal" only once. *Id.* (citing Ex. 1007 ¶ 24). According to Patent Owner, Mirfakhraei's "problem and solution . . . is specific to multi-carrier communications over conventional telephone lines" and does not mention "coaxial cables" or an "on-premises" implementation. *Id.* at 24–25 (citing Ex. 1007 ¶¶ 2–5).

Patent Owner contends that Petitioner's declarant, Mr. Bertonis, stated that "Mirfakhraei is in the field of network communication and therefore in my opinion analogous to the '518 patent." *Id.* (citing Ex. 1002 ¶ 88; Ex. 1007 ¶ 1). Patent Owner alleges that Mr. Bertonis's statement was conclusory and lacked analysis. *Id.* Patent Owner also asserts that Mr. Bertonis makes no mention of "broadband," "coaxial cable," or "local area" networks which are the "overwhelming focus" of the '518 patent. *Id.* As support for its argument, Patent Owner points to a case stating that semiconductor "memory" was too broad of a field as support for its contentions. *Id.* at 25–26 (citing *Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 864-65 (Fed. Cir. 1993)).

We do not agree with Patent Owner's argument that Mirfakhraei is not in the same field of endeavor, and therefore not analogous, to

the ’518 patent. Mirfakhraei’s title, abstract, “Field of the Invention,” and claims describe its bit loading process for multicarrier communications generally, and do not limit its modems or receivers to using telephone lines as the communication medium. Ex. 1006, codes (54, 57), ¶ 1, claims 1–18. Although telephone lines are mentioned in the “Description of the Related Art” and “Detailed Description of the Preferred Embodiments” sections, Mirfakhraei cautions that “[a]lthough the invention has been described with reference to particular embodiments, the description is only an example of the invention’s application and should not be taken as a limitation.” *Id.* ¶ 36. Accordingly, we do not agree with Patent Owner’s argument that Mirfakhraei’s field of endeavor is limited to telephone lines or DSL, as Patent Owner argues.

Patent Owner further contends that Petitioner does not demonstrate that Mirfakhraei is reasonably pertinent to the problems that the inventors of the ’518 patent were trying to solve. Prelim. Resp. 26–27. Patent Owner contends that the ’518 patent lays out a clear problem and solution addressing impediments that previously restricted high bandwidth communication between terminal devices over on-premises coaxial cabling. *Id.* at 26 (citing Ex. 1001, code (54), 4:19–33). Patent Owner asserts that the ’518 patent addresses inter-port isolation across splitters, variable signal attenuation caused by different channel paths, and imperfect connections at splitters which cause micro reflections. *Id.* at 26–27 (citing Ex. 1001, 2:27–34, 2:41–48, 3:5–16, 4:23–25).

Patent Owner argues that Mirfakhraei is directed to an entirely different problem, which is that sub-channels in conventional telephone lines differ in the amount of data they can carry but the DMT protocols used for

multi-carrier transmission to increase data rate employ the same QAM[4] modulation scheme, leading to transmission inefficiency. Patent Owner asserts that Mirfakhraei attempts to address this issue by adjusting the modulation scheme, and hence the bit loading, used for each sub-channel. *Id.* at 27 (citing Ex. 1007 ¶¶ 3–4).

However, variable attenuation across channel paths is a problem addressed by Mirfakhraei and the ’518 patent. Ex. 1001, 6:45–46; Ex. 1006 ¶ 6. And Mirfakhraei performs bit loading with multi-carrier signals for other reasons besides overcoming transmission inefficiency. For example, Mirfakhraei addresses the problem of achieving the desired noise immunity required for multicarrier transmissions. Ex. 1007 ¶ 6. Similarly, the ’518 patent addresses the problem of noise on signal transmissions. Ex. 1001, 4:36–65. Thus, there is overlap in the problems addressed by Mirfakhraei and the ’518 patent.

Patent Owner’s arguments that the problems of Mirfakhraei are not reasonably pertinent, and therefore not analogous, to those of the ’518 patent are unavailing.

*b) Impermissible Hindsight*

Patent Owner argues that Petitioner uses impermissible hindsight to combine Afshary and Mirkakhraei. Prelim. Resp. 27–31. Specifically, Patent Owner asserts that Afshary and Mirfakhraei “are different network types and operate over differing mediums.” *Id.* at 28. Patent Owner asserts that Ashfary provides and in-home LAN whereas Mirfakhraei provides a premises-to-infrastructure link from customer to the telephone using ADSL.

[4] Quadrature Amplitude Modulation. Ex. 1007 ¶ 4.

*Id.* Patent Owner further asserts that Ashfary communicates over high bandwidth coaxial cables whereas Mirfakhraei uses bandwidth-constrained twisted pair telephone lines. *Id.* Patent Owner contends that Ashfary differentiates coaxial cables and telephone lines and highlights the issues presented in using telephone lines. *Id.* (citing Ex. 1006 ¶¶ 5–6).

Petitioner provided sufficient evidence that a POSITA would have understood that Mirfakhraei's DMT bit loading for a conventional telephone line can be applied to a coaxial cable. *Id.* at 42 (citing Ex. 1010, 374; Ex. 1013, code (54), 2:30–5:39, Figs. 1–2; Ex. 1016, code (54), 1:9–16, 3:34–59, 6:66–7:46, Fig. 1; Ex. 1017, 74; Ex. 1018, 305–307, 312; Ex. 1002 ¶ 140). Patent Owner also does not explain why Petitioner allegedly engaged in hindsight reconstruction when the claims do not identify where the network components are located, whether inside or outside of a home. Patent Owner's arguments do not undercut Petitioner's showing of a motivation to combine.

Patent Owner next argues that Afshary and Mirfakhraei operate in incompatible environments because Ashfary operates at frequencies above those used by conventional cable services to avoid interference, whereas Mirfakhraei's ADSL transceiver communicates over the low frequency bands avoided by Ashfary. Prelim. Resp. 28–29 (citing Ex. 1006 ¶ 7; Ex. 1007 ¶¶ 2–3), 32–35. Mirfakhraei discloses that its modem or transceiver may operate on a broadband signal which presumably would include conventional low frequency bands for conventional cable services and the frequencies above them. We also note that while this argument may have relevance for dependent claim 3, on this record, it appears irrelevant to claims 1, 2, and 4.

Patent Owner then asserts that Ashfary and Mirfakhraei use differing signaling technology. Prelim. Resp. 29 (citing Ex. 1006 ¶ 37; Ex. 1007 ¶¶ 2–6), 35–38. Patent Owner argues that Ashfary uses a "clean" medium like coaxial cables where single carrier signaling is sufficient, whereas Mirfakhraei is "saddled" with telephone cables and thus uses multi-carrier signaling. *Id.* Patent Owner argues that Petitioner did not address the differing signaling architectures, and that a POSITA would not have been motivated to combine Ashfary and Mirfakhraei. *Id.*

On this record, Petitioner shows sufficiently that implementing Mirfakhraei's DMT bit-loading protocol would increase data transmission rate in Ashfary's coaxial cable network, and would also improve reliability and robustness of communications therein. *Id.* at 41–42 (citing Ex. 1007 ¶ 3; Ex. 1002 ¶¶ 29–55, 139). Hence, Patent Owner's assertion of different signaling architectures does not outweigh Petitioner's evidence that there were advantages to be obtained by the combination notwithstanding Patent Owner's noted differences in signaling architectures.

Patent Owner also argues that Petitioner made "[b]road, generic references to 'impairments' and increased data transmission rates" but that such generic concerns relate to nearly every communications system in existence, and not the motivation to combine particular bits of technology. Prelim. Resp. 38 (citing Pet. 40–41). However, under similar circumstances, our reviewing court stated that a motivation to combine "is not inherently suspect merely because it's generic in the sense of having broad applicability or appeal." *Intel Corp. v. Qualcomm Inc.*, 21 F.4th 784, 797 (Fed. Cir. 2021).

Patent Owner asserts that Petitioner contended in its motivation section that a coaxial cable is a "harsh medium" but that Ashfary teaches that coaxial cabling is "a very clear, clean medium capable of handling operating frequencies of up to 2000 MHz." *Id.* at 38–39 (citing Ex. 1006 ¶ 24). Patent Owner further argues that Petitioner's declarant, Mr. Bertonis, stated that a coaxial cable "can be a harsh environment" because its frequency response can vary significantly. *Id.* at 39. Patent Owner also argues that Mr. Bertonis relies on Jacobsen94 (Exhibit 1018) but argues that it addressed data transmission outside of the home using frequencies different from Afshary. *Id.* at 39–40.

This evidence at best establishes that coaxial cabling may present a "harsh" or "clear" environment depending on the circumstances. We do not see this evidence as negating Petitioner's motivation to combine.

Patent Owner further argues that Afshary touts the high bandwidth of its system without the use of multi-carrier signaling, so a POSITA would not have been motivated to further increase bandwidth of Afshary's system with Mirfakhraei. *Id.* at 40 (citing Pet. 41; Ex. 1006 ¶ 27). Patent Owner also reiterates its argument that Petitioner failed to consider the differing communication mediums between Ashfary and Mirfakhraei in its motivation to combine section, and that just because a POSITA could have made the combination does not mean the POSITA would have been motivated to do so. *Id.* at 40–41.

On this record, we find these arguments do not undermine Petitioner's motivation to combine. While Afshary's inventors may have touted the high bandwidth of its single-carrier system, that does not necessarily imply that a

POSITA would not have recognized further improvement under at least some circumstances by implementing multi-carrier signaling.

We have already addressed Patent Owner's argument concerning differing mediums earlier in this section.

*c) Frustration of Goals*

Patent Owner asserts that inserting Mirfakhraei's multi-carrier signaling functionality into Afshary's adapters would frustrate Afshary's goal or providing a cost-effective, in-home LAN for distributing data. Prelim. Resp. 41–43 (citing Ex. 1006 ¶¶ 4–6, 29–42; Pet. 39, 42–43; § IV.A.1). Patent Owner asserts that a POSITA would not have been motivated to insert Mirfakhraei's components into Afshary's adapters because the combination would add costs and complexity contrary to Afshary's disclosure, and that Afshary teaches away from the claimed invention. *Id.* at 42. According to Patent Owner, Afshary designs its adapters to provide robust communications with cost-effective components, whereas Mirfakhraei is concerned with optimization. *Id.* at 42–45 (citing Ex. 1004 ¶¶ 29–42, Fig. 4; Ex. 1007 ¶¶ 5, 14, 17, 19; Pet. 39, 42–43).

On this record, Patent Owner's arguments at most establish that a POSITA would have considered tradeoffs between cost and complexity and performance in making the combination. On the evidence presented here, Petitioner shows sufficiently that a POSITA would have combined Afshary and Mirfakhraei at least under some circumstances.

*d) Conclusion for Patent Owner Arguments*

On this record, Petitioner has shown a reasonable likelihood that a POSITA would have combined Afshary and Mirfakhraei with a reasonable expectation of success.

*5. Claim 1*

We now address Petitioner's contentions that claim 1 is disclosed by the combination of Afshary and Mirfakhraei. Pet. 28–51. Patent Owner does not dispute Petitioner's contentions at this time. We conclude that Petitioner has shown a reasonable likelihood to prevail in showing that claim 1 would have been obvious over Afshary and Mirfakhraei for the reasons that follow.

*a) Preamble 1pre: Data Communication Network*

Petitioner contends that Afshary discloses a coaxial cable local area network (LAN) ("data communication network"). Pet. 28–29 (citing Ex. 1006 ¶¶ 2, 7, 12, 14, 19–23, 41, Figs. 1–2; Ex. 1002 ¶¶ 118–120).

Petitioner shows a reasonable likelihood that Afshary discloses the preamble 1pre so we do not decide whether the preamble is limiting.

*b) Limitation 1A: At Least Two Network Devices*

Limitations 1A recites "at least two network devices, each network device comprising a multi-carrier modulator for modulating data, an up converter for translating the modulated data to an RF carrier frequency, a down converter for translating an RF signal, and a multi-carrier demodulator for demodulating the translated RF signal to produce data."

Petitioner contends that Afshary discloses each feature of limitation 1A other than a modulator and demodulator that are multi-carrier, but asserts that such devices are disclosed by Mirfakhraei. Pet. 19.

Petitioner contends that Afshary discloses cable LAN adapters 32 ("at least two network devices") within its coaxial LAN. Pet. 30 (citing *id.* at § VI.A.1.a; Ex. 1006 ¶¶ 18–19, 21–23, 41, Figs. 1–2; Ex. 1002 ¶ 121).

Petitioner contends that Afshary discloses a modulator 96 and RF & Mixed Signal section 100, digital to analog converter (DAC) 108, up converter 112, local oscillator (LO) frequency synthesizer timing circuit 120, mixer 122, and power amplifier (PA) 116 (collectively, "up converter for translating the modulated data to an RF carrier frequency"). Pet. 31–32 (citing Ex. 1006 ¶¶ 38–39; Ex. 1002 ¶¶ 123–124).

Petitioner contends that Afshary discloses that these components operate to translate the modulated data from the Baseband section 90 to a 1300 MHz center frequency ("RF carrier frequency") and that the modulated data occupies a bandwidth of 5 MHz. *Id.* at 32 (citing Ex. 1006 ¶¶ 25, 38–39; Ex. 1002 ¶¶ 123–124). Petitioner asserts that the up-converted modulated data is transmitted as an RF signal to another cable LAN adapter 32 to facilitate communication between client devices. *Id.* (citing Ex. 1006 ¶¶ 23, 26, 39, 41, Fig. 3; Ex. 1002 ¶¶ 123–124).

Petitioner further contends that, for receiving RF modulated data, the RF & Mixed Signal section 100 includes low noise amplifier (LNA) 118, LO 120, mixer 122, down converter 114, and analog to digital converter (ADC) 110 (collectively, "down converter for translating an RF signal"). Pet. 33 (citing Ex. 1006 ¶¶ 38–39, 41; Ex. 1002 ¶¶ 125–126). Petitioner asserts that "Afshary teaches that these components operate to translate a received RF signal to a lower frequency signal." *Id.* (citing Ex. 1006 ¶¶ 38–39, 41; Ex. 1002 ¶¶ 125–126). According to Petitioner, "Afshary teaches that the down-converted signal from the RF & Mixed Signal section 100 is demodulated by demodulator 98." *Id.* (citing Ex. 1006 ¶¶ 41–42; Ex. 1002, ¶¶ 125–126). Petitioner states that the "demodulated data from demodulator 98 is decoded and corrected by FEC decoder 94 to recover

digital data that is provided to MAC & Client Interface section 80." *Id.* (citing Ex. 1006 ¶¶ 41–42; Ex. 1002 ¶¶ 125–126).

Petitioner asserts that "Figure 1 of Mirfakhraei . . . shows a transmitter 110 and a receiver 190 of a transceiver 100 that communicates using Mirfakhraei's DMT and a bit-loading scheme." Pet. 35 (citing Ex. 1007 ¶¶ 5–8, 14–15; Ex. 1002 ¶ 130). According to Petitioner, Mirfakhraei teaches that the transmitter 110 includes framer 113, tone ordering block 114, constellation mapper 115, Inverse Discrete Fourier Transform (IDFT) block 116, buffer 117, and TX handshake block 120 (collectively, "multi-carrier modulator for modulating data"). *Id.* at 35–36 (citing Ex. 1007 ¶¶ 15–19; Ex. 1002 ¶ 130).

Petitioner contends that "Mirfakhraei teaches that the receiver 190 includes time domain equalizer (TEQ) 180, buffer 197, Discrete Fourier Transform (DFT) block 196, frequency domain equalizer 195, slicer 194, deframer 193, and RX handshake block 170 (collectively, "multi-carrier demodulator for demodulating the translated RF signal to produce data")." Pet. 38–39 (citing Ex. 1007 ¶¶ 21–24; Ex. 1002 ¶ 135).

Petitioner shows a reasonable likelihood that limitation 1A is disclosed by the combination of Afshary and Mirfakhraei.

*c) Limitation 1B: Cable Wiring*

Limitation 1B recites "cable wiring comprising a splitter with a common port and a plurality of tap ports, and a plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices."

Petitioner contends that Afshary shows cable LAN adapters 32 within the coaxial cable LAN. Pet. 45 (citing Ex. 1006 ¶¶ 18–19, 21–23, Figs. 1–2;

Ex. 1002 ¶¶ 148–149). According to Petitioner, "Afshary explains that drop cable 10 is provided to splitter 22 within home 12." *Id.* (citing Ex. 1006 ¶¶ 16, 18–19; Ex. 1002 ¶¶ 148–149). Petitioner asserts that "Afshary teaches that 'drop cable 10 is split by splitter 22 into different cable wires 24, [with] each cable wire 24 being routed to different rooms in home 12.'" *Id.* at 45–46 (citing Ex. 1006 ¶ 18; Ex. 1002 ¶¶ 148–149).

Referring to Afshary's Figure 1, Petitioner contends that the splitter 22 ("splitter") includes an input port ("common port") and multiple output ports ("plurality of tap ports"). *Id.* at 46 (citing Ex. 1006 ¶¶ 16, 18–19; Ex. 1001, 1:53–57, Fig. 1; Ex. 1002 ¶¶ 148–149). According to Petitioner, from the output ports, multiple cable wires 24 ("cable wiring" and "plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices") are connected to the cable LAN adapters 32. *Id.* at 46–47 (citing Ex. 1006 ¶¶ 16, 18–19; Ex. 1001, 1:53–57, Fig. 1; Ex. 1002 ¶¶ 148–150).

Petitioner shows a reasonable likelihood that limitation 1B is disclosed by Afshary.

*d) Limitation 1C: Multi-Carrier Signaling*

Limitation 1C recites "whereby network devices communicate with each other through the cable wiring using multi-carrier signaling."

Petitioner contends that Afshary discloses cable LAN adapters 32 ("network devices") that communicate with each other via cable wire 24 ("cable wiring"). Pet. 47 (citing Ex. 1006 ¶¶ 16, 18–19, 21–23, Figs. 1–2; Ex. 1002 ¶ 151). Petitioner asserts that the cable LAN adapters 32 in the Afshary-Mirfakhraei system communicate with each other using the DMT bit-loading protocol taught by Mirfakhraei. *Id.* at 47–48 (citing Ex. 1007,

code (54), ¶¶ 2–3, 5–8, 14–15, Fig. 1; Ex. 1002 ¶ 151). Petitioner alleges that "Mirfakhraei explains that DMT is a multi-carrier communication technique (claimed "communicat[ing] … using multi-carrier signaling")." *Id.* at 48 (citing Ex. 1007, code (54), ¶¶ 2–3, 5–6, Fig. 1; Ex. 1002 ¶¶ 151–152).

Petitioner shows a reasonable likelihood that limitation 1C is disclosed by the combination of Afshary and Mirfakhraei.

*e) Limitation 1D: Probe Messages*

Limitation 1D recites "wherein network devices transmit probe messages through the cable wiring and analyze received probe message signals to determine channel characteristics and bit loading is selected based on the determined channel characteristics."

Petitioner asserts that "the Afshary-Mirfakhraei system implements the DMT bit loading scheme taught by Mirfakhraei." Pet. 48 (citing Ex. 1007, code (54), ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶ 153). Petitioner states that, "[t]o facilitate the DMT bit loading scheme, the cable LAN adapters (claimed "network devices") of the Afshary-Mirfakhraei system include the TX handshake block 120 . . . and the RX handshake block 170 . . . to implement the 'bit-loading' process that characterizes the capabilities of sub-channels and determines the number of bits-per-symbol transmitted over the channel' as taught by Mirfakhraei." *Id.* (citing Ex. 1007 ¶ code (57), 14, ¶¶ 2–3, 5–8, 14–25, Figs. 1–3; Ex. 1002 ¶ 153).

According to Petitioner, Mirfakhraei discloses that TX handshake block 120 of a first transceiver generates and transmits handshake signals to a second transceiver ("transmit probe messages through the cable wiring"), with each handshake signal comprising a known signal (*e.g.*, a known signal

pattern or a known pseudo-random signal). Pet. 49–50 (citing Ex. 1007 ¶¶ 20–23; Ex. 1002 ¶ 154; Ex. 1007 ¶¶ 20, 22; Ex. 1002 ¶ 154). Petitioner asserts that "Mirfakhraei further teaches that RX handshake block 170 of the second transceiver estimates the SNR (claimed "channel characteristics") for each sub-channel based on received handshake signals (claimed "analyze received probe message signals"). *Id.* at 50 (citing Ex. 1007 ¶¶ 21–23; Ex. 1002 ¶ 154).

Regarding Mirfakhraei's bit-loading, Petitioner contends that Mirfakhraei discloses that "the size of a constellation map for a subchannel, and hence the number of bits represented by each transmitted signal, is based on the SNR of the subchannel." *Id.* at 50 (citing Ex. 1007 ¶¶ 4–8, 14, 17–18, Figs. 1–2; Ex. 1002 ¶¶ 29–55, 155).

According to Petitioner, Mirfakhraei discloses that "the RX handshake block 170 facilitates implementation of the bit loading process by comparing the received handshake signal to the known signal values that were transmitted." Pet. 50 (citing Ex. 1007 ¶¶ 5–8, 14, 20, 22–23, 25–32, Figs. 1–2; Ex. 1002 ¶ 155). Petitioner asserts that, "[b]ased on the comparison, SNR values for each sub-channel are determined." *Id.* (citing Ex. 1007 ¶¶ 5–8, 14, 20, 22–23, 25–32, Figs. 1–2; Ex. 1002 ¶ 155). Petitioner argues that the "appropriate bit-loadings for each sub-channel are then determined based on the SNR values determined for each sub-channel (claimed "bit loading is selected based on the determined channel characteristics")." Pet. 50–51 (citing Ex. 1007 ¶¶ 5–8, 14, 17, 20, 22–23, 25–32, Figs. 1–2; Ex. 1002 ¶ 155).

Petitioner further contends that "[s]ub-channels having higher SNRs are assigned higher order modulation constellations." Pet. 51 (citing

Ex. 1007 ¶¶ 5–8, 14, 17, 20, 22–23, 25–32, Figs. 1–2; Ex. 1002 ¶ 155). According to Petitioner, "[s]ub-channels having lower SNRs are assigned lower order modulation constellations." *Id.* Petitioner states that "[f]or example, a sub-channel with a higher SNR modulates data using a larger QAM constellation such as 256-QAM, which enables each transmitted QAM symbol to represent 8 bits, while a sub-channel with a lower SNR modulates data using a smaller QAM constellation such as 16-QAM, which enables each transmitted QAM symbol to represent 4 bits." *Id.* (citing Ex. 1007 ¶¶ 4, 17–18, 23–24; Ex. 1002 ¶¶ 29–55, 155). Petitioner contends that the "RX handshake block 170 of the second transceiver sends the determined bit-loadings for each sub-channel to the first transceiver, which then employs the bit-loadings in subsequent communications with the second transceiver." *Id.* (citing Ex. 1007 ¶¶ 5–8, 14, 20, 22–23, 25–32, Figs. 1–2; Ex. 1002 ¶¶ 29–55, 153–156).

Petitioner presents a reasonable likelihood that limitation 1D is disclosed by the combination of Afshary and Mirfakhraei.

*f) Conclusion for Claim 1*

On the record developed thus far, Petitioner shows that a POSITA would have combined Afshary and Mirfakhraei with a reasonable expectation of success notwithstanding Patent Owner's arguments to the contrary. Petitioner further demonstrates that each limitation is disclosed by the combination of Afshary and Mirfakhraei. Accordingly, Petitioner presents a reasonable likelihood to prevail in showing that claim 1 of the '518 patent would have been obvious over the combination of Afshary and Mirfakhraei.

*6. Claims 2–4*

Claim 2 depends from claim 1 and recites "wherein a network device comprises a means for determining signal activity and selects a frequency band for operation that is not used by other services."

For claim 2, Petitioner relies on Mirfakhraei's A/D converter for determining signal activity. Pet. 52–56. While an A/D converter can sample a signal to obtain spectral content, it cannot by itself determine signal activity. Consequently, Petitioner has not shown a reasonable likelihood to prevail in demonstrating obviousness of claim 2 in this ground.

Claim 3 depends from claim 1 and recites "wherein the network shares the cable wiring with a cable television service and the network device up converter translates the modulated data to an RF carrier frequency above the frequency used by the cable television service."

Reviewing Petitioner's contentions for claim 3, we determine that Petitioner has presented a reasonable likelihood that this claim would have been obvious over the combination of Afshary and Mirfakhraei. In particular, Afshary's Figure 3 and related description disclose this feature.

Claim 4 is similar to claim 1 and incorporates means-plus function limitations discussed in § II.C. Reviewing Petitioner's contentions for claim 4 (Pet. 57–68), we determine that Petitioner has shown a reasonable likelihood to prevail in showing claim 4 would have been obvious over the combination of Afshary and Mirfakhraei.

*E. Ground B: Obviousness over Afshary, Mirfakhraei, and Welles*

Petitioner relies on Welles to disclose an envelope detector. Pet. 68–73. Petitioner shows sufficiently that a POSITA would have been motivated to combine Welles with Afshary-Mirfakhraei. *Id.* at 69–73. In addition, Petitioner shows sufficiently that Afshary's A/D converter joined with Welles' envelope detector would have had the ability to determine signal activity, and otherwise meets the limitations of claim 2. *Id.* at 69.

Accordingly, Petitioner presents a reasonable likelihood that claim 2 would have been obvious over the combination of Afshary, Mirfakhraei, and Welles.

## III. CONCLUSION

In light the foregoing, based on the current record and at this stage of the proceeding, we are persuaded that Petitioner has demonstrated a reasonable likelihood of prevailing on its assertions that at least one of claims 1–4 of the '518 patent would have been obvious under 35 U.S.C. § 103 based on the grounds set forth in the Petition. Accordingly, we institute trial for all challenged claims on all grounds asserted by Petitioner. 37 C.F.R. § 42.108(a) ("When instituting . . . review, the Board will authorize the review to proceed on all of the challenged claims and on all grounds of unpatentability asserted for each claim.").

Our factual findings, conclusions of law, and determinations at this stage of the proceeding are preliminary, and based on the evidentiary record developed thus far. At this stage of the proceeding, we have not made a final determination with respect to the patentability of the challenged claims or to the construction of any claim term.

## IV. ORDER

For the foregoing reasons, it is

ORDERED that pursuant to 35 U.S.C. § 314(a), an *inter partes* review of claims 1–4 of the ’518 patent is hereby instituted on all challenges to patentability set forth in the Petition; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial and that the trial will commence on the entry date of this decision.

For PETITIONER:

Frederic M. Meeker
Paul T. Qualey
Christopher McKee
Wesley Jones
BANNER & WITCOFF, LTD.
fmeeker@bannerwitcoff.com
pqualey@bannerwitcoff.com
cmckee@bannerwitcoff.com
wjones@bannerwitcoff.com

For PATENT OWNER:

Jason A. Engel
Erik J. Halverson
Jared Lund
K&L GATES LLP
jason.engel.PTAB@klgates.com
erik.halverson@klgates.com
jared.lund@klgates.com

**UNITED STATES PATENT AND TRADEMARK OFFICE**

---

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

---

COMCAST CABLE COMMUNICATIONS, LLC,

Petitioner,

v.

ENTROPIC COMMUNICATIONS, LLC,

Patent Owner.

---

CASE: IPR2024-00431

U.S. PATENT NO. 7,295,518

---

# PATENT OWNER RESPONSE




Ex. 1001, Fig. 1 (illustrating traditional channel path of signal distribution (green) and isolated channel path between devices (red)); Ex. 2001, ¶ 47.

Although splitters provide needed functions for distributing a signal from a head-end or external source to multiple devices in a home, prior art cable TV wiring configurations present obstacles for device-to-device communication. Ex. 1001, 2:28-34, 2:35-48, 4:19-32; Ex. 2001, ¶ 46.

***First***, a splitter's tap ports are isolated. Ex. 1001, 2:27-34; Ex. 2001, ¶ 47. Inter-port isolation leads to signal attenuation when terminal devices communicate through the tap ports. *Id.* In a conventional cable TV configuration, this isolation is desirable because terminal devices did not communicate with each other (and instead

would only receive and transmit signals from/to the head-end). Ex. 1001, 2:28-38; Ex. 2001, ¶ 47. Thus, most on-premises splitters have this isolation. The described and claimed system, however, requires terminal devices to communicate with each other, and the signal loss caused by inter-port isolation becomes an undesirable byproduct of the existing design. Ex. 1001, 2:35-41; Ex. 2001, ¶ 47.

***Second***, signal attenuation in the on-premises broadband coaxial network is variable across the different paths. Ex. 1001, 2:41-48; Ex. 2001, ¶ 48. The signal path between each terminal device is unique, which results in varying levels of loss between each terminal device through a varied number of splitters/combiners, various connected and nearby devices, and channel length. *Id*. This signal loss could be overcome by replacing the main splitter at a building point-of-entry with a symmetric splitter/combiner. Ex. 1001; 2:54-56; Ex. 2001, ¶ 48. However, a bi-directional power amplifier would have to be installed to boost the signal, and power (which is generally not available at the main splitter) would have to be provided to the amplifier. *See* Ex. 1001, 2:54-3:4; Ex. 2001, ¶ 48.

***Third***, imperfect connection points create micro reflections, which may combine with the dominant main signal to produce a multipath signal. Ex. 1001, 3:5-10, 10:39-54, Fig. 8; Ex. 2001, ¶ 49. Multipath signals may be undesirable because they create inter-symbol interference ("ISI"). Ex. 1001, 3:7-10; Ex. 2001,

¶ 49. ISI degrades the bit error rate performance of the communication channel and impairs data rates in the network. Ex. 1001, 3:15-16, 4:23-25; Ex. 2001, ¶ 49.

The ’518 Patent, recognizing the above impediments to on-premises broadband networks over coaxial cable, provides an innovative approach to communication networks to solve the above impairments that restrict on-premises intra-terminal device communications. Ex. 1001, 4:36-47; Ex. 2001, ¶ 50. To transmit data signals through existing coaxial cabling and address the shortcomings of the prior art, the ’518 Patent uses variable multi-carrier modulation, where a channel’s modulation scheme (bit loading) is optimized through using probe messages to gather information regarding the channels (signal paths) between network devices (across coaxial splitters). Ex. 1001, 4:36-62; Ex. 2001, ¶¶ 50-51.

## III. THE LEVEL OF ORDINARY SKILL IN THE ART

A POSITA would have at least a bachelor’s degree in electrical engineering, computer engineering, or an equivalent field with at least two years of experience with coaxial cables. Ex. 2001, ¶¶ 37-43. Experience with coaxial networking is central to the patent’s field of work. *Id*. The title, claims, abstract, background, and detailed description all refer to coaxial cable. Ex. 1001, Cover, Abstract, 1:27-29, 4:36-40, 5:14-16, Fig. 3, cl. 1; Ex. 2001, ¶ 38. As referenced in the summary of the invention, the use of terms such as “coaxial cable wiring” in connection with

"splitters" confirms that the summary of the invention section refers to a coaxial network. Ex. 1001, 4:36-47. Claim 1's use of a "splitter with a common port and a plurality of tap ports" also confirms the coaxial network. *Id*., cl. 1.

## IV. GROUND A FAILS TO ESTABLISH THAT *MIRFAKHRAEI* IS ANALOGOUS ART

"A reference qualifies as prior art for an obviousness determination … only when it is analogous to the claimed invention." *In re Klein*, 647 F.3d 1343, 1348 (Fed. Cir. 2011); *see also SCHOTT Gemtron Corp. v. SSW Holding Co., Inc.*, IPR2013-00358, Paper 106, 26 (PTAB Aug. 20, 2014) (explaining that the Petitioner bears the burden to show that the asserted prior art references are analogous art). To be analogous, a reference must be either (1) from the ***same*** field of endeavor as the patent-at-issue, or (2) reasonably pertinent to the ***particular*** problem with which the inventor of the challenged patent is involved. *In re Clay*, 966 F.2d 656, 658-59 (Fed. Cir. 1992). The Petition fails to allege, let alone establish, that *Mirfakhraei* is analogous under either prong.

***First***, the ’518 Patent and *Mirfakhraei* are not from the same field of endeavor. The Petition does not even allege, let alone show, that *Mirfakhraei* is from the same field of endeavor as the ’518 Patent.[4]

The ’518 Patent concerns an on-premises broadband network implemented over existing coaxial cables. *See* Section IV.B.1. *Mirfakhraei*, in contrast, provides an ADSL transceiver over twisted pair telephone wiring, which is an out-of-home facing device that communicates via a point-to-point methodology. Petition, 42; Ex. 1007, [0015], [0019]; *see* Ex. 2001, ¶¶ 61-72; Ex. 2002, 78:6-16. *Mirfakhraei* does not discuss cable broadband networks or existing on-premises coaxial cables, and its bit loading process for multicarrier communication would not work in a coaxial environment which includes signal splitters.

[4] While Mr. Bertonis has a single sentence on this issue (Ex. 1002, ¶ 88), the Petition’s failure to make any argument regarding the field of endeavor cannot be remedied through improper incorporation by reference of Mr. Bertonis’ declaration.

***Second***, *Mirfakhraei* is not pertinent to the problem solved by the ’518 Patent. The Petition makes no argument on this point.[5]

The ’518 Patent identifies and solves impediments that restrict on-premises communications between network devices over existing coaxial cable wiring. Ex. 1001, 4:36-47. For example, existing coaxial systems include splitters, which cause signal attenuation from inter-port isolation when terminal devices communicate over the tap ports. *Id*., 2:27-34. Because *Mirfakhraei* provides a fundamentally different, structurally simple system—which does not include coaxial cables and does not communicate over splitters—*Mirfakhraei* is not pertinent to the problems caused by communicating over coaxial cables or splitters in an on-premises local network like the communication network of the ’518 Patent.

### A. Overview of *Mirfakhraei* and Its Twisted Pair Communication

*Mirfakhraei’s* disclosure relates to a system implemented over conventional twisted pair telephone lines. Ex. 1007, [0014]-[0015]; Ex. 2001, ¶ 52. *Mirfakhraei*

[5] While Mr. Bertonis makes passing argument on this issue in his declaration at paragraph 88, the Petition’s failure to make such an argument cannot be remedied through improper incorporation by reference of Mr. Bertonis’ argument. *See* Ex. 1002, ¶ 88.

explains that DMT protocols were "developed to increase the data transmission rate over conventional telephone lines" with specific references to Asymmetric Subscriber Loops, High bit rate Digital Subscriber Loops, the Very fast asymmetric digital Subscriber Loop, and light rate ADSL. Ex. 1007, [0003]; Ex. 2001, ¶ 66. The transmitter-to-receiver connection of *Mirfakhraei* utilizes a similar discrete multi-tone protocol to increase data rates over these conventional twisted pair telephone lines. Ex. 1007, [0003], [0007]; Ex. 2001, ¶¶ 77-78.

*Mirfakhraei* describes its transceivers as "xDSL transceiver[s]" as implementing the bit loading process described in its invention. Ex. 1007, [0014]; Ex. 2001, ¶ 62. These transceivers "connect to a conventional telephone line via a hybrid circuit." Ex. 1007, [0015]. These types of transceivers are "implemented with dedicated hardware as in conventional xDSL transceivers and modems" which would specifically connect to conventional telephone lines alone. *Id.*; Ex. 2001, ¶ 62. *Mirfakhraei* states that all transmissions from the hybrid circuit are sent via an "analog signal from DAC 140 to telephone lines 152" which are "coupled to hybrid circuit 150." Ex. 1007, [0019]; Ex. 2001, ¶ 62. The diagram of *Mirfakhraei's* conventional xDSL transceiver is exemplified in Figure 1 reproduced below:




Ex. 1007, Fig. 1.

### B. ***Mirfakhraei* and the '518 Patent Do Not Share the Same Field of Endeavor**

The '518 Patent concerns an on-premises broadband network implemented over existing coaxial cables. *Mirfakhraei*, in contrast, provides an out-of-home,

point-to-point system that communicates over conventional telephone lines. *See, e.g.*, Ex. 1007, [0015], [0019]; Ex. 2001, ¶¶ 61, 71-72. *Mirfakhraei* does not discuss broadband networks or existing on-premises coaxial cables, coaxial splitters, or multi-path reflections—all key to the ’518 Patent. The ID ignores that the Petition never makes the showing that *Mirfakhraei* is analogous art, and over-generalizes the field of *Mirfakhraei*, while confirming that the two fields are themselves not the same.

Nowhere does the ID identify any argument by the Petition that *Mirfakhraei* is analogous art. ID at 20-22. Instead, the Board improperly makes its own findings, separate and apart from the arguments in the Petition. *See TQ Delta, LLC v. CISCO Systems, Inc.*, 942 F.3d 1352, 1361-62 (Fed. Cir. 2019).

**1.** <u>The ’518 Patent’s Field of Endeavor is On-premises Local Area Broadband Coaxial Cable Networks</u>

The ’518 Patent’s field of endeavor is on-premises local area broadband coaxial cable networks. Ex. 1001, 1:25-29; Ex. 2001, ¶ 58.

To determine the field of endeavor, the Federal Circuit considers the “background of invention” and “field of the invention.” *See, e.g., Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1381 n.8 (Fed. Cir. 2019) (“[T]he specification of each reference includes a ‘Field of the Invention’ section that distinctly describes each applicable field of endeavor.”). A patent’s title, claim preamble, and function

and structure of the claimed invention may also be considered. *Id.*, 1380-81 (affirming Board's finding of field of endeavor based on "the title of the [] patent and the preamble of a … claim").

The '518 Patent is titled, "Broadband network for coaxial cable using multi-carrier modulation." Ex. 1001, Cover; Ex. 2001, ¶ 59. The abstract is consistent with the title, stating "[a] broadband ***local area data network*** uses ***coaxial cable*** wiring for interconnection of terminal devices." *Id.* The '518 Patent's "technical field" states that this "invention relates to ***broadband communication networks*** and specifically to communications using ***coaxial cable building wiring***." Ex. 1001, 1:27-29; Ex. 2001, ¶ 59. The background focuses on ***local broadband coaxial networks*** and the issues present in such networks. *See generally* Ex. 1001, 1:33-4:33; Ex. 2001, ¶ 59.

The background of the '518 Patent expressly distinguishes on-premises networks with out-of-home systems. *See* Ex. 1001, 4:19-33; Ex. 2001, ¶ 59. This distinction allows on-premise networks to decrease interference from out-of-home networks. The claims of the '518 Patent reflect this field of endeavor, reciting a specific data network over ***coaxial cables***. *See, e.g.,* Ex. 1001, cl. 1; Ex. 2001, ¶ 59.

The Petition appears to agree: "[t]he '518 patent is directed to 'communications using ***coaxial*** cable building wiring.'" Petition, 2 (citing Ex. 1001,

1:28-29); *see* Ex. 1002, ¶ 58 ("[t]he '518 patent acknowledges that '[] a coaxial cable based local area network (LAN).'") (citing Ex. 1001, 1:33-35). It is clear that the field of endeavor of the '518 Patent is specific to "broadband local area network that uses ***coaxial*** cable wiring for interconnecting terminal devices." ID, 4; *see also* Ex. 1001, 1:27-29; Ex. 2001, ¶¶ 59-61.

**2.** *Mirfakhraei's* Field of Endeavor Is DSL Connections Over Twisted Pair, Not On-premises Local Area Broadband Coaxial Cable Networks

*Mirfakhraei* consistently reiterates that its system is specific to twisted pair telephone lines—a communication medium inapplicable to the '518 Patent's field of endeavor. Ex. 1007, [0002]-[0006]; Ex. 2001, ¶ 61. *Mirfakhraei* is solely described with regard to DMT and conventional telephone lines, and does not ever refer to other communication mediums. Ex. 1007, [0002]-[0006].

*Mirfakhraei* states that the DMT protocols were "developed to increase the data transmission rate over conventional telephone lines." Ex. 1007, [0003]; Ex. 2001, ¶ 66. Other aspects of *Mirfakhraei* confirm its teachings are applicable to twisted pair telephone wires. Ex. 1007, [0019], [0021] (noting that the communication signals are transmitted over telephone wires); Ex. 2001, ¶ 62. The detailed description of the preferred embodiments further describe communication using ADSL transceivers which connect to conventional telephone wires: twisted

pair wiring. Ex. 1007, [0015]; Ex. 2001, ¶ 61. These disclosures in turn define *Mirfakhraei's* teachings and confirm it is directed towards communications over telephone lines. Ex. 2001, ¶ 61.

The field of the '518 Patent and the WAN-based twisted pair field of *Mirfakhraei* are different, having different physical mediums, which results in different properties relevant to signal transmission. Ex. 2001, ¶¶ 63-64; Ex. 2004. As an unshielded medium, twisted pair transmits low frequencies and filters out high frequencies. Ex. 2001, ¶¶ 65-68; Ex. 2004. This results in low bandwidth capabilities; therefore, twisted pair is often implemented on simple, point-to-point networks. Ex. 2001, ¶ 65. In contrast, coaxial cables are shielded. Ex. 2001, ¶ 64; Ex. 2004. Because of this shielding, coaxial cables can support large and high-frequency bandwidths. *Id*. Thus, coaxial cables are used as a shared medium for complex mesh networks.

In addition to bandwidth differences, coaxial cable and twisted pair have dramatically different frequencies and therefore wavelengths. Ex. 2001, ¶ 69; Ex. 2003, 82. The difference in wavelength is physically significant as transmission-line effects, such as reflections, cause the frequency response of coaxial cable to be much more chaotic than telephone lines. Ex. 2001, ¶ 70; Ex. 2003, 67. Signals transmitted at high frequencies over twisted pair results in higher losses and drops

in signal strength while signals transmitted over coaxial cables at high frequencies are known to be chaotic, with sharp increases in attenuation at specific frequencies. Ex. 2001, ¶ 70. Further, these transmission-line effects appear over much shorter cable lengths, such as those found inside homes, than telephone lines. *Id*. Inside a home, propagation over telephone lines is lumped, not distributed, and transmission-line effects such as reflections disappear. *Id*.

#### 3. The Petition, and ID, Do Not Show that *Mirfakhraei* is of the Same Field of Endeavor as the '518 Patent.

The Petition does not allege, let alone analyze, whether *Mirfakhraei* is of the same field of endeavor as the '518 Patent. The ID erroneously states that *Mirfakhraei* is directed to "multicarrier communications generally," which is an improper simplification of *Mirfakhraei*. ID, 21. Contrary to the ID's statement, *Mirfakhraei* is entirely directed to conventional telephone line (twisted pair) communications. Ex. 1007, [0002]-[0006], [0014]-[0015]; Ex. 2001, ¶ 61.

The ID's conclusion brushes aside the discussion of conventional telephone lines in the "Detailed Description of the Preferred Embodiments" and "Description of the Related Art" sections in favor of the generic boilerplate language in the specification that "the specification should not be limiting" when defining the field of endeavor of *Mirfakhraei*. ID, 21. This conclusion is legally erroneous. *Fromson*

*v. Anitec Printing Plates*, 132 F.3d 1437, 1447 (Fed. Cir. 1997) (rejecting boilerplate statements from a prior art reference as being insufficiently specific).

The Petition seems to agree that *Mirfakhraei* is limited to "communications over a conventional telephone line," by suggesting its teachings could be applied to other fields such as coaxial cable, thereby confirming that its teachings are not already of those other fields. Petition, 42.[6]

The Petition does not undertake any analysis of *Mirfakhraei's* field of endeavor, let alone compare it to that of the '518 Patent. Mr. Bertonis' declaration simply concludes, without analysis, that *Mirfakhraei* is "analogous to the '518 patent." *See* Ex. 1002, ¶ 88. Mr. Bertonis makes no mention of "broadband," "coaxial cable," "splitter," or "local area" networks, which are the overwhelming focus of the '518 Patent's disclosures and claims. Mr. Bertonis instead broadly characterizes *Mirfakhraei*, without analysis, as in the field of endeavor of "network

[6] Patent Owner notes that Petitioner specifically states that the "DMT bit-loading scheme" of *Mirfakhraei* "***could*** be implemented over a variety of mediums, including coaxial cable." Petition, 41. Such admission to this lack of disclosure in *Mirfakhraei* itself clearly highlights that even the Petitioner recognizes *Mirfakhraei* is limited to telephone line communications.

communication." Ex. 1002, ¶ 88. This type of characterization is unreasonably broad. *See Wang Labs., Inc. v. Toshiba Corp.*, 993 F.2d 858, 864-65 (Fed. Cir. 1993).

The Federal Circuit rejects the type of generic characterization that Mr. Bertonis advances. For example, the Federal Circuit found that semiconductor "memory" was too broad of a field. *Wang Labs.*, 993 F.2d at 864-65. The court explained in *Wang* that the references were not in the same field of endeavor "merely because it relates to memories." *Id*. The court found that the type of memory, swappable versus fixed size memory banks, and the size of the memory banks needed to be accounted for when deciding the field of endeavor. *Id.* For the same reason, "wired communication networks" and "network communication" without regard to the type, the medium, and the location of the network (e.g., WAN vs. LAN), is too broad of a field of endeavor. *Id.*; *see also Amazon.com Inc. et al v. ZitoVault,* IPR2016-00021, Paper 8, 33 (PTAB Apr. 15, 2016) (recognizing that the Petitioner's characterization of the field of endeavor as "encrypted, distributed network communication" was unduly broad).

The ID was incorrect in concluding that *Mirfakhraei* and the '518 Patent share the same field of endeavor. ID, 20-21. The ID incorrectly uses aspects of *Mirfakhraei's* boiler-plate prosecution language to support its conclusion of

analogous art. *Id.*, 21. Specifically, the ID notes that the claims of *Mirfakhraei* are not limited to "modems or receivers using telephone lines as the communication medium." *Id.* The ID supplements this assertion by citing *Mirfakhraei's* statement that "the description is only an example of the invention's application[.]" *Id.* This is erroneous.

Claim 1 of *Mirfakhraei* recites that it is "[a] process for determining bit loadings … of a ***communication signal***." Ex. 1007, cl. 1. The ID contends that the claims of *Mirfakhraei* are not limited to just telephone communications, yet the specification of *Mirfakhraei* specifically defines how the "communication signal" is transferred to the rest of the system in *Mirfakhraei*. Ex. 1007, [0021] ("Hybrid circuit 150 directs a received analog communication signal from ***telephone lines*** 152 to receiver 190."). A POSITA at the time of the invention would understand that *Mirfakhraei* discloses DMT modulation schemes for its communication, a scheme specific to the "communication signals" *Mirfakhraei* sends over conventional telephone wires. Ex. 2001, ¶ 62.

Just as the Federal Circuit found that material differences in size and type of memory prevented two references from being in the same generic field of endeavor as "memory," so too do the material differences between local networking over coaxial cable and wide-area networking over twisted pair prevent the '518 Patent

and *Mirfakhraei* from sharing the same field of endeavor. *Mirfakhraei* is not analogous art under this prong.

### C. ***Mirfakhraei* is Not Reasonably Pertinent to the Problems that the ’518 Patent Addresses**

Neither the Petition nor Petitioner’s declarant even attempt to establish that *Mirfakhraei* is reasonably pertinent to the problem that the ’518 Patent solves. Therefore, this cannot be the prong used to establish *Mirfakhraei* is analogous to the ’518 Patent.

In any event, *Mirfakhraei* is not reasonably pertinent to the problem solved by the ’518 Patent. The ’518 Patent solves impairments ***specific to*** on-premises communications between network devices over existing coaxial cable wiring. Ex. 1001, 4:36-47; Ex. 2001, ¶ 73. *Mirfakhraei* cannot be reasonably pertinent to this problem because *Mirfakhraei* does not include coaxial cables or communicate over splitters, let alone propose solutions to the impediments that splitters cause in a coaxial network. Ex. 2001, ¶ 79.

Instead, *Mirfakhraei’s* system addresses synchronization for “point-to-point” communication within a twisted pair system—a system without these splitters or the micro-reflections they cause. Ex. 2001, ¶¶ 73, 79; Ex. 2002, 78:6-16.

**1.** The ’518 Patent Addresses Issues Specific to Its On-premises Local Area Broadband Coaxial Cable Network

The background of the ’518 Patent lays out a specific problem and solution. The inventors of the ’518 Patent did not merely set out to solve “signal impairment” generally, but rather address specific impairments that previously restricted high bandwidth communication between devices over ***on-premises coaxial cabling***. Ex. 1001, Abstract, 4:19-33; Ex. 2001, ¶ 74. These impediments include (1) inter-port isolation from communicating across ***splitters***, (2) variable signal attenuation caused by ***different channel paths***, and (3) imperfect connection points at ***splitters***, which cause micro reflections. Ex. 1001, 2:27-34, 2:41-48, 3:5-16, 4:23-25; Ex. 2001, ¶ 75.

Such impairments are the result of using a preexisting coaxial network and are not present in every type of wired network. Ex. 2001, ¶ 75. For example, coaxial networks include splitters to distribute signals downstream; twisted pair networks do not use splitters in this fashion. Ex. 1001, 2:27-34; Ex. 2001, ¶ 76. In these coaxial networks, splitter ports are isolated and include imperfect connections, leading to the inter-port isolation and reflections that would not be found in network types that do not use splitters. Ex. 1001, 2:27-34, 3:5-16; Ex. 2001, ¶ 76. Further, signal paths vary between devices in a coaxial network based on the branch topology, causing variable signal attenuation. Ex. 1001, 2:35-48; Ex. 2001, ¶ 76.

These issues are specific to coaxial cable installations. Ex. 2001, ¶ 76. The '518 Patent provides a novel solution that overcomes these issues that previously restricted network devices from communicating with each other. Ex. 2001, ¶ 76; Ex. 1001, 4:36-47.

When asked about the different signal attenuation characteristics at issue that would be specific to coaxial cables, Mr. Bertonis stated that these attenuation characteristics are equally applicable to any medium. Ex. 2002, 120:18-21. However, he did confirm that intersymbol interference ("ISI") is, in his mind, specific to reflections caused at insertion points in the coaxial mediums created by amplifiers and splitters. *Id.*, 118:21-119:10. As such, Petitioner's expert confirms that the ISI solution of the '518 Patent is a problem and solution specific to the use of splitters in the coaxial LAN environment.

**2.** *Mirfakhraei* Addresses Different Attenuation Characteristics That Are Not Analogous to the Problems Identified in the '518 Patent

The signal impairments mentioned in the '518 Patent are characteristics that are ***specific*** to addressing noise across splitters within a coaxial LAN home network. *See* Section IV.C.1. In contrast, the attenuation characteristics mentioned in *Mirfakhraei* are tied to attenuation characteristics of cables with increased length, as *Mirfakhraei's* out-of-home focus confirms. Ex. 2001, ¶ 79. A POSITA would

recognize that the signal impairments are fundamentally different between the ’518 Patent and *Mirfakhraei*. *Id*.

*Mirfakhraei* is directed to an entirely different problem than that of the ’518 Patent. *Mirfakhraei* explains that bit loading techniques affect the total bandwidth and rate for the connection of the system by estimating the signal attenuation for each sub-channel. Ex. 1007, [0006]; Ex. 2001, ¶ 77. These attenuations are caused by frequency dependent issues that “distort communication signals having large bandwidths.” Ex. 1007, [0002]; Ex. 2001, ¶ 77. To combat these frequency dependent attenuation distortions, DMT protocols were developed to allow each signal to be transmitted over narrow bandwidths to reduce any distortion that may arise. Ex. 1007, [0003]; Ex. 2001, ¶ 78. These DMT protocols allows “the local modem [to] estimate the capacity or the target loading of each sub-channel.” Ex. 1007, [0006]. *Mirfakhraei’s* invention relates to “a process for determining a bit loading for a discrete multi-tone (DMT) communication signal.” Ex. 1007, [0005]; Ex. 2001, ¶ 78; *see* Petition, 11 (“Mirfakhraei describes modems that use discrete multi-tone (DMT) and bit loading to increase data transmission rates.”) (citing Ex. 1007, ¶¶ 2-3; Ex. 1002, ¶¶ 88-89).

### 3. *Mirfakhraei* is Not Pertinent to the ’518 Patent’s Problems

The ID erroneously concludes that the “variable attenuation across channel paths is a problem addressed by *Mirfakhraei* and the ’518 patent.” ID, 22. This is not the inquiry. The ’518 Patent specifically sets forth a solution unique to the coaxial environment. The ID impermissibly broadens the problem of the ’518 Patent beyond its actual text in an effort to find *Mirfakhraei* analogous.

Instead, the signal attenuation scheme identified by *Mirfakhraei* is not the same variable attenuation as the coaxial-specific solution outlined in the ’518 Patent. Ex. 2001, ¶ 79. *Mirfakhraei* was troubled with the distortion caused by the allocation of large bandwidths to communication signals. Ex. 1007, [0002]; Ex. 2001, ¶ 77. Such large bandwidths were prone to distortion and created a funnel preventing optimal data rates from being achieved over ***long distances***. Ex. 1007, [0002]; Ex. 2001, ¶ 79. These distortions over long-distance communications are a reason DSL is used as it provides a “more pronounced [] benefit” to the long-distance transmissions. Ex. 2002, 79:22-80:17.

The ’518 Patent, in contrast, is focused on solving issues related to attenuation across ***splitters*** and channel paths based on branched topologies. Ex. 1001, 2:27-34, 2:41-48, 3:5-16, 4:23-25; Ex. 2001, ¶¶ 74-76. *Mirfakhraei* communicates over a single point-to-point communication system that does not use branched topology,

nor does *Mirfakhraei* utilize splitters. Ex. 2001, ¶¶ 71-72, 79; Ex. 2002, 78:6-16. *Mirfakhraei* does not suffer from inter-port isolation or imperfect connections at splitters due to *Mirfakhraei's* system lacking these components. Ex. 2001, ¶ 79. Thus, *Mirfakhraei* does not utilize the same communication system as the '518 Patent and does not suffer from the same variable attenuation as addressed by the '518 Patent. Ex. 2001, ¶ 79.

Therefore, the problem and solution of overcoming signal impairments identified in the '518 Patent is not reasonably pertinent to the problem and solution of overcoming signal impairments in *Mirfakhraei* as they deal with fundamentally different problems. Ex. 2001, ¶ 79. Because *Mirfakhraei* is not analogous art to the '518 Patent, Ground A fails.

## V. THE INSTITUTION DECISION ERRED IN FINDING THAT GROUND A RENDERS THE CHALLENGED CLAIMS OBVIOUS

The ID preliminary found that Ground A had a reasonable likelihood of success. However, this decision was made on an incomplete technical record. Mr. Garrett's declaration and technical analysis shows that a person of skill would lack both a motivation to combine *Afshary* and *Mirfakhraei* and a reasonable expectation of success from the combination of *Afshary* and *Mirfakhraei*. Ex. 2001, ¶¶ 80-133. Mr. Garrett's declaration and technical analysis will further show that the Petition's

## VII. GROUND B: CLAIM 2 IS NOT OBVIOUS OVER GROUND A IN VIEW OF *WELLES*

Ground B's additional reference, *Welles*, fails to alter the above deficiencies with regards to the combination of Ground A. *Welles* is only relied upon by the Petition for dependent claim 2 and is not relied upon for the deficient analysis outlined above. As a result, Ground B similarly fails.

## VIII. CONCLUSION

Patent Owner's new technical evidence establishes that both grounds of the Petition fail. *Mirfakhraei* is not analogous art to the '518 Patent and therefore cannot serve as the basis for obviousness. Because *Mirfakhraei* is relied on for the sole challenge to Claim 1, this issue is dispositive.

Moreover, a POSITA would not have been motivated to combine *Afshary* and *Mirfakhraei* because they use fundamentally different architectures (local with splitters vs. wide area networks without splitters), mediums (coaxial vs. twisted pair), frequency ranges (higher vs. lower), and design goals (low-cost simplicity vs. costly complexity). Patent Owner's arguments are supported by credible technical evidence grounded in the disclosures of the references themselves. Petitioner's technical evidence, by contrast, ignores the disclosures and the technical problems that the proposed combination would create, exposing the hindsight that infects the Petition.

As a result, the Petition fails to establish any claim is unpatentable.

Dated: December 18, 2024

Respectfully submitted,

By: /Jason A. Engel/
Jason A. Engel
Reg. No. 51,654
K&L Gates LLP

*Counsel for Patent Owner*

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

COMCAST CABLE COMMUNICATIONS, LLC,
Petitioner,

v.

ENTROPIC COMMUNICATIONS, LLC,
Patent Owner.

Case IPR2024-00431
Patent 7,295,518 B1

**PETITIONER'S REPLY TO PATENT OWNER'S RESPONSE UNDER 37 C.F.R. § 42.23**

PO also alleges various technical difficulties in combining Afshary and Mirfakhraei, such as circuitry level modification of an ASIC and details in data package encapsulations. However, these are routine engineering tasks well within the skillset of a POSITA—details omitted from the ’518 patent itself.

A POSITA familiar with Afshary would consult Mirfakhraei and readily adopt modifications to Afshary to arrive at the claimed invention of ’518 patent, by replacing the single-carrier modulation in Afshary with bit-loaded multi-carrier modulation in accordance with the teachings of Mirfakhraei. This would improve signal transmission efficiency in face of known transmission impairments—a motivation that is apparent in both Afshary and Mirfakhraei.

## II. MIRFAKHRAEI IS ANALOGOUS ART

Mirfakhraei is analogous art because it is both in the field of endeavor of the ’518 patent and pertinent to the problem addressed. *See In re Clay,* 966 F.2d 656, 658-59 (Fed. Cir. 1992) (only one of the two prongs need be met). Whether prior art is analogous is simply another way of asking “whether the art is ‘too remote to be treated as prior art.’” *Id.* at 658 (quoting *In re Sovish,* 769 F.2d 738, 741 (Fed. Cir. 1985)). *See also, Corephotonics, Ltd. v. Apple Inc.*, 84 F.4th 990, 1004 (Fed. Cir. 2023); *Netflix, Inc. v. DivX, LLC*, 80 F.4th 1352, 1359 (Fed. Cir. 2023). Mirfakhraei is not at all remote from the ’518 patent.

### A. Mirfakhraei Is Within the Field of Endeavor of the ’518 Patent

PO surmises a false dichotomy between the ’518 patent’s “on-premises local area broadband coaxial cable networks” and Mirfakhraei’s “DSL connections over twisted pair.” POR 16-18. However, as the ID found, even accepting PO’s characterization of the ’518 patent, Mirfakhraei shares a field of endeavor because it is not limited to “using telephone lines as the communication medium.” *See* ID 20-21.

Mr. Bertonis explained that Mirfakhraei is in the field of network communication and is therefore analogous art. Ex. 1002, ¶88; Ex. 1036, ¶2. PO’s challenge on the point is meritless. *See Corephotonics,* 84 F.4th at 1009-1010.

#### 1. PO’s narrow characterization of the field of endeavor is flawed

A patent’s title, background, field of invention, and the claims of the subject patent can all provide evidence of the patent’s relevant field. *Airbus S.A.S. v. Firepass Corp.*, 941 F.3d 1374, 1380-81, n.8 (Fed. Cir. 2019); *see also*, *In re Bigio*, 381 F.3d 1320, 1326 (Fed. Cir. 2004). “The field … is not limited to the specific point of novelty, the narrowest possible conception of the field, or the particular focus within a given field.” *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 995, 1001 (Fed. Cir. 2016); *see also, Netflix* 80 F.4th at 1359.

Mr. Bertonis’s characterization of the relevant field of endeavor as “network communications” complies with *Airbus*’s holistic approach. Ex. 1036, ¶3. The ’518

skill to modify Afshary's RF & Mixed Signal section 100 to up-convert a signal to virtually any carrier frequency and therefore frequency range. Ex. 1036, ¶¶60-61.

## IV. MR. BERTONIS IS WELL QUALIFIED TO OPINE FROM THE PERSPECTIVE OF A POSITA

### A. PO's Proposed Skill Level is Not Supported

PO's proposed skill level requires "at least two years of experience with coaxial cables," (POR 10) although the type of experience, or why it is necessary, is unclear. In short, PO provides no sound basis for rejecting Petitioner's level of skill. In any event, Mr. Bertonis's stated opinions would be the same under either level of skill. Ex. 1036, ¶62.

### B. Mr. Bertonis is Well Qualified to Testify From the Perspective of a POSITA Under Either Skill Level

Mr. Bertonis's industry experience with coaxial cable and with multicarrier modulation is extensive. Ex. 1036, ¶¶62-63. His work on coaxial cable began in 1976 at Blonder-Tongue Laboratories, which includes "[c]able modulators," "traditional cable box[es]" and even "headend equipment that would go in the rack at the cable headend." Ex. 1002, A-3; Ex. 2002, 81:9-85:8; Ex. 1036, ¶62. PO characterizes Mr. Bertonis's expertise as being limited to wireless technology (POR 48-49), but ignores that he began to study the cable DOCSIS standard in 1999, that he "followed the development of DOCSIS fairly heavily … [b]ecause it was important for how our product operated to be compliant with the DOCSIS standard," and that the

## V. CONCLUSION

For the reasons set forth above and in the Petition, all claims of the ’518 patent are unpatentable for obviousness and should be canceled.

Respectfully submitted

Dated: March 12, 2025

By: /Frederic M. Meeker/

Frederic M. Meeker
Reg. No. 35,282
Banner & Witcoff, Ltd.
1100 13th Street, NW
Suite 1200
Washington, DC 20005
(202) 824-3000
fmeeker@bannerwitcoff.com

**UNITED STATES PATENT AND TRADEMARK OFFICE**

---

**BEFORE THE PATENT TRIAL AND APPEAL BOARD**

---

COMCAST CABLE COMMUNICATIONS, LLC,
Petitioner,

v.

ENTROPIC COMMUNICATIONS, LLC,
Patent Owner.

---

CASE: IPR2024-00431
U.S. PATENT NO. 7,295,518

---

**PATENT OWNER SUR-REPLY**

The ’518 Patent also provides a detailed explanation of its probe messages, even specifying the number of symbols present in the bit loading training sequence. Ex. 1001, 10:6-9 (“The bit loading training sequence 730 is 80 symbols transmitted in the frequency domain using BPSK modulation and is used to compute the actual bit loading needed for data traffic.”); *see id.*, 9:59-10:20. While Petitioner improperly uses the disclosure of the ’518 Patent as a roadmap, the ’518 Patent details the structure and implementation of the probe messages, going far beyond any disclosure in either *Afshary* or *Mirfakhraei*. Thus, Petitioner’s reliance on the ’518 Patent to show that “a POSITA would know how to implement probing messages” should be given no weight as impermissible hindsight reconstruction.

## III. LEVEL OF ORDINARY SKILL IN THE ART

Petitioner ignores the disclosure of the ’518 Patent when arguing that it is “unclear” why a POSITA would need coaxial cable experience. Reply, 27 (“[T]he type of experience, or why it is necessary, is unclear.”); *see* POR, 10-11. This experience is necessary because the claims require coaxial cables and the ’518 Patent is entirely directed to coaxial cables. The title, abstract, background, technical field, and detailed description all refer to coaxial cable as central to the field of work. POR, 11; Ex. 2001, ¶¶ 37-43. Moreover, the claims themselves are not only limited to coaxial cable, but further limited to communication ***between*** network devices across tap ports of a coaxial splitter. Ex. 1001, Cl. 1 (reciting cable wiring that

include "a plurality of segments of coaxial cable connecting between the splitter tap ports and the network devices" and requiring "network devices [to] communicate with each other through the cable wiring using multi-carrier signaling"). This evidence shows the need for experience with coaxial cabling.

But Petitioner does not address this evidence. Petitioner simply concludes that "PO provides no sound basis for rejecting Petitioner's level of skill." Reply, 25. Not so. PO's level of ordinary skill is rooted in the '518 Patent. In contrast, Petitioner does not provide a "sounds basis" for its own position that the level of ordinary skill does not require coaxial experience despite all evidence to the contrary. Reply, 25. Moreover, Mr. Bertonis' position contradicts Petitioner's argument that coaxial experience is not necessary. Namely, Mr. Bertonis explained that two years of experience with coaxial experience is not explicitly required because his definition of the level of skill in the art already includes experience with coaxial cables. *See* Ex. 2006, 12:9-11, 15:15-19. Both experts agree with PO that the level of ordinary skill in the art must include experience with coaxial cables.

Based on Petitioner's failure to substantively respond to the disclosure of the '518 Patent or explain why coaxial cable experience is ***not*** required, especially when its own expert applied a level of skill that included coaxial experience, the Board should adopt PO's level of skill, requiring coaxial experience. And under PO's level of skill, Petitioner's motivation to combine is even weaker. A POSITA, with coaxial

experience, would recognize the differences between coaxial cabling and twisted pair and the issues with communicating across tap ports of coaxial splitters. *See* Ex. 2001, ¶¶ 64-72.

## IV. ANALOGOUS ART

The Reply fails to save *Mirfakhraei*; it is neither "reasonably pertinent" to the problem of the '518 Patent nor of the same "field of endeavor." *In re Clay*, 966 F.2d 656, 658-59 (Fed. Cir. 1992). Both Grounds fail because both rely on *Mirfakhraei*, and *Mirfakhraei* is not analogous art. *See* Petition, 17.

### A. *Mirfakhraei* is Not Reasonably Pertinent to the Problems that the '518 Patent Addresses

The '518 Patent solves impairments specific to on-premises communications between network devices ***over existing coaxial cable wiring***. POR, 24-26. The Reply continues to ignore the coaxial context, including the claim language, which is directed towards communication between network devices through tap ports of a splitter. Ex. 1001, Cl. 1; Ex. 2001, ¶ 47 (showing the communication between network devices via two tap ports of a coaxial signal splitter). Moreover, Petitioner applies the wrong framework under the "reasonably pertinent" prong. Petitioner cannot establish that *Mirfakhraei* and the '518 Patent are analogous under this prong by pointing to a solution rather than the ***problem*** addressed by the '518 Patent. For these reasons, the Reply fails to establish that *Mirfakhraei* is reasonably pertinent to

the problem of addressing impairments specific to on-premises communications between network devices over existing coaxial cable wiring.

**1.** Petitioner Ignores the Problems of the ’518 Patent and Improperly Considers the Solution

The ’518 Patent itself explains that it addresses “impairments present ***in the home wiring*** that restricts high bandwidth communication.” Ex. 1001, 4:28-33; *Google LLC, et al. v. CyWee Group Ltd.*, IPR2018-01257, Paper 87, 56 (PTAB Jan. 9, 2020) (relying on the specification under the “reasonably pertinent” prong). Moreover, the claims are specifically directed towards communication between network devices through tap ports of a splitter. Ex. 1001, Cl. 1; Ex. 2001, ¶ 47 (showing the communication between network devices via two tap ports of a coaxial signal splitter). The ’518 Patent requires communication across two tap ports of the same coaxial splitter; the ’518 Patent is directed towards on-premise networking. *Id*.

Petitioner’s alleged problem of “variable attenuation across channel others” is improperly broad and ignores the ’518 Patent’s consistent disclosure. Reply, 10; Ex. 1001, 1:27-29. The signal impairments described in the ’518 Patent result from using existing on-premises coaxial networks, and the ’518 Patent provides a solution to these issues while claiming coaxial cables. POR, 16-17. Moreover, the ’518 Patent specifically distinguished its problem and proposed a solution from references like *Mirfakhraei*. The ’518 Patent explains that solutions existed to address issues

in cable head end communications. Ex. 1001, 4:28-33. But these references did ***not*** address "impairments present in the home wiring," which the '518 Patent solves. *Id*.

**2.** Petitioner Only Now Addresses the "Reasonably Pertinent" Prong While Applying the Wrong Framework

PO previously identified the Petition's failure to provide any argument that *Mirfakhraei* is reasonably pertinent to the problem that the '518 Patent solves. POR, 24. Now, only after the PO identified this shortcoming, Petitioner adds new arguments and cites to Mr. Bertonis' new declaration. *See* Reply, 99 (citing Ex. 1036, ¶¶ 23-24). Petitioner was required to present this theory, and the evidence supporting it, in the Petition. 37 C.F.R. § 42.23(b); *Intelligent Bio-Systems, Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1369 (Fed. Cir. 2016) ("[T]he initial petition [must] identify 'with particularity' the 'evidence that supports the grounds for the challenge.'"). Having failed to do so, Petitioner cannot now try to backtrack and explain how *Mirfakhraei* is analogous when it should have been included in the Petition—to give the PO and Mr. Garrett a full opportunity to respond.

But even if considered, Petitioner applies the wrong framework. To avoid addressing the problems that are reasonably pertinent to the '518 Patent, Petitioner improperly argues that the ***solutions*** of *Mirfakhraei* and the '518 Patent are the same. *See* Reply, 9 (arguing that multi-carrier modulation is agnostic to the cause of the impairments and *Mirfakhraei* "teaches the same solution—bit-loaded multi-carrier

modulation"). Petitioner identifies the problem as "deal[ing] with encountered transmission impairments, ***whatever their cause***." Reply, 10. This statement highlights the issue. The cause (*i.e.*, impairments from communicating across splitters in a coaxial environment) ***is*** the problem that the '518 Patent addresses.

Unlike the claimed coaxial network of the '518 Patent, *Mirfakhraei* provides a single point-to-point communication system that does not use a branched topology and does not use splitters. Ex. 2001, ¶¶ 71-72, 79; Ex. 2002, 78:6-16. *Mirfakhraei* does not suffer from inter-port isolation or imperfect connections at splitters because its system does not include these components. Ex. 2001, ¶ 79. *Mirfakhraei* does not utilize the same network as the '518 Patent and does not suffer from the same variable attenuation as addressed by the '518 Patent. Ex. 2001, ¶ 79. *Mirfakhraei* cannot be reasonably pertinent to solving an issue that does not affect its network.

Finally, Petitioner alleges that PO attempts to exclude *Mirfakhraei* under both prongs for "essentially the same reason: that that Mirfakhraei is allegedly focused on a twisted-pair telephone line rather than coaxial cable network." Reply, 10. To the contrary, the difference in medium is just one of many differences that prove that *Mirfakhraei's* "twisted-pair, no-splitter, non-local" system is not reasonably pertinent to the problems that the '518 Patent addresses—impairments in the home wiring caused by communicating across splitters in a coaxial network. *Donner Tech. v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1360 (Fed. Cir. 2020).

The problem and solution of overcoming signal impairments in the ’518 Patent is not reasonably pertinent to the problem and solution of overcoming signal impairments in *Mirfakhraei* as they deal with fundamentally different problems.

### B. *Mirfakhraei* and the ’518 Patent Do Not Share the Same Field of Endeavor

For two reasons, Petitioner incorrectly concludes that *Mirfakhraei* and the ’518 Patent share the same field of endeavor. First, the ’518 Patent’s field of endeavor is specific to coaxial cables. This conclusion does not restrict the ’518 Patent’s disclosure to its patentable distinction but instead accurately reflects the disclosure. Petitioner ignores this disclosure of the ’518 Patent to broadly conclude that its field of endeavor is “network communication.” *See* Reply, 3.

Second, *Mirfakhraei* is directed to twisted pair communications, not coaxial cables like the claims of the ’518 Patent. Petitioner’s use of boilerplate statements does not outweigh *Mirfakhraei’s* disclosure. Furthermore, even if *Mirfakhraei* is not limited to twisted pair, Petitioner fails to establish that *Mirfakhraei* is the same field of endeavor of the ’518 Patent because Petitioner does not (and cannot) establish that *Mirfakhraei* is in the field of endeavor of coaxial cables.

#### 1. PO Does Not Improperly Narrow the Field of Endeavor of the ’518 Patent

Petitioner’s argument that PO is “attempting to narrow the field of endeavor” should be ignored. Reply, 1. Instead, when properly considering the complete

disclosure of the ’518 Patent, the field of endeavor of the ’518 Patent is not so broad as to encompass all “network communications” as Petitioner contends. Reply, 3. The field of endeavor of the ’518 Patent is rather specific to on-premises local area broadband ***coaxial cable networks*** and even more specific to communication between network devices over the tap-ports of a coaxial splitter.

Every aspect of the ’518 Patent’s disclosure supports this conclusion. POR, 16-18 (detailing how the title, abstract, technical field, background, and claims support coaxial cables as the field of endeavor). Namely, the ’518 Patent explicitly defines the technical field as “broadband communication networks and specifically to communications using coaxial cable building wiring.” Ex. 1001, Cl. 1, 1:26-29. Further, claim 1 recites “a plurality of segments of ***coaxial cable*** connecting between the splitter tap ports and the network devices.” *Id.*, Cl. 1. Petitioner does not respond to this evidence or explain why the ’518 Patent is not specific to coaxial cabling.

While Mr. Bertonis acknowledged the overwhelming amount of evidence limiting the ’518 Patent to coaxial cabling, his analysis of *Mirfakhraei* demonstrates his results-oriented approach. *See* Ex. 2006, 13:16-14:8 (considering the title), 14:12-21 (considering the claims, which are specific to coaxial cable), 15:12-14 (considering the abstract). Mr. Bertonis relies on the broad title, field of invention, and claims of *Mirfakhraei* to argue that *Mirfakhraei* is not limited to twisted pair. *See* Ex. 1036, ¶ 17; Ex. 2006, 17:10-12, 18:18-24, 20:14-23. Moreover, Mr. Bertonis

agreed that, if *Mirfakhraei* did specify twisted pair, he would have considered that in his opinion. *See, e.g., id.* at 20:24-21:1 ("If [the claims] were limited to twisted pair, would you consider that in your analysis? Sure, I would consider it."); 21:10-21 (same for *Mirfakhraei's* field of the invention).

But when presented with the same considerations in the '518 Patent—all of which specifically identify coaxial cables—Mr. Bertonis changes his approach and argues that the '518 Patent is not limited to coaxial cables. This directly contradicts his approach in *Mirfakhraei* where he uses *Mirfakhraei's* failure to specify twisted pair in its title, field of invention, or claims, to support his opinion that *Mirfakhraei's* field of endeavor should not be limited to twisted pair networks.

Petitioner applies this flawed analysis to conclude that the '518 Patent's field of endeavor "includes, but is not limited to, 'communications using coaxial building wiring.'" Reply, 3-4 (citing Ex. 1001, 1:26-28). Petitioner only supports this position by selectively citing claim 1 while ignoring the limitation of the "coaxial cable connecting between the splitter tap ports and the network devices." Ex. 1001, Cl. 1. Petitioner also fails to address the '518 Patent's title: "Broadband Network for ***Coaxial Cable*** Using Multi-Carrier Modulation." Ex. 1001, Cover. It cannot be said that Petitioner's approach in ignoring the title and claims (along with other instances of coaxial-specific disclosure) "complies with *Airbur*'s holistic approach."

Reply, 3-4. The field of endeavor of the ’518 Patent is wired networking systems ***using coaxial cables*** and the splitters and their tap ports. POR, 16-18.

Petitioner mischaracterizes this conclusion and alleges that PO is “restrict[ing] the field of endeavor” to the patentable distinction of “transmitting and analyzing probe messaging for adaptive bit loading.” Reply, 6. Petitioner takes a sentence out of context from PO’s ***introduction*** explaining how ***Afshary*** “lacks critical attributes of the Challenged Claims, including transmitting and analyzing probe messaging for adaptive bit loading.” POR, 3. Contrary to Petitioner’s argument, PO never limited the ’518 Patent’s field of endeavor to the use of probe messages for adaptive bit-loading. As explained in the POR and Section IV.B.1, the field of endeavor of the ’518 Patent is wired networking systems using coaxial cables and the splitters and their tap ports. POR, 16-18.

**2.** Petitioner’s Attempt to Broaden the ’518 Patent’s Field of Endeavor Should be Ignored

Petitioner’s attempt to broaden the ’518 Patent’s field of endeavor should be ignored because it conflates the two prongs of the analogous art test. Specifically, Petitioner argues that “a POSITA looking to solve the problem facing the ’518 patent inventors” would look to *Mirfakhraei*. Reply, 5; Ex. 1036, ¶ 5; Ex. 2006, 52:7-17 (considering the problem that the ’518 Patent addressed in the field of endeavor prong). As relevant to the “reasonably pertinent” prong, PO details how Petitioner’s

argument is wrong. *See* Section IV.A. Moreover, Petitioner's use of the '518 Patent's citations to references that use bit-loading in its specification does not "support a broad field of endeavor." Reply, 5, 6. This instead shows Petitioner's hindsight reconstruction by using the disclosure of the '518 Patent to arrive at the Challenged Claims, a common theme throughout the Reply.

Petitioner uses the '518 Patent's citations to non-coaxial references to conclude that the '518 Patent can apply to different mediums (like twisted pair), despite the plain limitations in the claims themselves. *See* Reply, 5. The '518 Patent cites dozens of references in its specification, explains the shortcomings, and claims an inventive system to solve existing issues on on-premises coaxial networks. POR, 1-4. Mr. Bertonis likewise used the '518 Patent as a roadmap by relying on the references cited in the background to support his analogous art opinion. Ex. 1036, ¶ 12; Ex. 2006, 52:22-53:1. In the parallel district court litigation, the court confirmed PO's position that "Claim 1 solves a specific problem ***in the coaxial network*** area because it facilitates device-to-device communication—something that was not previously possible." Ex. 2005, *Entropic Commc'ns, LLC v. DISH Network Corp.*, No. 2:23-cv-01043-JWH-KES, ECF No. 575, at 23-25 (C.D. Cal. Feb. 25, 2025).

### 3. *Mirfakhraei's* Field of Endeavor is Not Coaxial Cables

Petitioner does not dispute PO's evidence showing that *Mirfakhraei* is entirely directed to conventional telephone line (twisted pair) communications. POR, 20. Petitioner instead uses broad, boilerplate statements that do not outweigh the entirety of *Mirfakhraei's* disclosure. Reply, 7-8. But even if this boilerplate language indicates that *Mirfakhraei* is not limited to twisted pair, the inquiry does not end. Petitioner must show that *Mirfakhraei* is the same field of endeavor of the '518 Patent, which is specific to systems using coaxial cables. Petitioner does not (and cannot) establish that *Mirfakhraei* is in the field of endeavor of coaxial cables. For this reason, Petitioner must broadly characterize the field of endeavor as "network communications" to capture the non-analogous *Mirfakhraei* reference. Mr. Bertonis used this same flawed approach by selectively relying on broad statements in the title and claims to conclude that *Mirfakhraei* is not limited to twisted pair networks. Ex. 1036, ¶ 17. But when faced with the '518 Patent, which ***does*** limit the network medium, Mr. Bertonis came to the same broad conclusion that the '518 Patent is in the field of network communications and not limited to coaxial cables.

As discussed in Section IV.B.1, this is not the correct field of endeavor, and Petitioner fails to establish that *Mirfakhraei* is analogous art under either prong.

## V. CONCLUSION

A POSITA would not have been motivated to make the proposed combination of *Afshary* and *Mirfakhraei*. Further, *Mirfakhraei* is not analogous art to the '518 Patent and therefore cannot serve as the basis for obviousness. Petitioner fails to establish any claim is unpatentable.

Dated: April 25, 2025

Respectfully submitted,

By: /Erik J. Halverson/
Erik J. Halverson
Reg. No. 73,552
**K&L GATES LLP**
Four Embarcadero Center, Suite 1200
San Francisco, CA 94111
T: (415) 882-8238
F: (415) 882-8220

*Counsel for Patent Owner*

**UNITED STATES PATENT AND TRADEMARK OFFICE**

**PATENT TRIAL AND APPEAL BOARD**

COMCAST CABLE COMMUNICATIONS, LLC,
Petitioner,

v.

ENTROPIC COMMUNICATIONS, LLC,
Patent Owner.

CASE: IPR2024-00431
U.S. PATENT NO. 7,295,518

# PATENT OWNER'S NOTICE OF APPEAL

Notice is hereby given, pursuant to 37 C.F.R. §§ 90.2(a), 90.3, and 35 U.S.C. §§ 141 and 142, that Patent Owner Entropic Communications, LLC ("Patent Owner") appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision of the Patent Trial and Appeal Board in IPR2024-00431, entered on September 5, 2025 (Paper 32), and from all underlying orders, decisions, rulings, and opinions. A copy of the Final Written Decision is attached hereto as Exhibit A. This Notice of Appeal is timely under 37 C.F.R § 90.3, having been filed within 63 days of the Final Written Decision.

In accordance with 37 C.F.R. § 90.2(a)(3)(ii), Patent Owner states that the issues on appeal include, but are not limited to, the Board's determination that challenged claims 1,3, and 4 of U.S. Patent No. 7,295,518 are unpatentable, and any related issues, findings, or determinations, leading thereto or underlying that decision.

Patent Owner is filing a copy of this Notice of Appeal with the Director of the United States Patent and Trademark Office, and a copy of this Notice of Appeal is being filed electronically with the Board. In addition, a copy of this Notice of Appeal is being electronically filed with the United States Court of Appeals for the Federal Circuit, along with the required docketing fee.

Dated: September 19, 2025

Respectfully submitted,

By: /*Erik J. Halverson*/

Erik J. Halverson
Reg. No. 73,552
K&L GATES LLP
4 Embarcadero Center, Suite 1200
San Francisco, CA 94111
erik.halverson@klgates.com
T: (415) 882-8238
F: (415) 882-8220

*Counsel for Patent Owner*

**CERTIFICATE OF SERVICE**

Pursuant to 37 C.F.R. § 90.2(a)(1), on September 19, 2025, the foregoing Notice of Appeal was electronically filed with the Patent Trial and Appeal Board via the P-TACTS System in accordance with 37 C.F.R. § 42.6(b)(1), and submitted electronically to the Director via email at efileSO@uspto.gov, in accordance with 37 C.F.R. § 90.2(a)(1)(i).

Pursuant to 37 C.F.R. § 90.2(a)(2) on September 19, 2025, the foregoing Notice of Appeal was electronically filed with the Court of Appeals for the Federal Circuit via CM/ECF with requisite fees paid via pay.gov.

Pursuant to 37 C.F.R. § 42.6(e) and the parties' agreement to accept electronic service, on September 19, 2025, the foregoing Notice of Appeal was served via email on the following counsel of record for Petitioner:

Frederic M. Meeker
Paul T. Qualey
Christopher L. McKee
Wesley W. Jones
**Banner & Witcoff, Ltd.**
1100 13th St. NW Suite 1200
Washington, DC 20005
fmeeker@bannerwitcoff.com
pqualey@bannerwitcoff.com
cmckee@bannerwitcoff.com
wjones@bannerwitcoff.com
ComcastIPRservice@bannerwitcoff.com

By: */Erik J. Halverson/*
Erik J. Halverson
Reg. No. 73,552

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

COMCAST CABLE COMMUNICATIONS, LLC,
Petitioner,

v.

ENTROPIC COMMUNICATIONS, LLC,
Patent Owner.

Patent No. 7,295,518
Filing Date: Dec. 18, 2002
Issue Date: Nov. 13, 2007
Title: BROADBAND NETWORK FOR COAXIAL CABLE USING MULTI-CARRIER MODULATION

*Inter Partes* Review No.: IPR2024-00431

**DECLARATION OF JAMES G. BERTONIS IN SUPPORT OF PETITION FOR *INTER PARTES* REVIEW OF U.S. PAT. NO. 7,295,518**

33. First, we have **frequency shift keying (FSK)**. In this simplest commonly used modulation method, information is transmitted by shifting an oscillator between two frequencies. *Id.*, page 163 (§ 4.2.2). FSK modulation is used for relatively low-speed data transmissions, including certain downstream data transmissions to addressable cable TV set-top terminals. The spectral efficiency of FSK is very poor, but this is relatively unimportant in low-speed applications. On the positive side, the transmission is robust, meaning it is not easily damaged by noise or distortion. Also, the required hardware is relatively low in cost. For further detail regarding FSK, see *Id.,* pages 163–167.

34. Next, we have **bi-phase shift keying (BPSK)**. In a BPSK system, the phase is shifted 180° between transmission of a zero and a one. BPSK modulation provides very good immunity to noise, is simple, and is low in cost. Its downside is that, similar to FSK, it is inefficient in its use of the spectrum. For further detail, see *id.* at pages 167–175.

35. In order to make better use of the spectrum, possible states can be represented by different analog levels and/or phases, transmitting more than one bit at a time. The next modulation formats to be discussed are expansions of BPSK, which improve on the spectrum efficiency by transmitting more than one bit at a time. The penalties are an increasing complexity and reduced immunity to noise and other transmission impairments. *Id.*, Page 175 (4.2.8).

36. The first expansion of BPSK to be discussed is **quadrature phase shift keying (QPSK)**, which is a technique specifically referenced in the ’518 patent. Ex. 1001, 8:51-63, 7:21-58. With QPSK, and as shown in Ciciora’s Figure 4.6, data into the transmitter is split into two channels. Those two channels are called the I (in–phase) and Q (quadrature) channels. Two bits are transmitted simultaneously, one in each channel. Spectrum efficiency is improved because the spectrum required to transmit the two bits is no wider than the spectrum required to transmit one bit using BPSK. Ex. 1024, page 175 (§ 4.2.8). However, QPSK does require twice the signal power (+3 dB) versus BPSK to achieve the same bit error rate (BER).

37. After the data is split into the I and Q channels, each channel is modulated onto a carrier, just as in the case of BPSK. The same carrier frequency is used for each channel, but the phase of the two are 90° apart, or in quadrature. *Id.*

38. On the receiver side, the signal is split into the in-phase (I) and quadrature (Q) components, and sent to respective demodulators. An encoder combines the two bits from the I and Q channels into the resulting data stream. *Id*. See Ciciora’s Figure 4.6 (reproduced below) for a basic QPSK modulator/ demodulator arrangement. *Id.,* page 176.

39. The rate at which bits are transmitted (the bit rate) is measured in bits per second. However, in QPSK, and most other (higher-order) modulation methods, more than one bit is transmitted at a time. The bits that are transmitted

simultaneously are grouped into what is called a “symbol. “The rate at which symbols are transmitted is the baud rate. For additional detail in this regard, see *id.*, pages 175-176 (§ 4.2.8).

40. A particularly useful representation of QPSK and higher-order signals/modulation schemes is the constellation diagram, such as seen (for QPSK) at the bottom of Ciciora’s Figure 4.6 (reproduced below). *Id.,* pages 176-177. Therein, each of the four possible positions of the symbol is formed from the I and Q channel data. The position along the X axis is determined by the I data, while the position along the Y axis is determined by the Q data. The peak amplitude of the signal is proportional to the length of the vector from the origin to any one of the four possible states. In the case of QPSK, these lengths are equidistant from the origin, reflecting equal peak amplitudes. *Id.,* page 177.



**Figure 4.6** Basic QPSK modulator and demodulator.

Ex. 1024, Fig. 4.6

41. "The Y axis forms the decision threshold for the I channel since it is halfway between the I channel states. Similarly, the decision threshold for the Q channel is defined by the X axis. Computation of a bit error rate (BER) is based on determining the proportion of time that any one 'spot' in the constellation could be forced to cross a threshold into another state's place in the constellation. When this happens, at least one, and sometimes more, bits are received an error." *Id.* It will be appreciated that the closer together the states in the constellation, that is the denser the modulation, the less noise or other disturbance can be tolerated before a state can be misinterpreted as another. *Id.*

42. Thus, a defining characteristic of QPSK is that it has four signal states, all of the same amplitude. It is interesting to observe in this regard that QPSK is nothing more than two BPSK signals combined 90° out of phase. Also of note, QPSK is also called 4-state quadrature amplitude modulation (i.e., 4-QAM), a reference to its four signal states and use of two sinusoidal waveforms in quadrature (QAM is discussed further below). *Id.*, pages 177, 181.

43. Ciciora describes the effects of interference on the constellation diagram with a helpful illustration provided in Figure 4.7 (reproduced below). *Id.*, pages 178-179, Fig. 4.7. The different types of interference include carrier wave, (CW) interference, phase noise interference, and random noise interference.



**Figure 4.7** The effect of interference on the constellation diagram.

Ex. 1024, Fig. 4.7

44. With QPSK, the signal state thresholds are defined by the axis of the constellation diagram. With more dense (higher-order) modulation, the thresholds are closer, so less interference will cause the thresholds to be crossed. Thus, it will be appreciated that higher-order modulation formats are more susceptible to signal interference. *Id.*

45. The next denser (higher-order) modulation format commonly found in cable television networks is **16–QAM** (16–state quadrature amplitude modulation). *Id.*, page 179 (§ 4.2.9) 16–QAM is similar to QPSK, except that each axis is divided into four levels, so that each channel (I and Q) can carry the information of two bits at a time. Each of the two phases carries two bits at a time, so there are four bits per symbol; the baud rate is 1/4 of the bit rate. Each channel of the 16–QAM modulator can take on not only the two phases of QPSK, but also the intermediate amplitude values (represented by differing distances from origin), as seen in the lower part of Figure 4.8 (reproduced below). *Id.*, pages 179-180.



Figure 4.8 16-QAM modulator and demodulator.

Ex. 1024, Fig. 4.8

46. Thus, with 16-QAM, instead of only one bit being routed to each channel at a time, two bits are routed to each. Each channel can take on any of four states. With the I channel in any of four states, and the Q channel independently in any of four states, a total of 16 states is possible. This is the number of states required to represent four bits ($2^4 = 16$). The modulation technique 16–QAM derives its name from the 16 possible states of the modulated signal. *Id.*, pages 180-181.

47. Continuing to move up the modulation density scale, we next have **64–QAM** and **256–QAM**. Figure 4.9 (reproduced below) of Ciciora illustrates the constellation diagrams for 4–QAM (that is, QPSK), 16–QAM, 64–QAM, and 256–

QAM, allowing those to be compared. *Id.*, page 182. Here, the differences in density are readily apparent. The distance between states is smaller as the order of QAM gets higher, so the susceptibility to noise and transmission path distortion increases. On the other hand, the spectral efficiency also increases, meaning that more bits can be transmitted in the same RF bandwidth.



**Figure 4.9** Constellation diagrams, 4-, 16-, 64-, and 256-QAM.

Ex. 1024, Fig. 4.9

48. Ciciora's Figure 4.9 indicates (among other things), the theoretical spectral efficiency in bits per hertz for each modulation type. Again, this indicates how many bits per second can be transmitted per hertz of RF bandwidth. For

additional information regarding these constellation diagrams, *see id.*, pages 181–182.

**B. Multi-Carrier Transmission**

49. Thus far, the modulation techniques discussed have been described in terms of how data is modulated for transmission on a specific carrier. It was also known to use these modulation techniques in conjunction with multi-carrier transmission schemes. Two well-known and closely related multi-carrier transmission schemes were **Discrete Multi-Tone (DMT)** and **Orthogonal Frequency Division Multiplexing (OFDM)**. With these techniques, instead of modulating a bitstream onto a single relatively wide carrier band, the bitstream is divided-up and spread across multiple sub-carriers within the band for transmission in parallel with each other. Ex. 1012, 1:18-33; *see also* Ex. 1007, ¶¶3-4, 17; Ex. 1011, pages 392-394.

50. DMT protocols had been developed, in large part, to increase the data transmission rates achievable over conventional telephone lines, for the provision of high-speed data networking. These known protocols include, e.g., Asymmetric Digital Subscriber Loop (ADSL), High bit rate Digital Subscriber Loop (HDSL) and Very fast asymmetric Digital Subscriber Loop (VDSL). Ex. 1007, ¶ 3.

51. With DMT, a frequency bandwidth for data transmission is divided into multiple sub-channels, with each sub-channel having a relatively narrow bandwidth

(e.g., 4 kHz) to reduce distortion within the sub-channel signal. Each sub-channel corresponds to a sub-carrier frequency of the multiple carriers for simultaneous data transmission. A sending modem breaks a data stream into packets for simultaneous transmission on the separate sub-channels, independently modulating that data onto the sub-channels, e.g., using QAM. A receiving modem demodulates the separate sub-channel signals, and reassembles the data. *Id.*, ¶ 4 (use of QAM for modulating data onto the sub-channels).

52. As Mirfakhraei further describes, "[a] concern for DMT protocols is differences between the separate channels. Specifically, sub-channels having low carrier frequencies may perform differently from sub-channels having high carrier frequencies. Accordingly, some sub-channels may be able to accurately carry more data than others." *Id.*

53. Similarly, with OFDM, data is transmitted in parallel using modulated-sub-carriers. Ex. 1011, pages 392-393. In particular, like DMT, in a typical OFDM transmitter, an incoming serial stream of bits is mapped by a serial-to-parallel converter into *N* parallel lines, with each line corresponding to a particular sub-carrier. Ex. 1012, 1:18-58, Fig. 1. The bits for each sub-carrier are then separately modulated, for example, using a modulation scheme such as QPSK or QAM as discussed above. Ex. 1011, pages 392-394, Fig. 2.

## XIII. CONCLUSION

185. All of the statements made in this declaration of my own knowledge are true. All statements made based on information and belief are believed to be true. Further, these statements are made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under § 1001 of Title 18 of the United States Code.

Date: 2-15-2024

James G. Bertonis

8386002

THE UNITED STATES OF AMERICA

TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

June 27, 2023

THIS IS TO CERTIFY THAT ANNEXED IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF THE FILE WRAPPER AND CONTENTS OF:

APPLICATION NUMBER: *10/230,687*
FILING DATE: *August 29, 2002*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

Miguel Tarver
Certifying Officer

102 1637 .082902

up converting the modulated signal to a predetermined radio frequency to create a radio frequency signal;

transmitting the radio frequency signal over the coaxial wiring network at a predetermined power level;

in a second terminal device, receiving the radio frequency signal from the coaxial wiring network;

downconverting the radio frequency signal to create a base band signal; and

demodulating the base band signal to create received digital data.

6. The method of claim 5 wherein the predetermined radio frequency is above the frequency used by other services transmitting over the coaxial wiring.

7. The method of claim 5 comprising the further steps of:

scanning all possibly frequencies for activity; and

selecting a frequency for network communication where no activity is detected.

8. A method of characterizing a communication channel used for communication between devices comprising the steps of:

forming a probe message comprising a preamble, a channel estimation training sequence, and a bit loading training sequence;

transmitting the probe message through the communication channel;

receiving the probe message;

from the received probe message, analyzing the preamble to estimate carrier and timing offset, analyzing the channel estimation training sequence to produce a set of equalizer coefficients, and analyzing the bit loading training sequence to determine a bit loading profile used for transmitting data.

US 20060218593A1

(19) United States
(12) Patent Application Publication
Afshary et al.
(10) Pub. No.: US 2006/0218593 A1
(43) Pub. Date: Sep. 28, 2006

(54) DIGITAL COAXIAL CABLE LAN

(76) Inventors: **Amir S. Afshary**, Chandler, AZ (US); **Desikan Iyadurai**, Phoenix, AZ (US); **Brian R. Mears**, Tempe, AZ (US); **Gregory B. Tucker**, Chandler, AZ (US)

Correspondence Address:
BLAKELY SOKOLOFF TAYLOR & ZAFMAN
12400 WILSHIRE BOULEVARD
SEVENTH FLOOR
LOS ANGELES, CA 90025-1030 (US)

(21) Appl. No.: 11/325,093

(22) Filed: Jan. 3, 2006

**Related U.S. Application Data**

(63) Continuation of application No. 09/164,427, filed on Sep. 30, 1998.

**Publication Classification**

(51) Int. Cl.
*H04N 7/18* (2006.01)

(52) U.S. Cl. .................................................. **725/74**; 725/78

(57) **ABSTRACT**

The invention relates to a coaxial cable local area network (LAN) for digitally communicating client generated data between clients of the cable LAN. The cable LAN has adapters in communication with both the clients and other adapters of the cable LAN. Connected through coaxial cable, these adapters generate and communicate data transmitting signals that take advantage of the operating frequency spectrum of the coaxial cable so as to not interfere with the operating frequency of the client data within the coaxial cable. Other features are disclosed.



Case: 25-2146 Document: 34-1 Page: 288 Filed: 10/05/2026




FIG. 1

Case: 25-2146 Document: 34-1 Page: 289 Filed: 10/05/2026




FIG. 2

Case: 25-2146 Document: 34-1 Page: 290 Filed: 10/05/2026




FIG. 3




FIG. 4

4

# DIGITAL COAXIAL CABLE LAN

## BACKGROUND OF THE INVENTION

[0001] 1. Field of the Invention

[0002] The invention relates generally to networking and more particularly to data distribution through a coaxial cable at frequencies that take advantage of the operating frequency spectrum of the coaxial cable so as to not interfere with the operating frequency of the client data within the coaxial cable.

[0003] 2. Background Information

[0004] Conventional homes contain many electronic devices that generate data or operate on data received internally, from other devices, or from sources outside of the home. For example, content devices such as televisions, video cassette recorders, personal computers, and stereos as well as monitor and control devices such as climate-control devices, security devices, and home automation devices all generate or use data. In-home local area networks (LANs) may be used to distribute such data around the home, both to and from these devices.

[0005] As home based LANs become more popular for in-home networking, the ability to transmit high-bandwidth data including digital video remains difficult to implement. Several alternative mediums for in-home networking are known. For example, current solutions that do not require new wiring include AC power lines, telephone lines, and wireless communication. There are also options that require installing new wires such as CAT-5 twisted pair, fiber optic, and IEEE 1394 (fire-wire). In general, the solutions that do not require new wires suffer from low bandwidth or high cost. Solutions that require new wires suffer from being expensive as well as technology that has not been proven over time as compared to coaxial cables. Table I lists some of these alternative mediums with their limitations.

TABLE 1

Alternative Mediums

| MEDIUM | LIMITATIONS |
|---|---|
| AC power-lines | Unregulated |
| | Low bit-rate (Harsh environment) |
| | Data security issues |
| | Perceived usage hazards |
| Telephone lines | RF interference |
| | RF emissions regulations |
| Wireless | Limited bandwidth |
| | Expensive |
| | Data security issues |
| | Transmission disruption due to movement |
| New wires | Installation costs |
| | Maintenance costs |

[0006] Thus, there is a need to transmit data around the home and elsewhere in cost-effective, quick, and secure fashion.

## SUMMARY OF THE INVENTION

[0007] The invention relates to a coaxial cable local area network (LAN) for digitally communicating client generated data between clients of the cable LAN. The cable LAN has adapters in communication with both the clients and other adapters of the cable LAN. Connected through coaxial cable, these adapters generate and communicate data transmitting signals that take advantage of the operating frequency spectrum of the coaxial cable so as to not interfere with the operating frequency of the client data within the coaxial cable. Other features are disclosed.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0008] **FIG. 1** is an illustration of an in-home coaxial cable LAN in accordance with an embodiment of the invention.

[0009] **FIG. 2** is a schematic illustration of a coaxial cable LAN in accordance with an embodiment of the invention.

[0010] **FIG. 3** illustrates an operating frequency of the client data and the adapter signal in accordance with an embodiment of the invention.

[0011] **FIG. 4** is a schematic of an architecture of a cable LAN adapter in accordance with an embodiment of the invention.

## DETAILED DESCRIPTION OF THE INVENTION

[0012] The invention discloses a coaxial cable local area network (LAN) for communicating data between clients of the cable LAN. The benefits of the cable LAN is the ability transmit data in cost-effective, secure fashion, without interfering with cable service company operations.

[0013] For purposes of explanation, specific embodiments are set forth to provide a thorough understanding of the present invention. However, it will be understood by one skilled in the art, from reading this disclosure, that the invention may be practiced without these details. Moreover, well-known elements, devices, process steps and the like are not set forth in detail in order to avoid obscuring the present invention.

[0014] Reference is now made to **FIGS. 1 through 4** to illustrate the embodiments of the invention. **FIG. 1** is an illustration of an in-home coaxial cable LAN. As shown, drop cable **10** enters home **12** after it is tapped off main trunk **14** through cable service company splitter **15** within distribution box **16**. Near the point at which drop cable **10** enters home **12**, low pass filter (LPF) **18** is installed by the user, upstream of the in-home cable LAN network and downstream of any cable service company supplied low pass filter **20**.

[0015] A cable LAN isolator such as LPF **18** preferably is installed by the user downstream of cable service company splitter **15**, even when a low pass filter is provided by the cable service company as shown by low pass filter **20** in **FIG. 1**. The need for such a device can be attributed to several operational limitations such as security, performance improvement of premise network, and legal compliance. Here, LPF **18** maintains security for the cable LAN, works to improve the performance of the cable LAN, and prevents signals generated within the cable LAN from interfering with cable service company operations.

[0016] By restricting spurious signals or cable LAN signals to the premise of the user, LPF **18** maintains security by preventing such signals from getting back to the public cable

network. Although LPF **18** is shown installed within the physical premise of home **12**, LPF **18** may be secured elsewhere to maintain security. For example, installing LPF **18** within a lock box external to home **12** would maintain security. LPF **18** will also reflect cable LAN transmitted signals back into the network of the cable LAN. Thus, where splitter **22** is located close to LPF **18**, the return loss characteristics of LPF **18** may be helpful in coupling the cable LAN signal power from one arm of splitter **22** to another arm of splitter **22**. This, in turn, would decrease the amount of power needed to transmit cable LAN signals and thus improve the performance of the invention. Moreover, by preventing signals generated within the cable LAN from interfering with cable service company signals within main trunk **14**, LPF **18** serves legal compliance requirements.

[**0017**] Depending on the type of cable system, LPF **18** will have different cut-off frequencies. For example, one cable system only requires that the low pass filter have a cut off frequency of less than 1000 MHz whereas older cable systems require that the low pass filter have a cut off frequency of less than 450 MHz.

[**0018**] Coaxial cable splitters permit more than one client to receive identical data by dividing the cable into two or more cable wires. Thus, from the point at which drop cable **10** enters home **12**, drop cable **10** is split by splitter **22** into different cable wires **24**, each cable wire **24** being routed to different rooms in home **12**. Within living room **26** of **FIG. 1** is living room television (TV) **28** having set top box (STB) **30**. Set top box **30** includes boxes that provide interactive television through high speed internet data access. Coupled between cable wire **24** and set top box **30** is cable LAN adapter **32**. Cable wire **24** is also routed to office **34**. Within office **34** is office personal computer (PC) **36** having an internet gateway. The internet gateway may be personal computer **36** having high speed access to the internet, where the high speed access may be achieved through the shown a cable modem **30**, as well as other connection such as asymmetric digital subscriber loop (ADSL) modem, an integrated service digital network (ISDN), a T1 line, and a multimedia cable network system (MCNS) cable modem. Coupled between cable wire **24** and personal computer **36** is a second cable LAN adapter **32**.

[**0019**] Cable wire **24** is also routed to bedroom **40** and to bedroom **46**. To communicate with cable LAN adapter **32** in bedroom **40** and bedroom **46**, cable wire **24** is further divided from splitter **22** by splitter **38** into two cable wires **24**. Within bedroom **40** is bedroom TV **42** having set top box **44**. Coupled between cable wire **24** and set top box **44** is a third cable LAN adapter **32**. Within bedroom **46** is bedroom PC **48** coupled to a fourth cable LAN adapter **32**. To complete the cable LAN network, cable wire **24** from splitter **38** is connected to cable LAN adapter **32** in bedroom **46**. The number and arrangement of rooms and clients in home **12** is not particular to an embodiment of the invention. Home **12** may have different rooms, in different numbers and arrangements, each having different clients.

[**0020**] Typical clients of the cable LAN network are shown in **FIG. 2**. These clients may include digital TV set top box **50**, digital video cassette recorder (VCR) **52**, digital TV **54**, home control and monitoring hub **56**, wireless hub **58** with bridge **60**, personal computer **62**, and personal computer motherboard **64**. Bridge **60** of wireless hub **58** is capable of communicating with different wireless devices. For example, one such wireless device may be a remote-control device that can be used for multiple clients on the network such as PC's, set top boxes, and digital TV's.

[**0021**] As shown in **FIG. 2**, client interface **66** couples cable LAN adapter **32** to a client. Adapter **32** serves to connect these clients to the network of cable wires **24**. Client interface **66** may be any suitable computer interface, such as a Peripheral Component Interconnect (PCI) adapter card, Universal Serial Bus (USB), or buses meeting the Institute of Electronic and Electrical Engineering standard for a high performance serial bus, IEEE 1394. Adapter **32** may also be coupled to a client by other techniques. For example, adapter **32** may be housed in a client of the cable-LAN network such as indicated by dashed lines **68** for PC motherboard **64**.

[**0022**] In the preferred embodiment, there is at least one cable wire **24** couple between a pair of adapters **32**. In tests run on signal attenuation due to cable length, coaxial cable wire **24** that totaled less than 1000 feet in length operated within acceptable attenuation loss limits. Longer lengths are possible and are a function of at least the hardware and software of adapter **32**.

[**0023**] The overall operation can be understood from **FIG. 2**. In the overall operation, a first client, such as PC **62**, communicates digital data to a first cable LAN adapter **32** through client interface **66**. After processing the data for transmission, the first cable LAN adapter **32** communicates the processed data to a second cable LAN adapter **32** through coaxial cable wire **24**. On receiving the data, the second adapter **32** further processes the transmitted data to a form usable by a second client, such as digital TV **54**, and transmits that data to second client digital TV **54** through client interface **66**. First cable LAN adapter **32** may also communicate this same data to other adapters **32**, that, in turn, may transmit the received data to their associated client.

[**0024**] **FIG. 3** illustrates an operating frequency of the client data and the adapter signal. Coaxial cables are currently being used by data suppliers to communicated data such as television and internet data to individual homes. These cables themselves are a very clear, clean medium capable of handling operating frequencies of up to 2000 MHz. However, most of this operating frequency spectrum goes unused by data suppliers since initially there was little need for frequencies higher than 450 MHz and, as need for higher operating frequencies slowly increased, costs to changing the infrastructure of the data suppliers became the prohibiting factor.

[**0025**] The lower region identified in **FIG. 3** as 0-950 MHz is where conventional cable TV, digital cable TV, and cable modem services are offered. Where this is the case, the cable LAN signal operating frequency may be located within the higher region identified as 1000-2000 MHz at the center frequency of 1300 MHz with a bandwidth of 5 MHz. Here, the cable LAN utilizes the operating frequency spectrum not used by conventional cable services. The same is true for other forms of data such climate-control data, security data, home automation data, Moving Picture Experts Group 2 (MPEG-2) high resolution digital video data, audio data, or internet data.

[**0026**] In the preferred embodiment, a signal generated by adapter **32** downstream of LPF **18** rapidly transmits data

from one adapter to another adapter as a carrier modulated digital signal. The carrier modulated digital signal may be generated in conjunction with using Quadrature Phase Shift Keying (QPSK) modulation typically employed on satellite technology. Since QPSK modulation operates at 2 bits per hertz, the signal speed would be 10 megabits per second (Mbps) for a 5 MHz bandwidth. Modulation is further discussed below.

[0027] A significant advantage of this invention is the large bandwidths that may be applied in transmitting data. For example, within the 1000-2000 MHz region shown in **FIG. 3**, bandwidths of 5 MHz, 10 MHz, 20 MHz, 50 MHz, or higher are possible. By using bandwidths larger than 5 MHz, the signal speed increases. With coaxial cabling, speeds greater than 100 Mbps can be achieved. Preferably, the signal speed will be greater than 10 Mbps when necessary to quickly distribute digital video and other types of high-bandwidth data within the home.

[0028] As depicted in **FIG. 3**, the signal operating frequency could be anywhere above 1000 MHz. However, Cable LAN's operating region is not limited to this. For example, in older homes that use older type coaxial cable and older type splitters, normal cable operations are maintained below 450 MHz. In this case, the signal operating frequency of the cable LAN would preferably be between 600 to 800 MHz, but need not be. Since the signal operating frequency is subject at the lower end to the client data operating frequency, the signal operating frequency could be just at the border or fringe of the rated or actual data operating frequency being utilized within the coaxial cable. Operating at the border or fringe of the data operating frequency takes advantage of the operating frequency spectrum of the coaxial cable so as to not interfere with the operating frequency of the data, thereby permitting the signal and data other than that carried by the signal to be communicated within the coaxial cable at the same time, within the same space. Being adaptable enough to operate at this periphery of the data operating frequency makes the cable LAN flexible enough to operate on any coaxial cable system, despite the different limitations such as older network components, different geographies, different service providers, and different regulations. Moreover, since the signal operating frequency is subject at the higher end only to the operating frequency spectrum of the coaxial cable, the signal bandwidth may be much greater than 5 MHz, thereby increasing the signal speed. A 100 MHz bandwidth, for example, results in a signal speed of 200 Mbps. In this way, the large operating bandwidth makes the cable LAN ideal for quickly transmitting high-resolution digital video (such as MPEG-2) and other high speed data.

[0029] **FIG. 4** is a schematic of an architecture of cable LAN adapter **32**. As seen in **FIG. 4**, client software layers **70** is comprised of cable LAN protocol layers/stacks **72** and interface software/driver stack **74**. Analog or digital data from a first client is processed as necessary through that client's software layer into a digital format. This digitized data is then communicated to cable LAN adapter **32** associated with that first client for processing through the hardware sections of the cable LAN adapter. In accordance with an embodiment of the cable LAN adapter of the invention, cable LAN adapter **32** partitions into four hardware sections: I. MAC & Client Interface Section **80**; II. Baseband Section **90**; III. RF & Mixed Signal Section **100**; and IV. Medium Interface Section **130**.

I. MAC & Client Interface Section

[0030] As part of broadband application specific integrated circuit (ASIC) **78**, Media Access Control (MAC) & Client Interface section **80** operates both as a burst controller and as a protocol device to coordinate events—such as when to receive the data from the client and when to transmit data to the client—between the client and Baseband section **90** of cable LAN adapter **32**.

[0031] Client interface **76** is the front line communication link between adapter **32** and the particular client. Preferably, the client interface logic communicates with the client, communicates with the modulator, processes the particular data from the client and the modulator, and keeps track of time. Given the variety of clients that may occupy the cable LAN, it is important to utilize a universal client interface.

[0032] As shown in **FIG. 4**, the hardware of client interface **76** may be a stand alone component coupled by coaxial cable between interface (I/F) core **82** of broadband ASIC **78** and the in/out (I/O) port of the client. Such stand alone components include a Universal Serial Bus (USB) attachment or attachments meeting the Institute of Electronic and Electrical Engineering (IEEE) standard for a high performance serial bus, IEEE 1394. Client interface **76** may also be integrated into MAC & Client Interface section **80** of cable LAN adapter **32** or housed into the motherboard of a client such as a personal computer (PC) or a set top box (STB). Moreover, through an expansion card such as a Peripheral Component Interconnect (PCI) adapter card, client interface **76** may be housed internally to adapter **32** or to a client.

[0033] If data copyright protection is a concern, client interface **76** can be coupled to a dongle security system key consisting of a serialized erasable programmable read-only memory (EPROM) and some drivers in a D-25 connector shell connected to the I/O port of either adapter **32** or the client. With a dongle security system key installed, users can make as many communications or "copies" of the data as they want but must respond with the dongle's programmed validation code for each copy, thereby accounting for each copy made. To allow daisy-chained dongles, the dongles can be designed to pass data through the I/O port and to monitor for magic codes (and combinations of status lines) with little interference to devices further down the line.

[0034] Burst controller **84** of MAC & Client Interface section **80** is a time division multiple access (TDMA) scheme that supports both isochronous and asynchronous data through burst control as well as accounts for high interrupt latency on the PC. Isochronous service guarantees the reserved bandwidth while asynchronous service provides a conventional LAN type of service that is ideal for data sharing applications.

II. Baseband Section

[0035] From MAC & Client Interface section **80**, the digital data is communicated to Baseband section **90** that is part of broadband ASIC **78**. In Baseband section **90**, the data is encoded and modulated.

[0036] To encode the data, Forward Error Correction (FEC) encoder **92** is used. Preferably, FEC encoder **92** is a

Reed-Solomon Error Correction Code (R-S ECC) encoder. The advantage of using a RS ECC encoder is that the RS ECC encoder may be reused in the FEC decoder **94**, thereby dramatically reducing the complexity of syndrome calculation and thus reducing processing speed burden on the syndrome block. On interacting with FEC encoder **92**, parity bits (or bytes) are added to the data to permit detection of data that becomes corrupted in transit as well as permit correction of the same. Other bits that may be added include network control data that specifies the routing, content data that specifies the what is being transmitted, as well as other known parity bits.

**[0037]** Once through FEC encoder **92**, the data encounters modulator **96**. Modulator **96** remaps the digital data and presents the data in an analog wave form to permit the data to be transmitted within the coaxial cable. It is important for cable LAN adapter **32** to be screened from noise and hardy enough to work in any environment while remaining inexpensive. Thus, in order to keep costs low and the system robust, the architecture design of adapter **32** uses a digital modulation scheme such as Frequency Shift Keying (FSK) modulation or Binary Phase Shift Keying (BPSK) modulation. Moreover, although data may be transmitted within the coaxial cable continuously, discontinuously, or a combination thereof, modulation is done preferably in a discontinuous, burst fashion to accommodate network type data with minimum receiver setup time. Other acceptable modulation schemes include Quadrature Phase Shift Keying (QPSK) digital modulation.

III. RF & Mixed Signal Section

**[0038]** From Baseband section **90**, the data encounters Radio Frequency (RF) and Mixed Signal section **100**. The RF & Mixed Signal section consists of a complementary metal-oxide semiconductor (CMOS) RF chip **102**, crystal oscillator **104**, and crystal oscillator **106**. Crystal oscillator **104** and crystal oscillator **106** generate the clock that runs CMOS RF chip **102**. As shown in **FIG. 4**, CMOS RF chip **102** comprises mixed-signal section having digital to analog converter (DAC) **108** and analog to digital converter (ADC) **110**, up converter **112** and down converter **114**, power amplifier (PA) **116** and a low noise amplifier (LNA) **118**, and Low (LO) frequency synthesizer (SYN) timing circuit **120** that couples the converters to their respective amplifiers through mixer **122**.

**[0039]** Within DAC **108**, the digital data from modulator **96** is converted to an analog signal having an intermediate frequency (IF) of around 44 MHz. To bring the signal operating frequency to the desired transmitting frequency, here 1300 MHz as seen in **FIG. 3**, the analog signal is processed by up converter **112**. Up converter **112** generates a carrier modulated digital signal on which to transmit client data through the coaxial cable network. The power is amplified in PA **116**, wherein the signal is then sent to Medium Interface section **130**.

IV. Medium Interface Section

**[0040]** In accordance with an embodiment of the invention, Medium Interface section **130** interfaces with cable wire **24** through switch **132** that operates to either transmit or receive signals. A single pole double throw (SPDT) transmission switch would accomplish this. Through switch **132**, the signal is transmitted into cable wire **24**. Although **FIG. 4** shows a one signal frequency design channel, more than one signal frequency may be used.

**[0041]** With the signal transmitted from a first adapter **32**, at least a designated second adapter **32** will receive the signal. On receiving the transmitted data through cable wire **24**, second adapter **32** reverses the process by converting the transmitted data into a form usable by a second client and transmitting that data to that client. From switch **132** of **FIG. 4**, LNA **118** focuses the signal so that down converter **114** may convert the signal to an intermediate frequency (IF) of around 44 MHz. The analog signal is then converted to a digital signal in ADC **110**.

**[0042]** At this point in the process, filtering may be necessary. As the signal travels within the coaxial cable network, reflection from low pass filter **18** may compensate for signal attenuation due to splitters in the coaxial cable network, but may also cause a reflection mismatch between the signal and the reflected signal. Filters within Baseband section **90** filter out such reflected signals. From there, the signal is demodulated at demodulator **98** with the data then being decoded and corrected at FEC decoder **94**. The digital data is then sent to the second client through MAC & Client Interface section **80**.

**[0043]** A specific embodiment of the cable LAN according to the invention has been described for the purpose of illustrating the manner in which the invention may be made and used. It should be understood that implementation of other variations and modifications of the invention and its various aspects will be apparent to those skilled in the art, who may develop a variation of structural details without departing from the principles of the present invention. For example, the components of the cable LAN adapter, either individually or in combination, can be housed in an integrated circuit. The cable LAN has been describe in reference to use in a private home, but may be used for any enterprise that has cabling equal to or superior than that found in a typical private home, including a small office/home office (SOHO).

What is claimed is:

**1.-26.** (canceled)

**27.** An interface component for communicating between a client device and a local area network (LAN), the interface component comprising:

a universal client interface to communicate a signal between a cable LAN adapter and the client device; and

the cable LAN adapter comprising:

a broadband application specific integrated circuit (ASIC) to encode and to modulate the signal received from the universal client interface and to decode and to demodulate the signal received from a radio frequency and mixed signal, section (RF&MSS);

the RF&MSS to convert the encoded and modulated signal received from the ASIC to a carrier modulated digital signal with a transmission frequency, the transmission frequency greater than a signal cut-off frequency defined for conventional coaxial cable services, and the RF&MSS to convert the carrier modulated digital signal received from a transmis-

sion switch to the encoded and modulated signal transmitted to the ASIC; and

the transmission switch to transmit the carrier modulated digital signal through a coaxial cable to at least one other cable LAN adapter and to transmit the carrier modulated digital signal to the RF&MSS.

**28**. The interface component of claim 27, wherein the universal client interface is a Universal Serial Bus (USB) attachment or an attachment meeting the IEEE 1394 standard.

**29**. The interface component of claim 27, wherein the universal client interface is integrated into the cable LAN adapter.

**30**. The interface component of claim 27, wherein the universal client interface is housed in any of a personal computer, a set top box, or the cable LAN adapter.

**31**. The interface component of claim 27, wherein the universal client interface is coupled to a dongle security system.

**32**. The interface component of claim 31, wherein the dongle security system is a serialized erasable programmable read-only memory.

**33**. The interface component of claim 27, wherein the ASIC comprises:

an interface core to communicate with the universal client interface and with a burst controller;

the burst controller to communicate with a baseband section; and

the baseband section to encode and to modulate the signal and to decode and to demodulate the encoded and modulated signal.

**34**. The interface component of claim 33, wherein the burst controller supports both isochronous and asynchronous data.

**35**. The interface component of claim 33, wherein the burst controller uses a time division multiple access scheme.

**36**. The interface component of claim 33, wherein the baseband section comprises:

an encoder coupled to a modulator, the encoder to receive the signal from the burst controller and to encode the signal;

the modulator coupled to the RF&MSS, the modulator to modulate the encoded signal and to send the encoded and modulated signal to the RF&MSS;

a demodulator coupled to a decoder, the demodulator to receive the encoded and modulated signal from the RF&MSS and to demodulate the encoded and modulated signal; and

the decoder coupled to the burst controller, the decoder to decode the encoded signal and to send the signal to the burst controller.

**37**. The interface component of claim 36, wherein the encoder is a Forward Error Correction (FEC) encoder.

**38**. The interface component of claim 37, wherein the FEC encoder is a Reed-Solomon Error Correction Code encoder.

**39**. The interface component of claim 36, wherein the decoder is a Forward Error Correction (FEC) decoder.

**40**. The interface component of claim 39, wherein the FEC decoder is a Reed-Solomon Error Correction Code decoder.

**41**. The interface component of claim 36, wherein the modulator and the demodulator modulate in a discontinuous, burst fashion.

**42**. The interface component of claim 36, wherein the modulator and the demodulator modulate using a Frequency Shift Keying digital modulation scheme.

**43**. The interface component of claim 36, wherein the modulator and the demodulator modulate using a Binary Phase Shift Keying digital modulation scheme.

**44**. The interface component of claim 36, wherein the modulator and the demodulator modulate using a Quadrature Phase Shift Keying digital modulation scheme.

**45**. The interface component of claim 27, wherein the RF&MSS comprises a complementary metal-oxide semiconductor (CMOS) radio frequency (RF) chip.

**46**. The interface component of claim 45, wherein the CMOS RF chip comprises:

a digital to analog converter (DAC) to receive the encoded and modulated signal from the ASIC and to convert the encoded and modulated signal to an analog waveform with an intermediate frequency;

an up converter coupled to the DAC, the up converter to convert the analog waveform to the carrier modulated digital signal;

a first mixer coupled to the up converter and to a power amplifier, the power amplifier to amplify the carrier modulated digital signal received from the up converter and to send the carrier modulated digital signal to the transmission switch;

a low noise amplifier (LNA) to receive the carrier modulated digital signal from the transmission switch;

a second mixer coupled to the LNA;

a down converter coupled to the second mixer, the down converter to convert the carrier modulated digital signal to the analog waveform; and

an analog to digital converter (ADC) coupled to the down converter, the ADC to convert the analog waveform to the encoded and modulated signal and to send the encoded and modulated signal to the ASIC.

**47**. The interface component of claim 27, wherein the transmission frequency is greater than 450 MHz.

**48**. The interface component of claim 47, wherein the transmission frequency is greater than 950 MHz.

**49**. The interface component of claim 48, wherein the transmission frequency is 1300 MHz.

**50**. The interface component of claim 27, wherein the transmission switch is a single pole double throw transmission switch.

**51**. A method for transmitting information from a client device to a local area network (LAN), the method comprising:

communicating a signal from the client device to a cable LAN adapter with a universal client interface;

encoding the signal in the cable LAN adapter;

modulating the encoded signal in the cable LAN adapter;

converting the encoded and modulated signal to a carrier modulated digital signal in the cable LAN adapter, the carrier modulated digital signal having a transmission frequency, the transmission frequency greater than a signal cut-off frequency defined for conventional coaxial cable services; and

transmitting the carrier modulated digital signal through a coaxial cable to at least one other cable LAN adapter.

**52**. The method of claim 51, wherein the universal client interface is a Universal Serial Bus (USB) attachment or an attachment meeting the IEEE 1394 standard.

**53**. The method of claim 51, wherein the universal client interface is integrated into the cable LAN adapter.

**54**. The method of claim 51, wherein the universal client interface is housed in any of a personal computer, a set top box, or the cable LAN adapter.

**55**. The method of claim 51, wherein the universal client interface is coupled to a dongle security system.

**56**. The method of claim 55, wherein the dongle security system is a serialized erasable programmable read-only memory.

**57**. The method of claim 51, wherein the encoded and modulated signal supports both isochronous and asynchronous data.

**58**. The method of claim 51, wherein the encoded and modulated signal uses a time division multiple access scheme.

**59**. The method of claim 51, wherein the transmission frequency is greater than 450 MHz.

**60**. The method of claim 59, wherein the transmission frequency is greater than 950 MHz.

**61**. The method of claim 60, wherein the transmission frequency is 1300 MHz.

**62**. The method of claim 51, wherein encoding the signal uses a Forward Error Correction (FEC) encoder.

**63**. The method of claim 62, wherein the FEC encoder is a Reed-Solomon Error Correction Code encoder.

**64**. The method of claim 51, wherein modulating the encoded signal is performed in a discontinuous, burst fashion.

**65**. The method of claim 51, wherein modulating the encoded signal uses a Frequency Shift Keying digital modulation scheme.

**66**. The method of claim 51, wherein modulating the encoded signal uses a Binary Phase Shift Keying digital modulation scheme.

**67**. The method of claim 51, wherein modulating the encoded signal uses a Quadrature Phase Shift Keying digital modulation scheme.

**68**. An apparatus for transmitting information from a client device to a local area network (LAN), the apparatus comprising:

a universal client interface communicating a signal from the client device to a cable LAN apparatus; and

the cable LAN apparatus comprising:

an encoding means for encoding the signal, the encoding means converting the signal to an encoded signal;

a modulating means for modulating the encoded signal, the modulating means converting the signal to an encoded and modulated signal;

a converting means for converting the encoded and modulated signal to a carrier modulated digital signal having a transmission frequency, the transmission frequency greater than a signal cut-off frequency defined for conventional coaxial cable services; and

a transmitting means for transmitting the carrier modulated digital signal through a coaxial cable to at least one other cable LAN apparatus.

**69**. The method of claim 68, wherein the universal client interface is a Universal Serial Bus (USB) attachment or an attachment meeting the IEEE 1394 standard.

**70**. The apparatus of claim 68, wherein the universal client interface is integrated into the cable LAN adapter.

**71**. The apparatus of claim 68, wherein the universal client interface is housed in any of a personal computer, a set top box, or the cable LAN adapter.

**72**. The apparatus of claim 68, wherein the universal client interface is coupled to a dongle security system.

**73**. The apparatus of claim 72, wherein the dongle security system is a serialized erasable programmable read-only memory.

**74**. The apparatus of claim 68, wherein the encoding means supports both isochronous and asynchronous data.

**75**. The apparatus of claim 68, wherein the encoding means uses a time division multiple access scheme.

**76**. The apparatus of claim 68, wherein the transmission frequency is greater than 450 MHz.

**77**. The apparatus of claim 76, wherein the transmission frequency is greater than 950 MHz.

**78**. The apparatus of claim 77, wherein the transmission frequency is 1300 MHz.

**79**. The apparatus of claim 68, wherein the encoding means uses a Forward Error Correction (FEC) encoder.

**80**. The apparatus of claim 79, wherein the FEC encoder is a Reed-Solomon Error Correction Code encoder.

**81**. The apparatus of claim 68, wherein the modulating means is performed in a discontinuous, burst fashion.

**82**. The apparatus of claim 68, wherein the modulating means uses a Frequency Shift Keying digital modulation scheme.

**83**. The apparatus of claim 68, wherein the modulating means uses a Binary Phase Shift Keying digital modulation scheme.

**84**. The apparatus of claim 68, wherein the modulating means uses a Quadrature Phase Shift Keying digital modulation scheme.

* * * * *

(19) Europäisches Patentamt
European Patent Office
Office européen des brevets

(11) EP 1 087 586 A2

(12) EUROPEAN PATENT APPLICATION

(43) Date of publication:
**28.03.2001 Bulletin 2001/13**

(51) Int Cl.[7]: **H04L 27/26**

(21) Application number: **00308323.5**

(22) Date of filing: **22.09.2000**

(84) Designated Contracting States:
**AT BE CH CY DE DK ES FI FR GB GR IE IT LI LU MC NL PT SE**
Designated Extension States:
**AL LT LV MK RO SI**

(30) Priority: **24.09.1999 US 406070**

(71) Applicant: **PC-Tel, Inc.**
**San Jose, California 95134 (US)**

(72) Inventor: **Mirfakhraei, Khashayer**
**Fremont, California 94538 (US)**

(74) Representative: **Freeman, Jacqueline Carol**
**W.P. THOMPSON & CO.**
**Celcon House**
**289-293 High Holborn**
**London WC1V 7HU (GB)**

(54) **Bit loading process for multicarrier communications**

(57) A process for determining bit loadings for a signal employing discrete multi-tone modulation includes: determining the noise in each sub-channel; determining target loadings that provide a desired error rate at the measured noise; rounding the target loadings to determine proposed loadings that are integers, and determining whether the proposed loadings provide a desired data rate. If the proposed loadings provide a data rate less than that desired, the process selects one or more sub-channels having a positive difference between target and proposed loading, and for each selected sub-channel increases the proposed loading by 1. The gains for the selected channels are increased to maintain the desired bit error rate at the higher loading. If the proposed loadings provide a data rate greater than that desired, the process selects one or more sub-channels having a negative difference between target and proposed loading, and for each selected sub-channel decreases the proposed loading by 1. The gains of the channels having decrease loadings are decrease to improve power efficiency.

EP 1 087 586 A2

Printed by Jouve, 75001 PARIS (FR)

## Description

### BACKGROUND

### Field of the Invention

**[0001]** This invention relates to communications and communications systems such as modems and transceivers that use multiple carrier frequencies for information transmissions.

### Description of Related Art

**[0002]** A typical modem currently transmits data using a communication signal having a single carrier frequency. To transmit data, a sending modem modulates the phase and/or amplitude of a communication signal in a manner dictated by a protocol established for the communication signal. A receiving modem receives and demodulates the communication signal, which approximately has the carrier frequency, and identifies the transmitted data from the modulation of the received signal. With such modems, the carrier frequency and the bandwidth of the communication signal limit the maximum data transmission rate. Generally, a higher frequency carrier signal permits a higher data transmission rate, but high frequencies are difficult to accurately transmit using systems such as conventional telephone lines. Similarly, conventional phone lines have frequency dependent attenuation, which distorts communication signals having large bandwidths. Accordingly, the maximum data rate of a conventional modem architecture is limited.

**[0003]** Discrete Multi-Tone (DMT) protocols have been developed to increase the data transmission rate over conventional telephone lines. Examples of DMT protocols include the Asymmetric Subscriber Loop (ADSL or G.992.1), the High bit rate Digital Subscriber Loop (HDSL), the Very fast asymmetric Digital Subscriber Loop (VDSL), and light rate ADSL ( G.992.2), which have been proposed by or are standards of groups including the ITU, ANSI, and ETSI. A DMT protocol simultaneously uses multiple carrier frequencies where each carrier frequency corresponds to a sub-channel. Each signal for a sub-channel has relatively narrow bandwidths (e.g., 4 kHz) to reduce distortion within the sub-channel signal. For data transmission, a sending modem breaks transmitted data into packets for simultaneous transmission on separate sub-channels and independently modulates communication signals for the sub-channels according to the data carried on each sub-channel. The receiving modem separates sub-channel signals according to carrier frequency, demodulates the separate sub-channel signals, and reassembles the data.

**[0004]** A concern for DMT protocols is differences between the separate channels. Specifically, sub-channels having low carrier frequencies may perform differently from sub-channels having high carrier frequencies. Accordingly, some sub-channels may be able to accurately carry more data than others. Many DMT protocols employ a conventional quadrature amplitude modulation (QAM) for modulating data transmitted on each sub-channel. Such QAM uses a constellation map defined by a two-dimensional symbol set. The size of the symbol set determines the number of data bits per symbol and the bit rate for transmission on the sub-channel. A large symbol set provides a high data rate for transmissions on the sub-channel but also decreases the separation between symbols in the constellation map, making it more difficult for a receiver distinguish and identify individual symbols. For efficient operation of DMT communications, the capability of each sub-channel needs to be determined to enable selection of optimal symbol sets for each sub-channel. However, the differences between sub-channels may be difficult to characterize and may vary from one communication connection to the next.

### SUMMARY

**[0005]** In accordance with the invention, a process for determining a bit loading for a discrete multi-tone (DMT) communication signal may include any combination of the steps: determining the noise in each sub-channel of ther DMT signal; determining target loadings that provide a desired error rate at the measures noise; rounding the target loadings to determine proposed loadings that are integers, and determining whether the proposed loadings provide a desired data rate. If the proposed loadings provide a data rate less than that desired, the process can select one or more sub-channels having a negative difference between target and proposed loading, and for each selected sub-channel decreases the proposed loading by 1. The gains of the channels having decrease loadings are decrease to improve power efficiency.

**[0006]** As part of the DMT initialization, a local modem or transceiver communicates to a remote modem or transceiver bit loadings determined using processes in accordance the invention. This initialization ensures that the receiver in the local modem can properly equalize, slice, and assign the appropriate bits to each symbol from each sub-channel. For determination of bit loadings, the remote modem sends a predetermined pseudo random periodic signal through the channel. Since the local modem has apriori knowledge of this signal, the local modem can estimate the signal attenuation and the present signal-to-noise ratio (SNR) for each sub-channel. Based on the SNR, and considering the power

budget for signal transmission, the degree of noise immunity, and the required data rate for the connection, the local modem can estimate the capacity or the target loading of each sub-channel. However, the estimated capacity is almost always a non-integer, and one constraint in some DMT systems or protocols is that the bit loadings must be integers. Normally, all sub-channels regardless of their capacity have equal transmit power, however, to accommodate for integer bit loadings, most DMT systems allow power variance among different sub-channels. In most DMT protocols, the variance or gain can be within 2.5 dB of the normal or specified transmit power. By varying the transmit power of each sub-channel, one can manipulate the SNR to obtain integer loadings that perform within the allowed bit error rate. Once the bit loadings and gains for the sub-channels are determined, the local modem communicates (dictates) the bit loadings and gains to the remote modem, so that the remote modem can adopt the dictated DMT format for data transmission to the local modem.

**[0007]** In accordance with one embodiment of the invention, a process for determining bit loadings for sub-channels of a communication signal, includes: measuring noise in the communication signal; determining target loadings for each sub-channel, wherein the target loading for a sub-channel provides an error probability equal to a target level when the noise is as measure; rounding the target loadings to generate proposed loadings for the sub-channels, wherein each proposed loading is an integer; determining, for each sub-channel, a differences between the target and proposed loadings for the sub-channel; selecting a sub-channel according to the difference for the selected sub-channel; and changing the proposed loading for the selected sub-channel by 1 to arrive at the bit loading for the selected sub-channel. This process can be used to increase the total data rate by i increasing the propose loading of one or more sub-channel having a positive different between its target and proposed loadings. Alternatively, the process can improve power efficiency by decreasing the loading and the gain for sub-channels having a negative different between target and proposed loadings.

**[0008]** In accordance with another embodiment of the invention, a process for determining bit loadings for sub-channels of a communication signal, includes: measuring noise in the communication signal; using the measured noise in determining proposed loadings of the sub-channels from the measured noise in the sub-channels, wherein each proposed loading indicates an integer number of bits per symbol transmitted on a sub-channel; setting gains for the sub-channels according to the proposed loadings and the measured noise; determining whether the proposed loadings provide a desired data rate for the communication signal; increasing the proposed loadings for one or more selected sub-channels in response to the proposed loadings failing to provide the desired data rate; and increasing gains for the selected sub-channels to reduces probability of error with the increase loading and the measured noise.

**[0009]** Other embodiments of the invention include xDSL transceiver implementing any of the process disclosed herein.

## BRIEF DESCRIPTION OF THE DRAWINGS

**[0010]** Fig. 1 is a block diagram of an xDSL transceiver in accordance with an embodiment of the invention.

**[0011]** Fig. 2 is a flow diagram of a bit loading process in accordance with an embodiment of the invention.

**[0012]** Fig. 3 is a flow diagram of a process for refining the bit loading found in the process of Fig. 2.

**[0013]** Use of the same reference symbols in different figures indicates similar or identical items.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

**[0014]** In accordance with an aspect of the invention, a modem or transceiver that implements a DMT protocol (herein after an xDSL transceiver) employs a "bit-loading" process that characterizes the capabilities of sub-channels and determines the number of bits-per-symbol transmitted over the channel. The gains of the sub-channels are adjusted to achieve a desired data rate with acceptable signal-to-noise ratios and bit error rates in each channel.

**[0015]** Fig. 1 is the general block diagram of a client side (atu-r) ADSL transceiver 100 including a transmitter 110 and a receiver 190, that connect to a conventional telephone line via a hybrid circuit 150. ADSL protocols are asymmetric and have more sub-channels and a higher data rate for downstream communication to receiver 190 and fewer sub-channels for up stream communications from transmitter 110. Thus, upstream and downstream transceivers are different from each other, but both the upstream and the downstream transceivers have elements or functional blocks performing the functions of the blocks illustrated in Fig. 1. Transceiver 100 can be implemented with dedicated hardware as in conventional xDSL transceivers and modems. Alternatively, transceiver 100 can be a host signal processing transceiver where a hybrid circuit 150 and a codec including a digital-to-analog converter (DAC) 140 and an analog-to-digital converter (ADC) 160 are dedicated communication hardware, and the other blocks of transceiver 100 are software that a host computer executes. Yet another alternative is a hybrid hardware/software transceiver such as described in co-owned U.S. Pat. App. Ser. No. 09/263,160, entitled "Hybrid Software/Hardware Discrete Multi-Tone Transceiver," which was filed March 5, 1999 and is hereby incorporated by reference in its entirety.

**[0016]** Transmitter 110 of transceiver 100 includes an asynchronous transfer mode (ATM) or synchronous transfer

mode (STM) interface 111 through which transceiver 100 receives data to be transmitted to a remote transceiver (not shown). Typically, interface 111 is implemented in hardware or software of a host computer (not shown), and the data may be from an application that the host computer executes or from a terminal in a local network connected to the host computer.

**[0017]** A scrambler and encoder 112 performs initial encoding of the data. The encoding is in accordance with a protocol that transceiver 100 implements. For example, encoder 112 may interleave the data and append cyclic redundancy codes or error detection and correction codes to the data. A framer 113 breaks the encoded data stream from encoder 112 into bit sets. Each bit set is assigned to a sub-channel for transmission and corresponds to a symbol to be transmitted on the assigned sub-channel. Each bit set contains a number of bits that depends on constellation for the assigned sub-channel or equivalently on the bit loading for the assigned sub-channel. Herein, a loading b(i) is the number of bits per symbol transmitted on a sub-channel corresponding to an index i. A tone ordering block 114 orders the bit sets by sub-channel for a constellation mapper 115.

**[0018]** For each bit set, constellation mapper 115 determines a QAM symbol associated with the bit set for the quadrature amplitude modulation (QAM) of the assigned sub-channel. Constellation mapper 115 also scales each determined QAM symbol according to a gain g(i) allocated to the sub-channel assigned to carry the QAM symbol. A DMT symbol includes one QAM symbol per sub-channel. The number of bits per DMT signal is the total loading Btot for the channel and is equal to the sum of the loadings b(i) for the sub-channels used for transmission of data. The data rate for transmission is the product of total loading Btot and the transmission rate for DMT symbols. Accordingly, since current xDSL protocols have constant symbol rates, the data rate for an xDSL transceiver is proportional to total loading Btot.

**[0019]** An IDFT block 116 receives the scaled QAM symbols that constitute a DMT symbol and performs inverse Fourier transforms on DMT symbols to convert the DMT symbol into a sequence of time domain samples. The sequence of samples from an inverse Fourier transform of a DMT symbol defines the transmitted signal for a symbol period. IDFT block 116 repeats the inverse Fourier transforms at a rate equal to the symbol rate to maintain a constant stream of time domain samples. A buffer 117 receives the time domain samples and sequentially provides samples to DAC 140 at the rate required for conversion to an analog communication signal. Hybrid circuit 150 transmits the analog signal from DAC 140 to telephone lines 152 coupled to hybrid circuit 150.

**[0020]** Transmitter 110 also includes a TX handshake block 120 which generates time domain samples for a handshake signal sent to a remote transceiver when establishing a connection or during retaining. Typically, the handshake signal includes a pattern that the remote transceiver requests or indicates a pattern for the remote transceiver to transmit to receiver 190. A control block 130 interprets a received signal from the remote transceiver to determine whether TX handshake block 120 or IDFT 116 provides the samples that define the transmitted signal.

**[0021]** Hybrid circuit 150 directs a received analog communication signal from telephone lines 152 to receiver 190. An analog-to-digital converter (ADC) 160 samples the analog signal and passes digitized samples to an RX handshake block 170 during a connection sequence and to a time domain equalizer (TEQ) 180 once a connection is established. TEQ 180 is an adaptable digital filter that transceiver 100 trains when connecting with the remote transceiver. For the training, the remote transceiver transmits a probing signal to the transceiver 100, and RX handshake block 170 receives digital samples from ADC 160. Block 170 determines the coefficients or taps of TEQ 180.

**[0022]** Handshake block 170 also estimates the signal-to-noise ratio SNR(i) for each sub-channel index i. The estimated signal to noise ratios SNR(i) can be determined, for example, by directing the remote transceiver to transmit a known pseudo-random signal and then comparing the received signal to the known signal. Fluctuations in the difference can be attributed to noise. Handshake block 170 can determine the noise ratios SNR(I) from the output of TEQ 180 after training TEQ 180

**[0023]** Based on the estimated ratios SNR(i), Rx handshake block 170 determines a bit loading b(i) and a scaling g (i) for each sub-channel i, and control 130 directs transmitter 110 to inform the remote transceiver of the determined loadings b(i) and scaling g(i). In the remote transceiver, a framer similar to framer 113 uses the loadings b(i) for selection of bit sets for each sub-channel carrying data to transceiver 110. A mapper and scaler similar to mapper and scaler 115 uses constellations selected according to the loadings b(i) and uses gains g(i) to scale the QAM symbols selected from the constellations.

**[0024]** After establishment of a connection, TEQ 180 filters incoming samples to shorten the impulse response of the channel and reduce distortion across the broadband signal. TEQ 180 stores filtered samples in a buffer 197. A discrete Fourier transform (DFT) block 196 performs a discrete Fourier transform on the filtered time-domain samples associated with a DMT symbol to determine frequency components associated with the sub-channels. A frequency domain equalizer 195 then filters the frequency components to further reduce channel distortion. A slicer 194 scales the individual components according to the gains g(i) that the remote transceiver used to adjust the relative powers in the sub-channels. [The (near end) modem 100 determines gains according to the outcome of the channel probing and transmits the results (as a bits and gains table) to the remote modem for use when transmitting to the near end modem 100. Slicer 194 of the near end modem 100 uses the same gains to scale the signals back to the pre-gain levels Slicer

194 then identifies QAM symbols from the constellation maps corresponding to loadings b(i) of the sub-channels. A deframer converts the QAM symbols into a bit stream which a descrambler and decoder 192 converts to the final data. An ATM or STM interface 191 directs the data to the appropriate receiving device or application.

**[0025]** In accordance with the invention, RX handshake block 170 implements a bit loading process that determines bit loadings b(i) and gains g(i) that achieve a desired or maximum data rate. Fig. 2 illustrates a bit loading process 200 in accordance with an embodiment of the invention. Prior to bit loading process 200, handshake block 170 determines an estimate SNR(i) of the signal-to-noise ratio in each sub-channel i. The estimates SNR(i) can be determined using any desired method. In particular, block 170 can compare a received signal to known values that were transmitted and determine estimates SNR(i) from that comparison.

**[0026]** Process 200 determines the appropriate loadings b(i) and gains g(i) for each sub-channel i, based on estimates SNR(i), transmission power constraints, noise immunity constraints, and a desired data rate. In an initial step 210, process 200 determines target loadings bt(i) using the relation of Equation 1.

$$\text{Equation 1: } bt(i)= \log_2(1+ SNR(i)/\Gamma)$$

for i=1:N where N is the maximum number of sub-channels for data received at the local modem. In Equation 1, parameter $\Gamma$ is called the 'SNR gap' and is the sum of three terms, $\chi$, $\gamma m$, $\gamma c$ as indicated in Equation 2.

$$\text{Equation 2: } \Gamma =\chi+\gamma m+\gamma c$$

Term $\gamma m$ is the noise immunity margin. Term $\gamma c$ is the adjustment in SNR for any coding gain, and term $\chi$ depends on the Bit Error Rate (BER) requirements of a connection. J. C. Cioffi, "A Multi-Carrier Primer". ANSI T1E1.4/97-157, Boca Raton, FL, pp. 91-157, Nov. 91 describes the full derivation of the above equations and is hereby incorporated by reference in its entirety. For a typical DSL connection with a bit error rate (BER) of less than about $10^{-7}$, term $\chi$ is about 9.8, term $\gamma m$ is 0-6 dB, and term $\gamma c$ is 0-3 dB.

**[0027]** Assuming that the channel is fully equalized and that only Gaussian white noise is present in the system, Equation 3 gives the approximate probability Pe of a two-dimensional symbol error in QAM.

$$\text{Equation 3: } Pe \Leftarrow 4Q(dmin/2\sigma) \qquad (1)$$

In Equation 3, dmin is minimum distance between adjacent constellation points, $\sigma$ is the power of the noise, and Q (dmin/2$\sigma$) is given in Equation 4.

$$\text{Equation 4: } Q(x)=\frac{1}{\sqrt{2\pi}}\int_0^x e^{\frac{-u^2}{2}}du$$

For a typical DSL connection, the error probability Pe is about $2*10^{-7}$. Substituting error probability Pe value in Equation 3 permits solving for the value for $(dmin/2\sigma)^2$, which is in turn equal to $3\Gamma$. Using the determined value for SNR gap $\Gamma$ in Equation 1 determines target bit loadings bt(i).

**[0028]** The target bit loadings bt(i) indicate the sub-channel capacities for the required bit error rate BER and the measured signal-to-noise ratios SNR(i) for gains g(i). Target loadings bt(i) determined from Equation 1 in step 210 are typically non-integer values. However, common ADSL protocols require that the bit loadings b(i) be integers. Accordingly, for a first estimate of bit loadings, step 220 rounds target loadings bt(i) to integer values b(i) as in Equation 5.

$$\text{Equation 5: } b(i)= round(bt(i))$$

Step 220 also determines the total loading Btot using Equation 6, differences bd(i) from Equation 7, and the number Nd of differences bd(i) that are greater than zero.

$$\text{Equation 6: } Btot = \Sigma\, b(i)$$

$$\text{Equation 7: } bd(i) = bt(i) - b(i)$$

Step 230 adjusts gains g(i) according to Equation 8.

$$\text{Equation 8: } g(i) = (\Gamma\text{-SNR}) + 10 \log_{10} (1\text{-}2^{b(i)})$$

Equation 2 defines Γ for Equation 8.Typically, steps 210, 220, and 220 are completed using a loop with a loop index i ranging over the number of sub-channels. Each pass through the loop determines a bit loading b(i) and a gain g(i) for a sub-channel i.

**[0029]** If the product of total loading Btot and the DMT symbol rate provides a data transmission rate greater than or equal to the desired data rate, the first estimates of loadings b(i) are acceptable for use. Step 250 determines whether the current loadings b(i) achieve the desired data rate. If so, process 200 transfers from step 250 to an optimization process 300. Process 300 optionally adjusts the loadings b(i) to optimize bandwidth utilization or transmission power efficiency. Optimization processes are described further below. If total loading Btot does not provide the desired data transmission rate, bit loading process 200 transfers from step 250 to step 260 to determine whether adjusting loadings b(i) and gains g(i) can achieve the desired data rate.

**[0030]** Step 260 determines whether any differences bd(i) are positive and correspond to loadings b(i) that process 200 has not adjusted. More specifically, a count, which a step 240 initializes the count to zero, indicates the number of adjustments that process 200 has made to loadings b(i). When the count is greater than or equal to number Nd of positive differences bd(i), there are no loadings b(i) available for further adjustment. If there are no positive differences or if all loadings b(i) having positive differences bd(i) have been adjusted, then for the given SNR margins, process 200 has cannot achieve the desired data rate, and process ends in step 280.

**[0031]** If there are loadings remaining to be adjusted, an adjustment process including steps 272, 274, 276, and 278 begins. Step 272 increments the count of adjustments made. Step 274 then identifies the greatest difference bd(j) and selects a sub-channel j corresponding to the greatest difference. The selected sub-channel j has a loading b(j) that step 276 increases by one. As a result, the total loading Btot increases by one. Selection of sub-channel j for further adjustment is disabled, for example, by setting difference bd(j) to zero or a negative value, without changing number Nd. Since sub-channel j had the largest difference between the determined capacity bt(i) and the first proposed loading b(i), the increased loading b(i)+1 provides the smallest error probability. However, to further decrease the error probability for sub-channel j and increase the signal-to-noise ratio of sub-channel j to comply with the requirements of the communication system (i.e., BER=10e-7, noise margin=6db), step 278 adjusts gain g(j) as indicated in Equation 9, where gain g(j) is in dB.

$$\text{Equation 9: } g(j) = g(j) + 10 \log_{10} (2^{1\text{-}bd(j)})$$

Increasing the signal strength for a sub-channel reduces the signal-to-noise ratio for the sub-channel and allows the incremented bit loading without unacceptably increasing the error probability. Further, process 200 only increases gain g(j) and bit loading b(j) for subchannels j having positive differences, i.e., the target loading bt(j) was rounded down. Accordingly, the rounding difference accommodates at least some of the increase in bit loading b(j) without raising the errors beyond the desired bit error rate.

**[0032]** After adjusting the loadings to increase total Btot, process 200 moves from step 278 back to step 250 and determines whether the new total loading achieves the desired data rate. If the desired data rate has been achieved, process 200 branches to process 300 and can optionally optimize loadings b(i) or gains g(i) for bandwidth utilization or transmission power efficiency. In the desired data rate has not been achieved, process 200 branches from step 250 to step 260 to determine whether further adjustments are possible to further increase the data rate. After zero, one, or several adjustments of loadings b(i) and gains g(i), process 200 ends with an optimization process 300 after the desired data rate was achieved or in step 280 after failing to achieve the desired data rate.

**[0033]** Process 300 can optimize the bit loading found in process 200, for example, according to bandwidth utilization or power efficiency if total bit loading Btot is larger than loading needed to achieve the desired bit rate. Fig. 3 illustrates an embodiment of optimization process 300. In process 300, a decision step 310 determines whether the total loading is greater than the ratio of the desired bit rate to the baud of the transmitted signal. If the total loading Btot is just equal to the ratio; no optimization is attempted, and process 300 is done in step 315. If total loading Btot is greater than the

ratio, decision step determines whether bit loading is to be changed for power efficiency optimization, bandwidth utilization optimization, or no optimization is desire. The process of reducing the bit loading of a subchannel is primarily for satisfying the bitrate requirements of a communication system. However, one can selectively remove or ease the bit loading on particular channels or, if possible zero out the loading, on channels that have low loads, which tend to be towards the end of the spectrum (higher frequencies). In both cases, reduction of bit loading results in power savings, and the latter case achieves selective frequency shaping.

**[0034]** To optimize bandwidth utilization, a step 332 selects a sub-channel k to be removed from the set of sub-channels carrying received data. The selected sub-channel k can be the channel having the lowest bit loading or a channel removed to improve frequency separations between utilized sub-channels. Step 334 reduces total loading Btot by the sub-channels current loading, sets bit loading b(k) for the selected sub-channel to zero, and sets difference bd(k) for the sub-channel to 0 so that subsequent processing change bit loading b(k) to a non-zero value. After sub-channel k has been released, the process 300 returns to step 250 (Fig. 2) to determine whether total loading Btot still provides the desired bit rate. The process continues from step 250 as described above.

**[0035]** If power optimization is desired, process 300 branches from step 320 to step 342 instead of step 332. Step 342 initializes a count for the optimization including steps 344, 346, 348, 350, 352, and 354. After the count is ready, step 344 determines whether the count is greater than or equal to the number of differences bd(i) that are less than zero. If the count is equal to (or greater than) the number of negative differences bd(i), process 300 is done. Otherwise, step 346 selects a sub-channel m that has the minimum (i.e., most negative) difference bd(m). Step 348 reduces gain g(m) of selected sub-channel m as indicated in Equation 10 in order to comply with the requirements of the communication system (i.e., BER=10e-7, noise margin=6db,.....), where gain g(m) is in dB.

$$\text{Equation 10: } g(m) = g(m) + 10 \log_{10} (2^{-1\text{-}bd(m)})$$

Step 350 then reduces the loading b(m) of selected sub-channel m to satisfy the bit rate requirements (bit loading) of the communication system.. Step 350 also reduces total loading Btot by one and sets difference bd(m) to zero to prevent further adjustment of loading b(m). A decision step 353 determines whether total loading Btot still provides more than the desired bit rate. If not, process 300 is done. If total loading Btot still provides more than the desired bit rate, step 354 increments the count and process 300 branches back to step 344 to attempt to reduce the power and loading of another sub-channel. Process 300 reduces gain for only sub-channels m that have negative differences bd (m), i.e., sub-channels where the target bit loading bt(m) was rounded up. Accordingly, the reductions in loading have the most effect for reducing error rates. Further, the reduction in gains g(m) reduces the require transmit power.

**[0036]** Although the invention has been described with reference to particular embodiments, the description is only an example of the invention's application and should not be taken as a limitation. For example, the above-described order in which adjustments are made to the loadings and gains of sub-channels is based on the size of the differences. However, the order of such adjustments can be made based on other factors such as the carrier frequencies of the sub-channels or even in a random order among the sub-channels having positive differences bd(i). As another example, the description gives specific equations for quantities such as the adjustments of gains are given, but other formulations or adjustments can be made to the same or similar effect. Further, although a specific order of process steps has been described, many of the steps can be performed in different orders or in parallel with other steps. Various other adaptations and combinations of features of the embodiments disclosed are within the scope of the invention as defined by the following claims.

## Claims

**1.** A process for determining bit loadings for subchannels of a communication signal, comprising:

measuring noise in the communication signal;
determining target loadings for each sub-channel, wherein the target loading for a sub-channel can be a non-integer value and provides an error probability equal to a target level when the noise is as measure;
rounding the target loadings to generate proposed loadings for the sub-channels, wherein each proposed loading is an integer;
determining, for each sub-channel, a differences between the target and proposed loadings for the sub-channel;
selecting a sub-channel according to the difference for the selected sub-channel; and
changing the proposed loading for the selected sub-channel by 1 to arrive at the bit loading for the selected sub-channel.

**2.** The process of claim 1, wherein selecting a sub-channel comprises selecting the sub-channel for which the difference is positive.

**3.** The process of claim 1 or claim 2, wherein changing the proposed loading comprises increasing the proposed loading by 1.

**4.** The process of any one of the preceding claims, further comprising increasing a gain for the selected sub-channel.

**5.** The process of any one of the preceding claims, further comprising:

setting the difference for the sub-channel to a non-positive value; and
repeating the selecting, changing, and increasing steps one or more times.

**6.** The process of claim 5, wherein each selecting further comprises selecting the sub-channel that then has the largest difference.

**7.** The process of claim 1, wherein selecting a sub-channel comprises selecting the sub-channel for which the difference is negative.

**8.** The process of claim 7, wherein changing the proposed loading comprises decreasing the proposed loading by 1.

**9.** The process of claim 7 or 8, further comprising decreasing a gain for the selected sub-channel.

**10.** The process of claim 7, 8 or 9, further comprising:

setting the difference for the sub-channel to a non-negative value; and
repeating the selecting, changing, and decreasing steps on or more times.

**11.** The process of claim 10, wherein each selecting further comprises selecting the sub-channel that then has the most-negative difference.

**12.** The process of any one of the preceding claims, further comprising adjusting a gain for the selected sub-channel to compensate for changing the proposed loading.

**13.** The process of any one of the preceding claims, wherein measuring noise comprises measuring noise in each sub-channel.

**14.** An ADSL transceiver that performs the process of any one of the preceding claims.

**15.** A process for determining bit loading for sub-channels of a communication signal, comprising:

measuring noise in the communication signal;
using the measured noises in determining proposed loadings of the sub-channels from the measured noise in the sub-channels, wherein each proposed loading indicates an integer number of bits per symbol transmitted on a sub-channel;
setting gains for the sub-channels according to the proposed loadings and the measured noise;
determining whether the proposed loadings provide a desired data rate for the communication signal;
increasing the proposed loadings for one or more selected sub-channels in response to the proposed loadings failing to provide the desired data rate; and
increasing gains for the selected sub-channels to reduces probability of error with the increase loading and the measured noise.

**16.** The process of claim 15, further comprising:

determining for each sub-channel, a difference between a target loading and the proposed loading for the sub-channel; and
rounding each target loading to the nearest integer to obtain the proposed loading for the sub-channel associated with the target loading, wherein:

the target loading can be a non-integer value;
the target loading provides an error probability equal to a threshold level when the noise is as measured; and
for each of the one or more selected sub-channel, a difference between the target and proposed loadings is greater than zero.

**17.** The process of claim 15 or 16, further comprising:

determining whether the proposed loadings provide a data rate greater than the desired data rate for the communication;
decreasing the proposed loading for one or more selected sub-channels in response to the loadings providing a data rate greater than the desired data rate; and
decreasing gains for the selected sub-channels for which the proposed loadings are decreased, whereby power efficiency of the communication signal improves.

**18.** The process of claim 17, further comprising:

determining for each sub-channel, a difference between a target loading and the proposed loading for the sub-channel; and
rounding each target loading to the nearest integer to obtain the proposed loading for the sub-channel associated with the target loading, wherein:
the target loading can be a non-integer value;
the target loading provides an error probability equal to a threshold level when the noise is as measured; and
for each of the one or more selected sub-channel for which the proposed loading is decreased, a difference between the target and proposed loadings is less than zero.


RECEIVER
190
100
ATM OR STM
INTERFACE
191
DESCRAMBLER
AND DECODER
192
DEFRAMER
193
SLICER
194
FREQ. DOMAIN
EQUALIZER
195
DFT
196
BUFFER
197
TIME DOMAIN
EQUALIZER
180
RX HANDSHAKE
170
ADC
160
TRANSMITTER
110
ATM OR STM
INTERFACE
111
SCRAMBLER
AND ENCODER
112
FRAMER
113
TONE
ORDERING
114
MAPPER AND
GAIN SCALER
115
IDFT
116
TX HANDSHAKE
120
CONTROL
130
BUFFER
117
DAC
140
HYBRID
CICUIT
150
152

FIG. 1


200
DETERMINE A TARGET LOADINGS
bt(i) = log2(1+SNRi/Γ)
210
DETERMINE LOADINGS b(i), TOTAL LOADING Btot, AND DIFFERENCES bd(i)
b(i) = round(bt(i))
Btot = Σ b(i)
bd(i) = bt(i) - b(i)
220
DETERMINE GAINS g(i)
g(i) = (x+γ - SNR(i)) + 10 log10(2b(i)-1)
230
INITIALIZE COUNT
240
DOES Btot PROVIDE THE DESIRED DATA RATE?
250
YES
OPTIMIZE LOADINGS AND GAINS
300
NO
IS THE NUMBER Nd OF POSITIVE bd(i) LESS THAN THE COUNT?
260
NO
YES
INCREMENT COUNT
272
THE PROCESS CANNOT ACHIEVE THE DESIRED DATA RATE FOR THE GIVEN SNR
280
SELECT THE SUB CHANNEL j THAT HAS MAXIMUM DIFFERENCE bd(j) AND SET DIFFERENCE bd(j) TO 0
274
ADJUST SUB-CHANNEL LOADING b(j) AND TOTAL LOADING Btot
b(j) = b(j) + 1 AND Btot = Btot + 1
276
ADJUST THE GAIN g(j) FOR THE SELECTED SUB-CHANNEL
g(j) = g(j) + 10 log10 (21-bd(j))
278

FIG. 2


FROM STEP 250
300
310
IS
Btot > (BIT RATE/BAUD RATE)?
NO
DONE
315
YES
320
POWER
OPTIMIZE
POWER EFFICIENCY OR
BANDWIDTH USE?
BANDWIDTH
INITIALIZE COUNT
342
NO
SELECT SUB-CHANNEL k
332
IS THE COUNT
> or = THE NUMBER
OF bd(i) < 0
344
SET
Btot = Btot - b(k)
b(k) = 0
bd(k) = 0
334
346
SELECT THE SUB CHANNEL m
THAT HAS MINIMUM
DIFFERENCE bd(m) AND SET
DIFFERENCE bd(m) TO 0
GO TO STEP 250
336
348
ADJUST THE GAIN g(m) FOR
THE SELECTED SUB-CHANNEL
g(m) = g(m) + 10 log10 (2-1-bd(m))
350
SET
Btot = Btot - 1
b(m) = b(m) - 1
bd(m) = 0
352
IS Btot >
BIT RATE/BAUD RATE?
NO
DONE
360
YES
354
INCREMENT COUNT

FIG. 3

US 20010031016A1

(19) United States
(12) Patent Application Publication (10) Pub. No.: US 2001/0031016 A1
Seagraves (43) Pub. Date: Oct. 18, 2001

(54) ENHANCED BITLOADING FOR MULTICARRIER COMMUNICATION CHANNEL

(76) Inventor: Ernest Seagraves, Fremont, CA (US)

Correspondence Address:
FENWICK & WEST LLP
TWO PALO ALTO SQUARE
PALO ALTO, CA 94306 (US)

(21) Appl. No.: 09/804,676

(22) Filed: Mar. 12, 2001

Related U.S. Application Data

(63) Non-provisional of provisional application No. 60/189,209, filed on Mar. 14, 2000.

Publication Classification

(51) Int. Cl.[7] .................................................... H04L 5/12
(52) U.S. Cl. ........................................... 375/264; 370/431

(57) ABSTRACT

Techniques for identifying an improved bitloading assignment for a multicarrier communication channel are provided. Generally, bit loadings of the sub-channels are equalized (either completely or partially) by selectively decrementing high bitload sub-channels until a desired degree of equalization between the sub-channel bit loadings is achieved. By reducing the bit loading of high bitload sub-channels relative to other sub-channels, the communication channel is effectively desensitized to non-stationary noise.




10
Transmission Line
TX BFR 96
Scram-bler 100
TX Rate Con-verter 101
Bit-to-Symbol Encoder 102
IFFT Mod-ulator 103
TX Filter 104
BFR 106
Transmitter 90
Hybrid 91
Analog Front-End 44
Clock Control 58
Burst CLK 56
A/D Buffer 107
TEQ Equal-izer 108
FFT Demod-ulator 110
FEQ Equal-izer 113
BAM 116
Symbol De-cision / Symbol-to-bit De-coder 114
RCV Rate Con-verter 118
De-scram-bler 120
RX BFR 122
Receiver 92

FIG. 1

Case: 25-2146 Document: 34-1 Page: 311 Filed: 10/05/2026






Fig. 2a




Fig. 2b


FEXT TIME
(Channel B)
SNR Curve
SNR (dB)
Bins 1 2 3 4 5 6 7 8 9
N
Frequency (Hz)
NEXT TIME
(Channel A)
SNR Curve
SNR (dB)
Bins 1 2 3 4 5 6 7 8 9
N
Frequency (Hz)

FIG. 3


Start
Calculate b(i)
405
Round b(i)
410
Calculate $b_{max}$
415
Determine $b_{target}$
420
Calculate difference (Delta) between
$b_{max}$ and $b_{target}$
425
Identify max b(i) and decrement by one bit or more
430
Decrement Delta
435
Yes
Delta > 0?
440
No
Stop

FIG. 4

# ENHANCED BITLOADING FOR MULTICARRIER COMMUNICATION CHANNEL

## CROSS-REFERENCES TO RELATED APPLICATIONS

[0001] This application claims the benefit of U.S. Provisional Application No. 60/189,209, filed on Mar. 14, 2000, which is herein incorporated by reference.

## FIELD OF THE INVENTION

[0002] This invention relates to communication systems, and more particularly, to performing bitloading for multicarrier communication channels subject to non-stationary noise.

## BACKGROUND OF THE INVENTION

[0003] The Telecommunications Standards Section of the International Telecommunication Union (designated as ITU-T) provides recommendations to facilitate the standardization of the telecommunications industry. Two of these recommendations are designated G.992.1 and G.992.2, respectively. Recommendation G.992.1 refers to an asymmetric digital subscriber line (ADSL) transceiver that is an ADSL industry standard for network access at rates up to 8.192 mbit/s downstream (toward subscriber) and 640 kbit/s upstream (toward central office or network administrator). Recommendation G.992.2, on the other hand, refers to an ADSL transceiver that is a lower data rate version of a G.992.1 ADSL transceiver. Bit rates up to 1.5 mbit/s in the downstream direction and 512 kbit/s upstream are possible with this standard. In general, such transceivers are prevalent because they offer practical solutions to communicating data over high traffic networks such as the Internet.

[0004] Both G.992.1 and G.992.2 have an Annex C that defines a special recommendation for ADSL transceivers under the time compression multiplexing—integrated services digital network (TCM-ISDN) noise environment. Each of these respective Annexes is herein incorporated by reference in its entirety. Reference to "Annex C" may be to either or both of G.992.1 and G.992.2. TCM-ISDN is defined in ITU-T recommendation G.961 Appendix III. This recommendation is also herein incorporated by reference in its entirety. Recommendation G.961 Appendix III describes a ping-pong scheme where the transmission (and reception) of data between two transceivers is performed under the control of a 400 Hz clock referred to as the TCM-ISDN timing reference (TTR). G.992.1 and G.992.2 Annex C transceivers transmit and receive signals based on this TTR signal. For example, the central office transceiver transmits the data stream in the first half of the TTR period, and the customer transceiver transmits basically in the second half of the TTR period. Such a ping pong scheme is particularly useful in the context of a communication channel that has high crosstalk interference levels due to the likes of poor quality insulators (e.g., pulp based insulation) within a cable bundle thereby rendering simultaneous transmission from both the central office and customer transceivers impractical.

[0005] The G.992.1 and G.992.2 standards are similar to one another in that they both use a multicarrier modulation scheme referred to as discrete multi-tone (DMT) modulation technology. DMT modulation employs multiple carriers for both upstream and downstream communication. In such multicarrier type systems, frequency-division-multiplexing is often used, where upstream and downstream communication use carriers in different frequency bands, while spectrum overlapping is also possible by using echo cancellers as is known in the art. By working with a large number of carriers rather than a single carrier, the available channel capacity can be maximized thereby optimizing performance of the transmission bandwidth.

[0006] A bitloading algorithm can be employed to ensure that each carrier operates at its optimal loading given a predefined performance margin and desired bit error rate (BER). Various conventional bitloading techniques are available. For example, a water-pouring technique can be employed to achieve an optimal energy distribution for a DMT-based channel. However, such a technique involves difficult computations (especially in DSL applications), and impractically assumes infinite granularity in signal constellation size. The Hughes-Hartogs technique, on the other hand, provides a finite-granularity DMT-based loading algorithm, but at the expense of increased processing time, particularly in ADSL applications.

[0007] Other conventional bitloading techniques involve an iterative algorithm that attempts to equalize the system noise margin on a bin-by-bin basis given a specified BER (e.g., $10^{-7}$). Thus, a constant noise margin is assumed for all bins. While such techniques may provide an optimal solution under stationary noise (e.g., additive white Gaussian noise—AWGN), they provide a sub-optimal solution against non-stationary noise (e.g., impulse noise). For instance, the impact of non-stationary noise on each bin of a channel is, in general, related to the SNR of each bin. Bins having a greater capacity (e.g., peak portion of SNR curve) are more adversely affected by such noise in comparison to bins having a relatively lower capacity (e.g., trough portion of SNR curve). This situation is of particular concern when the channel impairment associated with non-stationary noise causes the SNR to be reduced to an amount greater than the noise margin causing the BER to rise above the target BER (e.g., $10^{-7}$).

[0008] What is needed, therefore, is a technique for providing improved bitloading for a multicarrier communication channel in the presence of non-stationary noise.

## SUMMARY OF THE INVENTION

[0009] One embodiment of the present invention provides a method for identifying a bitloading assignment for a multicarrier communication channel having a number of sub-channels and a disposable bit capacity of one or more bits. The method includes identifying a sub-channel having a maximum bit loading relative to bit loadings of other sub-channels, decrementing the bit loading of the identified sub-channel by at least one bit thereby reducing bit loading differences between the identified sub-channel and the other sub-channels, and decrementing the disposable bit capacity by the number of bits the identified sub-channel loading was decremented. The identifying step and the decrementing steps may be repeated until a desired degree of equalization between the sub-channel bit loadings is achieved (e.g., the disposable bit capacity is zero) thereby producing a bitloading assignment for the multicarrier communication channel.

[0010] Another embodiment of the present invention provides a transceiver for identifying a bitloading assignment

for a multicarrier communication channel having a number of sub-channels and a disposable bit capacity of one or more bits. The transceiver includes a bitloading assignment module for generating the bitloading assignments of the sub-channels by selectively decrementing high bitload sub-channels until a desired degree of equalization between the sub-channel bit loadings is achieved (e.g., until the disposable bit capacity is zero). A bitloading assignment for the multicarrier communication channel is produced.

[0011] These and other embodiments are described in the detailed description of the invention section. The features and advantages described in the specification are not all inclusive and, in particular, many additional features and advantages will be apparent to one of ordinary skill in the art in view of the drawings, specification, and claims. Moreover, it should be noted that the language used in the specification has been principally selected for readability and instructional purposes, and not to limit the inventive subject matter.

## BRIEF DESCRIPTION OF THE DRAWINGS

[0012] **FIG. 1** is a block diagram of an ADSL transceiver that can perform bitloading in accordance with one embodiment of the present invention.

[0013] **FIG. 2*a*** illustrates a timing diagram for a TCM-ISDN transmission line.

[0014] **FIG. 2*b*** illustrates a diagram of interference at a central office from several ISDN lines transmitting in synchronization.

[0015] **FIG. 3** illustrates a relationship between sub-channel capacity and signal to noise ratio in a multicarrier communication system.

[0016] **FIG. 4** is a flow chart illustrating a method for identifying an improved bitloading assignment for a multi-carrier communication system in accordance with one embodiment of the present invention.

## DETAILED DESCRIPTION OF THE INVENTION

[0017] **FIG. 1** is a block diagram of an ADSL transceiver that can perform bitloading in accordance with one embodiment of the present invention. Transceiver **10** is comprised of a transmitter **90**, an analog front-end **44**, a hybrid circuit **91**, a clock control unit **58**, and a receiver **92**. One or more of the functions shown in **FIG. 1** may be implemented by a digital signal processor (DSP). For example, transmitter **90** and or receiver **92** can be effected by DSP technology. Additionally, one or more of the functions shown in **FIG. 1** may be implemented in software, hardware, firmware, or any combination thereof. Those skilled in the art will appreciate that although the components comprising transceiver **10** are depicted as individual units, any combination of the components may also be implemented in a single discrete unit. For example, transmitter **90** and receiver **92** can be implemented in a single DSP chip or chip set. Transceiver **10** can be used either at the customer premises or at the central office. The central office implementation is shown in the example.

[0018] Overview

[0019] Hybrid circuit **91** performs 2-to-4-wire conversion thereby converting the bi-directional two-wire signal from the transmission line into two pairs of one-directional transmissions. One pair is for receiving and the other pair is for transmitting. Hybrid circuit **90** can include a splitter to filter-out undesired signals outside the desired transmission band. For example, the low frequency plain old telephone service (POTS) signal can be blocked by the splitter so that the POTS signal will not interfere with the high frequency ADSL signal, as is well known in the art. Hybrid circuit **91** may also include an isolation transformer for isolating the electronics of transceiver **10** from the transmission line.

[0020] Analog front-end **44** includes an analog-to-digital (A/D) converter and a digital-to-analog (D/A) converter (neither converter is shown). The separated, filtered signal received by analog front-end **44** from hybrid circuit **91** is converted from analog to digital by the A/D converter, and is sent to receiver **92**. Analog front-end **44** may further comprise a gain adjust module for optimizing the signal sent to receiver **92**. The output from transmitter **90**, on the other hand, is converted from digital to analog by the D/A converter in analog front-end **44**, and is filtered and sent to hybrid circuit **91**.

[0021] Transmitter

[0022] Transmitter **90** is comprised of a transmit buffer **96**, a scrambler **100**, a transmitter rate converter **101**, a bit-to-symbol encoder **102**, an IFFT modulator **103**, a transmitter filter **104** and a buffer **106**. Data ready for transmission is received from the customer's data terminal equipment or from the telephone company's network, and is buffered by transmit buffer **96**.

[0023] Scrambler **100** operates on the input data bits in order to randomize the data pattern. Such randomizing is for optimizing the transmission performance. Scrambling also minimizes the possibility of repetitive data patterns. In one embodiment, scrambler **100** is further combined with a forward error correction (FEC) encoder module and an interleaver module. Such modules can be implemented to further ensure a robust and efficient transmission, as is well known in the art.

[0024] Transmitter rate converter **101** can be used to insert dummy bits into the scrambled data stream to equalize the difference between the user data rate, which is typically a multiple of 32 kilobits per second (kbps), and the physical layer data rate, which is not necessarily a multiple of 32 kbps.

[0025] Bit-to-symbol encoder **102** receives sequences of bits from transmitter rate converter **101** and encodes them as signal points in a signal constellation. This process is generally referred to as bitloading. For QAM modulation, a two-dimensional signal constellation is used where each signal point in the constellation has an in-phase component and a quadrature component. Depending on the signal constellation size of each sub-channel, each symbol carries multiple bits. For example, 64-QAM has 64 signal points in the constellation, meaning that in each symbol, a sub-channel can carry six binary bits. An even bigger signal constellation (e.g., 128 point constellation) may be used to carry more bits per symbol. The total number of bits transmitted is the sum of the number of bits transmitted by

each sub-channel. In one embodiment, bit-to-symbol encoder **102** further includes a convolutional encoder module for obtaining the coding gain. Bit-to-symbol encoder **102** may alternatively include (or have access to) a bitloading assignment module **116**, which produces a bitloading assignment in accordance with the present invention. This bitloading assignment module **116** will be explained in the context of receiver **92**.

[0026] The bit-to-symbol encoder **102** is followed by IFFT modulator **103** that modulates the signal constellations (e.g., QAM constellations) on to the available transmission sub-channels and combines all the sub-channels together for transmission.

[0027] The transmission rate of transmitter **90** is a function of the total number of bits per symbol and the symbol rate. For example, using 96 sub-channels with each sub-channel carrying 8 bits per symbol, at a 4 K-baud symbol rate, a transmission rate of 4×96×8=3072 kbit/second is achieved. Due to TCM-ISDN noise, if the FEXT bitmap mode is used, each transmission direction sends data in only 126/340=37% of the time. Hence, the average transmission rate in the example case above is 1138 kbps≈1120 kbps (rounded to the nearest multiple of 32 kbps). Thus, a user data rate of 1120 kbps can be achieved, while the physical layer data rate is 1138 kbps. Dummy bits inserted by transmitter rate converter **101** compensate for the difference between the two rates.

[0028] Transmission filter **104** shapes the transmitted signal and reduces out-of-band signal components. A cyclic prefix can be added before the transmission filter **104** to add separation between symbols in order to help the receiver eliminate inter-symbol interference. Buffer **106** stores the filtered samples for transmission. The D/A converter of analog front-end **44** converts the samples to analog signals. Those analog signals can then be filtered, amplified and coupled to the transmission line via hybrid **91**.

[0029] Clock Control

[0030] At the central office, clock control **58** receives burst clock **56** (also referred to as the TCM-ISDN timing reference or TTR) from the central office TCM-ISDN burst-timing control circuit (not shown). The TTR is used to lock the central office transceiver (ATU-C) local clock frequency, which controls the ATU-C A/D and D/A sampling rates, and the transmitter and receiver symbol rates. The ATU-C transmitter also checks the phase of the system TTR, and locks its hyperframe window to the TTR. At the remote transceiver (ATU-R), the receiver tracks the received signal from ATU-C transmitter, and locks the local clock to the ATU-C clock frequency. ATU-R also detects the hyperframe pattern from the received signal from the ATU-C, and aligns its symbol counter to the hyperframe pattern (referred to as hyperframe alignment). The symbol counter is used to track the symbol index, and is incremented by 1 for each symbol. The counter is reset to zero when it reaches 345.

[0031] Receiver

[0032] Receiver **92** includes an A/D buffer **107**, a time-domain equalizer (TEQ) **108**, an Fast Fourier Transform (FFT) demodulator **110**, a frequency-domain equalizer (FEQ) **113**, a symbol decision/symbol-to-bit decoder module **114**, a bitloading assignment module (BAM) **116**, a receiver rate converter **118**, a descrambler **120** and the receiver buffer **122**. Data is received from the from the transmission line, processed through hybrid **91** and converted to its digital equivalent by the AD converter of analog front-end **44**. A/D buffer **107** receives the digital signal from analog front-end **44**.

[0033] TEQ **108** compensates for channel distortion in the time-domain such that the combined impulse response of the communication channel and TEQ **108** is within the length of the cyclic prefix. FFT demodulator **110**, which is coupled to TEQ **108**, separates and demodulates all the sub-channels. The cyclic prefix is removed after TEQ **108**.

[0034] After FFT demodulator **110**, FEQ **113** provides further compensation for amplitude and phase distortion for each carrier (note that carrier can also be referred to as bin or sub-channel). Thus, there is one FEQ **113** for each sub-channel of communication. The equalizer coefficients characterize the distortion of the associated sub-channel and can be used to compensate for that distortion.

[0035] Symbol decision/symbol-to-bit decoder module **114** decides which signal point from the signal constellation represents the received signal at each sub-channel. The actual structure of symbol decision/symbol-to-bit decoder module **114** may vary depending on the encoding scheme used by the remote transmitter. For an uncoded system, the symbol decision portion of module **114** may be a slicer. For a Trellis-code modulation system, a Viterbi decoder can be used for symbol decision to improve the reliability of the decision. Generally, the difference between the output of FEQ equalizer **113** and the output of symbol decision is the error signal that can be used to adjust the FEQ coefficients.

[0036] Since in each symbol, each sub-channel can encode a series of bits, the symbol-to-bit decoder portion of module **114** converts the symbols to binary bits. Thus, symbol decision/symbol-to-bit decoder module **114** is used to recover the bit stream that was loaded into the transmitted constellations by bit-to-symbol encoder **102** of the remote transceiver's transmitter **90**.

[0037] Symbol decision/symbol-to-bit decoder module **114** also includes (or has access to) a bitloading assignment module **116**, which improves a bitloading assignment in accordance with the present invention. The functionality of the bitloading assignment module **116** is described in detail with reference to **FIG. 4**. Although the embodiment illustrated in **FIG. 1** shows bitloading assignment module **116** as part of symbol decision/symbol-to-bit decoder module **114**, the functionality of bitloading assignment module **116** can be effected in other transceiver components or in a self contained module. Note that the bitloading assignment module **116** could alternatively be operatively coupled to the bit-to-symbol encoder **102** of the transmitter as will be explained.

[0038] Receiver rate converter **118** removes dummy bits inserted by the remote transmitter rate converter **101**, and passes only user data bits to descrambler **120**. Descrambler **120** restores the bits to their original value before they were scrambled by scrambler **100** of the transmitting transceiver. The de-scrambled bit stream is buffered by receive buffer **122** before being sent to a high-speed data network at the central office, or to the customer's data terminal equipment. In one embodiment, descrambler **120** is further combined with a forward error correction (FEC) decoder module and a deinterleaver module to ensure a robust and efficient transmission.

[0039] Those skilled in the art will appreciate that transceiver **10** shown in **FIG. 1** is only an example of one possible transceiver configuration. Other transceivers may be comprised of components not specifically represented in the figure (e.g., tone ordering module, CRC unit, modulating signal generator). Also, other transceivers may not include the components shown in **FIG. 1**. In short, the configuration of the transceiver depends on factors such as the particular application (e.g., ADSL-based applications). Also note that, depending on the transceiver's mode of operation (e.g., data mode, TEQ training mode, bitloading optimization mode, FEQ training mode), the various components shown may or may not actually come into play. For example, the scrambler **101**, transmit rate converter **101**, descrambler **120** and receive rate converter **118** are generally only used in the data mode after transceiver **10** has been trained and equalized. The principles of the present invention can be applied to a number of multicarrier-based systems, and is not intended to be limited to any one particular system or transceiver type.

[0040] **FIG. 2***a* illustrates a timing diagram for a TCM-ISDN transmission line. During time period or window **22**, data is transmitted from a TCM-ISDN transceiver at the central office to the remote TCM-ISDN transceiver at the customer's premises. The downstream data arrives at the remote transceiver of the customer's premises during window **24**. A pause occurs after this downstream transmission is complete. This pause is sometimes called the turnaround period of the TTR. During window **26**, upstream data is transmitted from the customer's premises transceiver to the remote central office transceiver. The upstream data arrives at the remote transceiver of the central office during reception window **28**. At any particular time, only one end of the TCM-ISDN line is transmitting, while the other end is receiving. Echo cancellation is not needed since the echo of the transmitted signal does not have to be removed. While such a TCM-ISDN system is effective for reducing crosstalk in the TCM-ISDN system, ADSL systems operating in the same cable bundle must also perform under the crosstalk from the ISDN lines.

[0041] **FIG. 2***b* illustrates an example diagram of crosstalk interference at a central office from several ISDN lines transmitting in synchronization. Crosstalk interference between the various wire-pairs bundled together in a conventional copper transmission line is a major contributor to channel impairment. Generally, crosstalk interference belongs to one of two groups: near end crosstalk (NEXT) and far end crosstalk (FEXT). NEXT is the crosstalk caused by signals in adjacent lines transmitted from the same end of the transmission line, while FEXT is the crosstalk caused by signals in adjacent lines transmitted from the remote end of the transmission line. NEXT is typically much stronger than FEXT. The ADSL symbols under FEXT noise are called FEXT symbols, while all the other symbols are called NEXT symbols.

[0042] FEXT bitmap mode Annex C transceivers synchronize the transmission and reception to the TCM-ISDN timing reference (TTR) so that the receiver receives signal in FEXT time where the signal-to-noise ratio is higher, while it receives no signal (e.g., in a FEXT bitmap mode, also referred to as a single bitmap mode) or signal at a lower data rate (e.g., in a dual bitmap mode) in NEXT time where the signal-to-noise ratio is low. As such, the ADSL transceivers function under a TCM-ISDN crosstalk noise environment having a level that changes periodically.

[0043] In general, the transceiver of the central office receives NEXT noise from the ISDN in one half of the TTR period (e.g., time period **22**) and FEXT noise from the ISDN in the other half of the TTR period (e.g., time period **28**). On the other hand, the remote transceiver at the customer's premises receives FEXT noise from the ISDN in the first half of the TTR period and NEXT noise from the ISDN in the second half of the TTR period. As shown in **FIGS. 2***a* and **2***b*, a burst of data is sent from the central office to the remote sites during time period **22**. NEXT is particularly strong at the central office side during transmit period **22** since the transceivers at the central office are all transmitting. During time period **28**, these transceivers at the central office are not transmitting, and the interference at the central office is primarily FEXT, which is weaker than NEXT since it is attenuated by the length of the transmission line.

[0044] Annex C defines a dual bitmap mode (DBM) encoding method for providing dual bitmaps that are switched synchronized with the hyperframe pattern that is synchronized to the TTR to provide a data stream having dual bit rates. The method is based on the observation that for short local loops (e.g., less than about two kilometers), the channel signal-to-noise ratio (SNR) can be sufficiently high during NEXT interference to transmit data at a low bit rate. Thus, under certain conditions DBM allows full-duplex operation of TCM-IDSN transceivers by employing different bit rates under NEXT and FEXT interference, respectively. In this sense, the communication channel operating under DBM in a TCM-ISDN environment is effectively two communication channels: one is a FEXT channel and the other is a NEXT channel.

[0045] For longer local loops, however, the SNR during NEXT time is typically too low for transceivers to send any data. In that case, therefore, the data transmission occurs only in FEXT time. This is referred to as FEXT bitmap mode (FBM) of encoding, also referred to as single bitmap mode (SBM). With FBM encoding, the central office and the remote transceivers are transmitting data only in FEXT time, and do not transmit data simultaneously (half-duplex mode).

[0046] In DBM encoding, bit rates can be changed by changing the bitmaps used to encode the symbols to be transmitted. As is understood by those skilled in the art, a "bitmap" determines the number of bits that can be encoded into each sub-channel in a symbol. A "symbol" is the basic unit of information transmitted by the transceiver. The number of bits encoded into each sub-channel in a symbol is limited by the quality of the communication channel. The quality of the communication channel can be represented by its SNR. Thus, a system employing DBM includes two bitmaps for providing different data rates: one bitmap for NEXT time and one bitmap for FEXT time. A system employing FBM, on the other hand, needs only one bitmap (e.g., a FEXT bitmap) since no data signal is transmitted in NEXT time.

[0047] **FIG. 3** illustrates FEXT and NEXT bitmaps for a full-duplex communication channel. This communication channel might be effected, for example, by a pair of ADSL Annex C transceivers employing DBM encoding under a TCM-ISDN noise environment. In general, such an ADSL Annex C transceiver pair effectively trains and operates on

two different channels. More particularly, the two different channels are really the same channel operating under two different types of crosstalk noise. The first channel (channel A) exists during NEXT time, while the second channel (channel B) exists during FEXT time. Note that other multicarrier communication systems might have only one effective channel.

[**0048**] As shown in **FIG. 3**, each of these effective channels is associated with a particular SNR curve. This SNR curve or pattern can be characterized by the receiver of one transceiver when it receives a training signal (e.g., Medley transmission signal period of Annex C) from the transmitter of the other transceiver (included in that transceiver pair) during a bitloading training sequence. The maximum number of bits that each sub-channel can carry can then be determined by the receiver based on the SNR corresponding to that sub-channel. Other factors, such as the SNR gap and desired performance margin, may also be used to determine the maximum number of bits that each sub-channel can carry. The resulting pattern of sub-channel bit capacities is the maximum possible bitloading assignment of the communication channel (generally referred to as the initial bitloading assignment herein). This initial bitloading assignment can then be reduced to meet the target service requirement ($b_{target}$) in accordance with the present invention. The resulting bitloading assignment provides better performance in the presence of non stationary noise and interference.

[**0049**] Note that a bitloading training sequence can be performed for each effective channel. Likewise, bitloading training sequences can be performed for both the upstream and downstream directions. Thus, one bitmap (e.g., NEXT bitmap) is developed for channel A—upstream, and a second bitmap (e.g., FEXT bitmap) is developed for channel B—upstream. Likewise, one bitmap (e.g., NEXT bitmap) is developed for channel A—downstream, and a second bitmap (e.g., FEXT bitmap) is developed for channel B—downstream.

[**0050**] As each effective channel has its own unique bitmap, each effective channel has a unique overall capacity, where the associated sub-channels (bins) are each capable of carrying a certain number of bits. Thus, each channel has a unique maximum bitloading assignment depending on the capacity of its associated bins. One embodiment of the present invention allocates the bits to be transmitted between channels A and B so as to equalize the number of bits per sub-channel. In such an embodiment, each unique bitloading assignment makes up a portion of an overall bitloading assignment. For example, channel A's bitloading assignment 2, 2, 4, 3, 2 can be combined with channel B's bitloading assignment 4, 4, 6, 5, 4 to make an overall bitloading assignment of 2, 2, 4, 3, 2, 4, 4, 6, 5, 4. Thus, the unique maximum capacity assignments of channel A and channel B can be processed together as one large bitloading assignment process. Once an is overall bitloading assignment is achieved, it can be separated back into two bitloading assignments, one for channel A and one for channel B. Alternatively, bits can be allocated between channels A and B, and then bits can be allocated within channel A and within channel B. Note that the loadings of the bins of a channel (or each effective channel) can be represented in a bit vector to facilitate the bitloading assignment enhancement process in accordance with the present invention.

[**0051**] In an alternative embodiment having only one effective channel, the bitloading assignment process is simplified in that there is no need to allocate bits to be transmitted between two or more channels. Rather, the bits associated with the bins of that one channel could simply be equalized without considering the bit loading of another effective channel.

[**0052**] Note that complete equalization (all bins having the exact same bit loading) may not be possible given factors such as a limited overall channel capacity and a high $b_{target}$ (e.g., desired number of bits per symbol also referred to as target loading). However, a partial equalization of bits in accordance with the present invention can also provide an improved bitloading scheme. Thus, complete equalization is not necessarily the present invention's objective. Rather, and in a general sense, the present invention provides a means for achieving an improved bitloading scheme by reducing the probability of error resulting from non-stationary noise. Such improved bitloading can be achieved with varying degrees of bit loading equalization among the individual sub-channels.

[**0053**] By equalizing (whether partially or completely) the number of bits per sub-channel, the multicarrier communication system can effectively be desensitized to non-stationary noise (e.g., impulse noise). By way of example, assume a channel is comprised of six sub-channels (bins). Further assume that the overall capacity ($b_{max}$) of the channel is 18 bits, where the respective bit capacities of bins one through six are as follows: bin one has 2 bits, bin two has 4 bits, bin three has 5 bits, bin four has 3 bits, bin five has 2 bits, and bin six has 2 bits for an initial assignment of (2, 4, 5, 3, 2, 2). In addition assume, that the desired $b_{target}$ is 15 bits per symbol. Thus, the channel has a disposable bit capacity of 3 bits.

[**0054**] In accordance with one embodiment of the present invention, the bin having the greatest number of bits loaded is identified, and its loading is reduced to bring that loading in line with the number of bits loaded in other bins of that channel. In the example, bin **3** has the greatest loading at 5 bits. This loading can be reduced in accordance with the present invention thereby yielding the following modified assignment (2, 4, 4, 3, 2, 2). The total bits assigned to this channel is now 17, which is greater than the target of 15 so the process continues. As both bins **2** and **3** now have 4 bits each, either can be reduced by one bit. By choosing bin **2** for reduction, the resulting assignment is (2, 3, 4, 3, 2, 2). The total bit assignment is now 16. Bin **3** now has the maximum of 4 bits and is reduced to 3 resulting in an assignment of (2, 3, 3, 3, 2, 2) with a total of 15. This total now matches the target so the process stops and this is the final bitloading assignment. This reduction can be made one bit at a time, analyzing all the bin loadings after each decrementing iteration so that the next bin for reduction can be identified. Alternatively, the reduction can be made all at once in a single iteration. The granularity of the reduction performed (e.g., bit-by-bit or other) depends on factors such as the number of bins associated with the communication channel, the maximum capacity pattern or bitmap associated with the communication channel, and the processing power of the associated transmitting transceiver.

[**0055**] For ADSL Annex C applications there are two effective channels A and B that are switched between as

explained above. One channel is used for a longer duration than the other per the G.992.1 and G.992.2 Annex C specification. In this application, the weighted average of the total bit assignments for both channel A and B needs to match $b_{target}$. Thus, the equation $b_{target} \leqq b_{target}(A)*x+b_{target}(B)*(1-x)$ must be satisfied with near equality (e.g., less than 1 bit difference between the two sides of the equation). Also $b_{target}(A)$ must be less than or equal to $b_{max}(A)$ and $b_{target}(B)$ must be less than or equal to $b_{max}(B)$. Since $b_{target}$, $b_{target}(A)$, and $b_{target}(B)$ are integers, and physical constraints are placed on $b_{target}(A)$ and $b_{target}(B)$, perfect equality cannot always be achieved. When this issue arises, $b_{target}(A)$ and $b_{target}(B)$ are chosen such that the weighted average is slightly larger (e.g., less than one bit larger) than $b_{target}$. This disposable bit capacity (sometimes referred to as dummy bits) can be discarded at the receiver.

**[0056]** Assume a fractional number x between 0 and 1 to represent the fraction of time channel A is used and let 1−x represent the amount of time channel B is used. Those skilled in the art will understand that x is basically the ratio of FEXT frames in a hyperframe to total frames in a hyperframe (e.g., 128/345). In addition, $b_{total}$ is the total bits assigned to the channel at any one time, where $b_{total}(A)$ is the total bits assigned to A channel and $b_{total}(B)$ is the total bits assigned to the B channel. Also, assume $b_{total}(A)$ is initialized to $b_{max}(A)$, and $b_{total}(B)$ is initialized to $b_{max}(B)$.

**[0057]** In this scenario the bitloading assignment problem can be broken down into two problems. First determining how many bits to allocate to channel A and channel B, then allocate those bits to sub-channels within channels A and B. From the equation above using the target total bit assignment $b_{target}$, the capacities of channels A and B, $b_{max}(A)$ and $b_{max}(B)$, the $b_{target}$ for channels A and B ($b_{target}(A)$ and $b_{target}(B)$) can be determined. Once $b_{target}(A)$ and $b_{target}(B)$ are determined then the bitloading within channels A and B can proceed independently as two individual bit assignment problems in accordance with the present invention.

**[0058]** The calculation of $b_{target}(A)$ and $b_{target}(B)$ is achieved employing the techniques described herein. The values of $b_{total}(A)$ and $b_{total}(B)$ are initialized with $b_{max}(A)$ and $b_{max}(B)$. The largest of $b_{total}(A)$ or $b_{total}(B)$ is decremented until $x*b_{total}(A)+(1-x)*b_{total}(B)$ is equal to or just larger than $b_{target}$ (e.g., less than one bit larger). Assume that channel A is the FEXT channel and channel B is the FEXT channel. Normally FEXT channel A will be larger than NEXT channel B (assuming FEXT channel A has a better SNR), so FEXT channel A will be decremented until the process stops or until it is equal to NEXT channel B. The decrementing will then ping pong back and forth between channel A and B until $b_{target}$ is met. The choice of which channel (e.g., FEXT channel or the NEXT channel) to decrement is made to maintain a difference between $b_{total}(A)$ and $b_{total}(B)$ of 1 bit or less and to minimize the number of dummy bits. The resulting $b_{total}(A)$ and $b_{total}(B)$ are the solution $b_{target}(A)$ and $b_{target}(B)$.

**[0059]** Note that decrementing the FEXT channel A decrements $b_{total}$ by approximately x (e.g., 0.37 bits), and decrementing the NEXT channel B decrements $b_{total}$ by approximately 1−x (e.g., 0.63 bits). For example, if the difference between $b_{total}$ and $b_{target}$ is less than 0.63, but greater than 0.37, then only the FEXT channel A can be further decremented to achieve $b_{target}$. If the difference between $b_{total}$ and $b_{target}$ is less than 0.37, then neither the FEXT channel A or the NEXT channel B is further decremented. If the difference between $b_{total}$ and $b_{target}$ is greater than 0.63, then the channel having the greater $b_{total}$ (whether it be $b_{total}(A)$ or $b_{total}(B)$) is decremented. Once $b_{target}$ is achieved ($b_{total}(A)$ and $b_{total}(B)$ are equalized), then the bitloading assignment process within channels A and B proceeds independently as two individual bitloading assignment problems in accordance with the present invention.

**[0060]** Equalizing the bit loadings of the individual bins of a multicarrier channel in accordance with the present invention can be performed in degrees. The degree of bit equalization across the bins of a channel depends on factors such as the number of disposable bits given a desired $b_{target}$ (e.g., desired number of bits per symbol), the maximum number of bits that can be transmitted through the channel ($b_{max}$) and the desired BER. In one embodiment of the present invention, equalization is performed until the total bits loaded ($b_{total}$) is equal to $b_{target}$. In alternative embodiments, equalization is performed until the bins associated with the communication channel have an optimally improved bitloading assignment given constraints such as depleted disposable bit capacity. In such an embodiment, not all bins have the same bit loading, but maximum capacity bins have had their bitloads reduced thereby reducing the bit loading difference between those bins and other lower capacity bins.

**[0061]** **FIG. 4** is a flow chart illustrating a method for identifying an improved bitloading assignment for a multicarrier communication system in accordance with one is embodiment of the present invention. This method can be employed, for example, by a multicarrier communication system that is susceptible to non-stationary noise, such as a DMT-based system. In a more general sense, this method can be applied to any multicarrier communication system having a number of sub-channels, a maximum capacity pattern or bitmap, and a disposable bit capacity of one or more bits. Thus, this method is not intended to be limited to any one particular multicarrier communication system or transceiver type.

**[0062]** The method includes calculating **405** the number of bits that can be transmitted through each sub-channel, which is referred to as b(i). In one embodiment, b(i) is calculated by:

$$b(i) = \log_2\left(1 + \frac{SNR(i)}{\Gamma \cdot \gamma_{marg\ in}}\right)$$

**[0063]** where b is the number of bits for a sub-channel i; SNR is the SNR estimate of a sub-channel i (e.g., based on training signals as explained above); Γ (gamma) is the SNR gap of the chosen system parameters (e.g., bit error rate of $10^{-7}$) for a sub-channel i, and $\gamma_{margin}$ is the specified system performance margin.

**[0064]** The method may further include rounding **410** b(i) to the nearest whole bit. For example, fractional bits of 0.5 or less are rounded down (e.g., 4.3 bits goes to 4 bits), while fractional bits greater than 0.5 are rounded up (e.g., 4.6 bits goes to 5 bits). The method further includes calculating **415** the maximum number of bits that can be transmitted through the channel ($b_{max}$) based on the rounded maximum number

of bits that can be transmitted by each sub-channel, which can be calculated by:

$$B_{max} = \sum_i b(i)$$

[0065] Thus, the summation of the total bits that can be carried by each sub-channel of a particular channel represents the overall capacity of that particular channel.

[0066] The method further includes determining **420** the number of bits per symbol or target loading ($b_{target}$), which can be determined, for example, based on the likes of system configuration options or specified system performance goals. Regardless of how $b_{target}$ is determined, the method further includes calculating **425** the difference between $b_{max}$ and $b_{target}$, which is referred to as Delta. It is assumed that $b_{max}$ is greater than $b_{target}$, which indicates that the available overall capacity exceeds the desired $b_{target}$ thereby providing a cushion of disposable bit capacity. In the event that $b_{max}$ is less then $b_{target}$, then $b_{target}$ must be lowered.

[0067] The method proceeds with identifying **430** the bin having the maximum loading (as defined by b(i)), and then decrementing that loading by one bit or more. In the event that more than one bin has the same high loading, then a selection from those particular bins can be made to determine which bin will be decremented. For example, the first bin identified as having the max b(i) could be selected for decrementing. Alternatively, the bin having the smallest round off error (e.g., the difference between b(i) of step **405** and the rounded b(i) of step **410**) could be selected for decrementing. Alternatively, the bin associated with a particular frequency range (e.g., the highest or lowest) could be selected for decrementing. Thus, the bin selection in such a case can be based on a predefined selection scheme, whether that selection be arbitrary or based on some quality or characteristics associated with the bin.

[0068] Note that the point of decrementing the bins having the greater bitloads is to reduce the difference between the loading of those bins and the loading of the other bins so as to achieve an improved bitloading assignment. Thus, whether the decrementing is performed in one bit increments, two bit increments or N bit increments depends on factors such as the number of bins associated with the communication channel, the target bitload of the communication channel, the maximum capacity pattern or bitmap associated with the communication channel and the processing power of the associated transmitting transceiver. For example, if the bitmap is such that a group of fifteen sub-channels have loadings that are two or more bits greater than the loadings of any other sub-channels, and the disposable bit capacity is such that those high bitload sub-channels can each be decremented by two bits without cutting into the target bitload, then those high bitload sub-channels could be reduced by 2 bits per iteration for a total of fifteen iterations.

[0069] Alternatively, those high bitload sub-channels could be each be reduced by 2 bits in a single iteration. Thus, processing time for developing the improved bitloading assignment can be reduced by using a greater than one bit per iteration reduction scheme. However, the given bitmap may make it necessary to perform one bit iterations to ensure an improved bitloading assignment. For example, it may be necessary to perform one bit iterations if all of the sub-channels are within one bit of each other, or the cushion of disposable bit capacity is relatively small (e.g., under 5 bits) and there are large number (e.g., 96) of sub-channels.

[0070] The method further includes decrementing **435** the Delta value. This adjustment allows the Delta value to reflect the decremented overall channel loading resulting from decrementing the loading of a particular bin in step **430**. The method may also include determining **440** as to whether Delta is greater than zero. If Delta is zero, then the cushion of disposable bit capacity has been utilized and an optimally improved bitloading scheme for that particular channel has been achieved in light of the given parameters (e.g., $b_{max}$ and $b_{target}$). However, if Delta is greater than zero, then steps **430**, **435** and **440** can be repeated until Delta is equal to zero thereby indicating that an optimally improved bitloading has been achieved in accordance with one embodiment of the present invention.

[0071] Alternatively, steps **430**, **435** and **440** can be repeated until a desired degree of equalization between the sub-channel loadings is achieved. In such an embodiment, although Delta should not go below zero, it need not actually reach zero in order to indicate improved bitloading has been achieved. For example, assume that the improved bitloading assignment for a communication channel having six sub-channels is: 3, 3, 3, 3, 3, and 3 bits. Further assume that the target load ($b_{target}$) for the channel is 15 bits. Thus, there is a disposable bit capacity (Delta) of 3 bits. However, the bitloading assignment has been completely equalized as all the sub-channels have the same bit loading. In such a case, the service could be upgraded to a $b_{target}$ of 18 bits. Alternatively, the method may simply continue to decrement despite the perfect equalization resulting in a bitloading assignment of, for example, 2, 2, 2, 3, 3, and 3 bits. In another example, assume that the improved bitloading assignment for a communication channel having six sub-channels is: 2, 2, 2, 4, 3, and 2 bits. Further assume that the target load ($b_{target}$) for the channel is 15 bits. As such, there is a Delta of 0 bits. Further assume that bin four was reduced from 8 bits to 4 bits, while none of the other bin loadings were decremented. Thus, an optimally improved bitloading assignment (given constraints such as the depleted disposable bit capacity) has been achieved in accordance with the present invention.

[0072] This method can be carried out, for example, by hardware, software, firmware or any combination thereof. In one embodiment, the method is carried out by codes or a set of instructions executed by a DSP processor. For example, the method could be carried out as part of the functionality of symbol decision/symbol-to-bit decoder **114** and bitloading assignment module **116** (with respect to receive side) and the bit-to-symbol encoder **102** (with respect to transmit side). More specifically, the symbol decision/symbol-to-bit decoder **114** of the receiving transceiver can define the maximum capacity assignment (referred to as initial bitloading assignment herein) of the corresponding channel (e.g., during a bitloading training session). The initial bitloading assignment can then be improved or enhanced by bitloading assignment module **116** in accordance with the method. The resulting bitloading assignment could then be provided to the transmitting transceiver. The bit-to-symbol encoder **102** of the transmitting transceiver could then use the bitloading

assignment to perform bitloading. Note the initial bitloading assignment and the resulting bitloading assignment can be developed in the same module (e.g., symbol decision/symbol-to-bit decoder **114** includes the functionality of the bitloading assignment module **116**).

[**0073**] Regardless of where the initial bitloading assignment is determined, the method can operate on the initial bitloading assignment thereby producing an improved bitloading assignment for the channel. This improved bitloading assignment can then be used by the likes of bit-to-symbol encoder **102** when performing its bitloading function (e.g., during data mode).

[**0074**] The foregoing description of the embodiments of the invention has been presented for the purposes of illustration and description. It is not intended to be exhaustive or to limit the invention to the precise form disclosed. Many modifications and variations are possible in light of the above teaching. For example, the present invention need not be limited to ADSL Annex C transceivers, but rather can be applied to any transceiver communicating over a multicarrier modulated channel. Once the channel characteristics (e.g., SNR curve) of the multicarrier channel are known, the loading of the individual bins making up that channel can be adjusted in accordance with the present invention. It is intended that the scope of the invention be limited not by this detailed description, but rather by the claims appended hereto.

What is claimed is:

**1**. A method for identifying a bitloading assignment for a multicarrier communication channel having a number of sub-channels, a maximum capacity assignment, and a disposable bit capacity of one or more bits, the method comprising:

identifying a sub-channel having a maximum bit loading relative to bit loadings of other sub-channels;

decrementing the bit loading of the identified sub-channel by at least one bit thereby reducing bit loading differences between the identified sub-channel and the other sub-channels;

decrementing the disposable bit capacity by the number of bits the identified sub-channel loading was decremented; and

repeating the identifying step and the decrementing steps until a desired degree of equalization between the sub-channel bit loadings is achieved thereby producing a bitloading assignment for the multicarrier communication channel.

**2**. The method of claim 1, wherein the steps are carried out by a set of codes or instructions executed by a processor included in a transceiver of the multicarrier communication system.

**3**. The method of claim 1, wherein in response to a number of sub-channels having the same maximum bit loading, the identifying step further includes:

selecting one of the sub-channels having the same maximum bit loading based on a predefined selection scheme.

**4**. The method of claim 1, wherein the number of bits by which the identified sub-channel loading is decremented depends on at least one of the number of sub-channels of the multicarrier communication channel, the disposable bit capacity of the multicarrier communication channel, and a bitmap associated with the multicarrier communication channel.

**5**. The method of claim 1, further comprising:

transmitting the bitloading assignment to a remote transceiver operatively coupled to the multicarrier communication channel thereby allowing the remote transceiver to use the bitloading assignment in performing bitloading.

**6**. The method of claim 1, wherein the desired degree of equalization between the sub-channel bit loadings is achieved when the disposable bit capacity is zero.

**7**. The method of claim 1, wherein the bitloading assignment produced by the method desensitizes the multicarrier communication channel to non-stationary noise.

**8**. The method of claim 1, wherein the multicarrier communication channel is realized with an ADSL Annex C transceiver pair coupled to one another via a transmission line.

**9**. The method of claim 1, wherein the multicarrier communication channel is effectively two different channels, one being a FEXT time channel and the other being a NEXT time channel, each effective channel having a unique maximum capacity assignment upon which the method operates thereby producing a first bitloading assignment for the FEXT channel and a second bitloading assignment for the NEXT channel.

**10**. The method of claim 1, wherein the maximum capacity assignment of the multicarrier communication channel is derived from a bitmap prepared during a bitloading training session.

**11**. The method of claim 1, wherein the maximum capacity assignment of the multicarrier communication channel is in the form of a bit vector upon which the method operates.

**12**. A method for identifying a bitloading assignment for a multicarrier communication channel having a number of sub-channels, the method comprising:

calculating a maximum number of bits that can be transmitted by each sub-channel;

rounding the maximum number of bits that can be transmitted by each sub-channel to the nearest whole bit;

calculating the maximum number of bits that can be transmitted by the multicarrier communication channel based on the rounded maximum number of bits that can be transmitted by each sub-channel;

determining a target load of the multicarrier communication channel thereby defining a disposable bit capacity representing a delta value between the maximum number of bits that can be transmitted by the multicarrier communication channel and the target load of the multicarrier communication channel;

identifying a maximum loaded sub-channel;

decrementing the maximum loaded sub-channel by at least one bit;

decrementing the delta value; and

repeating the identifying step and the decrementing steps until the delta value is zero thereby producing a bitloading assignment that desensitizes the multicarrier communication channel to non-stationary noise.

**13**. The method of claim 12, wherein the maximum number of bits that can be transmitted by each sub-channel, and the maximum number of bits that can be transmitted by the multicarrier communication channel are derived from a bitmap resulting from a bitloading training sequence, the bitmap characterizing the signal to noise ratio of the multicarrier communication channel.

**14**. The method of claim 12, wherein the target load of the multicarrier communication channel is based on system configuration options.

**15**. The method of claim 12, wherein the multicarrier communication channel is realized using digital multi-tone modulation.

**16**. The method of claim 12, wherein in response to identifying more than one maximum loaded sub-channel thereby requiring a selection to be made, the method further includes:

calculating a round off error for each sub-channel; and

selecting the maximum loaded sub-channel having the greatest round off error.

**17**. The method of claim 12, wherein in response to identifying more than one maximum loaded sub-channel thereby requiring a selection to be made, the method further includes:

selecting the maximum loaded sub-channel based on a predefined selection scheme.

**18**. A transceiver for identifying a bitloading assignment for a multicarrier communication channel having a number of sub-channels and a disposable bit capacity of one or more bits, the transceiver comprising:

a bitloading assignment module for equalizing bit loadings of the sub-channels by selectively decrementing high bitload sub-channels until the disposable bit capacity is zero thereby producing a bitloading assignment for the multicarrier communication channel.

**19**. The transceiver of claim 18, further comprising:

a symbol decision and symbol-to-bit decoder module operatively coupled to the bitloading assignment module and for deriving a maximum capacity assignment from a bitmap that characterizes the multicarrier communication channel.

**20**. The transceiver of claim 18, wherein the high bitload sub-channels are decremented by a number of bits depending on at least one of the number of sub-channels of the multicarrier communication channel, the disposable bit capacity of the multicarrier communication channel, and a bitmap associated with the multicarrier communication channel.

**21**. The transceiver of claim 18, wherein the high bitload sub-channels are decremented one bit at a time.

**22**. The transceiver of claim 18, wherein the disposable bit capacity cannot be below zero as a result of decrementing high bitload sub-channels.

**23**. The transceiver of claim 18, wherein the bitloading assignment is enhanced in that it desensitizes the multicarrier communication channel to non-stationary noise.

**24**. The transceiver of claim 18, wherein the multicarrier communication channel is effectively two different channels, one being a FEXT time channel and the other being a NEXT time channel, each effective channel having a unique maximum capacity assignment upon which the bitloading assignment module operates thereby producing a first bitloading assignment for the FEXT channel and a second bitloading assignment for the NEXT channel.

**25**. The transceiver of claim 18, wherein the bitloading assignment is in the form of a bit vector upon which the bitloading assignment module operates.

**26**. The transceiver of claim 18, wherein the bitloading assignment module selects a high bitload sub-channel for decrementing based on a predefined selection scheme.

**27**. A method for identifying a bitloading assignment for an ADSL Annex C multicarrier communication channel having a number of sub-channels, a maximum capacity assignment, and a disposable bit capacity of one or more bits, the method comprising:

identifying a sub-channel having a maximum bit loading relative to bit loadings of other sub-channels;

decrementing the bit loading of the identified sub-channel by at least one bit thereby reducing bit loading differences between the identified sub-channel and the other sub-channels;

decrementing the disposable bit capacity by the number of bits the identified sub-channel loading was decremented; and

repeating the identifying step and the decrementing steps until the disposable bit capacity is zero thereby producing a bitloading assignment that desensitizes the ADSL Annex C multicarrier communication channel to non-stationary noise.

**28**. A method for identifying a bitloading assignment for an ADSL Annex C multicarrier communication channel having a FEXT channel, a NEXT channel, and an overall target bit capacity, the method comprising:

equalizing bits allocated to the FEXT channel and the NEXT channel until the overall target bit capacity is achieved thereby identifying a target bit capacity for the FEXT channel and a target bit capacity for the NEXT channel;

equalizing bits allocated to sub-channels included in the FEXT channel by:

identifying a sub-channel having a maximum bit loading relative to bit loadings of other sub-channels of the FEXT channel;

decrementing the bit loading of the identified sub-channel by at least one bit thereby reducing bit loading differences between the identified sub-channel and the other sub-channels; and

repeating the identifying step and the decrementing steps until the target bit capacity for the FEXT channel is achieved thereby producing a bitloading assignment that desensitizes the FEXT channel to non-stationary noise;

equalizing bits allocated to sub-channels included in the NEXT channel by:

identifying a sub-channel having a maximum bit loading relative to bit loadings of other sub-channels of the NEXT channel;

decrementing the bit loading of the identified sub-channel by at least one bit thereby reducing bit

loading differences between the identified sub-channel and the other sub-channels; and

repeating the identifying step and the decrementing steps until the target bit capacity for the NEXT channel is achieved thereby producing a bitloading assignment that desensitizes the NEXT channel to non-stationary noise.

**29**. A transceiver for identifying a bitloading assignment for an ADSL Annex C multicarrier communication channel having a FEXT channel, a NEXT channel, and an overall target bit capacity, the transceiver comprising:

a bitloading assignment module adapted to equalize bits allocated to the FEXT channel and the NEXT channel until the overall target bit capacity is achieved thereby identifying a target bit capacity for the FEXT channel and a target bit capacity for the NEXT channel, and the bitloading assignment module further adapted to equalize bits allocated to sub-channels included in the FEXT channel until the target bit capacity for the FEXT channel is achieved thereby producing a bitloading assignment that desensitizes the FEXT channel to non-stationary noise, and the bitloading assignment module further adapted to equalize bits allocated to sub-channels included in the NEXT channel until the target bit capacity for the NEXT channel is achieved thereby producing a bitloading assignment that desensitizes the NEXT channel to non-stationary noise.

**30**. A method for identifying a bitloading assignment for an ADSL Annex C multicarrier communication channel having a FEXT channel, a NEXT channel, and an overall target bit capacity, the method comprising:

equalizing bits allocated to the FEXT channel and the NEXT channel until the overall target bit capacity is achieved thereby identifying a target bit capacity for the FEXT channel and a target bit capacity for the NEXT channel.

**31**. A method for identifying a bitloading assignment for an ADSL Annex C multicarrier communication channel having a FEXT channel, a NEXT channel, and an overall target bit capacity, the method comprising:

allocating bits between the FEXT channel and the NEXT channel until the overall target bit capacity is achieved thereby identifying a target bit capacity for the FEXT channel and a target bit capacity for the NEXT channel.

* * * * *

# Multicarrier Modulation for Data Transmission: An Idea Whose Time Has Come

*John A. C. Bingham*

THE PRINCIPLE OF TRANSMITTING DATA BY dividing it into several interleaved bit streams, and using these to modulate several carriers, was used more than 30 years ago in the Collins Kineplex system [1], and has been of continuing, albeit peripheral, interest ever since. Now, however, interest is increasing because modems based on the principle are being used—or being considered for use—for transmission of data and facsimile on the following:

- General Switched Telephone Network (GSTN)
- 60–108 kHz Frequency-Division Multiplexed (FDM) group-band
- Cellular radio

In addition, high-speed data is being considered for transmission on the High-rate Digital Subscriber Line (HDSL).

The technique has been called by many names—orthogonally multiplexed Quadrature Amplitude Modulation (QAM) [2], orthogonal FDM [3], and dynamically assigned multiple QAM [4]—but we will refer to it by a generic name: Multicarrier Modulation (MCM). A more general form of the technique, which uses more complex signals as carriers [5], has been developed recently as vector coding [6] and structured channel signalling [7] [8]. Unless otherwise stated, the discussion here will concentrate on the special MCM form.

The reasons for the interest in MCM depend upon the transmission medium, and have also changed over the years as signal processing techniques (mainly digital) have improved, but the two most important ones are first, that an MCM signal can be processed in a receiver without the enhancement (by as much as 8 dB in some media) of noise or interference that is caused by linear equalization of a single-carrier signal, and second, that the long symbol time used in MCM produces a much greater immunity to impulse noise and fast fades.

The first seven sections of this article will discuss the following: the general technique of parallel transmission on many carriers; the performance that can be achieved on an undistorted channel; algorithms for achieving that performance; dealing with channel impairments; improving the performance through coding; and methods of implementation. The last two sections discuss duplex operation of MCM and the possible use of this on the GSTN.

## Multiplexing

MCM is a form of FDM; the basic principle is shown in Figure 1. Input data at $Mf_s$ b/s are grouped into blocks of $M$ bits at a block ("symbol") rate of $f_s$. The $M$ bits are used, $m_n$ bits[1] for the carrier at $f_{c,n}$ to modulate $N_c$ carriers, which are spaced $\Delta f$ apart across any usable frequency band; that is,




*Fig. 1. Basic multicarrier transmitter.*

$$f_{c,n} = n\,\Delta f \text{ for } n = n_1 \text{ to } n_2 \tag{1}$$

and

$$M = \sum_{n=n_1}^{n_2} m_n$$

where

$$N_c = n_2 - n_1 + 1$$

The modulated carriers are summed for transmission, and must be separated in the receiver before demodulation. Three methods have been used for this separation:

- First, the earliest MCM modems borrowed from conventional FDM technology, and used filters to completely separate the bands. The transmitted power spectra for just three sub-bands of a multicarrier system are shown in Figure 2a.

[1]Each of the $m$s typically = 2 to 8.

0163-6804/90/0005-0005 $01.00 © 1990 IEEE





Comcast, Ex. 1009




*Fig. 7. Basic multicarrier "mo-dem."*

metric, and decoding all of the remaining bits from the nodes on that path. This means that the coding gains for the last few carriers decrease more or less linearly from the maximum to about 0 dB for the last carrier. This effect can be anticipated in the original loading of these carriers, and will probably reduce the overall bit rate by about four bits per symbol.

## Implementation

A simplified block diagram of a multicarrier "mo-dem" (the transmitter of one modem and the receiver of another) is shown in Figure 7. The main processing in the transmitter and receiver is done with an IFFT and an FFT, respectively. In order to compare the amounts of computation in SCQAM and Multicarrier Quadrature Amplitude Shift Keying (MCQASK), which use very different symbol lengths, it is simplest to consider a multicarrier symbol as comprising $N_c$ equivalent single-carrier (esc) symbols. Then the number of multiplications required to generate one esc symbol—the principal computational "loading"—is approximately proportional to $\log_2 N_{tot}$ for MCM and $N_e$ for SCQAM, where $N_e$ is the number of taps in the equalizer. The constants of proportionality are each between 6 and 8, $N_e$ is typically 30, and in one widely used implementation of MCM for use on the GSTN, $N_{tot} = 512$. The resultant loadings are about 210 for SCQAM and 63 for MCQASK.

In these days of programmable processors that multiply almost as fast as they do anything else, the number of multiplications is, however, a simplistic measure of computational load. These processors were mostly designed to do sums of products (convolutions) very efficiently; by contrast, they are not very efficient at performing FFTs. The net result is that for modulation and demodulation the two methods require about the same number of processor instruction cycles.

It should be noted, however, that in systems using TCM the different amounts of computation needed for demodulation are overshadowed by that needed for the Viterbi decoder, which is common to both modulation techniques.

## Echo Cancellation

Although most data communication systems do not need true full duplex ("maximum" speed in both directions) modems, there are many advantages to be gained from some duplex capability. In order not to reduce the capacity in the primary direction the two signals must occupy the same frequency band, so that if communication is to be via a two-wire channel, the two signals must be separated in the receivers by echo cancellation.

The first Echo Cancelers (ECs) to be developed were signal-driven; a generic one is shown in Figure 8a. The transmit signal is input to both the four-wire-to-two-wire connector ("hybrid") and an echo emulator (usually a TDL), which slowly learns the characteristics of the echo path, calculates samples of the estimated echo (usually by time-domain convolution), and subtracts them from the corrupted receive signal. It was soon recognized, however, that an EC can be greatly simplified if its input is the transmit data instead of the modulated and filtered signal; a "data-driven" EC is shown in Figure 8b.

A straightforward application of data-driven echo canceling for QASK MCM would require that, in order to deal with both ISI and ICI, the impulse response of the echo path be modeled as a three-dimensional, $N_c \times N_c \times 2$ matrix. Even with $N_c = 20$ (too small for all other purposes) the memory and processing requirements would be prohibitive. More innovative approaches to data-driven ECs are needed, but since they have not yet appeared, signal-driven ECs are being re-examined.

## The Ultimate GSTN Modem: A One-Member Family

Most of the advances in theory and implementation of data transmission in the last twenty years have been made in countries that have good, and continually improving, transmission channels, and have been applied to the problem of achieving ever higher speeds on those channels; the same ingenuity and dedication have not been applied to the problem of widening the range of channels over which a given speed can be achieved. As each advance has been made (better timing recovery, better tracking of phase jitter, trellis-coding, etc.), it has seldom been used to improve transmission at the lower speeds, and the older, less efficient techniques have usually survived.

The result of this can be seen in the half-duplex succession of CCITT Recommendations V.26, 27, 29, and 33. All use different coding and modulation schemes, and none is compatible with any other; that is, they belong to different families. Finding a supportable speed on a given line ("falling back") has been likened to climbing down a ladder from which some of the rungs are missing.

This has been particularly aggravating for facsimile transmission according to Recommendations T.4 and 30. There is currently a movement to partially solve the missing rung ("hole") problem by extending the trellis coding recommended in V.33 down to 9.6 and 7.2 kb/s—speeds previously considered the province of V.29. Nevertheless, ultrareliable transmission at 4.8 kb/s will not be ensured, and the erratic, time-consuming stepping-down process will still be necessary.



Appx1114

# Line Code Debates

*The line code (modulation method) for ADSL has been a topic of heated discussion among engineers, with people taking steadfastly rigid sides on the subject. In January 1993, Bellcore (with BT and NYNEX) organized the "ADSL Olympics" as a test, to compare the three main candidates: DMT (discrete multitone), CAP (carrierless amplitude/phase), and QAM (quadrature amplitude modulation).*

*While they were perhaps not completely authoritative (there are continued complaints it was not a fair test), the results of the trial indicated DMT had better performance, and the ANSI committee made its choice on that basis. Had the stakes not been as high as they are, that might have been the end of it, but that was not to be...*

QAM is a very well understood and widely-used modulation technique. In essence, it is a single carrier signal, where the data rate is split in two and modulated onto two orthogonal carriers (I and Q) using sine/cosine mixers, before being combined and transmitted. CAP is very closely related to QAM—indeed, the two can be considered identical and compatible; the difference is primarily in the implementation.

Instead of the two signals being generated by a sine/cosine mixer, the modulation of the orthogonal signals is performed digitally using two digital transversal bandpass filters with the same amplitude characteristics and a p/2 difference in phase response (Hilbert pair), before being combined, fed to a digital-to-audio converter (DAC), and transmitted. The advantage over QAM is that the digital implementation can be realized very elegantly in silicon, and there is great scope for flexibility or efficiency in the implementation.

Being a multicarrier modulation system, DMT is a very different animal. DMT (essentially the same as OFDM—orthogonal frequency division multiplexing) divides the frequency range up onto a large number of discrete bands, or sub-channels. Each of these is independently modulated—with a carrier frequency corresponding to the center frequency of the bin—and the system uses them all in parallel, all at the same time.

The multi-carrier modulation technique requires orthogonality between all the subcarriers. A very elegant way to achieve this is by using fast Fourier transforms (FFTs). In ANSI standard DMT, there are 256 subcarriers, each with 4-kHz bandwidth, that can be independently modulated from zero to a maximum of 15 bits/Hz. This allows up to 60 kbits/s per tone. At low frequencies where the copper's attenuation is low and there is a good signal-to-noise ratio (SNR), it is easy to use a very dense constellation—10 bits/Hz is typical. Where the line is in worse condition, the modulation can be relaxed to allow for the lower SNR—perhaps to 4 bits/Hz or less, to give the necessary noise immunity. Furthermore, as the modem measures the line, it can avoid or compensate for crosstalk or interference. For example, an adaptive system can reduce the modulation in the band where an AM station is causing RFI.

The two techniques can be considered as duals: QAM/CAP techniques are frequency domain-based, as they have fast symbols, each lasting a short time, with a big bandwidth *(see the figure)*. For example, in a 6-Mbit/s DSL scheme, the symbol rate is 1088 baud— roughly about a symbol per microsecond—modulated to 256 points, with a bandwidth of 1.4 MHz. The short symbol time increases CAP's susceptibility to time-domain noise interference.

DMT is a time-domain approach, with symbols lasting a long time but only occupying a narrow frequency band *(see the figure, again)*. With a leisurely 250-ms symbol time, a 256-tone DMT system (4 kHz per tone, 1.1 MHz total bandwidth) needs only a 4-kbaud symbol rate to deliver 6 Mbits/s! This long symbol time makes it less susceptible to time-domain noise.

As duals, the two should, in principle, achieve the same throughput on a channel (Shannon's law does not specify line code). In practice, they will have implementation differences and will be affected differently by noise in the time domain or frequency domain—so real performance and complexity will differ. A single RF tone will be averaged across the wide band of a single carrier system—effectively rendering these systems highly resistant to narrow-band interference.

In contrast, a narrow-band signal will directly hit a subcarrier on a DMT system. This effect is clearly seen in VDSL, where the higher frequency range overlaps with the amateur radio ("Ham") operator's bands and a system must cope with strong pulses of narrow-band RFI. The reverse is true for a wideband noise signal—for example impulse noise burst from lightning, a hair-dryer or an electric light dimmer—which will be averaged across a short time on many DMT symbols, but will seriously clobber a single carrier symbol.

Both use error correction and interleaving to deal with these problems, and both are very effective. DMT claims an advantage in that time-domain noise is hard to predict, while RFI tends to be more stable and can be measured and adjusted for during training or operation.

There are many discussions on the relative advantages/disadvantages of CAP & DMT. A reasonably impartial summary of these is:

- DMT can direct information to subcarriers and modulate them independently, while CAP has a single carrier which has to be treated as a whole, even though the channel characteristics vary widely. As a result, DMT may deliver better performance or be more spectrally efficient. DMT has more complex initialization and needs more start-up time than CAP.
- DMT is inherently and straightforwardly rate-adaptive, delivering the maximum data for any given line. This

*(continued on page 144)*



Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

THE 1997 SUPLEMENTS ARE COMING !

Some of the best technical articles from recent issues of *Electronic Design* have been compiled into 8 handy reference supplements. These supplement "keepers" will be useful for your future design projects. So, take note, **"the supplements are coming!"**

March 3, 1997 Supplement
**EMBEDDED SYSTEMS SOFTWARE & HARDWARE**
(Ad Close: 1/22/97)

May 27, 1997 Supplement
**DESIGN AUTOMATION FPGAs & PLDs**
(Ad Close: 4/17/97)

June 23, 1997 Supplement
**ANALOG APPLICATIONS I**
(Ad Close: 5/14/97)

Aug. 4, 1997 Supplement
**BEST OF BOB PEASE**
(Ad Close: 6/25/97)

Oct. 1, 1997 Supplement
**BEST PORTABLE PAPERS Of 1997**
(Ad Close: 8/22/97)

Oct. 23, 1997 Supplement
**BEST OF IDEAS FOR DESIGN**
(Ad Close: 9/12/97)

Nov. 17, 1997 Supplement
**ANALOG APPLICATION II**
(AdClose: 10/8/97)

Dec. 1, 1997 Supplement
**PIPS GUIDE BOOK & *EEPN* TOP PRODUCTS OF THE YEAR**
(Ad Close: 10/22/97)

*Your Strategic Information Partner*
**ELECTRONIC DESIGN**
A Penton Publication

For ad space reservations, contact your sales representative.

by simply varying the duty cycle of send/receive. Secondly, the complexity is lower: little effort is needed to separate signals (i.e., no filters are required), and hardware can be shared at each end—swapped between transmitting and receiving as required.

On the other hand, DMT is perhaps more power-hungry than is desirable in the power-limited environment of an ONU. Secondly, the ping-pong system must be very tightly controlled between all systems (if there is any difference or jitter, a transmitter will swamp a receiver)—this might be difficult in a deregulated environment with competitive access. Finally, there is some concern that the proposed ping-pong frame rate (2 kHz) might be demodulated into an annoying audio-frequency signal (perhaps in an adjacent pair, which might not have a VDSL-splitter or filter). This has been claimed to occur with TDMA digital cellphones, where the burst frequency is detected in hearing aids.

A number of manufacturers are supporting a frequency division duplex system, with CAP for the downstream. This has the advantage that it is a low-power solution, and can be optimized to give a simple transmitter. Being a high-capacity broadband signal, it also is resistant to RFI and can be placed in a region where there is less concern with impulse noise.

Manufacturers including Analog Devices, Aware, Orckit, BBT, Globespan, Broadcomm and others all are developing a common draft standard based on this technology. (Importantly, the first three have all developed DMT solutions for ADSL, showing that line-code choices can be decided by technical criteria and are not unchanging). However, the consensus breaks down for the upstream. Some manufacturers are proposing single carrier techniques (CAP or QPSK) which have the attractions of low power and simplicity. On the other hand, in the home (where the upstream signal starts), low power is not as critical as it is in the ONU, so this is of less use.

### Coping With Noise

Then there is the problem of noise, and how to deal with it. The low-frequency bands can be very noisy, with a lot of impulse noise and ingress from sources like electric light dimmers, vacuum cleaners, and the like. This can inflict a lot of grief on a system, in the form of noise that is very hard to filter out or work around. To get around this, some systems (for example, DAVIC 1.0's FTTC) place the up stream signal high in frequency—above the downstream. Here the system avoids the low-frequency wideband noise, and the filtering can be easier (reducing the waste from a large guard band).

Unfortunately, this region has lots of attenuation in the copper, reducing the useful capacity of the system; the DAVIC system only has 1.6 Mbits/s upstream and it is doubtful if the same arguments would work for higher rates of say 3 Mbits/s. In addition, the (narrow) high-frequency upstream link is now very vulnerable to notches in the channel caused by bridge taps.

Recognizing the very different characteristics of downstream (power constraints, high-speed/high-band-width) and upstream (lots of impulse noise, concern on frequency plan), Analog Devices, Aware, and BBT have proposed a hybrid solution, that uses very different techniques for each direction—hopefully getting the best of both worlds.

By adopting a CAP single carrier for the down-stream channel, the benefits listed above are achieved. The upstream is located at low frequencies, and uses a new multi-carrier technique—discrete wavelet multitone (DWMT). This copes extremely well with impulse noise, so the frequency plan can use the "good" low-frequency copper without worrying about noise. In addition, the technique easily lends itself to support multidrop in-home wiring (multi-point to point/passive network architectures).

*Rupert Baines is the product manager for the ASDSL Products Division at Analog Devices Inc. He joined ADI in 1993, and holds a MSEE degree from Hull University, England, and an MBA from IESE.*

| HOW VALUABLE | CIRCLE |
|---|---|
| HIGHLY | 547 |
| MODERATELY | 548 |
| SLIGHTLY | 549 |



Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

# A multicarrier modem architecture for VDSL

Michiel Esvelt

Version 1.0

6-2-1998

Copyright ©1997

Imec vzw
VSDM division - DISTA/DBATE group
Kapeldreef 75
B-3001 Leuven
BELGIUM

Technische Universiteit Eindhoven
Den Dolech 2
Postbus 513
5600 MB Eindhoven

All rights reserved

Coach : Ir. J. Maris
Supervisor : Ir. S. Vernalde
Promoter : Prof. Dr. Ir. W.G.M. van Bokhoven
Erasmus coordinator : Dr. Ir. L.K.J. Vandamme

## Abstract

To provide high bit-rates to the customer a number of new access technologies is being developed: cable modems, optical fiber transmission systems, and Digital Subscriber Line (DSL) technologies.

This report concentrates on a Discrete Multitone (DMT) multicarrier implementation of the DSL technologies. DSL uses the twisted pair of the plain old telephone system.

A simulation model is presented together with an implementation on a TMS320C40 Digital Signal Processor. Performance studies of this model show that 52 Mbit/s VDSL is possible using DMT.

Again the leakage occurs because the continues signal in part (a) can not be continued periodically without having discontinuities in the time domain (Figure 15).




Figure 14: Leakage (c) due to group delay.

To avoid this problem the guard interval is introduced. This means the transmitted symbol is repeated $\frac{N_i+N_{DFT}}{N_{DFT}}$ times to compensate for the total length of the impulse response, $N_i$, and to assure the signal in a frame behaves like a periodic signal. The symbols no longer interfere and the spectra can be decoded without ISI and ICI. In Figure 16 the marked blocks in the time domain are the blocks that will be processed by the DFT. Figure 16a shows there will be a substantial amount of information from the previous frame in the current frame. In Figure 16b this is not the case, the frames have no interference from the previous frame.

A disadvantage is the reduced efficiency, because no information is transmitted during the guard interval. A DMT data frame has the length of the used DFT plus the guard interval length. This makes the efficiency equal to this formula.

$$\frac{N_{DFT}}{N_{guard}+N_{DFT}} \leq 1$$